**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELLIOTT BROIDY and
BROIDY CAPITAL MANAGEMENT, LLC,

                                        Plaintiffs,

                    —v.—

GLOBAL RISK ADVISORS LLC,
GRA MAVEN LLC,
GRA QUANTUM LLC,
GLOBAL RISK ADVISORS EMEA LIMITED,
GRA RESEARCH LLC,
QRYPT, INC.,
KEVIN CHALKER,
DENNIS MANDICH,
ANTONIO GARCIA, and
COURTNEY CHALKER,

                                        Defendants.

19 Civ. 11861 (MKV)

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

September 21, 2020

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

    I.      Defendants Are Not Protected by Sovereign Immunity ......................................... 3

    II.     The Court Should Not Dismiss Under the Prior Pending Action Doctrine ........... 8

    III.    The FAC Easily Meets the Minimum Rule 8 Notice Standards .......................... 10

    IV.    Defendants Violated Federal Anti-Hacking Laws ............................................... 13

    V.     Defendants Misappropriated Trade Secrets ......................................................... 13

    VI.    Defendants are Liable Under RICO ..................................................................... 14

           A.      The RICO Violation Proximately Caused Broidy's Injuries .................. 14

           B.      Defendants Operated the Qatari-Funded RICO "Enterprise" .................. 15

           C.      Defendants Engaged in a "Pattern" of Racketeering ............................... 16

           D.      Defendants Engaged in Multiple "Predicate Acts" .................................. 18

           E.      Defendants Engaged in a RICO Conspiracy ........................................... 20

    VII.    The State Law Claims Should Not Be Dismissed ............................................... 20

           A.      Defendants Violated the CDAFA ........................................................... 21

           B.      Defendants Committed the Tort of Intrusion on Seclusion ..................... 21

           C.      Defendants Received Stolen Property ..................................................... 22

           D.      Defendants Engaged in a Civil Conspiracy ............................................ 22

    VIII.   The Court Has Jurisdiction Over the Foreign Defendants ................................... 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABI Jaoudi &Azar Trading Corp. v. Cigna Worldwide Insurance C*o.,
2016 WL 3959078 (E.D. Pa. July 22, 2016) ........................................................ 4

*Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured
Products, Inc.,*
5 F. Supp. 3d 543 (S.D.N.Y. 2014) ................................................................... 10

*Anderson News, L.L.C. v. American Media, Inc.,*
680 F.3d 162 (2d Cir. 2012) ............................................................................ 10

*Angermeir v. Cohen,*
14 F. Supp. 3d 134 (S.D.N.Y. 2014) ................................................................. 19

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................ 10

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................ 11

*Boyle v. United States,*
556 U.S. 938 (2009) ........................................................................................ 15

*Broidy Capital Management LLC v. Benomar,*
944 F.3d 436 (2d Cir. 2019) .............................................................................. 8

*Broidy Capital Management LLC v. Muzin,*
2020 WL 1536350 (D.D.C. Mar. 31, 2020) ................................................. passim

*Butters v. Vance International,*
225 F.3d 462 (4th Cir. 2000) ............................................................................. 6

*Consumer Financial Protection Bureau v. RD Legal Funding, LLC,*
332 F. Supp. 3d 729 (S.D.N.Y. 2018) ............................................................... 12

*Curtis v. Citibank, N.A.,*
226 F.3d 133 (2d Cir. 2000) .............................................................................. 9

*D'Addario v. D'Addario,*
901 F.3d 80 (2d Cir. 2018) .............................................................................. 15

*Democratic National Committee v. Russian Federation,*
392 F. Supp. 3d 410 (S.D.N.Y. 2019) ............................................................... 24

*Dixon v. Mack*,
    507 F. Supp. 345 (S.D.N.Y. 1980) ................................................................................ 24

*Doe 1 v. Buratai*,
    318 F. Supp. 3d 218 (D.D.C. 2018) ................................................................................ 5

*Doe v. Qi*,
    349 F. Supp. 2d 1258 (N.D. Cal. 2004) ......................................................................... 5

*Edelman v. Jordan*,
    415 U.S. 651 (1974) ........................................................................................................ 5

*First Capital Asset Management, Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) ......................................................................................... 18

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
    492 U.S. 229 (1989) ...................................................................................................... 17

*Heaney v. Government of Spain*,
    445 F.2d 501 (2d Cir. 1971) ........................................................................................... 5

*Hecht v. Commerce Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990) ........................................................................................... 15

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*,
    763 F.2d 55 (2d Cir. 1986) ........................................................................................... 25

*Hollander v. Flash Dancers Topless Club*,
    173 F. App'x 15 (2d Cir. 2006) ................................................................................... 15

*Howard v. Klynveld Peat Marwick Goerdeler*,
    977 F. Supp. 654 (S.D.N.Y. 1997) ............................................................................ 8, 9

*In re Initial Public Offering Securities Litigation*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008) .......................................................................... 10

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*,
    2015 WL 6740953 (S.D.N.Y. Nov. 4, 2015) ................................................................. 9

*In re Terrorist Attacks on September 11, 2001*,
    122 F. Supp. 3d 181 (S.D.N.Y. 2015) ........................................................................... 7

*In re Yahoo Mail Litigation*,
    7 F. Supp. 3d 1016 (N.D. Cal. 2014) ........................................................................... 21

*Island Intellectual Proptery, LLC v. StoneCastle Asset Management LLC*,
    2020 WL 2793000 (S.D.N.Y. May 29, 2020) .............................................................. 14

*Kraus USA, Inc. v. Magarik,*
    2020 WL 2415670 (S.D.N.Y. May 12, 2020) ................................................. 14

*Kreutter v. McFadden Oil Corp.,*
    467, 522 N.E.2d 40 (1988) ........................................................................ 23

*Kucher v. Domino's Pizza, Inc.,*
    2017 WL 2987214 (S.D.N.Y. Feb. 13, 2017) ................................................ 24

*Lewis v. Clarke,*
    137 S. Ct. 1285 (2017) ............................................................................... 6

*Lewis v. Mutond,*
    918 F.3d 142 (D.C. Cir. 2019) ..................................................................... 6

*Local 875 I.B.T. Pension Fund v. Pollack,*
    992 F. Supp. 545 (E.D.N.Y. 1998) .............................................................. 17

*Maersk, Inc. v. Neewra, Inc.,*
    554 F. Supp. 2d 424 (S.D.N.Y. 2008) .......................................................... 23

*Matar v. Dichter,*
    563 F.3d 9 (2d Cir. 2009) ............................................................................ 3

*Medtech Products Inc. v. Ranir, LLC,*
    596 F. Supp. 2d 778 (S.D.N.Y. 2008) .......................................................... 14

*Metromedia Co. v. Fugazy,*
    983 F.2d 350 (2d Cir. 1992) ...................................................................... 17

*Moriah v. Bank of China Ltd.,*
    107 F. Supp. 3d 272 (S.D.N.Y. 2015) ............................................................ 7

*N.L.R.B. v. Thalbo Corp.,*
    171 F.3d 102 (2d Cir. 1999) ...................................................................... 16

*Omari v. Ras Al Khaimah Free Trade Zone Authority,*
    2017 WL 3896399 (S.D.N.Y. Aug. 18, 2017) ................................................. 7

*Posven, C.A. v. Liberty Mutual Insurance Co.,*
    303 F. Supp. 2d 391 (S.D.N.Y. 2004) ............................................................ 9

*Ramiro Aviles v. S & P Global, Inc.,*
    380 F. Supp. 3d 221 (S.D.N.Y. 2019) ............................................................ 9

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ................................................................................. 16

*Sacerdote v. Cammack Larhette Advisors, LLC*,
   939 F.3d 498 (2d Cir. 2019)...................................................................... 8

*Samantar v. Yousuf*,
   560 U.S. 305 (2010)........................................................................... 3, 6

*Shulman v. Group W Productions, Inc.*,
   955 P.2d 469 (Cal. 1998) ...................................................................... 21

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
   262 F. Supp. 2d 217 (S.D.N.Y. 2003)........................................................ 8

*Strategic Partners Inc. v. Vestagen Protective Technologies Inc.*,
   2016 WL 10611186 (C.D. Cal. Nov. 23, 2016)............................................ 14

*Terminate Control Corp. v. Horowitz*,
   28 F.3d 1335 (2d Cir. 1994)................................................................... 17

*Town of Kearny v. Hudson Meadows Urban Renewal Corp.*,
   829 F.2d 1263 (3d Cir. 1987) ................................................................. 18

*United States v. Minicone*,
   960 F.2d 1099 (2d Cir.1992)................................................................... 18

*United States v. Yannotti*,
   541 F.3d 112 (2d Cir. 2008).................................................................... 20

*Vantone Group Ltd. Liability Co. v. Yangpu NGT Industries Co., Ltd.*,
   2015 WL 4040882 (S.D.N.Y. July 2, 2015) ............................................... 12

*Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*,
   2019 WL 3252907 (S.D.N.Y. July 19, 2019) .............................................. 25

*Verlinden B.V. v. Central Bank of Nigeria*,
   461 U.S. 480 (1983).............................................................................. 3

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
   751 F.2d 117 (2d Cir. 1984).................................................................... 24

*Volmar Distributors, Inc. v. New York Post Co., Inc.*,
   825 F. Supp. 1153 (S.D.N.Y 1993)........................................................... 19

*WhatsApp Inc. v. NSO Group Tech. Ltd.*,
   2020 WL 4016812 (N.D. Cal. July 16, 2020)................................................ 7

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980).............................................................................. 25

*Wyatt v. Union Mortgage Co.*,
   598 P.2d 45 (1979)............................................................................................. 22

*Wynder v. McMahon*,
   360 F.3d 73 (2d Cir. 2004)................................................................................ 12

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) ............................................................................. 4

## STATUTES

18 U.S.C. § 1961 ..................................................................................................... 15

18 U.S.C. § 1962 ..................................................................................................... 16

28 U.S.C. § 1404 ....................................................................................................... 9

N.Y. C.P.L.R. 302 ................................................................................................... 23

## TREATISES

Restatement (Second) Foreign Relations Law (1965) ........................................ 3, 5, 6

## OTHER AUTHORITIES

Beth Stephens, *The Modern Common Law of Foreign Official Immunity*,
   79 Fordham L. Rev. 2669 (2011).......................................................................... 5

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| BCM | Plaintiff Broidy Capital Management LLC |
| Broidy | Plaintiffs Elliott Broidy and BCM |
| Compl. | Complaint, December 27, 2019 (ECF 1) |
| CDAFA | California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 |
| CFAA | Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* |
| CUTSA | California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 |
| DTSA | Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. |
| EMEA | Defendant Global Risk Advisors EMEA Ltd. |
| the Enterprise | The Qatari-Funded Enterprise (*see* FAC ¶ 2) |
| FAC | First Amended Complaint, June 26, 2020 (ECF 57) |
| Foreign Defendants | Maven, Research, Quantum, EMEA, and Courtney Chalker |
| FSIA | Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* |
| Garcia | Defendant Antonio Garcia |
| GRA Defendants or GRA | Defendants EMEA, Global Risk Advisors, LLC, Maven, Qrypt, Quantum, Research, Kevin Chalker, Garcia and Mandich (*i.e.*, all except Courtney Chalker) |
| Mandich | Defendant Denis Mandich |
| Maven | Defendant GRA Maven LLC |
| MTD | Defendants' Memorandum of Law in Support of their Motion to Dismiss the First Amended Complaint, Aug. 10, 2020 (ECF 73) |
| Qrypt | Defendant Qrypt, Inc. |
| Quantum | Defendant GRA Quantum LLC |
| Research | Defendant GRA Research LLC |
| RICO | Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* |
| SCA | Stored Communications Act, 18 U.S.C. § 2701 *et seq.* |
| UAE | United Arab Emirates |

## INTRODUCTION

Elliott Broidy is a businessman active in politics, who has long spoken out against state sponsors of terrorism. For most of 2017, he was particularly effective in pointing to the misdeeds of the State of Qatar, an oil-rich refuge for and sponsor of some of the most notorious terrorist organizations in the Middle East. In retaliation for Broidy's advocacy and to silence him—and to instill fear in other prominent Americans who might dare criticize Qatar—Qatar hired Defendants to hack into Broidy's computer systems and steal thousands of private documents. Defendants then helped curate and package (and in some instances modify) the stolen material for the press, so as to cause maximum damage to Broidy.

Defendants are led by Kevin Chalker, who operates his collection of "GRA"-affiliated companies as a single firm under the umbrella of the parent entity, defendant Global Risk Advisors, LLC. The Broidy operation was only one of a number of clandestine projects to intimidate and silence prominent figures during a partnership between Qatar and GRA that dates back to at least 2010. GRA was hired to (among other things) engage in "dirty tricks" to help Qatar relating to its corrupt bid for the 2022 FIFA World Cup. Qatar also paid GRA tens of millions of dollars to hack, surveil, and denigrate the UAE ambassador to the United States and others close to him in an operation with striking similarities to the tactics GRA later used against Broidy and his business. The GRA Defendants now seek to dismiss the FAC entirely. Their motion is meritless and should be denied.

*First,* the astonishing "derivative sovereign immunity" GRA seeks—erasing all liability for serious crimes by Americans against an American citizen on U.S. soil, simply because the paymaster was a foreign government—is contrary to precedent and to the underlying principles of comity and reciprocity that justify sovereign immunity in the first place. In a parallel action in the District of Columbia against the "media placement" professionals who conspired with GRA

and distributed the fruits of the hack (the *Muzin* case), the court rejected the same argument and even concluded, in denying an interlocutory appeal, that there was no "substantial ground for disagreement" on the issue. *See* Minute Order, No. 19-cv-00150 (D.D.C. April 23, 2020).

*Second*, this case should not be dismissed under the "prior pending action" doctrine in favor of the *Muzin* case, because, with limited exceptions not present here, that doctrine requires that the defendants be the same in both cases. There are *no* common defendants here. Contrary to GRA's charges of "gamesmanship," Broidy sued GRA in its home state to avoid a repeat of his first case against GRA in California, which was dismissed for lack of personal jurisdiction.

*Third*, GRA's motion wrongly seeks a blanket dismissal on the theory that it is not even "plausible" GRA was responsible for the hack. This overlooks the bedrock principle that factual allegations are *assumed true* on a motion to dismiss. The Rule 8 "plausibility" standard GRA cites refers to whether the factual allegations, *taken as true*, plausibly make out a legal claim. That is easily met here. The FAC includes remarkably detailed allegations inculpating GRA.

*Fourth*, Broidy states claims under the federal anti-hacking laws (the SCA and CFAA). While GRA argues the SCA covers only "secondary" actors, GRA is hardly secondary. The FAC plainly alleges that GRA *itself* did the hacking.

*Fifth*, GRA's argument for dismissing Broidy's trade secret claims—that Broidy was supposed to describe in detail all the trade secrets GRA stole—is contrary to clear case law (including the *Muzin* case) that general descriptions suffice at the pleading stage.

*Sixth*, GRA's scattershot challenge to Broidy's RICO claim is likewise unpersuasive. GRA's argument that Broidy has alleged only a "one-time racket," and not the required "pattern," of wrongdoing, inexplicably focuses on *only* the scheme targeting Broidy. But in the Second Circuit, a "pattern" includes targeting any victim, not just the plaintiff. The FAC clearly

alleges that the RICO conspiracy of which GRA personnel are the "boots on the ground" engaged in various intimidation/hacking schemes, only one of which was aimed at Broidy.

*Seventh*, Broidy adequately pleads the various state law claims, which were upheld in the *Muzin* case, despite GRA's attempts to revive rejected arguments.

*Finally*, the Court has jurisdiction over the Foreign Defendants because (among other reasons) the FAC details how they conspired with other defendants in New York (like Chalker), and because the various GRA Defendants operate as one entity, with commingled finances.

## ARGUMENT

## I.   DEFENDANTS ARE NOT PROTECTED BY "DERIVATIVE" SOVEREIGN IMMUNITY

Defendants are U.S. citizens and companies that live or operate here (FAC ¶¶ 25-26) but seek to avoid responsibility for their wrongs committed on U.S. soil against U.S. citizens because they committed these acts at the behest of a foreign government. MTD 3-5.[1] This would be contrary to law, the stated policy of the Executive Branch, and common sense.

Defendants' alleged immunity is governed by common law (not the FSIA). *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010). Under common law, where the State Department has not issued a "suggestion of immunity," the Court must decide the issue "for itself," by examining whether the immunity sought "is one which it is the established policy of the State Department to recognize." *Id*. at 312 (citation omitted). This analysis is made (1) "by reference to prior State Department decisions," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487 (1983), and (2) by common law standards reflected in the Restatement of Foreign Relations Law. *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009). Both confirm no immunity is appropriate here.

---

[1] EMEA, while incorporated in Gibraltar, is qualified to do business in New York, is a subsidiary of a U.S. company, Global Risk Advisors LLC, and controlled by an American, Kevin Chalker. FAC ¶¶ 25, 385, 390. GRA's choice to conduct its international business through a foreign subsidiary should not allow EMEA to escape liability, particularly when the entities were used interchangeably, operating as one enterprise. *Id*. ¶¶ 26, 167.

First, GRA cannot point to any "established policy" supporting immunity here because the State Department has long made clear that U.S. citizens are generally *not* entitled to *foreign* immunity. In *Yousuf v. Samantar,* 699 F.3d 763, 777–78 (4th Cir. 2012), the State Department filed a "statement of interest" asserting a former high-ranking Somali government official who had since become a U.S. resident was not entitled to immunity because "U.S. residents . . . who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts, particularly when sued by U.S. residents." *Id.* at 777. The Fourth Circuit agreed, concluding,"as a permanent legal resident, Samantar has a binding tie to the United States and its court system" that would be undermined by granting immunity. *Id.* at 777–78; *see also* Statement of Interest of the United States, *Ahmed v. Magan*, No. 2:10-cv-342, ECF 45, at 9 (S.D. Ohio Mar. 15, 2011) ("[A] state generally has a right to exercise jurisdiction over its residents.").

Following this guidance, the court in *ABI Jaoudi &Azar Trading Corp. v. Cigna Worldwide Insurance C*o., 2016 WL 3959078 (E.D. Pa. July 22, 2016), rejected an attorney's attempt to cloak himself in the immunity of his Liberian clients because the attorney's "U.S. citizenship precludes him from claiming derivative foreign sovereign immunity." *Id*. at *18. If the law were otherwise, "any foreign-based U.S. citizen [could] evade compliance with domestic laws and court orders simply by alleging that he is a foreign government's agent." *Id.*

In the parallel *Muzin* case against GRA's co-conspirators, the court relied on *Samantar* (among other authorities) to conclude there was no policy supporting immunity for U.S. citizens, and also noted the defendants there did "not identify any examples" of the State Department supporting immunity for U.S. citizens. *Broidy Capital Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *6-8 (D.D.C. Mar. 31, 2020). Defendants here provide no examples, either.

Second, longstanding common law principles under the Restatement confirm that no immunity applies here. An alleged agent of a foreign state enjoys immunity only (1) "with respect to acts performed in his official capacity" and only if (2) "the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Heaney v. Gov't of Spain,* 445 F.2d 501, 504 (2d Cir. 1971) (quoting Restatement (Second) Foreign Relations Law § 66(f) (1965)). GRA has shown neither.

Acts are considered in an official capacity if they are "within the structure" of the foreign government and "draw[] on official powers and duties," or if the foreign government has made statements "that either authorize or ratify the acts at issue." *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 232 (D.D.C. 2018) (citation omitted). Actions under a "covert unofficial policy of the state" are, by definition, *not* official acts. *Doe v. Qi*, 349 F. Supp. 2d 1258, 1286 (N.D. Cal. 2004); *see also* Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79 Fordham L. Rev. 2669, 2706 (2011) (government officials' acts are not "official" merely because the conduct is "consistent with the covert policies of their governments"). Here, the GRA Defendants have no official role with Qatar's government, and Qatar has not made any statement ratifying their conduct. There is nothing "official" about the covert, criminal scheme that the FAC alleges. *Accord Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995) (war crimes are not a protected "act of state" where defendant does not allege they were the "officially approved policy of a state").

Nor would denying immunity "enforce a rule of law against" Qatar. *Muzin*, 2020 WL 1536350, at *8. This standard is met when "the action is in essence one for the recovery of money from the state," *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (citation omitted), and, conversely, is *not* met when the defendants are "being sued in their individual capacities," without any claim for "compensation out of state funds. *Lewis v. Mutond*, 918 F.3d 142, 147

- 5 -

(D.C. Cir. 2019), *cert. denied*, 2020 WL 3492651 (June 29, 2020). The Restatement offers a helpful illustration that mirrors the distinction above: if a defense ministry official is sued "seeking to compel him to apply certain funds" the official is holding for the state, the official is immune. Restatement (Second) Foreign Relations Law States § 66(f) illus. 2 (1965). In other words, the key inquiry is whether the suit is seeking state funds or not.[2] Here, Broidy is *not* attempting to obtain Qatar's state funds. Defendants ignore this essential element. MTD 3-5.

GRA relies on *Butters v. Vance International*, 225 F.3d 462 (4th Cir. 2000) (MTD 4), but that case was undermined by the Supreme Court in *Samantar* and is not controlling.

In *Butters*, a woman employed by a U.S. security firm protecting the Saudi royal family was denied assignments because Saudi officials did not want her to "spend long periods of time" with men. *Id*. at 464. The Fourth Circuit dismissed her sex discrimination claims against her employer because it concluded that "private agents of foreign governments" should enjoy immunity under the FSIA just as a "private company which contracts with the federal government to perform the duties of the government" enjoys immunity. *Id*. at 466.

*Butters'* reasoning has been severely undermined by the Supreme Court's decision in *Samantar* in two ways. First, *Butters* was purporting to interpret the FSIA, when *Samantar* later held that the FSIA applies only to foreign states or their agencies (leaving immunity claims of foreign officials to the common law). 560 U.S. at 315-18. Second, as *Muzin* explained, "*Samantar* instructed that courts base their immunity determinations on the 'established policy of the State Department,'" but *Butters* was decided before *Samantar* and hence never considered that critical instruction. *Muzin*, 2020 WL 1536350, at *7 (citation omitted).

---

[2] The Supreme Court has made this same distinction in the context of tribal sovereign immunity, looking to "whether the remedy sought is truly against the sovereign" to determine if a sovereign's agent is immune. *Lewis v. Clarke*, 137 S.Ct. 1285, 1290 (2017). No immunity was appropriate in *Clarke* because "the judgment w[ould] not operate against the Tribe." *Id*. at 1291.

The *Muzin* court also criticized *Butters* for blindly transferring the doctrine of derivative sovereign immunity for contractors of the *U.S.* government—a doctrine based on the principle that the United States and its contractors "have the same interest in getting the Government's work done"—into the realm of contractors of *foreign* sovereigns, whose interests "will routinely diverge" from those of the United States. *Id*. Another court recently agreed that *Butters* is not "persuasive" for these same reasons. *WhatsApp Inc. v. NSO Group Tech. Ltd*., 2020 WL 4016812, at *8 (N.D. Cal. July 16, 2020).

Equally unhelpful to GRA are three cases it cites from this District involving foreign officials undertaking classically official, government actions—not unofficial, covert criminal schemes undertaken, as here, by Americans (MTD 4-5):

- In *In re Terrorist Attacks on September 11, 2001*, 122 F. Supp. 3d 181 (S.D.N.Y. 2015) the defendant was a Saudi national and the head of two Saudi government charities. The Saudi government confirmed he was acting as "an official of the Saudi government," carrying out "core governmental functions." *Id.* at 188. The court granted immunity because the "State Department has consistently recommended conduct-based sovereign immunity when (1) the foreign state requests it, and (2) the defendant acted in his official capacity on behalf of a recognized foreign government." *Id*. at 188-89. Those factors are absent here.

- In *Omari v. Ras Al Khaimah Free Trade Zone Authority*, 2017 WL 3896399 (S.D.N.Y. Aug. 18, 2017), a UAE national who was the head of one of the seven emirates comprising the UAE was accused of making false allegations against the plaintiff, causing the plaintiff to be detained by U.S. Customs. *Id.* at *4. These acts were taken "presumptively in furtherance of its enforcement of [UAE]'s laws." *Id*. at *10. The hacking here involved no official Qatari government function.

- In *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 277 (S.D.N.Y. 2015), a former high-ranking Israeli government official and current (at that time) senior advisor to the Prime Minister, placed a call to try to settle litigation that risked disrupting Israel's relationship with China. The court ruled the official was immune from a deposition about the call. *Id.* at 278. Israel's National Security Advisor confirmed to the court that the advisor, unlike here, was undertaking an officially-sanctioned government action. *Id*.

Even further afield is GRA's reliance on offhand comments by Judge Seibel in the *Benomar* case about what she *might* rule if pressed to do so. MTD 5. That case was decided based on the defendant foreign national's status as a diplomat; the Second Circuit did not address derivative immunity. *Broidy Capital Mgmt. LLC v. Benomar*, 944 F.3d 436 (2d Cir. 2019).

GRA's conception of immunity would have profound and illogical consequences. Foreign governments could recruit Americans to commit all manner of wrongdoing in the United States, simply by hiring them to do their dirty work—and those paid mercenaries (like GRA) would face no fear of liability for tortious conduct against U.S. citizens on U.S. soil. The core rationale for sovereign immunity—the "government's interest in comity and reciprocity," *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 224 (S.D.N.Y. 2003)— would not be advanced by that outcome. There is no suggestion that Qatar would grant similar immunity to its own citizens if they violated Qatari law in Qatar at the behest of the United States. Defendants' immunity defense should be rejected.

## II.   THE COURT SHOULD NOT DISMISS UNDER THE PRIOR PENDING ACTION DOCTRINE

The Second Circuit has held that "if a plaintiff suffers the same harm at the hands of two defendants, the plaintiff may institute one suit against one defendant and a separate suit against another defendant alleging that each caused his injury." *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 505 (2d Cir. 2019). In that scenario, the second suit may only be dismissed as duplicative in the "limited circumstance[]" where the two defendants have a close relationship of "privity," such that claim preclusion principles would bar the defendant in the second suit from relitigating issues in the first. *Id*. at 506-07, 509. GRA cites *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654 (S.D.N.Y. 1997) (MTD 7), which dismissed a second suit involving two new defendants, but, there, the new defendants were partners in the accounting firm Peat Marwick that was itself a defendant in the first. The court dismissed the

second case because "claims against Peat Marwick partners for acts within the scope of their employment are essentially, claims against Peat Marwick." *Id*. at 664. In short, because the first suit would conclusively decide both cases, the second suit was unnecessary.

Here, there is nothing of the sort. The defendants in the two cases are not in any type of legal partnership that would give rise to contractual privity as in *Peat Marwick*. GRA has certainly not said that a judgment against the *Muzin* defendants would be enforceable against it. GRA implicitly recognizes it lacks privity with the *Muzin* defendants because it is arguing here that various conclusions in the *Muzin* case (such as the lack of immunity) do not bind this Court.

But even if GRA could somehow show the necessary privity for the "prior pending action" doctrine, the Could would still have to "consider the equities of the situation." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,* 2015 WL 6740953, at *3 (S.D.N.Y. Nov. 4, 2015) (citation omitted). Here, Broidy sued GRA in its home state of New York to avoid the "needless risk" of having GRA dismissed on personal jurisdiction grounds, as happened in his first case against GRA, in California. FAC ¶ 194.[3] While GRA accuses Broidy of "gamesmanship" (MTD at 6), GRA does not explain what tactical advantage Broidy is seeking.[4]

---

[3] GRA points out that nationwide service of process under Broidy's RICO claim would have allowed for jurisdiction over GRA in the District Columbia where the *Muzin* case is pending (MTD 6), but in the same brief GRA argues that "[b]ecause Plaintiffs' RICO claims are subject to immediate dismissal . . . RICO cannot provide a basis for personal jurisdiction for the other counts." MTD 7. If Broidy had included the GRA Defendants in the *Muzin* case, GRA would have advanced this same argument, and, if GRA succeeded, Broidy would have had to show sufficient contacts with the District of Columbia (instead of New York, where GRA is located).

[4] In the alternative, given the severe prejudice that would result if such claims were dismissed in light of the potential risk of lapsed statute of limitations (FAC ¶ 194), Broidy requests the case be transferred to the District of Columbia and consolidated with *Muzin*, in lieu of dismissal. *See* 28 U.S.C. § 1404(a)); *see also Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (a court facing "duplicative suit[s] will commonly stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, *or consolidate the two actions*.") (emphasis added); *Posven, C.A. v. Liberty Mut. Ins. Co*., 303 F. Supp. 2d 391, 407–409 (S.D.N.Y. 2004) (transferring case to allow related claims to remain together, where one defendant would otherwise be dismissed on personal jurisdiction grounds and transfer is convenient to witnesses).

### III.   THE FAC EASILY MEETS THE MINIMUM RULE 8 NOTICE STANDARDS

GRA's argument that the FAC lacks allegations "plausibly tying Defendants to the claimed wrongdoing" (MTD 10) confuses the legal standard and ignores the facts. On the legal standard, this Court must "*assume* the[] veracity" of Broidy's factual allegations—including that the GRA Defendants conducted the hacks (FAC ¶¶ 68-105) (describing GRA Defendants' commission of the hack in detail)—"*and then* determine whether [those allegations] plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added). The question before the Court is not whether the "plaintiffs' factual allegations themselves are implausible," but "whether, taking all facts alleged as true, there is a plausible claim for relief." *In re Initial Public Offering Sec. Litig*., 544 F. Supp. 2d 277, 291 n.97 (S.D.N.Y. 2008). A pervasive error in GRA's brief is arguing that the hacking has not been "plausibly" attributed to GRA when, at this stage, that must be *assumed* to be so.[5]

In any case, the allegation that GRA did the hacking are hardly solely based (as GRA argues) on the fact that "some Defendants operate in the same U.S. states as IP addresses" used in the hacks (MTD 10-11). There are detailed allegations as to who executed the hacks and how. Examples abound (*see* FAC ¶¶ 40-76, 93-99, 108-35), but a few suffice to make the point.

First, GRA has exactly the skill set and trusted relationship with Qatar to carry out the attack. *Id*. ¶¶ 42-51. As detailed in FAC, GRA has long advertised its ability to conduct advanced hacking (including the sophisticated "spear-phishing" technique used here) (*id*. ¶¶ 47-50). GRA has earned Qatar's trust through work dating back to its lucrative "dirty tricks" campaign to help Qatar preserve its FIFA World Cup bid in 2022. *Id*. ¶¶ 140-52.

---

[5] *See Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 185 (2d Cir. 2012) (a court cannot dismiss "based on a judge's disbelief of a complaint's factual allegations"); *Ace Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Products, Inc*., 5 F. Supp. 3d 543, 559 (S.D.N.Y. 2014) ("[A] court must ask whether the plaintiff's factual allegations, *taken* as true, make the *claim* . . . 'plausible.'") (emphasis in original).

Second, the FAC identifies the senior Qatari officials with whom GRA coordinated and explains that GRA dealt closely with the same officials who in the critical timeframe also worked with the media professionals caught red-handed on text messages discussing their involvement in distributing the hacked material. *Id.* ¶¶ 9-10 (Ali al-Thawadi, Ahmad Nimeh), 120-21 (the Emir and his brother), 126-29 (Jamal Benomar, Muzin, and Allaham). In the weeks leading up to the hacks, one of those professionals had multiple phone calls with a senior Qatari official, Ali al-Thawadi, who is GRA's primary contact for its Qatar business. *Id.* ¶¶ 9, 64, 120 163. Also just before the hacks, those same media placement professionals were paid millions of dollars by a front company controlled by a second Qatari agent—GRA codename "Botany"— who had worked alongside GRA on the World Cup projects. *Id.* ¶¶ 10, 55.

Third, the FAC describes that GRA had a dedicated "special projects" unit that (among other things) hacked the emails of the ambassador to the United States from the UAE, and then over a period of many months, strategically leaked them in curated compilations to the media— indeed to many of the same members of the media to whom Qatar's media placement agents later funneled Broidy's emails. *Id.* ¶¶ 6-7, 164, 174-87. The Otaiba hack had other striking similarities to the Broidy hack, including common hacking tactics. *Id.* ¶ 182.

Equally incorrect is GRA's argument that Rule 8 prohibits Broidy from making certain allegations against the GRA Defendants as a group. All that Rule 8 requires is that a complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Here, Defendants are closely-affiliated entities that have been specifically accused of joint conduct in detailed pleadings. FAC ¶¶ 2-3, 26, 319 (Defendants acted jointly, as agents of one another and co-conspirators). Nothing about Rule 8's lenient standard requires that a "complaint separate out claims against individual

defendants," *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004), or "prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 771 (S.D.N.Y. 2018) (citation omitted). In other words, a complaint may "allege[] joint activity" by various defendants without having to "elaborate extensively on the details with regard to each defendant." *Vantone Group Ltd. Liability Co. v. Yangpu NGT Indus. Co., Ltd.*, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015).[6]

Moreover, although the GRA Defendants feign confusion, there is no mystery as to what the claims are, or to which defendants those claims apply. The FAC explicitly accuses individual GRA Defendants of specific wrongdoing (*see, e.g.*, FAC ¶¶ 72 (Garcia and Courtney Chalker destroyed evidence), 74 (Kevin Chalker directed the activity of all GRA Defendants), 102 (linking an unmasked IP address to GRA Maven), 178 (Mandich masterminded the UAE Ambassador operation with Chalker, Sabin, and Garcia), 389 (Quantum participated in attacks on UAE and Broidy), 391 (EMEA conspired with Qatari government officials to conduct "special projects"), 396 (GRA Research employed hackers for the Broidy operation), 400 (Qrypt facilitated wire fraud, money laundering, and economic espionage), and contains detailed factual allegations regarding the particular role and involvement of each of the GRA Defendants in the broader Enterprise. *See, e.g., id.* ¶¶ 370-401. This provides the necessary fair notice.

---

[6] *See also In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 365 (S.D.N.Y. 2009) ("Rule 8 does not require Plaintiffs to identify each Defendant by name when the Complaint makes an allegation that applies equally to all"); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) ("The fact that most of Plaintiffs' claims apply to all Defendants and that the factual allegations refer to them collectively does not render the Complaint violative of Rule 8").

## IV.   DEFENDANTS VIOLATED FEDERAL ANTI-HACKING LAWS

GRA's only argument for dismissing Broidy's SCA claim is that the SCA does not reach secondary actors. MTD 12-13. But the FAC accuses GRA Defendants of being the *primary* actors who did the hacking. FAC ¶¶ 68-99. For example, the FAC alleges the GRA Defendants used a spear phishing campaign to hack into BCM servers, beginning on December 27, 2017. *Id.* ¶ 75; *id.* ¶¶ 77-87, 202-03 (detailing hacking of Broidy's wife and executive assistant). The FAC details how the GRA Defendants used the stolen credentials to infiltrate BCM's servers and unlawfully obtain private emails, documents, and intellectual property. *Id.* ¶¶ 88-100.

GRA asks the Court to ignore these allegations, claiming they contradict the original complaint. MTD 12 n.5. Not so. The original complaint also alleged the GRA Defendants "willfully and intentionally accessed … BCM's computer systems." Compl. ¶ 133. While GRA points to the dismissal of this count in *Muzin*, the media professionals there only *conspired* with the hackers—the GRA Defendants—but did not "themselves access[] BCM's computer systems." 2020 WL 1536350, at *11. The *Muzin* decision supports upholding the claim here.

As for Broidy's claim under the CFAA, GRA's argument for dismissal rests entirely on the mistaken premise that Broidy "fail[s] to plausibly allege" GRA conducted the hacking. MTD 13. As discussed, the FAC easily meets the minimal Rule 8 standards. *See* pp. 10-12, *supra*.

## V.   DEFENDANTS MISAPPROPRIATED TRADE SECRETS

GRA argues Broidy's claims for trade secret misappropriation under federal law (DTSA) and state law (CUTSA) are not pleaded with enough particularity (MTD 13-14, 22), but the FAC specifically alleges the hacked BCM computer systems stored valuable information, such as confidential business plans and proposals; research supporting those plans and proposals; information concerning business strategies and opportunities; and contacts for important business relationships. FAC ¶¶ 231-36. Contrary to Defendants' assertion (MTD 14-15), Broidy also

- 13 -

pleads there is significant economic value from these trade secrets not being public. *Id*. ¶¶ 233-36 (Broidy protected this confidential, sensitive information that derives value from being unknown and unavailable to the public). This meets the minimal Rule 8 standards because, at "the pleading stage, alleging categories of trade secrets" suffices. *Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020).[7]  The same is true under the CUTSA. *Strategic Partners Inc. v. Vestagen Protective Techs. Inc*., 2016 WL 10611186, at *4 (C.D. Cal. Nov. 23, 2016) (even "broad categories of descriptions suffice at the pleading stage."). Indeed, the *Muzin* court allowed Broidy's trade secret claims to proceed, rejecting the same argument GRA advances here. 2020 WL 1536350, at *12-13. The result should be the same here.

## VI.   DEFENDANTS ARE LIABLE UNDER RICO

### A.   The RICO Violation Proximately Caused Broidy's Injuries

Contrary to GRA's standing arguments (MTD 20), Broidy adequately alleges injury from the RICO violation, including (among other things) "harm to . . . computers, servers and accounts," "losses associated with identifying and investigating the cyberattacks," replacement costs for computers and cell phones with dual authentication systems, and "lost revenue from business arrangements cancelled or lost due to the hack and associated media onslaught." FAC ¶ 402. GRA argues that losses associated with Broidy's *response* to the alleged racketeering are not recoverable (MTD 20), but that ignores all the other damages alleged (such as lost

---

[7] *See also Medtech Prod. Inc. v. Ranir, LLC,* 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008) ("specificity as to the precise trade secrets misappropriated is not required in order for [plaintiff] to defeat the present Motions to Dismiss").GRA cites *Island Intellectual Property, LLC v. StoneCastle Asset Management LLC*, 2020 WL 2793000 (S.D.N.Y. May 29, 2020), but the court there acknowledged that even a "relatively general descriptions," such as "internal pricing information," are generally sufficient. *Id*. at *7. The claim was rejected in *Island* only because the "extremely general description" given—"certain proprietary" information "relating to cash management and money regulation system"—did not even amount to fair notice of the claim. *Id*.

business), about which GRA advances no argument. And, of course, the losses associated with remedial measures *are* recoverable.

Arguing otherwise, GRA misconstrues *Hollander v. Flash Dancers Topless Club*, 173 F. App'x 15 (2d Cir. 2006). There, a *pro se* plaintiff alleged a global criminal enterprise of which he was not a target, but nevertheless sought compensation for having chosen to stop his "normal work" as a lawyer and consultant to investigate the enterprise. *Id.* at 17. The Second Circuit found those losses were not compensable because "it was not the object of the conspiracy to cause him to cease work and thereby lose profits." *Id*. at 18.

By stark contrast, here, the whole point of the scheme was to "inflict maximum damage on Mr. Broidy" via the hacking and media campaigns. FAC ¶ 3. The damages alleged—remedial costs for the hacking, and lost business deals (among other things)—are "reasonably foreseeable" and "natural consequence[s]" of that conduct, and hence are recoverable. *Hecht v. Commerce Clearing House, Inc*., 897 F.2d 21, 24 (2d Cir. 1990).

### B. <u>Defendants Operated the Qatari-Funded RICO "Enterprise"</u>

An "enterprise" is "any union or group of individuals associated in fact," 18 U.S.C. § 1961(4), and the term is to be "liberally construed" and given a "broad and flexible reach." *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018). While GRA complains that the FAC does not provide enough detail about the Enterprise's "hierarchy" or Defendants' "respective roles" (MTD 21), the Supreme Court has specifically *rejected* the argument that an enterprise needs to have "structural attributes, such as a structural 'hierarchy,' [or] 'role differentiation.'" *Boyle v. United States*, 556 U.S. 938, 948 (2009). Still, the FAC spells out the relationships and roles of the various named conspirators, including, for example, that Kevin Chalker oversaw and managed the hacking operations, while "Mandich and Garcia [were] key operatives who at times shared oversight and management responsibility" with Chalker. FAC ¶¶ 312-13. The roles of the

GRA subsidiaries, and other co-conspirators, are described in detail too, including the names and

roles of the individual Qataris and U.S. media professionals involved. *Id*. ¶¶ 9-10, 59-67, 162.

GRA's argument concerning the "operation or management" allegations is likewise

meritless. MTD 20-21. RICO reaches those who "conduct or participate, directly or indirectly, in

the conduct of such enterprise's affairs," 18 U.S.C. § 1962(c), meaning "one must have some

part in directing [the enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

This includes not only "upper management" but also "lower rung participants in the enterprise

. . . under the direction of upper management." *Id*. at 184. The same allegations cited above

demonstrate Defendants' operation and management of the Enterprise. *See also* FAC ¶¶ 42

("GRA contributed its unique, highly specialized skillset to manage and direct the covert

cyberattacks" for the Enterprise), 73 (same), 309-18 (detailing GRA operation and management

of Enterprise). GRA does not address those allegations or explain their deficiency beyond the

odd assertion that "[i]t is simply implausible that *any* Defendant exercised any degree of control

over the sovereign nation of Qatar . . . ." MTD 21. But the FAC does not allege Defendants

operate *Qatar*; they operate *the Enterprise. Id* ¶ 311.

## C.   Defendants Engaged in a "Pattern" of Racketeering

RICO's "pattern" element is pleaded more than adequately. GRA is wrong that *Muzin*

collaterally estops Broidy from alleging GRA engaged in a pattern of racketeering activity. MTD

15-16. Collateral estoppel is triggered only where "the issues in both proceedings are identical."

*N.L.R.B. v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999). Here, they are not identical.

The FAC, filed more than a year after the *Muzin* complaint, presents an enormous amount

of newly uncovered facts, specific to these Defendants, which the *Muzin* court had no

opportunity to review or decide. These include detailed allegations of "black hat" operations and

other hacking targets, such as the UAE Ambassador. *See, e.g.*, FAC ¶¶ 42-51, 63, 68-76, 139-87.

As for the merits, a RICO "pattern" generally requires "continuity" of misconduct that is either "closed-ended" (*i.e.*, a "series of related predicates extending over a substantial period of time") or "open-ended" (*i.e.*, involves a "*threat* of continuity)." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989). Here, both are pleaded; either would suffice.

For closed-ended continuity, the Second Circuit has noted that 19 or 20 months is "sufficient to support a finding of continuity," and has upheld a jury verdict where the pattern spanned two years. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992); *see also Local 875 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 567 (E.D.N.Y. 1998) (two years). The FAC plainly alleges that  Defendants' involvement in the Enterprise began *at least* in 2010 and continued *at least* well into 2019, when media outlets continued to publish the hacked materials *nearly 20 months after* the start of the hacking efforts. FAC ¶¶ 38, 134, 141, 145. During that period, the Enterprise targeted numerous victims for cyberattacks and smear campaigns, including Broidy, FIFA officials and related figures, the UAE Ambassador, and—according to media outlets and forensic evidence—over 1,000 people and entities who criticized Qatar. *Id.* ¶ 324. This suffices, particularly on a motion to dismiss.

GRA's argument that the relevant timeframe is "less than one year" (MTD 18) ignores that the conduct persisted well over a year beyond the initial hack, and assumes that only conduct victimizing Broidy is relevant. Yet the Second Circuit has acknowledged "that a pattern of racketeering activity may be based upon predicate acts directed against nonplaintiffs as long as one act injures the plaintiff so as to create standing." *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1347 (2d Cir. 1994). A rule to the contrary would make little sense. The paradigmatic RICO "pattern" is a "protection racket" where a "hoodlum . . . sell[s] 'insurance' to a neighborhood's storekeepers to cover them against breakage of their windows," collecting

monthly "premium[s]." *H.J.*, 492 U.S. at 242. If GRA's narrow view of relevance under RICO were true—such that only conduct aimed at a plaintiff counted towards a "pattern"— "then each merchant's injury would be separate, and therefore . . . none could recover." *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir. 1987).

As for open-ended continuity, the FAC makes clear the conspiracy here is more akin to the ongoing unlawful activity of organized crime, *see, e.g.*, *United States v. Minicone*, 960 F.2d 1099, 1107 (2d Cir.1992), than "inherently terminable" acts such as a singular scheme, *see, e.g.*, *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180–81 (2d Cir. 2004). In arguing that the FAC "alleges only a 'one time racket'" (MTD 17), GRA repeats its mistakes of undercounting the campaign's duration and assuming that only those acts victimizing Broidy are considered. Because that is not the law, the FAC plainly alleges open-ended RICO continuity.

### D.   Defendants Engaged in Multiple "Predicate Acts"

Broidy sufficiently alleges that each GRA Defendant committed multiple predicate acts in furtherance of the Enterprise. The FAC details the predicate acts, (FAC ¶¶ 320-68 (describing multiple acts of wire fraud, money laundering, trade secret misappropriation, and economic espionage)) and specifies each GRA Defendants' participation in those acts (*id*. ¶¶ 369-400 (providing detailed allegations for each Defendant under separate subheadings)).

First, contrary to GRA's unexplained assertion that Broidy does "not even attempt to meet Rule 9(b)'s standard for pleading wire fraud" (MTD 19), the FAC details the many misrepresentations the GRA Defendants made in connection with hacking Broidy's computer systems (FAC ¶¶ 68-99, 335-44), and how they intentionally misled various individuals into clicking on fraudulent links and unwittingly granting the hackers access to their confidential log-in data. *Id.* ¶¶ 77-87 (*e.g.*, spear phishing, deceptive account modification, unauthorized use of Google trademarks, use of shortened URLs). The FAC further details the GRA Defendants'

work silencing critics of Qatar's hosting status for the 2022 World Cup (*id.* ¶¶ 326-29 (GRA

Defendants conducted covert cyber-ops to defraud targets through fraudulent representations

transmitted across wires in interstate and/or foreign commerce, with the intent that targets rely on

the false representations to their detriment)), and hacking and smearing the UAE Ambassador

(*id.* ¶¶ 330-34 (defrauding the UAE Ambassador to hack his confidential information)).

In any event, to the extent any factual details were somehow not sufficiently pled, or not

sufficiently attributed to a specific Defendant, that is because the facts supporting the claim are

"particularly within the defendant's knowledge," which is a "recognized exception" to

Rule 9(b)'s particularity requirement. *Volmar Distrib., Inc. v. New York Post Co., Inc.*, 825 F.

Supp. 1153, 1162 (S.D.N.Y 1993). This was, after all, a covert illegal operation. Indeed, where,

as here, many of the GRA Defendants collectively planned and executed intentionally covert

attacks, it would be impossible for Plaintiffs to know which hacker sent which email at any given

time. "In such cases, including 'complex civil RICO actions involving multiple defendants, . . .

'Rule 9(b) requires only that the plaintiff delineate with adequate particularity . . . the specific

circumstances constituting the overall fraudulent scheme.'" *Angermeir v. Cohen*, 14 F. Supp. 3d

134, 145–46 (S.D.N.Y. 2014) (citations omitted). That scheme is thoroughly delineated here.

Second, Broidy also adequately pleads money laundering tied to the wire fraud. FAC

¶¶ 345-49. GRA argues that Broidy only speculates that the value of the criminally-derived

property is more than the statutorily-required $10,000. MTD 20. But the value is evident by

GRA's lucrative compensation. Qatar paid the GRA Defendants at least tens of millions of

dollars to direct and engage in the hack-and-smear operations against Broidy and the UAE

Ambassador, as well as to conduct the covert black ops campaign to silence Qatar's perceived

enemies in connection with World Cup 2022. FAC ¶¶ 346-49. These facts easily suffice,

particularly since they are to be assumed true and given every favorable inference.

Finally, for the reasons discussed (pp. 13-14, *supra*), Broidy also properly alleges predicate acts under the Defend Trade Secrets Act and Economic Espionage. FAC ¶¶ 350-68.

### E.      Defendants Engaged in a RICO Conspiracy

GRA argues the RICO conspiracy claim rises and falls with the substantive RICO count. MTD 21. This argument fails since the substantive RICO count *is* pleaded properly.

GRA's only other basis for dismissal of the RICO conspiracy is a repeat of its misguided "group pleading" argument, and should be rejected for the reasons discussed above (*see* pp. 10-12, *supra*). In fact, what is required for a plaintiff to state a claim for RICO conspiracy is an allegation that the defendant "kn[e]w of, and agree[d] to, the general criminal objective of a jointly undertaken scheme." *United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) (citation omitted). Here, the FAC plainly alleges that each GRA Defendant knew of and agreed to support and facilitate the alleged RICO violations: Chalker oversaw and managed hacking operations, Mandich and Garcia were operatives who shared oversight and management responsibility, and Global Risk Advisors LLC, Maven, Quantum, EMEA, Qrypt, and GRA Research "employ[ed] hackers who help develop the plans to attack perceived critics of Qatar." FAC ¶ 313; *see also* pp. 10-12, 15 *supra*. As alleged in the FAC, Defendants not only each agreed to support the conspiracy, they helped launch it in the first place. *See, e.g.*, *id.* ¶¶ 147 (GRA Defendants pitched cyber operations to neutralize Qatar's critics), 153-60 (GRA proposed expanding Qatari operations to include geopolitical targets), 324, 330-44.

## VII.   THE STATE LAW CLAIMS SHOULD NOT BE DISMISSED

In arguing that the Court should not exercise supplemental jurisdiction over the state law claims (MTD 22), GRA overlooks that the FAC also pleads diversity jurisdiction. FAC ¶ 23. Each state law claim is pleaded adequately.

### A.   Defendants Violated the CDAFA

GRA's argument regarding the CDAFA (MTD 23) mirrors its no-secondary-liability argument under the SCA, and should be rejected for the same reasons. *See* pp 12-13, *supra*. The GRA Defendants were the primary actors in the hack—that is, the hackers.

### B.   Defendants Committed the Tort of Intrusion on Seclusion

Broidy's intrusion upon seclusion claim is not, as GRA claims, preempted by the CUTSA. MTD 24. The court in *Muzin* correctly explained that any state law claim which does "not require that the confidential information qualify as a trade secret in order for Broidy to prevail" would not be preempted. 2020 WL 1536350, at * 14. (internal quotations omitted). There is no reason to depart from this analysis.

Equally incorrect is GRA's argument that there is generally no expectation of privacy in emails, and that Broidy must therefore "plead specific email content in specific emails" to state a claim. MTD 24-25. The FAC alleges that GRA accessed "personal emails, business emails and documents, signed contracts, attorney-client privileged communications," as well as "private communications, corporate and personal documents." FAC ¶¶ 80, 90. The FAC also describes in detail how the materials stolen by GRA were curated to present desired impressions and given to reporters who published damaging stories based on their contents. *See, e.g.*, *id* ¶¶ 119, 122-23, 131. Broidy need not reprint all the emails that were splashed across the pages of the country's largest newspapers for the Court to recognize that there was an "intrusion into a private place" that was done "in a manner highly offensive to a reasonable person." *Shulman v. Grp. W Prods., Inc.*, 955 P.2d 469, 490 (Cal. 1998). As the *Muzin* court recognized, "hacking into a person's private computer" is exactly this sort of "highly offensive" intrusion that triggers liability. 2020 WL 1536350, at *19 (citation omitted). GRA relies on *In re Yahoo Mail Litigation*, 7 F. Supp. 3d 1016 (N.D. Cal. 2014) (MTD 25), but that case concerned the use of computer algorithms to scan

emails to help drive targeted advertising to users. This is categorically different from human beings reading, and disclosing to the press, the full content of sensitive emails, with the express aim to inflict maximum damage in order to silence the victim.

### C.   Defendants Received Stolen Property

GRA's challenge to Broidy's receipt of stolen property claim repeats the same flawed preemption argument, and should be rejected as it was in *Muzin*. *See* pg. 21, *supra*. The GRA Defendants' only other argument, that the they lacked "actual knowledge" that the material was stolen (MTD 23) is nonsensical, given that *they* stole the material. FAC ¶¶ 91, 280-83.

### D.   Defendants Engaged in a Civil Conspiracy

Broidy's civil conspiracy claim is not preempted (*see* pg. 22, *supra*), and GRA is also wrong to argue that Broidy has failed to plead any "underlying tort[s]." MTD 24. As discussed above (*see* pp. 20-22, *supra*), every substantive claim been sufficiently pleaded.

GRA's only other argument, that Broidy did not "specifically allege acts taken in furtherance of the tortious 'conspiracy" (MTD 24) is wrong on both the facts and law. Broidy alleges numerous specific acts taken in furtherance of the conspiracy, as the GRA Defendants agreed to and did act in concert with one another to plan and perpetrate the hacking of Broidy (FAC ¶¶ 68-105), the hacking of the UAE Ambassador, and the covert black ops campaign to silence Qatar's critics (*id.* ¶¶ 141-87). In addition, for purposes of a conspiracy claim, "[t]acit consent" is enough, and "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Wyatt v. Union Mortg. Co.*, 598 P.2d 45, 52 (1979) (citation omitted). Here, as the *Muzin* court found, there are "detailed factual allegations the hacking scheme purportedly perpetuated *by GRA* and other members of the Qatari Enterprise," and "the totality of the circumstantial evidence alleged plausibly supports a conspiracy claim." 2020 WL 1536350, at *12, 21 (emphasis added).

## VIII.   THE COURT HAS JURISDICTION OVER THE FOREIGN DEFENDANTS

GRA concedes that jurisdiction over *all* Defendants is appropriate if a RICO claim is properly alleged. MTD 7. Since it is, the Court need go no further. But there are ample other bases for personal jurisdiction as to the Foreign Defendants.

First, the CPLR authorizes jurisdiction over anyone who "in person or through an agent . . . transacts any business" in New York. N.Y.C.P.L.R. 302(a)(1). This is a "single act statute," meaning that "one transaction in New York is sufficient  . . . so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (1988). The statutory phrase "through an agent" means that the "New York activities of a co-conspirator may also be imputed to an out-of-state tortfeasor." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 441 (S.D.N.Y. 2008) (citation omitted). The FAC alleges conduct in New York that was both undertaken by the Foreign Defendants directly and that is attributable to them via the conspiracy.

 For example, the FAC alleges one instance of hacking that traces back to Harlem (FAC ¶ 98), and more generally alleges that tortious conduct took place in "Qatar, California, *New York*, and Washington, D.C." *Id*. ¶ 318 (emphasis added). The "mastermind" of the scheme and owner of GRA, Kevin Chalker, is a New York resident, and the GRA parent entity is incorporated and headquartered here. *Id*. ¶¶ 194, 16-17. Since the conspiracy was run from New York, the FAC also alleges a "substantial part of the events giving rise to the claims occurred in New York City." *Id*. ¶ 27. And the FAC is clear that the Foreign Defendants challenging jurisdiction were co-conspirators with (and agents of) Chalker and his New York entities, and were used to carry out the cyberattacks on Broidy. *Id*. ¶¶ 20, 26, 73, 74, 272, 299.

Beyond that, Defendant Courtney Chalker destroyed the electronic evidence of the hack *in New York*, on the instruction of his brother, Kevin Chalker, a New York resident. *Id*. ¶¶ 72,

190, 194. Having joined the conspiracy at that point, Courtney Chalker is deemed to have "ratifie[d] all that has come before." *Dixon v. Mack*, 507 F. Supp. 345, 350–51 (S.D.N.Y. 1980) (finding jurisdiction). GRA cites *Democratic National Committee v. Russian Federation*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019) to suggest that acts of concealment fall outside the conspiracy (MTD 10), but critically in that case "the harm suffered  . . . had already taken place before the alleged acts of concealment." *Id*. at 444 n.29. Not so here; the articles smearing Broidy kept coming for well over a year after this specific allegation. FAC ¶ 134.

Second, under New York law, a foreign entity may be considered a "mere department" of a local entity under common ownership when there is a "disregard for the separate corporate existence" of the entities via, for example, financial dependence, and a failure to "observe corporate formalities." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp*., 751 F.2d 117, 120–21 (2d Cir. 1984). Here, the FAC alleges the Foreign Defendants acted as "mere departments" of the New York parent entity, because the entities "operate as separate but intertwined departments of a single company whose finances are thoroughly comingled." FAC ¶¶ 26, 313. The FAC gives an example of the work performed by one entity being invoiced by others "so as to conceal the illegal work from financial records" (*id*. ¶ 69), and explains how publicly available financial records reveal huge sums of "off books" revenue for illegal work that the GRA entities were collectively performing. *Id*. ¶ 167. These allegations are easily sufficient, particularly at this stage. Alternatively, because the "mere department" analysis is "very fact-specific" courts are generally wary of dismissing these allegations on the pleadings alone, "without an opportunity for jurisdictional discovery." *Kucher v. Domino's Pizza, Inc*., 2017 WL 2987214, at *13 (S.D.N.Y. Feb. 13, 2017).

Third, asserting jurisdiction over the Foreign Defendants is consistent with due process because by virtue of working under the direction of a New York resident (Kevin Chalker) and ultimately for a New York parent entity, they "should reasonably anticipate being haled into court" in New York. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

GRA's argument against jurisdiction is based largely on the puzzling assertion that "only *three* of the 415 paragraphs in the FAC concern conduct in New York." MTD at 9. But, beyond the numerus specific examples of New York conduct above (and ignored by GRA), the FAC describes a scheme masterminded by a New York resident and under the umbrella of a New York entity—hence why, as discussed, "a substantial part of the events" occurred in New York. FAC ¶ 27. The FAC is to be read in "the light most favorable to plaintiff," *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1986) (discussing jurisdictional allegations), and GRA's brief does the opposite. Broidy was not required to append the phrase "from New York" to every allegation of wrongdoing, when that is the obvious inference from the facts pleaded.

Finally, the Court should at a minimum allow jurisdictional discovery. Under the "generous" standard for doing so, the Court should exercise its "broad discretion" to allow discovery, so long the pleadings reveal "a genuine issue of jurisdictional fact." *Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*, 2019 WL 3252907, at *1 (S.D.N.Y. July 19, 2019) (citation omitted). The allegations here suggest manipulation of the corporate entities, and that the Foreign Entities were co-conspirators and agents of the GRA parent. Those genuine issues ought not be forever foreclosed without a chance for discovery.

## CONCLUSION

For the stated reasons, the Court should deny Defendants' motion to dismiss.

Dated:  September 21, 2020

Respectfully submitted,

STEPTOE & JOHNSON LLP

By:   _/s/ Filberto Agusti_____

Charles Michael
Morgan Lucas
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900
cmichael@steptoe.com
mlucas@steptoe.com

Filiberto Agusti
Leah M. Quadrino
Linda C. Bailey
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
fagusti@steptoe.com
lquadrino@steptoe.com
lbailey@steptoe.com

*Counsel for Plaintiffs Elliott Broidy and Broidy Capital Management LLC*