# EXHIBIT A

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT, LLC; and ELLIOTT BROIDY, *Plaintiffs-Appellants*, | No. 18-56256 <br><br> D.C. No. 2:18-cv-02421-JFW-E |
| v. | |
| STATE OF QATAR, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court for the
Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted February 11, 2020
Pasadena, California

Filed December 2, 2020

Before: Jay S. Bybee, Daniel P. Collins, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Collins

# SUMMARY[*]

## Foreign Sovereign Immunities Act

The panel affirmed the district court's dismissal, for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, of an action brought against the State of Qatar, alleging violation of the Computer Fraud and Abuse Act and other causes of action.

The panel held that neither the FSIA's exception to immunity for tortious activity nor its exception for commercial activity applied, and the State of Qatar therefore was immune from jurisdiction.

The panel concluded that all of plaintiffs' tort claims were barred under the discretionary function exclusion from the tortious activity exception because the challenged conduct met two criteria: (1) it was discretionary in nature or involved an element of judgment or choice; and (2) the judgment was of the kind that the exception was designed to shield. The first criterion was met because there was no showing that Qatari or international law proscribed Qatar's actions. The second criterion was met because Qatar's alleged actions involved considerations of public policy.

Plaintiffs argued that the commercial activity exception applied because their action was based upon a commercial activity carried on in the United States by Qatar. The panel concluded that plaintiffs' claims were based on the alleged

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

surreptitious intrusion into their servers and email accounts in order to obtain information and the dissemination of such information to others, including persons in the media, and this conduct did not qualify as commercial activity within the meaning of the FSIA.

## COUNSEL

Shannen Wayne Coffin (argued), Filiberto Agusti, Christopher M. Re, Linda C. Bailey, and Mark C. Savignac, Steptoe & Johnson LLP, Washington, D.C., for Plaintiffs-Appellants.

David Meir Zionts (argued), Robert A. Long Jr., Jonathan Gimblett, Lauren K. Moxley, and Megan M. O'Neill, Covington & Burling LLP, Washington, D.C.; Mitchell A. Kamin, Neema T. Sahni, and Rebecca G. Van Tassell, Covington & Burling LLP, Los Angeles, California; for Defendant-Appellee.

## OPINION

COLLINS, Circuit Judge:

Plaintiffs-Appellants Elliott Broidy and his investment firm, Broidy Capital Management, LLC, sued the State of Qatar and various other defendants after Qatari agents allegedly hacked into Plaintiffs' computer servers, stole their confidential information, and leaked it to the media in a retaliatory effort to embarrass Broidy and thereby to neutralize his ability to continue to effectively criticize the Qatari regime and its alleged support of terrorism. The district court dismissed the claims against Qatar for lack of

subject matter jurisdiction, concluding that Qatar was immune under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*.  Although for somewhat different reasons, we agree with the district court that subject matter jurisdiction is lacking under the FSIA, and we therefore affirm its judgment dismissing this action.

## I

### A

Qatar's motion to dismiss relied on a "facial attack on the subject matter jurisdiction of the district court" under the FSIA, and therefore, in reviewing de novo the district court's order granting that motion, we take as true the well-pleaded allegations of Plaintiffs' operative First Amended Complaint.  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009); *see also Holden v. Canadian Consulate*, 92 F.3d 918, 920 (9th Cir. 1996) (de novo review applies to dismissal for lack of jurisdiction under the FSIA).  In addition, we note that Plaintiffs' opposition to Qatar's motion to dismiss requested leave to amend "in order to incorporate additional allegations based on Plaintiffs' discovery efforts," and the then-current status of those discovery efforts were set forth in a contemporaneously filed declaration from Plaintiffs' counsel.  The district court, however, denied leave to amend based on its conclusion that "discovery had failed to provide any evidence that might cure or change the Court's analysis that it lacks subject matter jurisdiction over Qatar" and that further amendment would be futile.  Because we review that determination de novo, *see Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004), and because we apply the same standards in evaluating the sufficiency of a proposed amendment as we do to the underlying complaint, *see Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988), we likewise take as true

for purposes of this appeal the additional well-pleaded contentions that are contained in that declaration of counsel. Considering these allegations together, we take the following factual assertions as true for purposes of this appeal.

In response to being sanctioned diplomatically and commercially by several of its neighbors in June 2017 for its alleged "support for terrorism and its close ties to Iran," Qatar launched "a wide-ranging and extremely well-resourced effort to influence public opinion in the United States."  In addition to attempting to burnish Qatar's image with the U.S. Government, Qatar's "public relations campaign" sought to "curtail[] the influence of individuals that could undermine the standing of the State of Qatar in the United States."  One of the persons whose influence Qatar sought to blunt was Elliott Broidy ("Broidy"), the CEO of an investment firm in Los Angeles called Broidy Capital Management, LLC ("BCM").  In addition to his business ventures, Broidy has been active in public affairs, serving on the Homeland Security Advisory Council for several years and also taking leadership roles in various political and civic organizations.  Starting in March 2017, Broidy became an outspoken critic of Qatar, condemning it for its alleged support for terrorism.  His activities were perceived by Qatar as thwarting its public relations efforts, such as when Broidy and others persuaded many "American Jewish leaders to refuse to meet with the Emir" of Qatar when the Emir traveled to New York in the fall of 2017 for the General Assembly of the United Nations.  Qatar also perceived that Broidy "'had been influential' in shaping the White House's views on Qatar."  As a result, one registered agent for Qatar noted that "Broidy's name [came] up in Embassy meetings often," and Qatar decided to target him in order to limit his future influence.

The centerpiece of Qatar's purported targeting of Broidy was a concerted series of cyberattacks aimed at BCM's California-based computer servers. In the latter half of 2017, Qatar retained the New York-based firm of Global Risk Advisors LLC ("GRA") to coordinate that effort, and GRA thereafter introduced Qatar "to cyber mercenaries in various countries to coordinate technical aspects of the illegal intrusion." Thereafter, through a series of "spearphishing" attacks aimed at several persons connected to Broidy, including his executive assistant, the hackers obtained access to BCM's Los Angeles-based servers. Beginning on January 16, 2018, and continuing through at least February 25, 2018, the hackers engaged in "thousands" of instances of unauthorized access into BCM's servers and obtained "Plaintiffs' private communications, emails, documents and intellectual property."

Subsequent forensic investigation revealed that the hackers were largely able to hide the origins of the attacks on BCM's servers by routing their communications through Virtual Private Networks ("VPNs"). However, two brief glitches in the VPN system revealed that at least two attacks in February 2018 originated from an IP address in Doha, Qatar, that belongs to an internet service provider that is majority-owned by Qatar. Additional forensic analysis also established that persons using IP addresses from Vermont "directly accessed Plaintiffs' servers 178 times from February 12, 2018 to February 25, 2018." Plaintiffs contend that these Vermont-based attacks were direct, *i.e.*, that they were not "associated with VPNs or similar anonymization tools."

After the hackers obtained Plaintiffs' private documents, the stolen materials were converted into PDF format and distributed to several U.S. media outlets via email and hand-

delivery.  A New York-based public relations firm that Qatar had previously hired in connection with its efforts to influence U.S. public opinion, Stonington Strategies LLC ("Stonington"), participated in this plan to "organize and disseminate Plaintiffs' stolen emails to media organizations."  The metadata from some of these leaked PDFs revealed timestamps from the Central and Eastern Time Zones, suggesting that the conversion of these files into PDF format took place in the United States.  Plaintiffs also allege that "many of the instances of unlawful distribution of illegally obtained [documents] took place within the United States."

The result of the dissemination of the stolen materials was an unflattering series of articles in March 2018 in the Wall Street Journal, the New York Times, and the Huffington Post alleging that, in exchange for tens of millions of dollars, Broidy and his wife had sought to scuttle a criminal investigation connected to a Malaysian state investment fund.  As a consequence, Plaintiffs suffered reputational harm and other injuries.

**B**

Based on these allegations, Plaintiffs filed this action against Qatar and various other defendants in the district court.  In the operative First Amended Complaint, Plaintiffs asserted 10 causes of action against Qatar, GRA, Stonington, and numerous individuals arising from the alleged unauthorized access into Plaintiffs' servers and the subsequent distribution of stolen materials.  Specifically, Plaintiffs alleged that the unlawful intrusion into the servers to obtain information was actionable under the common law tort of intrusion upon seclusion, as well as under the civil suit provisions of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g); the Stored Communications Act,

18 U.S.C. § 2707(a); the Digital Millennium Copyright Act, 17 U.S.C. § 1203(a); and the California Comprehensive Computer Data Access and Fraud Act, *see* Cal. Penal Code § 502(e). Plaintiffs also alleged that the unlawful acquisition and dissemination of the stolen materials were actionable under common-law theories of conversion and intrusion upon seclusion, as well as under the civil actions authorized by California Penal Code § 496(c) (relating to receipt of stolen property); the California Uniform Trade Secrets Act, *see* Cal. Civ. Code §§ 3426.2, 3426.3; and the Defend Trade Secrets Act, 18 U.S.C. § 1836(b). The complaint also alleged a cause of action for "civil conspiracy," but as the district court correctly noted, there is no such cause of action under California law. *See*, *e.g.*, *Kenne v. Stennis*, 179 Cal. Rptr. 3d 198, 210 (Ct. App. 2014) ("Conspiracy is not a cause of action. It is a theory of liability under which persons who, although they do not actually commit a tort themselves, share with the tortfeasor or tortfeasors a common plan or design in its perpetration."). Based on these claims, Plaintiffs sought declaratory, monetary, and injunctive relief, as well as attorneys' fees.[1]

Qatar filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2) for lack of subject matter and personal jurisdiction, asserting that it was immune under the FSIA. In opposing Qatar's motion, Plaintiffs argued that two of the FSIA's exceptions—the tortious activity exception and the commercial activity exception—defeated Qatar's claimed immunity. On August 8, 2018, the district court granted Qatar's motion, finding both exceptions inapplicable. The tortious activity exception did not apply, according to the district court, because Plaintiffs had failed to "allege at least 'one entire tort'

---

[1] Plaintiffs also sought punitive damages, but such damages are not available against Qatar. *See* 28 U.S.C. § 1606.

occurring in the United States" as required by our decision in *Olsen by Sheldon v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984), *abrogated in part on other grounds as recognized in Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987). The district court concluded that all of the torts alleged by Plaintiffs were "premised on allegedly wrongful conduct by Qatar, its agents, or co-conspirators in gaining access to Plaintiffs' data servers from outside the United States, making each tort transnational." The alleged attacks from Vermont, the court held, "were merely the continuation of purported conduct allegedly originating in Qatar and 'do not demonstrate an independent tort occurring entirely within the United States'" (citation omitted). The district court held that the commercial activity exception was inapplicable because Qatar's alleged conduct—hacking and cyberespionage—did not qualify as "commercial activity" within the meaning of the FSIA. The district court therefore dismissed the action against Qatar without leave to amend.

Shortly thereafter, the district court dismissed GRA, Stonington, and various individual defendants affiliated with those entities for lack of personal jurisdiction. With the approval of the district court, Plaintiffs' claims against three remaining individual defendants, who had not been served, were voluntarily dismissed without prejudice and a formal "final, appealable judgment" was entered by the district court. *See Galaza v. Wolf*, 954 F.3d 1267, 1272 (9th Cir. 2020) (where dismissal of remaining claims without prejudice is done with "the approval and meaningful participation of the district court," the resulting judgment is final and appealable). Plaintiffs timely appealed the judgment, challenging only the dismissal of the claims against Qatar.

## II

The FSIA is the "'sole basis'" for obtaining jurisdiction over a foreign state in a civil action. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (citation omitted). Under the FSIA, a foreign state "shall be immune from the jurisdiction of the courts of the United States" unless one of the Act's enumerated exceptions applies. 28 U.S.C. § 1604. This default rule of immunity reflects "the absolute independence of every sovereign authority" and also "helps to induce each nation state, as a matter of international comity, to respect the independence and dignity of every other, including our own." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017) (simplified).

The Act, however, contains a number of explicit exceptions to this default rule of foreign sovereign immunity, thereby acknowledging that there are some limited situations in which a foreign state entity should be subject to suit. In establishing such exceptions, the FSIA generally codifies the so-called "restrictive theory" of sovereign immunity, under which immunity "is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 705–06 (9th Cir. 1992) (citation and internal quotation marks omitted). Although this "restrictive theory of sovereign immunity was developed in the context of commercial activities of states, . . . it is not limited to claims arising out of contractual relationships," and in appropriate circumstances it also imposes liability upon a foreign state for torts, such as traffic accidents, committed by that state's agents. *See* Restatement (Third) of the Foreign Relations Law of the United States § 454 cmt. a (Am. L. Inst. 1987).

The FSIA thus contains separate exceptions that permit certain actions against foreign states based on their commercial activities, 28 U.S.C. § 1605(a)(2), as well as certain actions based on the tortious acts of their agents, *id.* § 1605(a)(5).  If either of these exceptions is applicable, then the district court may assert jurisdiction over a "nonjury civil action against [the] foreign state," but only "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity."  28 U.S.C. § 1330(a); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) ("Sections 1604 and 1330(a) work in tandem: § 1604 bars . . . jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction . . . when a foreign state is *not* entitled to immunity.").[2]

There is, of course, no dispute that the State of Qatar qualifies as a "foreign state" for purposes of the FSIA, and it is therefore immune from jurisdiction here unless Plaintiffs' claims fit within one of the FSIA's enumerated exceptions. Plaintiffs invoke both the tortious activity exception and the commercial activity exception, and it is their burden to make an initial showing as to the applicability of one or both of them.  *Packsys, S.A. v. Exportadora de Sal, S.A.*, 899 F.3d 1081, 1088 (9th Cir. 2018).  We agree with the district court that as a matter of law neither exception is applicable here, although our reasoning differs in some respects from the district court's.  We discuss each exception in turn.

---

[2] Plaintiffs are therefore wrong in suggesting that the district court can assert jurisdiction over this entire action against Qatar so long as any *one* of their claims fits within an exception in the FSIA.  This "foot-in-the-door" approach cannot be reconciled with the limited grant of jurisdiction in § 1330(a).  *See Simon v. Republic of Hungary*, 812 F.3d 127, 141 (D.C. Cir. 2016) (courts must "make FSIA immunity determinations on a claim-by-claim basis").

## A

Subject to two enumerated exclusions, the FSIA's tortious activity exception allows a foreign sovereign to be sued in any case:

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5); *see also Liu v. Republic of China*, 892 F.2d 1419, 1425 (9th Cir. 1989). Although the actual words of the statute require only that a claimant's *injury* occur in the United States, *see* 28 U.S.C. § 1605(a)(5), the Supreme Court has stated that this exception "covers only torts occurring within the territorial jurisdiction of the United States," *Amerada Hess*, 488 U.S. at 441. *See also Asociación de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1524 (D.C. Cir. 1984) (Scalia, J.) ("Although the statutory provision is susceptible of the interpretation that only the effect of the tortious action need occur here, where Congress intended such a result elsewhere in the FSIA it said so more explicitly."). Accordingly, we have held that, while not "every aspect of the tortious conduct" must "occur in the United States," the exception in § 1605(a)(5) applies only where the plaintiff alleges "at least one entire tort occurring in the United States." *Olsen*, 729 F.2d at 646.

The parties vigorously dispute how *Olsen*'s "entire tort" rule applies to Plaintiffs' allegations in this case, but we find it unnecessary to address this issue because Plaintiffs' claims

fall within one of § 1605(a)(5)'s express exclusions from the tortious activity exception. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) ("[W]e may affirm based on any ground supported by the record."). In addition to preserving a foreign sovereign's immunity over a specified list of torts, § 1605(a)(5) also expressly precludes any tort claim against a foreign state "based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A). We conclude that all of Plaintiffs' tort claims are barred under this "discretionary function" exclusion from the FSIA's tortious activity exception.

As we have previously observed, "[t]he language of the discretionary function exclusion closely parallels the language of a similar exclusion in the Federal Tort Claims Act ('FTCA'), so we look to case law on the FTCA when interpreting the FSIA's discretionary function exclusion." *Holy See*, 557 F.3d at 1083. Accordingly, the FSIA's discretionary function exclusion applies if the challenged conduct "meets two criteria: (1) it is 'discretionary in nature' or 'involve[s] an element of judgment or choice' and (2) 'the judgment is of the kind that the discretionary function exception was designed to shield.'" *Id*. at 1083–84 (quoting *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991)). Although Qatar ultimately has the burden to establish that the exclusion applies, that burden arises only if Plaintiffs have "'advance[d] a claim that is facially outside the discretionary function exception.'" *Id.* at 1084 (citation omitted). We conclude that the particular tortious conduct that Plaintiffs allege in this case facially satisfies both of *Gaubert*'s criteria, and that the discretionary function exclusion therefore applies.

**1**

As the Supreme Court has recognized, "conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Accordingly, the discretionary function exclusion cannot apply when an applicable "statute, regulation, or policy specifically *prescribes* a course of action." *Id.* (emphasis added). Put another way, a defendant is not exercising discretion if it is "bound to act in a particular way." *Gaubert*, 499 U.S. at 329. Applying similar reasoning, we have also held that the FTCA's comparable discretionary function exception does not apply when the defendants' assertedly discretionary actions are specifically *proscribed* by applicable law. *Fazaga v. FBI*, 965 F.3d 1015, 1065 (9th Cir. 2020) (conduct that violates "federal constitutional or statutory directives" is not within the FTCA's discretionary function exception); *Tobar v. United States*, 731 F.3d 938, 946 (9th Cir. 2013) (same where conduct violated agency's "own regulations and policies" (emphasis omitted)); *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) ("'[F]ederal officials do not possess discretion to violate constitutional rights.'" (citation omitted)). Plaintiffs contend that "[t]his principle is dispositive here," because their operative complaint alleges multiple violations of specific federal and state statutory prohibitions. We disagree.

In drawing upon the relevant caselaw applicable to the U.S. Government under the FTCA's discretionary function exception, we must apply those principles *mutatis mutandis* in construing the scope of the similar language used in the FSIA with respect to a foreign state. The discretion of the U.S. Government is, of course, cabined by the applicable limitations in the U.S. Constitution, federal statutes and

regulations, and any other relevant binding source of law. But the *policy discretion* of a *foreign sovereign* is not evaluated by those same constraints, but rather by the corresponding limitations that bind *that* sovereign, whether contained in its own domestic law or (we will assume) in applicable and established principles of international law. We drew precisely this distinction in *Risk v. Halvorsen*, 936 F.2d 393 (9th Cir. 1991), in which we upheld Norway's immunity under the FSIA on the ground that the discretionary function exclusion applied to the challenged actions of Norwegian officials, despite the fact that those actions "may constitute a violation of California criminal law." *Id*. at 396–97. We noted that we had previously held that the FSIA's discretionary function exclusion "'is inapplicable when an employee of a foreign government violates *its own internal law*,'" but we concluded that this principle did not apply in *Risk*, because there was "no assertion that the Norwegian officials violated any Norwegian law." *Id*. at 396 (quoting *Liu*, 892 F.2d at 1431) (emphasis added); *see also Liu*, 892 F.2d at 1431 (discretionary function exclusion did not apply where, in ordering assassination, Taiwanese official had violated Taiwanese law). And *Risk* similarly distinguished *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980), on the ground that it involved an alleged assassination in violation of international law. *Risk*, 936 F.2d at 396 (noting that *Letelier* addressed "'action that is clearly contrary to the precepts of humanity'"); *cf. MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 922 n.4 (D.C. Cir. 1987) (similarly distinguishing *Letelier* in a case involving Peru's alleged criminal violation of D.C. zoning laws in establishing a chancery, noting that "it is hardly clear that, even if a criminal act were shown, it would automatically prevent designation of Peru's acts as discretionary").

The alleged actions that Qatar took here have not been shown to violate either Qatari law or applicable international law.  The parties do not dispute that, under Qatari law, the various criminal prohibitions against hacking, theft, or disclosure of trade secrets do not bind government agents acting in accordance with official orders.  Indeed, it would perhaps be surprising if the domestic law of any country prohibited its own government agents from engaging in covert cyberespionage and public relations activities *aimed at foreign nationals in other countries*.  Nor have the specific forms of cyberespionage alleged here been shown to violate judicially enforceable principles of international law.  *Cf. Letelier*, 488 F. Supp. at 673.  The status of peacetime espionage under international law is a subject of vigorous debate, *see, e.g.*, Patrick C.R. Terry, *"The Riddle of the Sands"—Peacetime Espionage and Public International Law*, 51 Geo. J. Int'l L. 377, 380–85 (2020); A. John Radsan, *The Unresolved Equation of Espionage and International Law*, 28 Mich. J. Int'l L. 595, 601–07 (2007), and the parties have not pointed us to any sufficiently clear rule of international law that would impose a mandatory and judicially enforceable duty on Qatar *not* to do what it allegedly did here.  *Cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 724–31 (2004) (explaining why courts should exercise great caution before purporting to identify and enforce norms of international law).

In the absence of a showing that Qatari or international law proscribes Qatar's actions here, that alleged conduct involves an exercise of discretion by Qatar that satisfies the first *Gaubert* criterion.  *Cf. Fazaga*, 965 F.3d at 1024, 1065 (to the extent that "Defendants did not violate any federal constitutional or statutory directives, the discretionary function exception *will bar* Plaintiffs' FTCA claims"

concerning alleged "covert surveillance program" aimed at mosque (emphasis added)).

## 2

There is, however, a further element that must be satisfied before the FSIA's discretionary function exclusion may be applied, *viz.*, the "judgment" involved must be "'of the kind that the discretionary function exception was designed to shield.'" *Holy See*, 557 F.3d at 1083–84 (citation omitted). This criterion is satisfied if the challenged "'governmental actions and decisions'" are "'based on considerations of public policy.'" *Id*. at 1084 (citation omitted); *see also Risk*, 936 F.2d at 395 (challenged acts must be "'grounded in social, economic, and political policy'" (citation omitted)). Thus, "[a]lthough driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Gaubert*, 499 U.S. at 325 n.7. Here, there can be little doubt that Qatar's alleged actions involved considerations of public policy that are sufficient to satisfy *Gaubert*'s second criterion.

Plaintiffs' complaint alleges that, in response to a diplomatic and economic boycott, Qatar undertook the challenged actions as one component of a public-relations strategy "to influence public opinion in the United States" by "curtailing the influence of individuals," such as Broidy, who "could undermine the standing of the State of Qatar in the United States." Indeed, although the *Letelier* court found that the discretionary function exclusion did not apply to the challenged assassination in that case because it "clearly" violated international law—*i.e.*, because it failed what we have described as *Gaubert*'s first criterion—that court also expressly acknowledged that Chile's act, however reprehensible it might have been, was "one most assuredly

involving policy judgment." 488 F. Supp. at 673; *see also Macharia v. United States*, 334 F.3d 61, 67 (D.C. Cir. 2003) (because matters of embassy location and security involved considerations that "'affect foreign relations,'" they satisfied *Gaubert*'s "second step" (citation omitted)). We therefore conclude that Qatar's alleged conduct here involved "the type of discretionary judgments that the exclusion was designed to protect." *Holy See*, 557 F.3d at 1084.

Because Plaintiffs have failed to "'advance a claim that is facially outside the discretionary function'" exclusion, the tortious activity exception to foreign sovereign immunity in § 1605(a)(5) is inapplicable here as a matter of law. *Id*. (citation omitted).

## B

Plaintiffs also contend that the FSIA's commercial activity exception allows the U.S. courts to assert jurisdiction over Plaintiffs' claims against Qatar, but we again disagree.

Section 1605(a)(2) contains three separate clauses that set forth three alternative variations for asserting jurisdiction over a foreign state based on its commercial activities. In this court, Plaintiffs rely only on one of the formulations, namely, the one that allows jurisdiction over a foreign state in a "case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). In applying this clause, we must first identify what are the activities on which "the action is based" and then determine whether those activities are "commercial" within the meaning of the FSIA. *Id*. Applying this two-step analysis, we conclude that the challenged actions of Qatar here do not constitute "commercial activity."

As noted, the "crucial" first step "in determining whether the basis of this suit was a commercial activity is defining the 'act complained of here.'" *MOL, Inc. v. People's Republic of Bangladesh*, 736 F.2d 1326, 1328 (9th Cir. 1984) (citation omitted); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993). "Although the Act contains no definition of the phrase 'based upon,'" the Supreme Court has held that the "phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his [or her] theory of the case." *Nelson*, 507 U.S. at 357. As explained earlier, all of Plaintiffs' claims are based upon either or both of two types of activities: (1) the surreptitious intrusion into Plaintiffs' servers and email accounts in order to obtain information; and (2) the dissemination of such information to others, including persons in the media. *See supra* at 7–8. Plaintiffs point out that these alleged activities are connected to other allegedly commercial conduct (such as the hiring of a public relations firm), but that other conduct is not what the suit "is based" on. 28 U.S.C. § 1605(a)(2). Even taking as true Plaintiffs' allegations that Qatar entered into various contracts in the United States to carry out its operations, "those facts alone entitle [Plaintiffs] to nothing under their theory of the case," and these activities therefore "are not the basis for [Plaintiffs'] suit." *Nelson*, 507 U.S. at 358. It is the "torts, and not the arguably commercial activities that preceded [or followed] their commission," that "form the basis for [Plaintiffs'] suit." *Id*.

The next question, then, is whether Qatar's "tortious conduct itself . . . qualif[ies] as 'commercial activity' within the meaning of the Act." *Nelson*, 507 U.S. at 358. The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The statute further explains

that the "commercial character of an activity shall be determined by reference to the nature" of the activity, "rather than by reference to its purpose." *Id.* In assessing whether the "nature" of particular state actions is commercial, courts look to whether they "are the type of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (simplified); *see also Adler v. Federal Republic of Nigeria*, 219 F.3d 869, 875–76 (9th Cir. 2000) (considering whether the defendants' challenged conduct was "what every private party does in the open market (notwithstanding the fact that their precise undertakings were illegal)"); *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167 (D.C. Cir. 1994) ("[W]e take from *Weltover* the key proposition that in determining whether a given government activity is commercial under the [FSIA], we must ask whether the activity is one in which commercial actors typically engage."). "[W]hether a state acts 'in the manner of' a private party is a question of behavior, not motivation." *Nelson*, 507 U.S. at 360 (citation omitted).

We have little difficulty in concluding that, without more, a foreign government's conduct of clandestine surveillance and espionage against a national of another nation in that other nation is not "one in which commercial actors typically engage." *Cicippio*, 30 F.3d at 167; *see also, e.g.*, *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 429 (S.D.N.Y. 2019) ("Transnational cyberattacks are not the 'type of actions by which a private party engages in trade and traffic or commerce.'" (citation omitted)). A foreign government engaged in such conduct is not exercising "powers that can also be exercised by private citizens," but rather is employing powers that— however controversial their status may be in international law—are "peculiar to sovereigns." *Nelson*, 507 U.S. at 360 (citations and internal quotation marks omitted).

Plaintiffs point out that there are bad actors in the commercial sphere who employ similar tactics, but any application of this argument to the particular facts of this case seems difficult to reconcile with *Nelson*.  In that case, plaintiff Scott Nelson was allegedly arrested, imprisoned, and beaten by police officials in Saudi Arabia, assertedly in retaliation for his reporting of safety defects in the state-owned hospital at which he worked.  507 U.S. at 352–53.  Nelson and his wife sued both the Saudi government and the hospital (among others), claiming that the commercial activity exception applied in light of the employment-related context in which the conduct occurred.  *Id*. at 358.  After identifying the tortious conduct—*e.g.*, the arrest, imprisonment, and beatings—as "the basis for the Nelsons' suit," the Court held that this conduct "fail[ed] to qualify as 'commercial activity.'"  *Id*.  Emphasizing that the actual tortious conduct was an exercise of the police power, rather than an act that can be "'performed by an individual acting in his own name,'" the Court held that, "however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." *Id*. at 361–62 (citation omitted).  Just as exercising police and penal powers "is not the sort of action by which private parties can engage in commerce," *id*. at 362, a foreign government's deployment of clandestine agents to collect foreign intelligence on its behalf, without more, is the sort of peculiarly sovereign conduct that all national governments (including our own) assert the distinctive power to perform.  Because the conduct Qatar allegedly engaged in here "'can be performed only by the state *acting as such*,'" *id*. (emphasis added) (citation omitted), it is not "commercial" for purposes of the commercial activity exception.  And we agree with the D.C. Circuit to the extent that it concluded that a foreign government's use of "irregular operatives" to

perform uniquely sovereign actions, such as occurred in this case, is not sufficient to distinguish *Nelson*. *Cicippio*, 30 F.3d at 168.

Having determined that Qatar's conduct of the espionage action against Plaintiffs was not a commercial activity, we also reject Plaintiffs' argument that Qatar's subsequent use of the materials it obtained constituted a "commercial" activity within the meaning of the FSIA. Although Plaintiffs contend that the materials that were accessed and disseminated included commercially sensitive materials, including trade secrets, there is no allegation that Qatar made commercial use of the materials. Plaintiffs contend that any consideration of Qatar's subsequent uses is an improper consideration of purpose, but we disagree. The Supreme Court confirmed in *Weltover* that it was not precluding consideration of the "context" of a sovereign's actions, and what a foreign sovereign does with covertly obtained intelligence is certainly an aspect of the "outward form of the conduct that the foreign state performs." 504 U.S. at 615, 617. To paraphrase the D.C. Circuit, when the outward actions are judged in context, there is an objective difference between (1) stealing the trade secrets of a "commercial rival" and deploying them against that rival and (2) stealing confidential materials from a policy critic and publishing embarrassing excerpts from them. *Cf. Cicippio*, 30 F.3d at 168 ("Perhaps a kidnapping of a commercial rival could be thought to be a commercial activity."). Here, the context confirms that Qatar was not acting "in the manner of a private player" in the marketplace. *Weltover*, 504 U.S. at 614. Although the materials were of commercial value to *Plaintiffs*, the statute's focus is on whether the particular actions *that the foreign sovereign took* amounted to the conduct of "'trade and traffic or commerce,'" *id.* (citation

omitted), and we agree with the district court that they were not.

## III

Our ruling in this case is neither an affirmation that the alleged conduct actually occurred nor an endorsement of any such conduct.  Our task is to assume the allegations to be true and then to apply the limitations of the FSIA according to the statute's plain terms.  Having done so, we conclude that the FSIA bars Plaintiffs' claims against Qatar here.

The judgment of the district court is **AFFIRMED**.