# K A S O W I T Z   B E N S O N   T O R R E S  LLP

<table>
<tr><td>

Daniel R. Benson
Direct Dial: (212) 506-1720
Direct Fax: (212) 880-8690
DBenson@kasowitz.com

</td><td>

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

</td><td>

Atlanta
Houston
Los Angeles
Miami
Newark
San Francisco
Silicon Valley
Washington DC

</td></tr>
</table>

June 2, 2022

<u>Via ECF</u>

The Honorable Mary Kay Vyskocil
United States District Court
Southern District of New York
500 Pearl Street, Room 2230
New York, NY 10007

   Re: *Broidy et al. v. Global Risk Advisors, et al.*, Case No. 19-cv-11861

Dear Judge Vyskocil:

   We represent Plaintiffs Elliott Broidy and Broidy Capital Management, LLC in the above-referenced action, and write to inform the Court of a decision issued earlier today in *Broidy Capital Management LLC, et al. v. Nicolas D. Muzin, et al.*, Case No. 19-cv-150-DLF (D.D.C.) in which the *Muzin* court denied defendants' motion to reconsider its earlier decision holding that Plaintiffs' common law claims were not preempted by the California Uniform Trade Secrets Act ("CUTSA"). A copy of the *Muzin* court's decision denying reconsideration (D.C. action ECF No. 149) is enclosed herewith.

   We bring this decision to the Court's attention because Defendants in their motion to dismiss have raised the same preemption argument with respect to Plaintiffs' common law claims in this action. *See* ECF No. 124 at 22-23. In Plaintiffs' opposition to Defendants' motion, filed earlier this week, we noted that the *Muzin* court already rejected the preemption argument. ECF No. 126 at 21. In today's decision, that court has again rejected the argument on reconsideration.

   We thank the Court for its consideration of this matter.

         Respectfully,

         /s/ Daniel R. Benson

         Daniel R. Benson

Encl.

cc: All Counsel of Record (via ECF)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BROIDY CAPITAL
MANAGEMENT LLC *et al.*,

     *Plaintiffs*,

  v.

NICOLAS D. MUZIN *et al.*,

     *Defendants.*

No. 19-cv-150 (DLF)

## <u>MEMORANDUM OPINION</u>

Plaintiffs Broidy Capital Management, LLC, and Elliott Broidy (together, "Broidy") brought this suit against several foreign agents of Qatar: Nicolas Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies, LLC (a company founded by Muzin and Allaham). *See* First Am. Compl. (Compl.) ¶¶ 11–18, Dkt. 18-2.  Broidy alleges that the defendants joined a "Qatari Enterprise," which conspired against him to hack his computers and disseminate the hacked information to the media in retaliation for Broidy's anti-Qatari advocacy.  *Id.* ¶¶ 1–2, 199.  He alleges that the hacked information included "private communications, documents, trade secrets and intellectual property."  *Id.* ¶ 325.

In a previous opinion, this Court held that the defendants' affiliation with Qatar did not entitle them to foreign sovereign immunity.  *See* Mem. Op. of Mar. 31, 2020 at 10–17, Dkt. 51, *aff'd in Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789 (D.C. Cir. 2021).  The Court also held that Broidy stated claims for which relief could be granted under the Computer Fraud and Abuse Act (CFAA), the Defend Trade Secrets Act (DTSA), and the California Uniform Trade Secrets Act (CUTSA), as well as for the torts of receiving stolen property, intrusion upon seclusion, and

civil conspiracy.[1]  *See* Mem. Op. at 23–32, 38–39, 41–43.  Finally, the Court held that CUTSA did not preempt Broidy's state common law claims.  *See id.* at 29.

Before the Court are two motions to reconsider and one motion to compel.  First, the defendants move for reconsideration of whether CUTSA preempts Broidy's remaining state law claims.  *See* Dkt. 98.  Second, Broidy moves for reconsideration of a protective order that this Court issued on December 8, 2021, insofar as it classifies certain discovery materials as "Attorneys' Eyes Only."  *See* Dkt. 102.  Finally, Broidy challenges the defendants' attempt to withhold discovery based on privileges that are purportedly held by a non-party, the State of Qatar.  *See* Dkt. 109.  For the reasons that follow, the Court will grant Broidy's motion to reconsider, grant Broidy's motion to compel, and deny the defendants' motion to reconsider.[2]

## I.    MOTIONS TO RECONSIDER

Under Federal Rule of Civil Procedure 54(b), a court may revise any non-final order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).   The Supreme Court has warned, however, that "courts should be loathe" to revisit prior decisions "in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice."  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (internal quotation marks omitted).  Thus, "a motion for reconsideration is not an opportunity to reargue facts and theories upon which the court has already ruled, or present theories or arguments that could have been

---

[1] The Court also held that Broidy failed to state a claim under the Racketeer Influenced and Corrupt Organizations Act, the Stored Communications Act, the California Comprehensive Computer Data Access and Fraud Act, or for the torts of conversion, tortious inference, or public disclosure of private facts.  *See* Mem. Op. at 17–23, 32–38, 39–41.

[2] The docket also contains multiple motions to quash or compel that the Court will address in a forthcoming hearing.

advanced earlier." *Negley v. FBI*, 825 F. Supp. 2d 58, 62 (D.D.C. 2011). To prevail on such a motion, the moving party must show: "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *In re Guantanamo Detainee Litig.*, 706 F. Supp. 2d 120, 122–23 (D.D.C. 2010) (internal quotation marks omitted).

### A.    CUTSA Does Not Preempt Broidy's Common Law Claims

The Court will begin with the defendants' motion to reconsider its holding on preemption. *See* Dkt. 98. California courts have held that CUTSA "preempts alternative civil remedies based on trade secret misappropriation." *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 90 Cal. Rptr. 3d 247, 258 (Ct. App. 2009) (internal quotation marks omitted). On that basis, defendant Gregory Howard argued in his motion to dismiss that CUTSA preempts Broidy's other claims under California law. *See* Howard's Mot. to Dismiss at 39, Dkt. 41. The Court rejected that argument on the ground that those other claims "each have a [factual] basis independent of any misappropriation of a trade secret." *See* Mem. Op. at 28 (quoting *Angelica Textile Servs., Inc. v. Park*, 163 Cal. Rptr. 3d 192, 202 (Ct. App. 2013)).

The defendants have not identified an appropriate ground for reconsideration of that decision. They do not argue that California law has changed on this issue. *See* Defs.' Mem. in Supp. of Mot. for Recons. at 1, Dkt. 98-1. And although they argue that this Court's decision was "plainly erroneous," *id.* at 18, they admit that there is a split of authority on the underlying issue, *see id.* at 7 (arguing that this Court relied on cases "in the minority"). Further, the defendants do not identify any controlling authority for their position. The California Supreme Court has not addressed the scope of CUTSA preemption. *Erie* principles do not require following the decisions of state intermediate courts. *See Comm'r of Internal Revenue v. Est. of*

*Bosch*, 387 U.S. 456, 465 (1967); *Norwood v. Marrocco*, 780 F.2d 110, 113 (D.C. Cir. 1986).

And in any event, those courts' decisions do not support the defendants' position.

The plain text of CUTSA provides that the statute "does not affect . . . other civil remedies that are not based upon misappropriation of a trade secret."  Cal. Civ. Code § 3426.7(b).  That provision "implicitly preempts alternative civil remedies based on trade secret misappropriation."  *K.C. Multimedia*, 90 Cal. Rptr. 3d at 258.  The California Court of Appeal has held that "the determination of whether a claim is based on trade secret misappropriation is largely factual."  *Id.* (citation omitted).  Thus, it has held that CUTSA preempts other state law claims that are "based on the same nucleus of facts as the misappropriation of trade secrets claim for relief."  *Id.* at 261 (citation omitted); *see also Angelica Textile Servs.*, 163 Cal. Rptr. 3d at 202 (asking whether the other state law claims are "based on facts distinct from the facts that support the misappropriation claim"); *PHL Assocs., Inc. v. Superior Ct. of Yolo Cnty.*, 2020 WL 4012763, at *11 (Cal. Ct. App. Jul. 16, 2020) (asking whether there is a "material distinction between the wrongdoing alleged in a [C]UTSA [claim] and that alleged in a different claim" (internal quotation marks omitted)).

Broidy's common law claims are not preempted because they rely on different factual allegations than his CUTSA claim.  Broidy argues that the defendants violated CUTSA by improperly disclosing his "trade secrets," which included "confidential business plans and proposals," supporting research, and "contacts for important business relationships."  Compl. ¶¶ 311, 316.  His common law claims, in contrast, allege wrongdoing regarding both his trade secrets and his personal property.  To support his claim for receiving stolen property, Broidy alleges that the defendants received his "private communications," *id.* ¶ 325, including communications stored on his email account, his wife's email account, and his assistant's email

4

account, *see id.* ¶¶ 78, 86, 89, 91.  And to support his claim for intrusion upon seclusion, he alleges that the defendants conspired to hack his computer systems and "intrude[] upon [his] secluded documents," "private communications," and "personal information."  *Id.* ¶¶ 352, 356.  Broidy could accordingly prevail on those common law claims without showing that the defendants took any action with respect to his trade secrets or other proprietary information.  Broidy's intrusion claim also alleged a different kind of wrongdoing—a conspiracy to infiltrate his computer systems—than he alleges to support his CUTSA claim.  *See id.* ¶ 352.  He could accordingly prevail on his intrusion claim without showing the conduct necessary to prevail on his CUTSA claim.  For those reasons, his common law claims have a factual basis "independent of any misappropriation of a trade secret" and are not preempted under CUTSA.[3]  *See* Mem. Op. at 28 (quoting *Angelica Textile Servs.*, 163 Cal. Rptr. 3d at 202).

As an alternative to the above analysis, the defendants argue that CUTSA preempts common laws claims related to the "misuse" of all confidential information, including "confidential personal materials."  Defs.' Reply in Supp. of Mot. for Recons. at 1, Dkt. 108.  To support that argument, they note that several federal district courts have interpreted CUTSA to preempt "all claims premised on the wrongful taking and use of confidential business and proprietary information, even if that information does not meet the statutory definition of a trade secret.  *See Erhart v. BofI Holding, Inc.*, 2020 WL 1550207, at *37 (S.D. Cal. Mar. 31, 2020)

---

[3] Because CUTSA does not preempt Broidy's claims for receiving stolen property and intrusion upon seclusion, it does not preempt his allegation of a civil conspiracy.  *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994) (en banc) ("Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who . . . share with the immediate tortfeasors a common plan or design in its perpetration.").  In addition, because Broidy's common law claims rely on different factual allegations than his CUTSA claim, the defendants' motion for judgment on the pleadings fails.  *See* Defs.' Mem. in Supp. of Mot. for Recons. at 19–20.

(citation omitted).  They also cite one district court for the proposition that a claim is preempted

under CUTSA "if the entire basis for the claim is information not generally known to the

public."  *Glam & Glits Nail Design, Inc. v. #NotPolish, Inc.*, 2021 WL 2317410, at *10 (S.D.

Cal. June 7, 2021) (internal quotation marks and ellipses omitted).  The above authorities rely, at

bottom, on dicta from *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27 (Cal. 2010), which

states that CUTSA preempts "common law conversion claims based on the taking of

information" that is "not a trade secret" and "is not otherwise made property by some provision

of positive law."  *Silvaco*, 109 Cal. Rptr. 3d at 53 n.22 (internal quotation marks omitted).  In

explaining that conclusion, *Silvaco* reasoned that any other approach would create a "new

category of intellectual property" under California law and "obliterat[e] the uniform system

[CUTSA] seeks to generate."  *Id.*

The defendants' broader theory of preemption is inconsistent with California law.  To

begin, the relevant dicta in *Silvaco* concerns only the kinds of information in which California

law recognizes a property interest.  *See id.*  It accordingly has no bearing on what conduct

constitutes intrusion upon seclusion, a tort that does not require a taking of property.  *See* Mem.

Op. at 38.  Moreover, California decisions following *Silvaco* have consistently held that "UTSA

does not displace [common law] claims that, although related to a trade secret misappropriation,

are independent and based on facts distinct from the facts that support the misappropriation

claim."  *Angelica Textile Servs.*, 163 Cal. Rptr. 3d at 202; *accord Medipro Med. Staffing, LLC v.

Certified Nursing Registry, Inc.*, 2021 WL 387879, at *8 (Cal. Ct. App. Feb. 4, 2021).  Those

decisions make clear that the sole standard for CUTSA preemption is whether a common claim

has a distinct factual basis.  *See Medipro*, 2021 WL 387879, at *8 (noting that CUTSA

"displaces another civil remedy only if that remedy hinges upon, is predicated on, rests squarely

on, or is based entirely on allegations that a trade secret was misappropriated" (internal quotation marks omitted)). Finally, the defendants' theory of preemption is incompatible with CUTSA's text, which provides that the statute "does not affect . . . other civil remedies that are not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b). There is no reason to think that the California Supreme Court would construe that language to cover claims that have no relation to trade secrets.

Moreover, even if CUTSA preempted all claims "premised on the wrongful taking and use of confidential business and proprietary information," *Erhart*, 2020 WL 1550207, at *37, the defendants would still fall short. As discussed above, Broidy raises common law claims with respect to his both private and proprietary information. *See supra.* And the defendants have not identified a single case that found CUTSA to preempt misconduct involving personal, private information.[4] Nor have they offered any account of why a statute that regulates trade secrets would cover private information. Their preemption argument accordingly fails.

---

[4] *See PHL Assocs.*, 2020 WL 4012763, at *11 (concerned ownership of an antigen); *Angelica Textile Servs.*, 163 Cal. Rptr. 3d at 202 (concerned documents owned by an employer); *Silvaco*, 109 Cal. Rptr. 3d at 34–36 (concerned proprietary source code); *K.C. Multimedia*, 90 Cal. Rptr. 3d at 250–51 (concerned proprietary software); *Applied Biological Lab'ys, Inc. v. Diomics Corp.*, 2021 WL 4060531, at *1, 6 (S.D. Cal. Sept. 7, 2021) (concerned trade secrets related to an antiviral nasal spray); *Strategic Partners, Inc. v. FIGS, Inc.*, 2021 WL 4813645, at *5 (C.D. Cal. Aug. 10, 2021) (concerned commercial business information); *Glam & Glits*, 2021 WL 2317410, at *2, 10 (concerned proprietary information about a business' customers); *Snapkeys, Ltd. v. Google LLC*, 442 F. Supp. 3d 1196, 1206 (N.D. Cal. 2020) (concerned misappropriation of technology); *Erhart*, 2020 WL 1550207, at *38 (distinguishing a "disguised trade secrets claim," which was preempted, from a "data breach claim" that involved "nonpublic personal information," which was not); *UCAR Tech. (USA) Inc. v. Yan Li*, 2018 WL 2555429, at *1 (N.D. Cal. June 4, 2018) (concerned proprietary information and "trade secret technology"); *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1157 (E.D. Cal. 2017) (concerned proprietary source code); *Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1064 (N.D. Cal. 2017) (concerned a property interest arising under trade secret law); *ATS Prod., Inc. v. Champion Fiberglass, Inc.*, 2015 WL 224815, at *2 (N.D. Cal. Jan. 15, 2015) (concerned trade secrets used to produce resins); *Pyro-Comm Sys. Inc. v. W. Coast Fire & Integration Inc.*, 2015

For the reasons above, the defendants have failed to show that CUTSA preempts Broidy's remaining common law claims. The Court will accordingly deny their motion for reconsideration.[5]

### B.  A Narrower Protective Order Is Required

The Court will next consider Broidy's motion to reconsider the Protective Order issued on December 8, 2021. *See* Pls.' Mot. to Recons., Dkt. 102. The terms of that Order "largely track[] the protections adopted by the U.S. District Court for the Central District of Columbia . . . in a similar case." Minute Order of Dec. 8, 2021 (referencing *Broidy Cap. Mgmt. LLC v. Qatar*, No. 2:18-cv-2421 (C.D. Cal. Nov. 2, 2018)). As relevant here, those terms include designating the following information as "highly confidential," and thus for "attorney's eyes only (AEO):"

> [confidential] information which a Party in good faith reasonably believes contains or comprises (i) sensitive, non-public, financial, marketing, customer, regulatory, research, development, personal, or commercial information; (ii) information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, to the extent such material is produced; or (iii) any other information relating to the conduct by Qatar of its foreign policy.

Protective Order at 2, Dkt. 96. Broidy now moves to reconsider on the ground that the breadth of the AEO designation unduly compromises his "powerful interest in being able to . . . consult

---

WL 12765143, at *1 (C.D. Cal. Apr. 2, 2015) (concerned proprietary software and engineering templates); *New Show Studios LLC v. Needle*, 2014 WL 2988271, at *2 (C.D. Cal. June 30, 2014) (concerned "confidential client data and proprietary trade secret information"); *SunPower Corp. v. SolarCity Corp.*, 2012 WL 6160472, at *5, 10 (N.D. Cal. Dec. 11, 2012) (concerned "confidential information and non-confidential proprietary information"); *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 959 (C.D. Cal. 2011) (concerned commercial proprietary information).

[5] To the extent that CUTSA limits the factual findings through which Broidy could prevail on his common law claims, the Court will address that issue at either the summary judgment stage or in its jury instructions.

freely with an attorney."  *See* Pls.' Mot. to Recons. at 2 (quoting *Doe v. District of Columbia*, 697 F.2d 1115, 1119 (D.C. Cir. 1983)).

Broidy's motion relies principally on the D.C. Circuit's decision in *Doe v. District of Columbia*, 697 F.2d 1115 (D.C. Cir. 1983).  There, the Circuit held that "[d]istrict courts must be . . . chary of issuing protective orders that restrict the ability of counsel and client to consult with one another during trial or during the preparation therefor."  *Id.* at 1119.  It further held that courts may only issue such orders if the harm posed by disclosure is "substantial and serious;" the orders themselves are "narrowly drawn and precise;" and there is "no alternative means of protecting the public interest which intrudes less directly on [attorney-client relations]."  *Id.* (quoting *In re Halkin*, 598 F.2d 176, 191 (D.C. Cir. 1979)); *see also Keaveney v. SRA Int'l, Inc.*, 2017 WL 1842544, at *3 n.2 (D.D.C. May 3, 2017) (explaining that *Doe* controls even though the Supreme Court ultimately overruled *Halkin*).  The party requesting an AEO designation bears the burden of showing that those conditions are satisfied.  *See ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc.*, 2019 WL 8755131, at *10 (D.D.C. Nov. 25, 2019).

Upon review of its initial Protective Order, *Doe*, and the parties' submissions, the Court concludes that the current AEO designation is overbroad.  The plain terms of the designation, which cover confidential "non-public . . . information" and "information relating to the conduct by Qatar of its foreign policy," are neither narrowly drawn nor precise.  Protective Order at 2; *see Doe*, 697 F.2d at 1119.  In addition, although the defendants worry that Broidy will disclose sensitive discovery materials to the public, they have not substantiated that concern.  *See* Defs.' Opp'n to Pls.' Mot. to Recons. at 15–16, Dkt. 105.  Nor have they shown that Broidy would violate this Court's prohibition on unauthorized disclosure, *see* Protective Order at 14, which would risk "contempt proceedings and monetary sanctions," Minute Order of Dec. 8, 2021.

Finally, although there are practical advantages to mirroring the protective order that another district court issued to cover overlapping information, those advantages cannot overcome *Doe*'s requirement of narrower tailoring. The Court will accordingly grant Broidy's motion for reconsideration.

The Court will also adopt Broidy's proposed revisions to the protective order. Broidy proposed that only the following information be designated as "highly confidential:"

> [confidential] information which a Producing Party in good faith reasonably believes contains or comprises (i) highly sensitive, non-public, financial, marketing, customer, regulatory, research, development, personal, or commercial information that the party reasonably believes would result in competitive, commercial or financial harm to the disclosing party or its personnel, clients or customers, including, for example, current or future business strategies, secret processes or methodologies, proprietary research, and customer or client lists; or (ii) if the Producing Party is a sovereign state or any diplomatic or consular mission of a sovereign state, information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

Pls.' Proposed Am. Protective Order at 2, Dkt. 102-3. This narrower formulation captures only two categories of information. First, it captures information the release of which "would result in competitive, commercial or financial harm to the disclosing party" or its affiliates. *Id.* The requirement of a particularized harm ensures that the first clause of the formulation is "narrowly drawn and precise." *Doe*, 697 F.2d at 1120. From there, the second clause of the formulation is consistent with this Court's interpretation of the Vienna Conventions, which is set out in more depth below. *See* Section II.A *infra*. The Court finds that no greater protection is necessary to avoid the "substantial and serious" harms of disclosure. *Doe*, 697 F.2d at 1120. Accordingly, the Court will issue an amended Protective Order that adopts the above AEO designation.

## II.    MOTION TO COMPEL

The Court will now address Broidy's motion to compel, which challenges the defendants' attempt to withhold discovery based on privileges that are purportedly held by Qatar. *See* Pls.'

Mot. to Compel, Dkt. 109.  The defendants have withheld considerable discovery in reliance on

the Vienna Convention on Diplomatic Relations, the Vienna Convention on Consular Relations,

and principles of international comity.  *See, e.g.*, Decl. of Henry B. Brownstein Ex. 1 (Gregory

Howard's Resps. and Objs. to Pls.' First Reqs. for Produc. of Docs.) ¶¶ 1–5, 7, 9, 13, Dkt. 109-3;

*id.* Ex. 4 (Nicolas Muzin's Resps. and Objs. to Pls.' First Reqs. for Produc. of Docs.) ¶¶ 1–4, 7,

Dkt. 109-6; *id.* Ex. 7 (Joseph Allaham's Resps. and Objs. to Pls.' First Reqs. for Produc. of

Docs.) ¶¶ 1–6, 8, 11, Dkt. 109-9.  They argue that those authorities permit them to withhold all

"[d]ocuments created for Qatar, communications between [them] and Qatar, and

communications between [themselves] when they were acting as agents for Qatar."  Defs.'

Opp'n to Pls.' Mot. to Compel, at 12, Dkt. 115.  The Court disagrees.  For the reasons that

follow, the Court will hold that none of those authorities permit the defendants to withhold

discovery that is otherwise required under the Federal Rules of Civil Procedure.

### A.      The Defendants Are Subject To Discovery

This Court has previously held that none of the defendants are immune from suit.  As the

Court explained, the defendants lack immunity under the Foreign Sovereign Immunities Act

(FSIA) because they are not foreign states.  Mem. Op. at 10.  They lack "status-based immunity"

because they are neither "Qatari diplomats nor Qatari heads of state."  *Id.*  And they lack

"conduct-based immunity" because the State Department never granted them a suggestion of

immunity, because the State Department lacks an "established policy" of recognizing immunity

in similar circumstances, and because exercising jurisdiction over them would not "serve to

enforce a rule of law" against Qatar.  *Id.* at 11–17 (quoting *Samantar v. Yousuf*, 560 U.S. 305,

312 (2010), and *Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir. 2019)).  The D.C. Circuit

affirmed that the defendants "have not shown 'all the requisites for . . . immunity [to] exist[ ].'"

*Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 804 (D.C. Cir. 2021) (quoting *Samantar*, 560 U.S. at 311). That conclusion is thus the law of the case.

 Because the defendants lack sovereign immunity, they lack the resulting immunity from the "attendant burdens of litigation," *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 581 (D.C. Cir. 2020). That conclusion is consistent with the FSIA, under which a foreign state's immunity from discovery is generally coextensive with its immunity from suit. As the Supreme Court has observed, the FSIA "speaks of discovery only once, in a subsection requiring courts to stay discovery requests directed to the United States that would interfere with criminal or national-security matters." *Republic of Arg. v. NML Cap., Ltd.*, 573 U.S. 134, 142–43 (2014) (citing 28 U.S.C. § 1605(g)(1)). Aside from that provision, the FSIA limits discovery only insofar as it limits courts' subject-matter jurisdiction. *See* 28 U.S.C. § 1604. The same rule is true under the common law doctrines of status-based and conduct-based immunity. Those doctrines grant certain individuals immunity from suit, *see Lewis*, 918 F.3d at 145–46, and the accompanying "burdens of litigation," *Process & Indus. Devs.*, 962 F.3d at 581. But the defendants have not identified any authority in the common law that limits discovery against individuals who *are* subject to suit merely because they do business with foreign states. Such individuals, including the defendants, are accordingly subject to the same discovery rules as other civil litigants. *See* Fed. R. Civ. P. 26(b)(1) (allowing discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case").

### B.    The Vienna Conventions Do Not Shield The Defendants From Discovery

The Vienna Convention on Diplomatic Relations (VCDR) does not separately shield the defendants from discovery. The defendants argue that certain documents they received from

Qatar are protected under Article 24 of that Convention, which provides that "[t]he archives and documents of the [diplomatic] mission shall be inviolable at any time and wherever they may be."  VCDR, Dec. 13, 1972, 23 U.S.T. 3227, art. 24.  But the phrase "documents of the mission" refers most naturally to documents that either belong to or are possessed by a mission, at the exclusion of those that have been delivered to their intended recipient.  *See* Webster's Ninth New Collegiate Dictionary 819 (1990) (noting that "of" may "indicate belonging or a possessive relationship").  That interpretation of the phrase most closely tracks the Article's concern with the theft or seizure of diplomatic materials, as reflected in its use of the term "inviolable," 23 U.S.T. 3227, art. 24.  *See* Black's Law Dictionary 955 (10th ed. 2014) (defining the term to mean "[s]afe from violation; incapable of being violated").  It is also consistent with the law of sovereign immunity, as discussed above, under which an entity's immunity from discovery is generally coextensive with its immunity from suit.  Here, Broidy does not seek any documents in Qatar's possession, and the defendants offer only conclusory statements that the requested documents belong to Qatar.  *See* E. Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 162 (4th ed. 2016) (noting "that correspondence to or documents supplied to a third party not being a member of the diplomatic mission . . . would normally become the property of the recipient").  In addition, the following structural considerations confirm that the documents at issue are no longer "of the mission," as that phrase is used in Article 24.[6]

 To begin, surrounding provisions of the VCDR strongly suggest that documents freely given to non-mission parties fall outside the Convention's scope.  This is because those

---

[6] The Court need not decide whether the Article's protections extend to documents held by bailees of diplomatic missions, *e.g.*, private companies that maintain their computer servers.

provisions share a common aim of protecting diplomatic missions and their members from harassment and interference.  For example, they provide that the "premises of [] mission[s] shall be inviolable," *id.* art. 22; that missions are exempt from certain taxes, *see id.* art. 23; that missions' members must enjoy "freedom of movement and travel," *id.* art. 26; that missions themselves must be permitted "free communication . . . for all official purposes," *id.* art. 27, § 1; that the "person[s] of [] diplomatic agent[s] shall be inviolable," *id.* art. 29.  None of those provisions extend protections to private citizens of what the Convention refers to as the "receiving State."  *See, e.g.*, *id.* art. 3 § 1(a).  Indeed, one of them specifically provides that the Convention's exemption from taxation does not apply to persons merely "contracting with" the mission.  *See id.* art. 23, § 2.  That surrounding provisions in the VCDR focus solely on the rights of missions and their members weighs heavily against reading Article 24 to shield non-mission parties, including the defendants in this case, from civil discovery.  *See Gutierrez v. Ada*, 528 U.S. 250, 254–55 (2000); *Pharm. Mfg. Rsch. Servs., Inc. v. FDA*, 957 F.3d 254, 261 (D.C. Cir. 2020).

The discovery rules in Article 31 also weigh against the defendants.  That Article confers immunity from all "criminal jurisdiction" and most "civil and administrative jurisdiction," *id.* art. 31, § 1, as well as from "giv[ing] evidence as a witness," *id.* art. 31, § 2.  But the plain text of the Article grants that immunity only to "diplomatic agent[s]," *id.* art. 31, which the Convention defines as either "head[s]" or "member[s]" of a mission's "diplomatic staff," *id.* art. 1(e).  The defendants in this case are not diplomatic agents.  And where a statute confers a benefit on one group expressly, there is little reason to think that it also confers a related privilege on a different group by implication.  *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018); *see also Republic of Arg.*, 573 U.S. at 143 (holding that a "plain statement [is] necessary to preclude application of

federal discovery rules" (internal quotation marks omitted)).  The structure of the Convention thus favors reading Article 24 to exclude material that Qatar sent to the defendants.

The defendants' contrary interpretation of Article 24 does not persuade.  The defendants argue that "documents of the mission" means "documents [relating to or about] the mission." *See* Defs.' Opp'n to Pls.' Mot. to Compel at 15.  But that approach would extend Article 24 to all documents that merely describe a mission's conduct, even those that were created by journalists, academics, or other private citizens.  That outcome would be far afield from the Article's aim to "ensure the efficient performance of the functions of diplomatic missions."  23 U.S.T. 3227, pmbl.  Moreover, although the defendants emphasize that the Article's protections extend to documents "wherever they may be," Defs.' Opp'n to Pls.' Mot. to Compel at 14 (quoting 23 U.S.T. 3227, art. 24), that phrase is best read to provide only that a mission's documents retain their inviolability even if they are lost or stolen.  *See* Denza, Diplomatic Law 156–59 (discussing the phrase's drafting history).  It accordingly provides no support to the defendants' position here.

Moreover, Qatar has failed to show that Article 27 of the VCDR provides the defendants any greater protection than Article 24.  *See* Qatar's Statement of Interest Regarding Pls.' Mot. to Compel at 6, Dkt. 114; Qatar's Statement of Interest Regarding Pls.' Mot. to Recons. at 11, Dkt. 107.  Article 27 provides that "[t]he official correspondence of the mission shall be inviolable" and defines "[o]fficial correspondence [to] mean[] all correspondence relating to the mission and its functions."  23 U.S.T. 3227, art. 27 § 2.  The phrase "correspondence of the mission" in that Article mirrors the phrase "documents of the mission" in Article 24.  *See supra.*  Federal courts generally aim to give terms a "consistent meaning throughout [a statute or treaty.]"  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995).  And here, for the reasons discussed above, that approach

15

favors reading "correspondence of the mission" to mean correspondence that belongs to or is possessed by a mission, at the exclusion of that which has been successfully delivered to a non-mission recipient.  *See* Webster's Ninth New Collegiate Dictionary 819 (defining "of").  Indeed, that conclusion is clearer under Article 27 than under Article 24.  Because the former provision defines "official" to mean "relating to the mission and its functions," 23 U.S.T. 3227, art. 27 § 2, the same meaning cannot attach to its phrase "of the mission," at risk of surplusage.  *See D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932).  In that respect, the definition precludes reading "of the mission" to mean "relating to the mission," as the defendants suggested in the context of Article 24.  *Cf.* Defs.' Opp'n to Pls.' Mot. to Compel at 15.

The same analysis applies with respect to the defendants' reliance on the Vienna Convention on Consular Relations (VCCR).  *See* Defs.' Opp'n to Pls.' Mot. to Compel at 14. Article 33 of that Convention provides that "consular archives and documents shall be inviolable at all times and wherever they may be."  VCCR, Jan. 1, 1970, 21 U.S.T. 77, art. 33.  Another clause of that Convention, in turn, defines "consular archives" to include "all the papers, documents, correspondence, books, films, tapes and registers of the consular post."  *Id.* art. 1 § 1(k).  The phrase "[documents] of the consular post" mirrors the VCDR's phrase "documents of the mission."  23 U.S.T. 3227, art. 24.  The VCCR also mirrors the VCDR in providing that its documents "shall be inviolable at all times and wherever they may be."  21 U.S.T. 77, art. 33; *accord* 23 U.S.T. 3227, art. 24.  Moreover, the defendants appear to assume that the two Conventions provide identical protections.  *See* Defs.' Opp'n to Pls.' Mot. to Compel at 14–18. In particular, although they argue that their communications with Qatar are "documents of the mission," they make no separate argument for why they are "consular documents."  *See id.*

Accordingly, for the reasons discussed above, the Court holds that the defendants may not claim any privilege under Article 33 of the VCCR.[7]

The disclosure obligations in the Foreign Agents Registration Act (FARA) confirm that neither Convention applies here. That statute requires agents of foreign principals to register with the Attorney General, to keep "such . . . records" as he may prescribe, and to make those records available for his "inspection." 22 U.S.C. §§ 612(a), 615. Pursuant to that statute, the Attorney General requires registrations to keep "[a]ll correspondence . . . and other written communications to and from all foreign principals and all other persons, relating to the registrant's activities on behalf of, or in the interest of any of his foreign principals." 28 C.F.R. § 5.500(a)(1). Those are among the kinds of documents that the defendants seek to shield from discovery under the Vienna Conventions. *See* Defs.' Opp'n to Pls.' Mot. to Compel at 12. But if the defendants' interpretation of the Conventions were correct, the Attorney General could not inspect those documents under FARA. *See 767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 300 (2d Cir. 1993) (noting that "inviolable . . . makes no provision for exceptions"). And it is well-settled that "a treaty and an earlier statute should be interpreted as consistent" "to the extent reasonably possible." *Am. Broad. Co. v. FCC*, 191 F.2d 492, 499 (D.C. Cir. 1951). Accordingly, because FARA permits the Attorney General

---

[7] The Court will not separately discuss Article 35 of the VCCR and Article 30 of the VCDR. *See* Qatar's Statement of Interest Regarding Pls.' Mot. to Compel at 6. Neither the defendants nor Qatar have offered a non-conclusory argument for applying them in this case. Moreover, Article 35 of the VCCR is virtually identical to Article 27 of the VCDR, such that it is readily subject to the above analysis. 21 U.S.T. 77, art. 35 § 2 (providing that "[t]he official correspondence of the consular post shall be inviolable," and that "[o]fficial correspondence means all correspondence relating to the consular post and its functions"). Finally, Article 30 of the VCDR, which, as relevant here, protects diplomatic agents' papers, is plainly narrower than the provisions on which the defendants affirmatively rely. 23 U.S.T. 3227, art. 30 § 2 (providing that an agent's "papers, correspondence and . . . property, shall likewise enjoy inviolability").

to inspect the defendants' communications with Qatar, it further confirms that those communications fall outside the Conventions' scope.[8]

At least two other courts have reached this conclusion.  A federal district court in the Southern District of New York determined, in an earlier case involving the parties' dispute, that "neither the FSIA nor the Vienna Conventions protect sovereign entities from civil discovery collected from non-agent third parties."[9]  Order, *Broidy Capital Mgmt. LLC et al v. Allaham*, No. 1:18-cv-240 (S.D.N.Y. June 11, 2018) (order granting motion to compel).  And the House of Lords of the United Kingdom took a related position in interpreting the inviolability due to documents of the since-collapsed International Tin Council, which it treated as coextensive with the inviolability conferred under Article 24 of the VCDR.  *See* Shearson Lehman Bros Inc v. Maclaine Watson & Co Ltd. (Int'l Tin Council Intervening) [1988] 1 All ER 116 (HL) 118, 125, *reproduced in* Brownstein Decl. Ex 14, Dkt. 109-16.  In particular, the Lords held that a "document communicated to a third party by an officer or employee of the [Council] with actual authority, express or implied, or with ostensible authority, no longer belongs to the [Council] and hence no longer enjoys inviolability."  *Id.* at 125.  That holding is relevant here because, in "interpreting any treaty, [t]he opinions of our sister signatories . . . are entitled to considerable

---

[8] FARA is consistent with this Court's interpretation of the Vienna Conventions because it exempts "diplomatic [and] consular officer[s]" from its scope.  22 U.S.C. § 613(a).

[9] The parties dispute whether the Southern District of New York squarely addressed the meaning of the Vienna Conventions.  *See* Defs.' Opp'n to Pls.' Mot. to Compel at 20–21; Qatar's Statement of Interest Regarding Pls.' Mot. to Compel at 14–15.  But that court reached the same conclusion after being presented with many of the arguments that the parties raise in this case. *See Broidy Capital Mgmt.*, No. 1:18-cv-240 (S.D.N.Y. June 8, 2018) (Qatar's discovery dispute letter), at 3–4; *Broidy Capital Mgmt.*, No. 1:18-cv-240 (S.D.N.Y. June 9, 2018) (Broidy's discovery dispute letter), at 2.  Moreover, contrary to the defendants' suggestion, the court's conclusion regarding the Vienna Conventions was independent from its discussion of forfeiture. *See Broidy Capital Mgmt.*, No. 1:18-cv-240 (S.D.N.Y. June 11, 2018) (order granting motion to compel), at 1–2.

weight." *Abbott v. Abbott*, 560 U.S. 1, 16 (2010) (internal quotation marks omitted).  And under

that holding, any documents communicated to the defendants by Qatar or its agents "no longer

belong[] to [Qatar] and hence no longer enjoy[] inviolability."  *Cf.* Shearson Lehman Bros 1 All

ER 116 (HL) 125.

      In contrast, the Court has found no authority that supports the defendants' view.  The

Second Circuit's decision in *767 Third Avenue Associates* concerned the VCDR's protections for

the "premises of [a] mission," 23 U.S.T. 3227, art. 22, as opposed to its "archives and

documents," *id.* art. 24.  *See* Defs.' Opp'n to Pls.' Mot. to Compel at 13–14.  The Ninth Circuit's

decision in *Taiwan v. United States District Court for the Northern District of California*, 128

F.3d 712 (9th Cir. 1997), concerned an effort to depose the deputy director of an entity that was

itself immune from suit, *see id.* at 714–16.  *See* Defs.' Opp'n to Pls.' Mot. to Compel at 18.

Many of Qatar's cases concern the treatment of documents possessed by foreign embassies or

consulates, as opposed to third-party contractors.  *See, e.g.*, *In re Terrorist Attacks on Sept. 11,

2001*, 2019 WL 3296959, at *2 (S.D.N.Y. July 22, 2019); *Ewald v. Royal Norwegian Embassy*,

2013 WL 6094600, at *5–6 & n.5 (D. Minn. Nov. 20, 2013); *see also* Qatar's Statement of

Interest Regarding Pls.' Mot. to Recons. at 8, 12.  Finally, although the defendants draw an

analogy to attorney-client privilege, *see* Defs.' Opp'n to Pls.' Mot. to Compel at 12 (citing

*Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612 (7th Cir. 2010)), the operation of that

privilege weighs against their position.  "Voluntary disclosure waives the attorney-client

privilege because it is inconsistent with the confidential attorney-client relationship."  *United

States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010).  Similarly here, sending a consular

document to an American lobbyist or media strategist subjects it to civil discovery because doing

so places the document outside the realm of privileged, diplomatic communication.

Moreover, to the degree that other government entities have addressed this issue, their positions weigh against the defendants.  *See Starr Int'l Co. v. United States*, 910 F.3d 527, 537 (D.C. Cir. 2018) (holding that "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight").  On this issue, both parties discuss a 2002 effort by the House Committee on Government Reform to obtain documents regarding the Embassy of Saudi Arabia through affiliated American lobbying firms.  *See* Pls.' Mot. to Compel at 11–13; Qatar's Statement of Interest on Pls.' Mot. to Compel at 7–9.  The "documents in question were records relating to professional services performed for the Embassy," and the lobbyists "refused to comply with the [Committee's subpoenas] on the ground that the documents requested were 'archives and documents of the mission.'"  Denza, Diplomatic Law 162 (quoting 23 U.S.T. 3227, art. 24).  The Committee rejected that argument, *see id.*, and the Committee's Chairman wrote separately that there was "no support" for shielding the subpoenaed records under the Vienna Convention, Brownstein Decl. Ex. 12 (Chairman Burman letter) at 9, Dkt. 109-14.  The State Department, in turn, did not take a position on the controversy.  *See* Letter from Paul V. Kelly, U.S. Dep't of State, to Dan Burton, Chairman, House Comm. on Gov't Reform (Dec. 4, 2002), in Hearings Before the House Comm. on Gov't Reform, No. 107-83, at 1467–70.  Instead, it remarked in general terms that the Vienna Conventions do not protect "U.S. citizens who are not attached to a foreign mission and who might be recruited by foreign missions [for] illegal activities," *id.* at 1467–68—a description that covers the conduct alleged in this case.  The Department also added that it has previously invoked the Conventions to shield foreign nationals that "fill [U.S.] embassy positions" or engage in embassy construction, *id.* at 1468—a concern that does not extend to the defendants in

this case, who do not meet those descriptions.  The Court thus understands the views of both the House Committee and the State Department to favor its interpretation of the Conventions.

For the reasons above, the Court holds that the Vienna Conventions do not apply to any documents or communications in the defendants' possession.  Accordingly, the defendants may not rely on those Conventions to withhold discovery that is otherwise required under the Federal Rules.

### C.    No Related Doctrine Shields The Defendants From Discovery

The defendants' reliance on international comity also fails.  *See* Defs.' Opp'n to Pls.' Mot. to Compel at 18–20.  There is no freestanding comity exception from the Federal Rules of Civil Procedure.  And although the Supreme Court has "long recognized the demands of comity in suits involving foreign states," *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987), neither the defendants nor Qatar have identified any authority that relies on comity to shield private, American parties from discovery.  Instead, their cases involved suits against foreign sovereigns, *see Republic of Arg.*, 573 U.S. at 146 n.6; *In re Terrorist Attacks*, 2019 WL 3296959, at *4–6; *Omari v. Ras Al Khaimah Free Trade Zone Auth.*, 2017 WL 3896399, at *7 (S.D.N.Y. Aug. 18, 2017); suits against corporations owned by foreign sovereigns, *see Aerospatiale*, 482 U.S. at 546; and efforts to obtain discovery from either foreign sovereigns or comparable supranational bodies, *see In re Rubber Chemicals Antitrust Litig.*, 486 F. Supp. 2d 1078, 1081–84 (N.D. Cal. 2007) (European Commission); *In re Payment Card Interchange Fee Antitrust Litig.*, 2010 WL 3420517, at *6–10 (E.D.N.Y. Aug. 27, 2010) (same). *See* Qatar's Statement of Interest Regarding Pls.' Mot. to Compel at 4–5.  Moreover, the defendants have not argued that any discovery in this case would violate any Qatari law or

circumvent Qatar's own discovery procedures. *See Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir.

1960).  Comity accordingly provides no barrier to discovery in this case.

    The Court would reach the same result under the balancing test that the Supreme Court

endorsed in *Aerospatiale* as "relevant to any comity analysis," 482 U.S. at 544 n.28.  That test

considers:

> (1) the importance to the . . . litigation of the documents or other information requested;
> (2) the degree of specificity of the request; (3) whether the information originated in the
> United States; (4) the availability of alternative means of securing the information; and
> (5) the extent to which noncompliance with the request would undermine important
> interests of the United States, or compliance with the request would undermine
> important interests of the state where the information is located.

*Id.* (citation omitted).  Here, the category of documents that the defendants seek to withhold—

"[d]ocuments created for Qatar, communications between [them] and Qatar, and

communications between [themselves] when they were acting as agents for Qatar," Defs.' Opp'n

to Pls.' Mot. to Compel, at 12—are central to the litigation.  Broidy's discovery requests for

them are sufficiently specific, especially considering that he submitted them to individual

American citizens, rather than Qatar itself.  The information at issue "originated in the United

States."  *Id.* at 20.  There is no other means of obtaining the defendants' communications with

Qatar and each other, which are central to the allegations in Broidy's complaint.  *See* Compl.

¶¶ 1–2, 199.  Shielding those communications from discovery would frustrate the vindication of

interests that Congress and the State of California have specifically protected by statute, whereas

Qatar has only an indirect interest in this case.  And finally, although the Supreme Court had no

occasion to mention this consideration in *Aerospatiale*, the Court places considerable weight on

the fact that Broidy seeks to obtain discovery from individual American citizens rather than a

foreign entity—let alone a foreign state.  There is accordingly no comity defense here.

The defendants' reference to the deliberative process privilege rests on even shakier ground. To begin, the defendants forfeited any reliance on that privilege by relegating it to a single, cursory sentence of their opposition brief. *See* Defs.' Opp'n to Pls.' Mot. to Compel at 19; *see also Pub. Serv. Elec. & Gas Co. v. FERC*, 485 F.3d 1164, 1170 (D.C. Cir. 2007); *United States v. Hall*, 370 F.3d 1204, 1209 (D.C. Cir. 2004). And because Qatar is present in this case only as an *amicus curiae*, *see* Minute Order of Dec. 8, 2021, it lacks the capacity to preserve arguments on the defendants' behalf. *See New Jersey v. New York*, 523 U.S. 767, 781 n.3 (1998); *Eldred v. Ashcroft*, 255 F.3d 849, 851 (D.C. Cir. 2001) (en banc) (collecting cases). In any event, neither the defendants nor Qatar have identified any authority that employed the deliberative process privilege to shield documents held by a private, non-governmental entity. That is hardly surprising, as the "ultimate purpose" of the privilege "is to prevent injury to the quality of agency decisions by allowing *government officials* freedom to debate alternative approaches in private." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (emphasis added) (internal quotation marks omitted); *see also id.* (noting that the privilege "allows *the government* to withhold documents" (emphasis added)). Finally, even if private parties could invoke the privilege in certain circumstances, it strains credulity to suggest that Qatar engaged the defendants—who work in lobbying and public relations—in formulating its foreign policy. *See id.* (noting that material protected by the privilege "must be predecisional"). At a minimum, the defendants have made no showing to that effect. The defendants accordingly have no basis for relying on the deliberative process privilege.

The defendants' remaining arguments lack merit. First, requiring the defendants to produce documents and answer interrogatories does not subject Qatar to the "attendant burdens of litigation," *Broidy Cap. Mgmt.*, 12 F.4th at 804. *See* Defs.' Opp'n to Pls.' Mot. to Compel at

13.  After all, Qatar is not a party to this case.  *See generally* Compl.  The plaintiffs have not attempted to subpoena Qatar or seek relief against it.  The defendants have not argued that Qatar is the real party in interest, *see Samantar*, 560 U.S. at 324–25—nor could they, as the complaint alleges discrete misconduct by the defendants.  And the defendants have not argued that Qatar is a necessary or indispensable party, *see* Fed. R. Civ. P. 19(a)–(b)—an effort that would fail for the reasons outlined above.  In short, Broidy's effort to obtain discovery from the defendants in order to support his claims against the defendants in no way compromises the immunity of an absent sovereign.

Finally, the defendants may not avoid an adverse ruling on this issue through gestures to ripeness and Article III standing.  The defendants argue that "Broidy seeks an improper advisory opinion regarding the scope of the Vienna Conventions" insofar as he does not identify a discrete document that he would be able to obtain but for the defendants' litigation position.  Defs.' Opp'n to Pls.' Mot. to Compel at 3.  But the defendants referred to the Vienna Conventions in their "specific objection[s]" to almost all of Broidy's discovery requests.  *See, e.g.*, Howard's Resps. and Objs. ¶¶ 1–5, 7, 9, 13; Muzin's Resps. and Objs. ¶¶ 1–4, 7; Allaham's Resps. and Objs. ¶¶ 1–6, 8, 11.  If the defendants had prevailed on their interpretation of the Conventions, they would clearly have been entitled to withhold otherwise discoverable information.  And as a practical matter, it appears that the defendants have yet to produce *any* documents in discovery.  *See* Pls.' Statement in Reply to Defs.' Notice of Non-Opposition, Dkt. 141.  The Court thus sees no ground for postponing its ruling on this issue.

For the reasons above, the Court holds that neither the Vienna Conventions nor principles of international comity permit the defendants to withhold discovery that is otherwise required

under the Federal Rules of Civil Procedure.  The Court will accordingly grant Broidy's motion to compel.

## CONCLUSION

For the foregoing reasons, the defendants' Motion for Reconsideration, Dkt. 98, is denied and the plaintiffs' Motion for Reconsideration, Dkt. 102, and Motion to Compel, Dkt. 109, are granted.  A separate order consistent with this decision accompanies this memorandum opinion.


DABNEY L. FRIEDRICH
United States District Judge

June 2, 2022