# Exhibit 4

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THREE ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1344 | Misc. Action No. 18-sc-322 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**FILED UNDER SEAL** |

**PARTIAL UNSEALING ORDER**

Pending before the Court is a request by the government for partial unsealing of two

Memorandum Opinions and the contemporaneous Orders issued in 2018 and 2019, respectively.

Gov't's Status Report Regarding Unsealing of Two Memorandum Opinions (dated Dec. 13,

2021), ECF No. 41. This request is granted.

The first Memorandum Opinion, issued on June 26, 2018, ("2018 Memorandum

Opinion"), ECF No. 9, and Order ("2018 Order"), ECF No. 8, resolved the government's *ex*

*parte*, sealed motion submitted a week earlier seeking authorization to review certain privileged

communications seized pursuant to a search warrant, under 18 U.S.C. § 2703(a) & (b).

Subsequently, at the government's requests, the 2018 Order and a redacted portion of the 2018

Memorandum Opinion were unsealed for the limited purpose of providing copies to counsel for

certain subjects of the investigation. *See* Orders, ECF Nos. 13 and 15.

In response, certain subjects moved for, *inter alia*, reconsideration of the 2018

Memorandum Opinion and Order and for unsealing of the remainder of the 2018 Memorandum

Opinion, which motion was resolved in the second sealed Memorandum Opinion, issued on

April 18, 2019 ("2019 Memorandum Opinion"), ECF No. 36, and Order ("2019 Order"), ECF

No. 35, granting in part and denying in part the relief requested.  The parties were directed to

submit, within 30 days of the return of any indictment against the subjects, a declaration

decision, or a lapse in the statute of limitations period, a joint report advising whether any

portions of the 2018 or 2019 Memorandum Opinions may be unsealed in whole or in part and, if

so, proposing any redactions. *See* 2019 Order.

On December 8, 2020, at the request of the parties, the Court unsealed additional portions

of the 2018 and 2019 Memorandum Opinions, after certain information became publicly

available following the entry of three guilty pleas and the filing of a civil forfeiture complaint

involving individuals named in the 2018 and 2019 Memorandum Opinions. *See* Order, ECF No.

40. The Court also directed the government to submit by the earlier of December 17, 2021, or

within 30 days of when any public disclosure obviates the need for further sealing, a status report

advising whether any portions of the 2018 or 2019 Memorandum Opinions may be further

unsealed and, if so, proposing any redactions. *Id.* at 2.

On December 13, 2021, the government submitted the pending request to unseal in

redacted form the 2018 and 2019 Memorandum Opinions and 2018 and 2019 Orders, indicating

that the government returned an indictment against two individuals and that the indictment

encompasses conduct referenced in the 2018 and 2019 Memorandum Opinions that has not yet

been unsealed. *See* Status Report at 3, ECF No. 41. Upon consideration of the Status Report, it

is hereby

**ORDERED** that this Order, along with the Redacted 2018 and 2019 Memorandum

Opinions and Redacted 2018 and 2019 Orders attached to this Order, be unsealed and posted for

public access on the appropriate part of the Court's website; and it is further

**ORDERED** that the government shall file, by the earlier of December 13, 2022, or

within thirty days of when any public disclosure obviates the need for further sealing, a status

report advising the Court whether the 2018 Memorandum Opinion, ECF No. 9, the 2018 Order,

ECF No. 8, the 2019 Memorandum Opinion, ECF No. 36, and the 2019 Order, ECF No. 35, may

be further unsealed and, if so, proposing any redactions to be made prior to any unsealing.

**SO ORDERED.**

Date: December 13, 2021

*Beryl A. Howell*

BERYL A. HOWELL
Chief Judge

# ATTACHMENT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
THREE ACCOUNTS STORED AT
PREMISES CONTROLLED BY GOOGLE,
INC. FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. § 1344

Misc. Action No. 18-sc-322 (BAH)

Chief Judge Beryl A. Howell

**FILED UNDER SEAL**

### MEMORANDUM OPINION

Pending before the Court is the government's *Ex Parte, In Camera* Application Seeking

Authorization to Review Certain Attorney-Client ▐▐▐▐ Communications between and

among ▐▐▐▐▐, ▐▐▐▐▐▐▐ Elliott Broidy, Nickie Lum Davis, Prakazrel

("Pras") Michel, Low Taek Jho ("Jho Low"), ▐▐▐▐▐▐▐, and their agents

("Gov't Mot."), ECF No. 7. The communications were obtained by the government, pursuant to

a February 8, 2018, search warrant, issued under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and

2703(c)(1)(A), requiring Google, Inc., and eNom, Inc., to disclose to the government and

authorizing the government to review the contents of email accounts associated with Nickie Lum

Davis, ▐▐▐▐▐, and Pras Michel, *see* ▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐, and from the voluntary production

to the Federal Bureau of Investigation ("FBI"), by Broidy and ▐▐▐▐'s attorney in a

separate matter, of forty-one emails from Broidy's and ▐▐▐▐'s personal and business

email accounts, *see* Gov't Mot. at 23–29.

In the course of reviewing records returned by the February 8, 2018, search warrant, the

government's filter team identified "several retainer agreements involving ▐▐▐▐▐▐,

██," and "[o]ut of an abundance of caution, the investigative team has neither accessed any communications involving ██████ nor confronted ██████, Broidy, or Lum Davis." Gov't Mot. at 4. Attorneys from the filter team now seek an order authorizing the investigative team to access communications involving ██████ and the alleged illegal schemes, "confront ██████, ██ purported clients, and ██████ Broidy, with the facts recited herein, and take any other investigative steps needed to complete its investigation." *Id.* at 4–5.

In support of this motion, the government argues that "no legitimate attorney-client relationship existed" between ██████ and ██ purported clients and that, "[i]n the alternative," "the crime-fraud exception applies to any past and future communications made in furtherance of the crimes and schemes" described below. *Id.* at 18. In addition, the government contends that Broidy and ██████ waived any claim to attorney-client privilege ██████ ██████ by voluntarily disclosing certain documents to the FBI in connection with an unrelated matter. *Id.* at 23–29. Based on an *ex parte*, *in camera* review of the government's motion and the attached exhibits, the Court finds that the government has made a *prima facie* showing that the crime-fraud exception to the attorney-client privilege applies and, with respect to the communications voluntarily provided to the FBI, that Broidy and ██████ waived the protections of the attorney-client ██████ privileges.

## I.     BACKGROUND

The government's motion paints a detailed picture of several schemes to influence the United States government on behalf of foreign interests. At the center of these schemes are Elliott Broidy, ██████████████████████████████████████, and ██████ ██████████████████████████████████. The relevant details are presented below.

2

### A.   Efforts to Benefit Malaysian National Low Taek Jho

#### 1.   *Legal Arrangement between Jho Low and* ███████████

Jho Low is a Malaysian national, who is allegedly involved in the money laundering of

billions of U.S. dollars from 1Malaysia Development Berhad ("1MDB"), a "strategic investment

and development company wholly-owned by the government of Malaysia." Gov't Mot., Ex. 20,

*United States v. Certain Rights To & Interests In the Viceroy Hotel Group*, No. 17-cv-4438 (C.D.

Cal. filed June 15, 2017), Complaint for Forfeiture *In Rem* ("Forfeiture Compl.") ¶ 6; *see also*

███████████. Jho Low and other individuals are currently subject to civil forfeiture and

criminal proceedings in the United States. *See generally* Forfeiture Compl.; ███████████. In

late 2016, Low's brother, ███████████, asked his acquaintance, Pras Michel, a businessman

in the entertainment industry, to assist Jho Low in finding legal representation to help with those

civil and criminal proceedings in the United States. Gov't Mot., Ex. 6, ███████████

███████████. Michel offered to look

for firms on Jho Low's behalf. *Id.*; Gov't Mot., Ex. 10, ███████████

███████████; Gov't Mot., Ex. 8, ███████████

███████████.

Michel then spoke with his acquaintance, Nickie Lum Davis, an individual with

"connections to ███████ or the ███████ Party," ███████████, about Jho Low's

case without mentioning Jho Low's name. ███████████. Lum Davis told Michel

about the ███████████, which she described as "a reputable law firm that employed great

attorneys who dealt with large cases at DOJ." ███████████. Lum Davis knew the ███████

███████████, Elliott Broidy and ███████████. *Id.* Michel relayed this

information to ███, who indicated that Jho Low was "interested." *Id.* Michel then flew to China

in February or March 2017 to meet with Jho Low, at which meeting Jho Low told Michel, "I

3

need someone who can talk to the DOJ to get this thing dismissed or move it along." ▮▮▮▮

▮▮▮▮; *see also* ▮▮▮▮. Michel allegedly "explained that Broidy has a ▮▮▮▮

▮▮▮▮, and that Broidy is a chairman in the ▮▮▮▮

▮▮▮▮." ▮▮▮▮. Lum Davis subsequently facilitated an in-person meeting

between Michel and Broidy in Los Angeles, at which meeting Michel "mentioned Low's name

to Lum and Broidy for the first time and explained that he had some legal issues about money

related to the 1MDB scandal." ▮▮▮▮; ▮▮▮▮. Broidy

represented that he would "consult on the matter and ▮▮▮▮" ▮▮▮▮

▮▮▮▮. Broidy is not a lawyer and is not a partner at ▮▮▮▮. *See* Gov't

Mot., Ex. 33, ▮▮▮▮

▮▮▮▮; Gov't Mot., Ex. 7, ▮▮▮▮

▮▮▮▮.

    Around the same time, Michel reached out to another acquaintance, George

Higginbotham, who had in the past "performed some 'episodic' legal work for Michel," to ask

Higginbotham about Broidy and the ▮▮▮▮. ▮▮▮▮. At the

time, Higginbotham was a congressional liaison for oversight matters at the DOJ Office of

Justice Programs. *Id.* ▮▮▮. Michel allegedly told Higginbotham that "the change in

administration meant that there would be changes in prosecutors, and [Broidy] could not do

anything until there were new appointments in place." Gov't Mot., Ex. 9, ▮▮▮▮

▮▮▮▮. Broidy had told Michel that "someone was

going to be appointed ▮▮▮▮ ▮▮▮▮

Jho Low. *Id.* Higginbotham agreed to assist Michel in facilitating Low's relationship with

███████ and to advise on a retainer agreement between ████ and Jho Low, among other various legal work for Michel.  *See* ███████████████.

On March 12, 2017, ██████—the owner of ██████████—sent Lum Davis a Retainer and Fee Agreement between the firm and Jho Low.  Under this agreement, an executed copy of which is not included in the proffered exhibits, the firm agreed to provide Jho Low with "all legal services reasonably required to represent" Jho Low in connection with forfeiture proceedings filed in the Central District of California and "[a]ll other Forfeiture *In Rem* actions filed by the United States of America . . . which apply to" Jho Low, in exchange for a nonrefundable $8 million retainer fee and a $50 million to $75 million success fee.  Gov't Mot., Ex. 13, Email from ███████ to Lum Davis, Mar. 12, 2017, Attach. 1, Retainer and Fee Agreement ("Jho Low/████ Agreement") at 1–3, 6. ███████ also sent Lum Davis a Consulting Services Agreement between ███████ and Lum Davis, indicating that "████ has been engaged to render litigation services to [ ] Jho Low" and that Lum Davis would "render Consulting Services to ████ with regard to the Matter" described in the Jho Low/████ Agreement—that is, assistance with the forfeiture proceedings.  Gov't Mot., Ex. 13, Email from ███████ to Lum Davis, Mar. 12, 2017, Attach. 2, Consulting Services Agreement ("Lum Davis/████ Agreement") at 1.  This agreement indicated that "[a]ll work product produced by [Lum Davis] for ████ shall be Attorney-Client Privileged and owned by ████," *id.*, and also awarded to Lum Davis 25 percent of the fees paid to ████ under the Jho Low/████ Agreement, *id.* at 1–2.

The Jho Low/████ Agreement made its way to Michel, who also provided Higginbotham with a copy of the proposed Agreement.  *See* ███████████████; ███████████████ Retainer and Fee Agreement ("Jho Low/████ Agreement") at

1. Michel instructed Higginbotham to change the Agreement to list Anicorn LLC, a company established by Michel, rather than Jho Low, and to "leave Low's name off of the retainer agreement." ████████████████. Michel and Higginbotham agreed to use the code name "Wu" in reference to Low. *Id.* ██ Higginbotham then provided Michel with a consulting agreement between Anicorn and "Client," stating that Client would assist in the resolution of the same civil forfeiture matters listed in the Jho Low/████ Agreement and providing for a $25 million retainer fee and a $300 million "success fee" that "Client" would pay to Anicorn regardless of the outcome of the services rendered. ████████████████, Retainer and Fee Agreement ("Anicorn/Client Agreement") at 1–2. According to Higginbotham, Michel told him that "while Broidy was still confident of success, movement on Jho Low's case was delayed pending transition appointments, such as the ████████████████."

████████████████. Michel also informed Higginbotham that "Broidy would not lift a finger until he had received his $8 million per the agreement." *Id.* In May 2017, Michel, Lum Davis, and Broidy traveled together to Thailand to meet with Jho Low, at which meeting Jho Low talked about his legal team. ████████████.

The government has not found executed versions of these proposed agreements between ████ and Jho Low or ████ and Lum Davis. Gov't Mot. at 8. Nevertheless, between May 2017 and August 2017, bank accounts associated with Michel's company, Anicorn, "received four wire transfers totaling approximately $21.4 million from a bank account held in Hong Kong . . . in the name of Lucky Mark (HK) Trading Limited ('Lucky Mark')," ████████, an entity with apparent ties to Jho Low, *id.* ████████. "Within a day of each wire transfer from Lucky Mark, Anicorn transferred a portion of the funds" to ████████. *Id.* ██; *see also* ████████. ████████ appears to have received between $8 million and $9

6



million from Anicorn during this three-month period, which funds "are believed to have been paid by Jho Taek Low under the auspices of legal work." ▋▋▋▋ ; *see also* ▋▋▋▋ ▋▋▋. Similarly, during this time period, Anicorn (Michel's company) and ▋▋▋ ▋▋▋ both made payments to Lum Davis, totaling approximately $9.2 million. Gov't Mot., Ex. 12, ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋. According to Michel, he paid these sums to Lum Davis because she had "made the introduction" to Broidy and because she "knew that Michel was getting lots of money." ▋▋▋▋▋▋.

The government's proffered exhibits also reveal that the parties contemplated these legal and consulting relationships at least in part to be able to invoke the attorney-client privilege. On May 22, 2017, ▋▋▋▋ emailed Lum Davis, copying Broidy, explaining that "[m]ost important for me right now is AN agreement with ▋▋ and ▋▋ re: J LOW. Pras needs to hire me as his consultant on legal matters in connection with J LOW. Then I also need.an [sic] Agreement between ▋▋▋ and you. I cannot operate without these." Gov't Mot., Ex. 14, Email from ▋▋▋ to Lum Davis, May 22, 2017 (" ▋▋▋ May 22, 2017 Email") at 1. Lum Davis responded the same day and told ▋▋▋▋, copying Broidy, that "we should all sit down and figure out how to best structure the agreements and structure the relationship so everyone feels comfortable and protected." Gov't Mot., Ex. 15, Email from Lum Davis to ▋▋▋▋, May 22, 2017 ("Lum Davis May 22, 2017 Email") at 1. Lum Davis also asked ▋▋▋▋ to send "a legal representation letter to officialize that ▋▋ is my atty and thus our correspondence is privleged [sic]." *Id.*

In addition, Broidy, who is not an attorney, repeatedly stressed to Lum Davis and ▋▋▋▋ that these agreements were needed. On May 18, 2017, ▋▋▋▋ informed Lum

7

Davis, copying Broidy, that ██ had "discuss[ed] these contracts with Elliott [Broidy] and he

agrees now that they are needed." Gov't Ex. 16, Email from ██████████ to Lum Davis, May 18,

2017 ("██████████ May 18, 2017 Email") at 1.  Notably, the government points out that

"Broidy is no stranger to the practice of using attorneys and agreements to conceal improper

payments." Gov't Mot. at 9.  In December 2009, Broidy pleaded guilty to corruption charges

after "enter[ing] into a sham consulting agreement with a family member of a senior [New York

state] official.  Broidy paid more than $380,000 to the consultant over a period of more than two

years." Gov't Mot., Ex. 17, New York State Attorney General's Office, Press Release, *Cuomo

Announces Guilty Plea by Founder of Private Equity Firm in Continuing Investigation of Pay-to-

Play Kickback Scheme at State Pension Fund*, dated Dec. 3, 2009 ("Broidy Article") at 2.

Despite these agreements, ██████████—the only lawyer involved so far—never entered

an appearance on behalf of Jho Low in court.  Rather, ██ only involvement appears to have been

drafting these agreements.  Gov't Mot. at 9–10.  Indeed, according to Michel, "██████ and

Broidy have not really done anything to help with the Malaysian legal matter." ████████

████████.

### 2.  *Lobbying Activity on Jho Low's Behalf*

Through a search warrant, the government obtained several documents and images from

Lum Davis's Google account illustrating the various efforts taken on Jho Low's behalf by

██████████, Broidy, Lum Davis, Michel, and Higginbotham, often after discussions or

collaboration with each other. *See, e.g.*, Gov't Mot., Ex. 27, Email from ██████████ to Lum

Davis, Apr. 30, 2017 at 1 (██████████ emailing Lum Davis, copying Broidy, regarding "JLOW

Strategy Doc" to inform her that "[w]e couldn't read the strategy document that you faxed last

night").  For example, one screenshot created on or before June 29, 2017, captures the following

text message from an undisclosed sender:

Call me urgent.

1. The DOJ filed asset forfeiture actions against 3 additional assets last Friday via California Courts. Assets are in London. They are clearly not stopping and we need it shut down asap.

2. I am still waiting on the document which was given to Nickie on Minister meetings and persons originally scheduled in USA. Please load ASAP.

Gov't Mot., Ex. 19, Screenshot ("Ex. 19 Screenshot") at 1. Indeed, on June 15, 2017, the

government filed a new forfeiture complaint against Jho Low in the Central District of

California. *See generally* Forfeiture Compl.

Another screenshot showed a message from "⬛⬛ Elliott Broidy" to Lum Davis

stating the following:

Spoke with ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. Meeting for ⬛ of Malaysia, ⬛⬛⬛ with POTUS is being set for month end July or early August. Working to get precise date. This information will be received soon and we will make sure contact is made through proper channels asap. When I get to D.C. tomorrow, I will work to receive precise date. Please feel comfortable that the meeting with POTUS will take place.

Gov't Mot., Ex. 21, Screenshot ("Ex. 21 Screenshot") at 1. The application used to send and

receive this message indicates that this message was set to "[d]estruct[ ] in 12 hours." *Id.* The

government noted that, "because there is a possibility—however remote—that this message was

authored by ⬛⬛⬛, it has been withheld from the investigative team pending this Court's

ruling on the instant motion." Gov't Mot. at 11.

A third screenshot, also found on Lum Davis's Google account from "⬛⬛ Elliott

Broidy" and also set to "[d]estruct[ ] in 12 hours," stated that "I just spoke to ⬛⬛ re M. Says

he is getting it done. I told him it is absolutely critical I get it today. Said he would do his best."

Gov't Mot., Ex. 22, Screenshot ("Ex. 22 Screenshot") at 1. ⬛⬛⬛⬛ was the President's

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, after serving as ⬛⬛⬛⬛⬛⬛⬛⬛

███████████. Gov't Mot. at 11.  Still other screenshots from Lum Davis's Google account describe Broidy's background and his apparent ability to influence higher-ups in the U.S. government.  For example, one image shows a printed document resting against a green folder.  This document does not describe Broidy by name but includes descriptors that match Broidy's role throughout 2016 and 2017: "Single largest fundraiser for ████ - raised the most money of any other person"; "███████████████████████████████████████

███████████████████████████"; "advising █████ transition with respect to nominees for key cabinet and deputy secretaries, undersecretaries and other appointments." Gov't Mot., Ex. 23, Screenshot ("Qualifications Screenshot") at 1.

Notably, the document in this screenshot also states that the individual described had a "[g]reat relationship with the ███████████—and we believe solution will be a collaboration between Dept of Justice and Atty General ████████, ████████, and the ████████," and that "[h]e has long standing relationship with the ████████████████

████████████████████████████████." Id. The document indicates that the parties were "[l]ooking at 4 months probably to get this settled" and to "stop seizure of assets here in the US and turn case over to the other country," and concludes by noting that "when you talk about ████ and/or ███████—you have to understand that those folks with official government capacity cannot move without scrutiny and will be uninterested or unwilling to assist.  Example of ████████ and also even ████████ and the Chinese company looking to buy ████████ in NYC." Id.  Another screenshot in the same file depicts a document, typed in the same font as the first document and also resting against a green folder, describing Broidy's biography with his name displayed at the top of the document. Id. at 2.

Still another screenshot recovered from Lum Davis's Google account is a Word document titled "Talking Points - 3 Priorities: Isolate N Korea, Counter terrorism, and Trade." Gov't Mot., Ex. 24, Screenshot ("Talking Points Screenshot") at 1.  The document appears to contain talking points regarding relations between Malaysia and the United States, including, as "Priority 1," that "Malaysia fully stands behind the US to do all that it can to isolate N Korea" and that "Malaysia is very interested in forming a personal and diplomatic relationship to the ███ administration."  *Id.*  In addition, the document includes talking points on counterterrorism, noting that "Malaysia is working with a US company headed by ███ ███ Elliott Broidy to be able to improve and monitor open source intelligence in order to combat terrorism," *id.* at 2, and trade, noting that Malaysia "would like to work with Secretary ███ and other private business individuals like Elliott Broidy to increase the trade and business between the 2 countries," *id.*  Of particular relevance to the pending motion, a final section of the document on the "[r]elationship between the US and Malaysia" notes that "[t]he US Justice Department's current investigation into 1MDB hinders this close relationship and is perplexing to Malaysia in a number of ways."  *Id.* at 3.  Specifically, the document notes:

   a. The investigation into the 1MDB is an *internal issue* and is being handled by Malaysia and any relevant parties i.e [sic] ███

   b. There should be no involvement by the US courts or Justice Department as no harm has been done to any American.

   c. Our own Justice Department and Attorney General have looked into the matter and found no proof of any wrongdoing.

   d. The US action under former Attorney ███ and the ███ administration causes unnecessary tension between our 2 countries that have a history of friendship and cooperation and may cause a negative reaction amongst the Malaysian people, who following our administrations [sic] lead, have been very supportive and have great affection for the US.

   e. I will send our Attorney General to Washington DC prior to my meetings with President ███ in September and would like him to meet directly with Attorney General ███ to begin to resolve this issue with 1MDB that lingers from the previous ███ administration.

*Id.* (emphasis in original).  As the government's exhibits show, Broidy had been trying to

facilitate a meeting with the President to discuss issues relevant to Malaysia.  *See, e.g.*, Ex. 21

Screenshot at 1; Ex. 22 Screenshot at 1.

In addition, in a screenshot of a message sent by Lum Davis to an unidentified recipient,

set to "[d]estruct[ ] in 6 days," Lum Davis explained to the recipient that "E wanted me to tell

him that don't expect anything today as admin is under fire and really preoccupied.  We are close

to new ▮▮▮▮▮▮ nominee and the us attorney appointments are still on track.  E is going in to

sit w big dude on this trip.  He told them he's not leaving D.C. till the m date is solidified."

Gov't Mot., Ex. 25, Screenshot ("Ex. 25 Screenshot") at 1.  The government contends that,

"[r]ead in conjunction with other communications identified by the filter team, it appears that

part of Broidy's activities on behalf of his foreign clients included efforts to influence the

appointment of individuals to key positions in the Department [of Justice]'s leadership."  Gov't

Mot. at 13.  Indeed, according to a log of WhatsApp messages exchanged between Broidy and

▮▮▮▮▮▮▮▮▮▮, a former deputy campaign manager ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮, Broidy and ▮▮▮ appeared to discuss efforts to

appoint ▮▮▮▮▮▮▮ as ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.  *See* Gov't

Mot., Ex. 18, Log of WhatsApp Messages ("▮▮▮ WhatsApp Messages") at 1–3; *see also* Gov't

Mot., Ex. 26, Email from Lum Davis to Broidy, Mar. 11, 2017 at 1 (Broidy forwarding Lum

Davis a news article about Attorney General ▮▮▮▮▮▮ asking "remaining 46 US attorneys to

resign" and asking her to "Share with our friend," which Lum Davis tells Broidy she "did [ ]

yesterday").

The government's exhibits do more than explain the lobbying efforts undertaken on Jho

Low's behalf, however.  The record also reflects a chain of financial transactions linking Jho

Low to political contributions made within the United States.  During the time ███████,

Broidy, Lum Davis, Michel, and Higginbotham appear to have been working on behalf of Jho

Low, a Malaysian national, ████████████ was receiving money from entities connected to

Jho Low ██████████████████████████████████████████████

████████████████████████. As discussed above, between May and August 2017, bank

accounts associated with Michel's company, Anicorn, received wire transfers totaling

approximately $21.4 million from Lucky Mark, a Jho Low–related entity. *See* ████████████

████. Within a day of those transfers from Lucky Mark, Anicorn would transfer funds to

████████████████. *Id.* ¶ 12; ████████████. An FBI analysis of subpoenaed bank records

from ████████████ indicates that between May 2, 2017, and August 9, 2017, ████

"received approximately ████████ in deposits via wire transfers and a cashier check deposit,"

approximately $8 million of which appear to have come from Anicorn and, by extension, from

Jho Low. *See* ████████████████████. Throughout this time period, the received

funds were routinely transferred from ██████'s account to Broidy's personal account, Broidy's

business account, and ████████'s personal account, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

██  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████





**C.      Efforts to Deport Chinese Dissident** ▆▆▆▆▆

The government has also provided in its materials exhibits referring to an alleged

"effort[ ] to deport a Chinese dissident, ▆▆▆▆▆ (a.k.a. ▆▆▆▆▆ ), from the United States

to China." Gov't Mot. at 5 n.3.  Although the government does not rely on this scheme in its

argument that the crime-fraud exception applies to the communications at issue, the facts relating

to ▆▆▆▆ nevertheless present an alarming attempt to influence U.S. policy with respect to a

single individual, on behalf of Jho Low and, possibly, the Chinese government.  Higginbotham

informed the FBI that, during a trip to Macau in September 2017, "he, Low, Michel, and ████

████████ discussed transferring funds to the U.S. for two purposes," one of which included the

settlement of Jho Low's legal troubles as discussed above.  Gov't Mot., Ex. 2, ██████████████

████████████████████████████████████████████████████████████████████████.  The

second purpose was to "influence U.S. policy related to ████████████" and to assist Low's

"petition[ ] to have ████ returned to China."  *Id.*  Higginbotham recalled "that he, Michel, and

Low discussed that they needed to get funds into the U.S. and understood they would need to be

able to explain to the banks what the source of the funds was and the reason for the transfers."

*Id.*  Higginbotham understood that the source of these funds "████████████████████

████████████" and he believed that "Low [wa]s under pressure from the Chinese government to

get ████ extradited back to China."  *Id.*

Eventually, in October 2017, some $41 million was transferred from Red Rock IX, a

company owned by Low, into an escrow account held by Higginbotham.  *Id.* at 5–6.

Higginbotham told the FBI that he "understood that the funds being transferred by Low were

potentially to be paid to ████████, ████████████████████████, and Elliott Broidy,

whom he referred to as the 'influencers'" advocating for ████████'s deportation.  *Id.* ████.

According to the government, "[o]pen source reporting further confirms that ████████████ has

taken steps to lobby President ████████████ to deport ████████ on behalf of the Chinese

government."  Gov't Mot. at 5 n.3; *see also* Gov't Mot., Ex. 5, Wall Street Journal, China's

Pursuit of Fugitive Businessman ████████████ Kicks Off Manhattan Caper Worthy of Spy

Thriller ("████████ Article") at 1.  The government has only "partially corroborated

Higginbotham's allegations," Gov't Mot. at 5 n.3, but the facts presented reveal a troubling

series of communications, meetings, and payoffs to deport a Chinese national at the behest of foreign nationals and foreign principals in exchange for substantial sums of money.

    **D.**    **Broidy and ███████'s Voluntary Disclosure of Communications to the FBI**

    Separately from this investigation, on March 26, 2018, Broidy Capital Management LLC, Broidy, and ███████ retained counsel and filed a complaint in the Central District of California against the State of Qatar, Stonington Strategies LLC, Nicolas D. Muzin, and Does 1–10, alleging that these defendants "hacked into the email accounts and computer servers" associated with ███████, "stole private emails and documents from them, and broadly disseminated the stolen emails and documents to domestic and foreign media." Gov't Mot., Ex. 35, *Broidy Capital Mgmt. LLC v. State of Qatar*, No. 18-cv-2421, Complaint ("Broidy Compl.") ¶ 2. In an amended complaint filed on May 24, 2018, ███████ i███████████

███████████████████████████████████████" Gov't Mot., Ex. 36, *Broidy Capital Mgmt. LLC v. State of Qatar*, No. 18-cv-2421, ███████████

███████.

    On March 27, 2018, ███████'s lawyer, ███████ of the law firm ███████ ███████, spoke to the FBI to report the alleged hacking. *See* Gov't Mot., Ex. 40, ███████ ███████████; Gov't Mot., Ex. 41, Email from ███████ to ███████, Mar. 30, 2018 at 1–3. Broidy, ███████, and their counsel later provided the FBI with information regarding a forensic analysis conducted by two cybersecurity firms during a conference call on April 2, 2018. Gov't Mot., Ex. 42, ███████████ ("Conference Call FBI Report") at 1. Then, on April 12, 2018, counsel for Broidy and ███████ informed the FBI that he had uploaded, to a File Transfer Protocol website maintained by his law firm, "41 PDFs that were

provided to [the firm] by members of the media and which [the firm] understood to have been leaked by anonymous sources." Gov't Mot., Ex. 43, ███████████████████

███████████████. According to the FBI, the emails had been provided "without restrictions on their use" and "the FBI had made no representations or promises to [the attorney] or others, including Broidy, about how the emails would be used by the FBI." Gov't Mot., Ex. 44, █████████████████████████████████████.[1]

The government explains that, "in an abundance of caution, the government's filter team reviewed the materials that Broidy and █████████ produced to the FBI before releasing any of them to the investigative team." Gov't Mot. at 17. Specifically, the filter team withheld 142 of the 1,393 pages across the 41 PDFs due to potentially privileged material. *Id.* The government grouped the withheld communications into three categories: "(1) e-mails in which Broidy or █████████ and Broidy are communicating with attorneys (Exhibit 37); (2) e-mails in which Broidy and █████████ are communicating only with one another (Exhibit 38); and (3) relevant e-mails among Broidy, █████████, and Nickie Lum Davis that are duplicative of those discovered through search and seizure warrants obtained in this matter (Exhibit 39)." *Id.*

## II.   LEGAL STANDARD

### A.   The Crime-Fraud Exception to Attorney-Client Privilege

"The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law,'" *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)), and applies to

---

[1]   On or about May 30, 2018, the law firm representing Broidy and █████████ learned that the cybersecurity firms employed by Broidy had ████████████████████████████████████████ ," Gov't Mot., Ex. 45, █████████████████████████. The attorney represented to the FBI that █████████████████████████████████████████ , *Id.*

18

"a confidential communication between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client," *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014); *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) ("[T]he privilege applies only if the person to whom the communication was made is 'a member of the bar of a court' who 'in connection with th[e] communication is acting as a lawyer' and the communication was made 'for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding.'" (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984))).

There are, however, certain exceptions to the attorney-client privilege. As relevant to this case, the crime-fraud exception "comes into play when a privileged relationship is used to further a crime, fraud, or other fundamental misconduct." *In re Sealed Case*, 676 F.2d 793, 807 (D.C. Cir. 1982). When such conduct is at issue, the attorney-client privilege no longer applies. *See In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) ("Attorney-client communications are not privileged if they 'are made in furtherance of a crime, fraud, or other misconduct.'" (quoting *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985))); *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986) ("The privilege for communications between client and attorney ceases when the purpose of the privilege is abused, when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act."). Generally, the crime-fraud exception reaches communications or work product with a relationship to the crime or fraud. *In re Sealed Case*, 754 F.2d at 399. Two conditions must be met for the crime-fraud exception to apply: "First, the client must have made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act. Second, the client must have carried out the crime or fraud." *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997) (footnote and internal citations

omitted). "The privilege is the client's, and it is the client's fraudulent or criminal intent that matters." *Id.*

As the party seeking to overcome attorney-client privilege, the government has the burden of establishing "a prima facie showing of a violation sufficiently serious to defeat the privilege." *In re Sealed Case*, 754 F.2d at 399. To satisfy this burden, the government may offer "evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *Id.* (citing *In re Sealed Case*, 676 F.2d at 815). "The determination that a prima facie showing has been made lies within the sound discretion of the district court," *id.*, which must "independently explain what facts would support th[e] conclusion" that the crime-fraud exception applies. *Chevron Corp. v. Weinberg Grp.*, 682 F.3d 96, 97 (D.C. Cir. 2012).

The D.C. Circuit has "approved the use of '*in camera, ex parte* proceedings to determine the propriety of a grand jury subpoena or the existence of a crime-fraud exception to the attorney-client privilege when such proceedings are necessary to ensure the secrecy of ongoing grand jury proceedings.'" *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1179 (D.C. Cir. 2006) (quoting *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1075 (D.C. Cir. 1998)). The Circuit nevertheless recognized that "*in camera, ex parte* submissions generally deprive one party to a proceeding of a full opportunity to be heard on an issue, and thus should only be used where a compelling interest exists." *In re Sealed Case No. 98-3077*, 151 F.3d at 1075 (internal citation and quotation marks omitted).

**B.   Waiver of Attorney-Client Privilege**

Even if the attorney-client privilege initially attaches to a communication, the client may waive the privilege by disclosing the communication to a third party. *See In re Sealed Case*, 877 F.2d 976, 979 (D.C. Cir. 1989) (recognizing the difference between "waiver of an existing

privilege and absence of an intent to maintain confidentiality in the first place"). The D.C. Circuit "adheres to a strict rule on waiver of privileges," requiring a privilege holder to "zealously protect the privileged materials" and "tak[e] all reasonable steps to prevent their disclosure." *SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) (citing *In re Sealed Case*, 877 F.2d at 980). "Any voluntary disclosure by the holder of such a privilege is inconsistent with the confidential relationship," *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. Cir. 1981) (quoting *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)), and as such, "will waive the privilege," *In re Sealed Case*, 877 F.2d at 980. A client waives the privilege by either "releasing documents" or "disclos[ing] the substance of privileged documents" to "an investigative body." *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989); *see also In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1370 (D.C. Cir. 1984) (concluding that a client waives the privilege entirely as to all "material that has been disclosed to [a] federal agency"); *Permian*, 665 F.2d at 1219 (concluding that a client "destroy[s] the confidential status of . . . attorney-client communications by permitting their disclosure to the SEC staff").

Waiver of the attorney-client privilege "extends to all other communications relating to the same subject matter." *In re Sealed Case*, 29 F.3d 715, 719 (D.C. Cir. 1994) (quoting *In re Sealed Case*, 877 F.2d at 981); *see also Williams & Connolly v. SEC*, 662 F.3d 1240, 1244 (D.C. Cir. 2011) ("[I]f a party voluntarily discloses part of an attorney-client conversation, the party may have waived confidentiality—and thus the attorney client privilege—for the rest of that conversation *and* for any conversations related to the same subject matter." (emphasis in original)); *In re Sealed Case*, 877 F.2d at 980–81 ("[W]aiver of the privilege in an attorney-client communication extends 'to all other communications relating to the same subject matter.'" (quoting *In re Sealed Case*, 676 F.2d at 809)).

C.



## III.   DISCUSSION

The documents to which the government seeks access can be grouped into two categories: documents obtained through a search warrant that pertain to the alleged criminal conspiracies, and documents obtained through Broidy and ████████'s voluntary disclosure to the FBI. These two categories of documents are discussed in turn.

### A.   Documents Obtained through a Search Warrant

The government posits that ████████ "entered into several sham attorney-client relationships to shield access to communications that ██ and ██ co-conspirators made in furtherance of alleged crimes and schemes," Gov't Mot. at 1, and that, accordingly, "no legitimate attorney-client relationship existed" and "no relevant past or future communications are protected by attorney-client privilege," *id.* at 18. Even assuming, however, that ████████'s attorney-client relationships were legitimate such that ██ client communications

were entitled to protection by the attorney-client privilege, the crime-fraud exception is

applicable in this case.[2]

The government alleges that the subject communications were in furtherance of a scheme

████████████████████████████████████████████████████████████████████████

██████████████████████████ on behalf of an undisclosed foreign principal in violation of 18

U.S.C. § 371, ██████████████, and the Foreign Agent Registration Act ("FARA"), 22 U.S.C.

§ 611 *et seq. Id.* at 20–23.  Under 18 U.S.C. § 371, it is a crime for "two or more persons [to]

conspire either to commit any offense against the United States, or to defraud the United States,

or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371.  Such a conspiracy is

established when the alleged conspirators "interfere with or obstruct one of the [United States']

lawful governmental functions by deceit, craft or trickery, or at least by means that are

dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  The FARA, in turn,

sets forth a regulatory scheme that requires "public disclosure by persons engaging in

propaganda activities and other activities for or on behalf of foreign governments, foreign

political parties, and other foreign principals so that the Government and the people of the United

States may be informed of the identity of such persons and may appraise their statements and

actions in the light of their associations and activities." *Meese v. Keene*, 481 U.S. 465, 469

---

[2]     The facts detailed above in Part I.A–D present ample reason to believe that ████████ 's purported
attorney-client relationships were, in fact, sham relationships set up to allow the participants to rely on the
protections of the attorney-client privilege.  Communications between ████████ and Lum Davis indicate that
Broidy and ████████ thought that agreements reflecting a legal representation between ████████████ and
Michel "are needed," ████████ May 18, 2017 Email at 1, and that the firm "cannot operate without those,"
████████ May 22, 2017 Email at 1, despite ████████ 's later statement to the FBI that ' ████ and Broidy have not
really done anything to help with the Malaysian legal matter," ████████████████ .  In addition, Lum Davis
appears to have been concerned about the availability of attorney-client privilege, writing to Broidy and ████████
that "we should all sit down and figure out how to best structure the agreements and structure the relationship so
everyone feels comfortable and protected," Lum Davis May 22, 2017 Email at 1, and asking ████████ to send "a
legal representation letter to officialize that ████ is my atty and thus our correspondence is privileged [sic]," *id.*
Nevertheless, a determination that these relationships were sham relationships is not necessary in this case as the
crime-fraud exception is applicable to the relevant communications.

(1987) (quoting *Viereck v. United States*, 318 U.S. 236, 244 (1943)). The FARA requires that "an agent must, within 10 days of commencing his or her activities, file a registration statement" with the DOJ including specific information about the activities. *United States v. McGoff*, 831 F.2d 1071, 1075 (D.C. Cir. 1987).[3] Failure to comply with FARA registration requirements risks both civil and criminal penalties. *See* 22 U.S.C. § 618(a)(2). ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

The government's evidence paints a compelling picture of a scheme to defraud the government by "mount[ing] lobbying campaigns on behalf of foreign principals without registering under FARA" ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Gov't Mot. at 21. Specifically, the evidence detailed above indicates that one purpose of the alleged scheme between ▬▬▬▬▬, Broidy, Lum Davis, Michel, and others was to work on behalf of Jho Low to find government officials who would be "friendl[y] to dismissing the charges" against Jho Low, ▬▬▬▬▬▬▬▬▬▬▬▬, and to have the civil forfeiture actions against Jho Low "shut down asap." Ex. 19 Screenshot at 1. Other documents reveal that Broidy was working on behalf of Jho Low to "stop seizure of

---

[3]        This information includes, *inter alia*, the "[r]egistrant's name" and "principal business address"; the "[s]tatus of the registrant" including the individual's "nationality"; "[a] comprehensive statement of the nature of registrant's business," including "the name and address of every foreign principal for whom the registrant is acting, assuming or purporting to act or has agreed to act"; "[c]opies of each written agreement and the terms and conditions of each oral agreement" between the registrant and any foreign principal; and "[t]he nature and amount of contributions, income, money, or thing of value, if any, that the registrant has received within the preceding sixty days from each such foreign principal." 22 U.S.C. § 612(a)(1)–(5).

assets here in the US and turn case over to the other country," that is, Malaysia.  Qualifications Screenshot at 1.  The repeated references to Broidy's close connection to the administration and to possible nominees for ███████████████████████████████████████████

████████████████████████████████████ further strengthen the conclusion that Broidy and others were working to influence the U.S. Government at the highest levels on behalf of an undisclosed foreign principal.  *See, e.g., id.*; Ex. 21 Screenshot.

Throughout this process, neither ████████ nor Broidy, nor any other individual associated in these schemes, filed FARA registration statements as required by law identifying their actions on behalf of Jho Low ████████████████████.  Nevertheless, ████████ appears to have used ██ law office to draft retainer and consulting agreements that provided legal cover for these campaigns and used ██ law office as a conduit for bringing foreign money into the U.S. banking system for carrying out FARA violations.  From May through August 2017, funds traceable to Jho Low and to █████████████████████

███████████████████████████ made their way to the coffers of the ████████

████.  In that time period, Lucky Mark, a Malaysian company with ties to Jho Low, transferred approximately $21.4 million to Anicorn, a company owned by Michel, which in turn transferred approximately $9 million to ███████████████.  █████████████████████████.

██████████████████████████████████████████.

███████████████████████████████.  Shortly after these funds were received by ████

████████, the firm would transfer the funds to Broidy's personal account, Broidy's business account, or ████████'s personal account, █████████████████████████

███████████████████████████.  *Id.* at 1–3.

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

Through its *ex parte* production of evidence, the government has met its burden of making a *prima facie* showing that the crime-fraud exception applies based on possible violations of Title 18 and Title 22 of the U.S. Code. Accordingly, the government's investigative team is authorized to review any and all communications, past and future, made in furtherance of the crimes and schemes described herein and to interview known members of the conspiracies described herein, including Broidy, █████████, Lum Davis, Michel, and others known to be involved in the conspiracy.

**B.     Documents Voluntarily Produced to the FBI**

The government also seeks authorization for the investigative team to review "certain attorney-client ██████ communications to which ███████████ and ██████, Elliott Broidy, waived privileges, and requests authorization to confront ███████ and Broidy, separately, with the facts" of this investigation. Gov't Mot. at 1. Specifically, the government alleges that ████████ waived both attorney-client privilege ███████████████ ██████ when their attorney produced ██████████ emails to the FBI for assistance in a separate matter. *See id.* at 23–24. The government is correct, and accordingly, the investigative team may review the materials that were voluntarily produced to the FBI.

As detailed above, Brody and █████████ retained counsel in connection with a civil suit regarding the alleged hacking of their information systems. *See supra*, Part I.D. Brody and ████████'s counsel in that matter provided the FBI with details about forensic work done on ████████ behalf and also produced to the FBI forty-one documents that had been allegedly stolen from Broidy's and ██████████'s accounts. *See* ███████████████. The government avers that "[t]he majority of the communications with attorneys that counsel to

Broidy and ████████ provided to the FBI are between Broidy and an attorney concerning

Broidy's business." Gov't Mot. at 25. Indeed, a review of these documents reveals that most are

emails between Broidy and attorneys regarding matters not connected to this investigation. *See*

Gov't Mot., Ex. 37, Emails Disclosed to FBI between Broidy and Lawyers ("Broidy Att'y

Emails") at 1–8.

Despite the privileged nature of these attorney-client communications, these documents

were voluntarily produced to the FBI, "without restrictions on their use," and "the FBI had made

no representations or promises to [the attorney] or others, including Broidy, about how the

emails would be used by the FBI." ██████████████████. By making this voluntary

disclosure to an investigative body, Broidy and ████████ thus waived the protections of the

attorney-client privilege for any privileged material produced to the FBI. *See In re Subpoenas*

*Duces Tecum*, 738 F.2d at 1370 (concluding that a client waives the privilege entirely as to all

"material that has been disclosed to [a] federal agency"); *Permian*, 665 F.2d at 1219 (concluding

that a client "destroy[s] the confidential status of . . . attorney-client communications by

permitting their disclosure to the SEC staff"); *White*, 887 F.2d at 271.[4]

The government also identified two copies of an email between ████████, Broidy, and

a different attorney concerning ████████'s agreement with Jho Low, bearing the subject line

"Privileged and Confidential—Elliott Broidy." Gov't Mot. at 26; *see also* Broidy Att'y Emails

at 9–10. "[I]n an abundance of caution," the government assumed that, in this email,

"████████ and Broidy were jointly consulting an attorney regarding a matter of common

---

[4]   Merely seeking the FBI's assistance in responding to a cybersecurity threat does not, on its own, waive the
protections of the attorney-client privilege. Rather, if the substance of privileged communications is properly
guarded from disclosure, the privilege will remain intact. *See, e.g., White*, 887 F.2d at 271 ("[P]retrial disclosures
have been found to waive the privilege only where a defendant disclosed the substance of privileged documents or
permitted actual testimony by his attorney before an investigative body."). Here, however, the voluntary production
of privileged documents to the FBI, an investigatory body, plainly disclosed the substance of such communications,
thereby waiving the attorney-client privilege, at a minimum, as to those communications.

interest and, therefore, the fact that ▮▮▮▮▮▮ copied Broidy on the e-mail to [the attorney] did not waive their attorney-client privilege, which they held jointly." Gov't Mot. at 26 (citing *In re Sealed Case*, 29 F.3d at 719 ("The common interest privilege protects communications between a lawyer and two or more clients regarding a matter of common interest.")). When such a common interest exists, the consent of both clients is required to waive the joint attorney-client privilege. *See, e.g., In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007) ("[W]aiving the joint-client privilege requires the consent of all joint clients."). The government need not rest on this assumption, however, because Broidy and ▮▮▮▮▮▮'s voluntary disclosure of the communication at issue represented a waiver, by both clients, of the confidentiality of the email regarding their common interest. The voluntary disclosure of these communications to the FBI was "inconsistent with the confidential relationship," *Permian*, 665 F.2d at 1219 (internal quotation marks omitted), and as such, operated to "waive the privilege," *In re Sealed Case*, 877 F.2d at 980.

Similarly, Broidy and ▮▮▮▮▮▮'s voluntary production of documents also waived any claim to ▮▮▮▮ privilege in the produced documents. As the government notes, "Broidy and ▮▮▮▮▮▮ also turned over several e-mail exchanges between the two of them." Gov't Mot. at 27; *see also generally* Gov't Mot., Ex. 38, Emails Disclosed to FBI between Broidy and

[REDACTED]

[REDACTED] [5]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Thus, by virtue of Broidy and [REDACTED]'s voluntary disclosure of forty-one documents to the FBI, any claims of attorney-client privilege [REDACTED] in those documents has been waived.  Moreover, that disclosure "waives the privilege, not only as to the specific communication disclosed but [also] as to all other communications relating to the same

---

[5]     The government also contends that "the context of many of the e-mails between Broidy and [REDACTED] suggest that they were not confidential" and were "intended to be shared with third parties by Broidy" or "to be included in public agendas and reports."  Gov't Mot. at 27.  While the government is correct that communications intended to be disclosed to third parties generally are not entitled to privilege protections, *see, e.g.*, *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355–56 (4th Cir. 1984), here the documents were also voluntarily disclosed to an investigative body, and therefore the Court need not assess whether Broidy and [REDACTED] "intended" to share the documents with third parties.

subject matter." *In re Sealed Case*, 676 F.2d at 809; *see also Williams & Connolly*, 662 F.3d at 1244 ("[I]f a party voluntarily discloses part of an attorney-client conversation, the party may have waived confidentiality—and thus the attorney client privilege—for the rest of that conversation *and* for any conversations related to the same subject matter." (emphasis in original)); *In re Sealed Case*, 877 F.2d at 980–81 ("[W]aiver of the privilege in an attorney-client communication extends to all other communications relating to the same subject matter." (internal quotation marks omitted)); *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991) ("[D]isclosure . . . effectively waives the privilege not only to the transmitted data but also as to the details underlying that information." (internal quotation marks omitted)).  The investigative team may therefore review the materials that have been produced to the FBI and may confront Brody and ▮▮▮▮▮ about the emails and the subject matters contained therein.

## IV.  CONCLUSION

Through its *ex parte* production of evidence, the government has met its burden of making a *prima facie* showing that the crime-fraud exception applies based on possible violations of Title 18 and Title 22 of the U.S. Code.  Accordingly, any communications, both past and future, between ▮▮▮▮▮, Broidy, Lum Davis, Michel, and others relating to the alleged schemes and crimes described above are not covered by the attorney-client privilege. The investigative team may therefore review any such communications and use them to confront the subjects of this investigation.  In addition, because Broidy and ▮▮▮▮▮'s voluntary production of forty-one documents to the FBI served to waive the protections of both the attorney-client privilege ▮▮▮▮▮▮▮▮▮ with respect to those documents, the investigative team may review those forty-one documents and use them to confront Broidy and ▮▮▮▮.  To the extent that the filter team encounters any

communications between ██████████, Broidy, Lum Davis, Michel, and others that appear to implicate legal advice or representation unrelated to the alleged schemes and crimes described above, they shall be withheld from the investigative team and protected accordingly as required by law.  An appropriate order accompanies this Memorandum Opinion.

Date: June 26, 2018

_Beryl A. Howell_

BERYL A. HOWELL
Chief Judge

# ATTACHMENT B

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THREE ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1344 | Misc. Action No. 18-sc-322 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**FILED UNDER SEAL** |

**ORDER**

Upon consideration of the government's *Ex Parte*, *In Camera* Motion Seeking

Authorization to Review Certain Attorney-Client and Spousal Communications, ECF No. 7, the

memorandum and exhibits submitted in support, and the entire record herein, for the reasons

stated in the accompanying Memorandum Opinion, it is hereby

    **ORDERED** that the government's motion is GRANTED; and it is further

    **ORDERED** that the communications between and among ███████████████ ,

ELLIOTT BROIDY, NICKIE LUM DAVIS, PRAKAZREL MICHEL, LOW TAEK JHO, and

███████████ , and/or their agents, both past and future, pertaining to the alleged schemes and

crimes described in the government's motion are not protected by the attorney-client or other

privilege and, therefore, may be reviewed by the investigative team and used to confront the

subjects and targets of this investigation; and it is further

    **ORDERED** that, because ███████████ and BROIDY waived privilege over the

communications that they voluntarily provided to the Federal Bureau of Investigation, through

counsel, on or about April 12, 2018, these communications may be reviewed by the investigative

team and used to confront the subjects and targets of this investigation; and it is further

**ORDERED** that, to the extent the filter team encounters any communications between these individuals that appear to implicate legal advice or representation and do not relate to the alleged schemes and crimes described in the government's motion, those communications shall be withheld from the investigative team and protected accordingly, as required by law.

**SO ORDERED.**

Date: June 26, 2018

BERYL A. HOWELL
Chief Judge

# ATTACHMENT C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
THREE ACCOUNTS STORED AT
PREMISES CONTROLLED BY GOOGLE,
INC. FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. § 1344

Misc. Action No. 18-sc-322 (BAH)

Chief Judge Beryl A. Howell

**FILED UNDER SEAL**

### MEMORANDUM OPINION

Two subjects of an ongoing grand jury investigation, Subject 1 and ██████ Subject 2

("Subjects"), seek reconsideration of this Court's prior *ex parte* ruling, *see* Memorandum Op.,

dated June 26, 2018 ("2018 Decision"), ECF No. 9, that their voluntary disclosure, through

counsel, to the Federal Bureau of Investigation ("FBI") of 45 electronic PDF-formatted files

("Disclosed PDFs"), which their counsel represented as stolen from the Subjects' personal and

business email accounts, constituted a waiver of their attorney-client ██████ privileges as to

certain emails within those PDFs as well as to the subject matter of those otherwise privileged

emails, Subjects' Mot. and Mem. Supp. Reconsideration of *Ex Parte* Ruling, Unsealing and

Production of Materials, Sealing, and to Quash ("Subjects' Mem.") at 2–3, 13–20, ECF No. 16.[1]

In addition to finding subject matter waiver of the Subjects' attorney-client ██████

privileges, this *ex parte* ruling also concluded that the crime-fraud exception to the

attorney-client privilege applied to other contents of the Disclosed PDFs, as well as to other

communications seized by the government pursuant to search warrants. 2018 Decision at 2, 31.

---

[1]    "Subject 1" refers to Elliott Broidy and "Subject 2" refers to ████████████████ Broidy seeks
reconsideration on his own behalf ████████████████████████████████████████ is similarly seeking reconsideration on
own behalf and on behalf of ████ ████████ ("S-2's Office"). The government has
represented that both Broidy and ████ ████████ are "Subjects" of an ongoing grand jury investigation. *See* Transcript
of Hearing (Apr. 2, 2019) ("Hr'g Tr.") at 37:1–38:11, ECF No. 32.

1

Following partial unsealing of the 2018 Decision for the limited purpose of sharing information

with the Subjects and their counsel, *see* Order (Oct. 22, 2018), ECF No. 15, the Subjects concede

that no privilege attaches to the Disclosed PDFs, *see* H'rg Tr. at 18:4–9, but contest extending

the scope of the Subjects' waiver of attorney-client ███████████████ to the subject matter

of certain emails, *id.* at 18:10–22.  As support for reconsideration of the subject matter waiver

portion of the 2018 Decision, the Subjects have provided more detailed facts concerning the

circumstances, and representations made by counsel at the time, of the Subjects' disclosure to the

FBI of the Disclosed PDFs.  *See* Subjects' Mem. at 4–8.  In particular, as clarified in the

Subjects' recent submissions, the Subjects' counsel provided the Disclosed PDFs to the FBI at

the latter's request and, at the time, the Subjects' counsel not only represented that the Disclosed

PDFs were in the form received from various media sources, which, in turn, had received the

electronic files from anonymous sources, but also took steps to preserve privilege by denying the

FBI access to the Subjects' email and computer systems.  *See* Decl. of Lawyer A from Law Firm

A ("Lawyer A Decl.") ¶¶ 18–20, 23, 26–28, 32, 33, ECF No. 16-2.[2]

Upon reconsideration, the Subjects seek broad relief, including: (1) the unsealing, in full,

of the 2018 Decision, along with the government's *ex parte* application and exhibits and any

transcripts, *see* Subjects' Mem. at 3; (2) the quashing of two grand jury subpoenas served on the

Subjects, respectively, on July 9, 2018, to the extent the subpoenas demand production of

privileged materials, *see id.* at 4; and (3) a protective order sealing "all documents and materials

the government has obtained that contain or purport to reflect the [Subjects'] privileged materials

until after [Subjects] have had a full and fair opportunity to persuade the Court to reconsider its

*ex parte* crime-fraud ruling," *id.* at 3, as well as "prohibiting the government from further

---

[2]    "Lawyer A" refers to ███████████████ ("Law Firm A").

accessing or using their privileged materials or information. . . . pending a fully contested

hearing," *id.* at 23.  Pending resolution of the Subjects' motion and, particularly, their request for

a protective order, the government has restricted any review of documents provided by, or seized

from, the Subjects to a filter team rather than the prosecutors involved in the ongoing grand jury

investigation. *See* Letter from Subjects' Counsel to Chambers (Mar. 22, 2019) at 2, ECF No. 29;

H'rg Tr. at 38:14–22 (government counsel stating "for the last three months, the review has been

on hold . . . because of the motion that the [Subjects] . . . filed").

    Upon consideration of the parties' voluminous briefing, declarations, and exhibits, and

the arguments presented at a hearing on April 2, 2019, the Subjects' motion is granted in part and

denied in part.  In light of the Subjects' more fulsome recitation of the circumstances and

representations made by their counsel to the FBI about the Disclosed PDFs, such disclosure did

not operate as a subject matter waiver of the Subjects' attorney-client ▮▮▮▮▮ privileges, and

the portion of the 2018 Decision so holding is vacated.  The Subjects' request for a protective

order is therefore granted but only to protect from review by the government those

communications protected by the Subjects' attorney-client ▮▮▮▮▮ privileges, except that no

such privileges attach to the Disclosed PDFs or to otherwise privileged material obtained by any

other means that are covered by the crime-fraud exception, as detailed in the 2018 Decision and

associated Order (June 26, 2018) at 1, ECF No. 8 (ordering "that the communications between

and among [SUBJECT 2], [SUBJECT 1], [CO-CONSPIRATOR 1], [CO-CONSPIRATOR 2],

[CO-CONSPIRATOR 3], and [CO-CONSPIRATOR 4], and/or their agents, both past and

future, pertaining to the alleged schemes and crimes described in the government's motion are

not protected by the attorney-client or other privilege and, therefore, may be reviewed by the

investigative team and used to confront the subjects and targets of this investigation").[3] Notably, the government anticipates that vacatur of the 2018 Decision's finding of subject matter waiver, with the crime-fraud exception holding intact, would remove from review only a small "sliver" of communications. *See* Hr'g Tr. at 58:14–18. Further, the Subjects' request for full unsealing of the 2018 Decision, along with related applications, exhibits, and transcripts, is denied since that step would prematurely reveal matters occurring before the grand jury and pose concomitant evidentiary risks that grand jury secrecy is designed to guard against.[4]

## I.   BACKGROUND

Set out below is a brief review of the 2018 Decision and the factual basis for its holdings, followed by the Subjects' description of the origins and handling of the Disclosed PDFs, including the circumstances under which the Disclosed PDFs were provided to the Office of Special Counsel Robert S. Mueller III ("OSC") and to the FBI, and a summary of the government's subsequent investigatory steps.

### A.   2018 Decision

On June 26, 2018, this Court held, based on the government's *ex parte* application and supporting exhibits, that the Subjects, by voluntarily producing the Disclosed PDFs to the FBI without restrictions on their use, thereby waived attorney-client ███████ privileges with

---

[3]      "Co-Conspirator 1" refers to Nickie Lum Davis; "Co-Conspirator 2" refers to Prakazrel Michel; "Co-Conspirator 3" refers to Low Taek Jho; and "Co-Conspirator 4" refers to ███████.

[4]      The Subjects' request that the July 9, 2018 grand jury subpoenas be quashed because compliance would "violate a valid privilege" and thereby "be unreasonable or oppressive," Subjects' Mem. at 23–24 (quoting FED. R. CRIM. P. 17(c)(2)), is denied.  The subpoenas direct the Subjects to produce only non-privileged documents related to contacts with enumerated individuals and entities, and any records concerning registration requirements under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611–21 *See* Gov't's Opp'n to Subjects' Mot. ("Gov't's Opp'n") at 6, ECF No. 26-2; Decl. of Lawyer B from Law Firm B ("Lawyer B Decl."), Ex. 6, Subjects' Grand Jury Subpoenas (July 9, 2018) ("Grand Jury Subpoenas") at 59–60, 64–65, ECF No. 16-1 ("Lawyer B" refers to ███████ ███████ ("Law Firm B")).  While, as noted, the 2018 Decision's crime-fraud ruling remains sealed, the redacted 2018 Decision, together with the related 2018 Order and this Memorandum Opinion, provide sufficient guidance to enable the Subjects to assess what documents must be turned over to the government or may be withheld as privileged. *See* Grand Jury Subpoenas at 60, 65 (explaining the process for withholding a record under a claim of privilege).

respect to those Disclosed PDFs containing communications in which Subject 1, or Subject 2 and Subject 1 together, communicated with attorneys, or with each other. *See* 2018 Decision at 2, 28–31. More precisely, Lawyer A disclosed to the FBI four electronic files, in PDF format, on April 4, 2018, and 41 electronic files, in PDF format, on April 12, 2018, for a total of 45 PDFs. *See* Lawyer A Decl. ¶ 31. The government identified 142 pages of potentially privileged information only in the latter set of 41 PDFs, consisting of 1393 pages, *see* 2018 Decision at 18, and thus the parties focus on those 41 PDFs. The 142 pages of potentially privileged information consist of (1) 10 pages of emails in which Subject 1, or Subject 2 and Subject 1 together, are communicating with attorneys, *id.* (citing Gov't's *Ex Parte* App., Ex. 37, ECF No. 34-15); (2) 24 pages of emails in which Subject 1 and Subject 2 are communicating only with each other, *id.* (citing Gov't's *Ex Parte* App., Ex. 38, ECF No. 34-16); and (3) 108 pages of emails among Subject 1, Subject 2, and Co-Conspirator 1, *id.* (citing Gov't's *Ex Parte* App., Ex. 39, ECF No. 34-17).[5]

The government's *ex parte* application portrayed the Disclosed PDFs as largely the same emails stolen from the Subjects' personal and business email accounts and turned over by the Subjects' counsel, Lawyer A, to enlist the FBI's assistance in uncovering the persons responsible for the unauthorized access to those accounts. For example, the *ex parte* application—which remains under seal and is partially unsealed here to the extent necessary to explain the Court's reasoning—indicates that "[o]n April 12, 2018, [Lawyer A] voluntarily turned over to the FBI 41 PDF files containing the e-mails that had allegedly been stolen through unauthorized access to [Subject 1's] and [Subject 2's] accounts." Gov't's *Ex Parte* App. at 16, ECF No. 7 (footnote

---

[5]    The Subjects' counsel agrees that the Disclosed PDFs contain 34 pages of emails that, absent waiver, are potentially subject to the Subjects' attorney-client ███████ privileges, *see* H'rg Tr. at 24:6–21, although the government expressed unfamiliarity with this specific number of pages, *see id.* at 46:17–47:13.

omitted); *see also id.* at 25 ("[Subject 1] and [Subject 2] voluntarily produced to the FBI their

e-mails with attorneys that otherwise might have been privileged. . . . and [Subject 1] expressly

waived any attorney-client privilege to these."); *id.* at 28 ("[I]n "[Subject 1's] and [Subject 2's]

case, when a third party allegedly stole their communications, rather than assert their privilege,

they instead explicitly waived it in providing the emails to the FBI.").  The government's *ex*

*parte* application noted that the Subjects' stolen emails had been circulated to the media, *id.* at 16

(citing the Subjects' civil suit alleging as much), but did not reference that the Disclosed PDFs

were documents that had been created by anonymous sources, circulated to various media, and

then forwarded by those media sources to the Subjects' counsel.  Internal FBI reports submitted

as exhibits to the *ex parte* application, however, noted that Lawyer A had uploaded for transfer to

the FBI on April 12, 2018, "41 PDFs that were provided to [Law Firm A] by members of the

media and which [Law Firm A] understood to have been leaked by anonymous sources," Gov't's

*Ex Parte* App., Ex. 43, FBI 302 Report, dated Apr. 13, 2018 ("Apr. 13, 2018 FBI 302"), at 1,

ECF No. 34-21, and that Lawyer A had told the FBI that "[s]ome of the email communications

are genuine but others were forged or otherwise altered," *id.*, Ex. 40, FBI 302 Report, dated Mar.

27, 2018, at 1, ECF No. 34-18; *id.*, Ex. 45, FBI 302 Report, dated May 18, 2018 ("May 18, 2018

FBI 302"), at 2–3, ECF No. 34-23 (noting that Lawyer A advised the FBI that, ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

    The 2018 Decision rooted out this information from the FBI reports to reference the

media source of the Disclosed PDFs, *see* 2018 Decision at 17–18 (citing Apr. 13, 2018 FBI 302,

at 1), and that some of the PDFs contained "altered documents and emails," *id.* at 18 n.1 (citing

May 18, 2018 FBI 302, at 2). Nonetheless, the import, if any, of the media sources for the

Disclosed PDFs and the production of the Disclosed PDFs at the request of the FBI at the same

time that the FBI was denied access to the Subjects' email accounts and computer systems, was

neither addressed by the government nor highlighted in the 2018 Decision's legal analysis.

Apart from these FBI reports submitted with the government's *ex parte* application, the

Subjects' own civil complaint filed in California against the State of Qatar and other defendants,

alleging that cyberattackers "distributed Plaintiffs' private information to the media," Gov't's *Ex

Parte* App., Ex. 35, Subjects' Compl. ¶ 85, ECF No. 34-13, supported the government's

understanding, relayed to this Court, that the Disclosed PDFs largely contained the Subjects'

stolen communications.[6] The Subjects' Complaint alleged that the defendants "publicly

disclosed Plaintiffs' personal information by disseminating . . . materials to the media for

publication," *id.* ¶ 109, and "deliberately accessed, received, possessed, stored, and helped to

disseminate Plaintiffs' stolen data and emails," *id.* ¶ 135. The Subjects' First Amended

Complaint ("FAC") bolstered these claims, by accusing the State of Qatar and cyberattackers of

"stealing emails from [the Subjects'] U.S.-based servers[,] and then printing collections of

Plaintiffs' stolen electronic files . . . sorting them by topic, and delivering them (in some cases by

hand) to news organizations in the United States, knowing that the news organizations would

---

[6]     The Subjects' civil suit was dismissed and the Subjects have appealed. *See Broidy Capital Mgmt. LLC v. State of Qatar*, Civil Action No. 18-cv-2421-JFW, Pls.' Amended Notice of Appeal (C.D. Cal. Sept. 28, 2018), ECF No. 228. The Subjects have since filed a new civil complaint in this Court stemming from the same hacking of their emails. *See* Gov't's Opp'n, Ex. 5, *Broidy Capital Mgmt. LLC v. Muzin*, Civil Action No. 19-cv-150-DLF, Public Version of Compl. (D.D.C. Jan. 24, 2019), ECF No. 26-7; *see also Broidy Capital Mgmt. LLC v. Muzin*, Civil Action No. 19-cv-150-DLF, First Amended Compl. (D.D.C. Apr. 2, 2019), ("D.D.C. FAC"), ECF No. 18-2. The California and District of Columbia suits both name Nicholas Muzin and Stonington Strategies LLC as defendants (among others), and are predicated on virtually identical narratives of a Qatari-backed campaign to release information in order to damage Broidy's credibility and business relationships. In the most recently filed Complaint in this Court, the Subjects continue to assert that the defendants "knowingly disseminat[ed] emails and documents hacked and stolen from Broidy," D.D.C. FAC ¶ 52, "expos[ed] [Broidy's] confidential communications . . . to the public," *id.* ¶ 8, and "participated in a conspiracy to disseminate stolen, confidential emails and other confidential information," *id.* ¶ 35.

publish the stolen emails under the cloak of the First Amendment," Gov't's *Ex Parte* App., Ex.

36, Subjects' FAC ¶ 15, ECF No. 34-14, "view[ing] the stolen documents . . . and convert[ing]

them to PDFs for dissemination to third parties," *id.* ¶ 117, and "unlawfully distribut[ing]

Plaintiffs' stolen emails to a United States journalist," *id.* ¶ 119.

The 2018 Decision ruled that the Subjects' and co-conspirators' attorney-client privilege

was vitiated by the crime-fraud exception as to the otherwise privileged 108 pages in the

45 Disclosed PDFs to the extent those communications furthered the ▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆ schemes, in violation of 18 U.S.C. §§ 371, ▆▆▆, and the FARA, 22 U.S.C.

§§ 611–21, for which the government had sustained its *prima facie* burden in the *ex parte*

application. *Id.* at 24–27, 31. This crime-fraud ruling also vitiated the ▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ "concerning a joint criminal enterprise."

*Id.* at 30 (internal quotation marks and citation omitted).[7] In addition, the 2018 Decision held

that disclosure to the FBI of the 34 pages of emails between the Subjects alone or with attorneys

waived the Subjects' attorney-client ▆▆▆▆▆▆ privileges not only as to those disclosed

34 pages, but also as to communications originating from other sources relating to the same

subject matter as those 34 pages. 2018 Decision at 30–31.

### B.   The Subjects' View of Circumstances Under Which Disclosed PDFs Were Provided To FBI

The Subjects' description of the events surrounding Lawyer A's provision of the

Disclosed PDFs to the FBI several months after the Subjects' personal and business email

accounts were hacked in December 2017, Subjects' Mem. at 4–14, largely parallels the

---

[7]      The 2018 Decision did not base the crime-fraud ruling on the contents of the Disclosed PDFs, *see* Gov't's Opp'n at 6 & n.5, but on evidence obtained by the government, pursuant to a search warrant issued on February 8, 2018, approximately two months before Lawyer A provided the Disclosed PDFs to the FBI, *see id.* at 6; 2018 Decision at 1. The Subjects do not challenge the February 8, 2018 search warrant or the seizure of any material pursuant to that warrant, except to the extent they seek a protective order as to potentially privileged materials.

government's *ex parte* description, except that the Subjects focus on the circumstances—

undisputed by the government—that the Disclosed PDFs were created by anonymous third

parties from stolen emails; that Lawyer A, who was retained after the hack to represent the

Subjects in litigation arising from this incident, Lawyer A Decl. ¶ 2, informed the FBI when

disclosing the Disclosed PDFs that some contents were not authentic, *id.* ¶ 32; and that Lawyer

A took steps to protect the Subjects' privileged communications and information in their email

accounts and on their computer systems, *see id.* ¶¶ 18–20, 26–27.  Beginning in March 2018 and

continuing through at least April 12, 2018, news organizations began publishing articles

containing information "sourced to private, confidential, and/or privileged communications

between" the Subjects and others. *Id.* ¶ 7.  "Contemporaneously with the publication of these

articles," reporters provided the Subjects copies of the documents that they had received from

anonymous sources, *id.* ¶ 8, including some doctored or fake communications, Subjects' Mem. at

5; *see also* Decl. of Lawyer B from Law Firm B ("Lawyer B Decl.") ¶¶ 8–9, ECF No. 16-1.[8]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

      In early March 2018, in response to an inquiry from OSC stemming from the news

reports about the Subjects' emails, Lawyer B produced 42 pages of non-privileged documents

from a 96-page PDF provided by an anonymous source to the *Huffington Post*, with redactions to

protect privileged material. *See* Lawyer B Decl. ¶¶ 7, 10; *id.*, Ex. 4, Emails Between Lawyer B

and OSC (Mar. 2018) ("OSC Emails") at 47–50, ECF No. 16-1; *see also* H'rg Tr. at 31:5–7,

32:15–33:3 (Lawyer B noting that the OSC's interest was because the news reports about the

---

[8]    "Lawyer B" refers to ████████████████████████ ("Law Firm B").

PDFs mentioned ▇▇▇▇). Lawyer B explained that "on the off [chance] that someone

would try to assert that [the PDFs] were [Subject 1's] documents[,] out of prudence, ▇▇ took

the extra step to . . . redact or remove any information that could arguably be subject to a claim

of privilege." Hr'g Tr. at 31:23–32:2. This interaction with the OSC was the Subjects' first

contact with the government regarding the hacking incident. *See id.* at 31:1–32:9; Subjects'

Mem. at 5.

Meanwhile, Lawyer A represented the Subjects ▇▇▇▇▇▇▇ in various matters

in California and, in this capacity, reported the hacking incident, on March 22, 2018, to the

California U.S. Attorney's Office ("California USAO"), prompting the office to open an official

investigation. Lawyer A Decl. ¶ 14. Subsequently, Law Firm A "communicated regularly and

extensively with the [California] USAO and FBI in the spring of 2018" through in-person

meetings as well as via telephone and email. *Id.* ¶¶ 15–16. The FBI also interviewed both

Subjects. *Id.* ¶ 16.

As part of the California USAO and FBI's investigation of the hacking incident, "the

government continually requested evidence and information from the [Subjects], which the

government emphasized would be essential to identifying the perpetrators and to detecting and

mitigating the cybersecurity threat." *Id.* ¶ 17. Lawyer A states that the Subjects provided

information to law enforcement to assist in the identification of the perpetrators, and that Law

Firm A "on multiple occasions explained to the [California] USAO and FBI that materials from

the [Subjects] that cyberattackers had accessed and stolen were confidential and highly

sensitive." *Id.* ¶ 18. Consequently, Law Firm A declined requests from the FBI and California

USAO for access to ▇▇▇▇▇▇s servers and email accounts, *id.*, or for the FBI to collect

forensic evidence from the Subjects' computer systems on the grounds that "doing so would

disclose confidential and sensitive communications, including many privileged communications," *id.* ¶¶ 19–20.

In April 2018, the California USAO and FBI requested "copies of the leaked PDF documents" that had been disseminated to the media, *id.*, Ex. G, Emails Between Lawyer A and FBI (Apr. 2018), at 100, ECF No. 16–2; *id.* ¶¶ 21–22, 30, in order "to obtain original, forensic evidence of the cyberattacks and identify the methods employed by the cyberattackers," *id.* ¶ 23, using "those files [that] originated from the cyberattackers who created them, . . . because [Law Firm A's] investigation had uncovered metadata information in the [files] that would be important to identify and stop the cyberattackers and those involved," *id.* Law Firm A was "particularly mindful that any alterations to these documents risked destroying important forensic data." *Id.* *See also* Subjects' Reply Mem. in Supp. of Mot. for Reconsideration ("Subjects' Reply") at 1, ECF No. 28 ("For the documents to be useful to the government, the [Subjects] had to provide them in the same form in which they themselves had received them from media sources (who had, in turn, apparently received them from third parties who had compiled and, in some cases, altered ostensible reproductions of the [Subjects'] stolen documents.")).

Law Firm A provided the FBI with a total of 45 PDFs "which [Law Firm A] did not alter in any manner so as to preserve all the original forensic evidence . . . and to avoid introducing forensic 'junk' into these files." *Id.* ¶ 31. While aware that these Disclosed PDFs contained "purported copies of private, confidential, and/or privileged communications between and among" the Subjects, *id.* ¶ 14, Lawyer A avers that "at no time" did he or Law Firm A represent "that the [Disclosed PDFs] constituted or reflected authentic records that were kept in the normal course of business," *id.* ¶ 32; *see also id.* ¶ 28. Instead, Lawyer A says that he "explained that it

11

was possible that some of the emails were fake" and that "it was not possible to determine if

documents were authentic." *Id.* ¶ 32. Thus, to the best of the Subjects' knowledge, the

government does not have a "basis for assuming or asserting that the [documents] constituted or

reflected authentic records that were kept in the normal course of business by the [Subjects]."

*Id.*; ████████████████████████████████████████

████████████████████████████████████████ Lawyer A

further stresses that in providing the Disclosed PDFs to the FBI, the Subjects "did not intend to

waive any privilege attaching to the communications ostensibly reflected therein, nor did they

intend to waive any privilege attaching to the confidential records that were kept in the ordinary

course of business by" ████████████ or the Subjects. Lawyer A Decl. ¶ 33. In fact, Law

Firm A "sought to protect the confidentiality of the [Disclosed PDFs]" by transferring them via

"a secure [File Transfer Protocol ("FTP")] designed to ensure the security and confidentiality of

the transmitted information." *Id.* ¶ 34. Lawyer A implies that law enforcement officials, not

Law Firm A, were responsible for any privilege waiver, complaining that "[a]t no point did the

[California] USAO or FBI inform [Law Firm A] or the [Subjects] that privileged information

may have been inadvertently produced to the government, or that the information provided by

[Law Firm A] would be disseminated beyond the named recipients." *Id.* ¶ 36; *see also id.* ¶ 46.

On June 8, 2018, the California USAO informed Law Firm A that the criminal

investigation would be stayed, *id.* ¶ 50, and the Subjects shared no additional information with

the California USAO or the FBI after this point, *id.* ¶ 51. On October 3, 2018, the California

USAO informed the Subjects of its decision not to proceed further with a criminal investigation.

*Id.* ¶ 52.

The Subjects indicate that, of the 45 Disclosed PDFs, (1) four appear to have been entirely fabricated by unknown third parties; (2) ███████████████████ containing altered versions of emails and other communications; and (3) "several" contain stolen communications that have been altered and presented to appear to be related, despite the fact that the authentic communications upon which they are based are unrelated in time and/or subject matter. Lawyer B Decl. ¶ 9. Other than describing the 34 pages of potentially privileged emails between or among the Subjects and their counsel as appearing in multiple Disclosed PDFs, *see* H'rg Tr. at 24:16–24; *id.* at 47:14–24, the Subjects have not clarified whether these 34 pages appear only in the six PDFs identified by the Subjects as fabricated by unknown parties ███

███████████ or in the "several" PDFs containing some altered emails. *Id.* at 24:16–25:2 (Subjects' counsel stating that 34 pages were "broadly scattered around [those documents]" and "I will get you the exact number" of the Disclosed PDFs containing the 34 pages).[9]

### C.   Investigative Steps Subsequent to the 2018 Decision and Negotiations to Encourage Subjects' Compliance with Subpoenas

Following the 2018 Decision, on July 9, 2018, law enforcement agents executed search warrants on Subject 1's business and the Subjects' ███ in California. Gov't's Opp'n at 6. That same day, the Subjects were served with grand jury subpoenas for an investigation of possible violations of federal criminal laws, including "████████████████████████

█████████████████████████████, conspiracy to act as an unregistered foreign agent, c██████████████████████████████

████████████████████████████████████████████

[those] statutes, [18 U.S.C. §§ 371, ███ and 22 U.S.C. §§ 611–21]." Grand Jury Subpoenas, at

---

[9]   The purpose of the Subjects' strategic obfuscation appears intended to leave the government (and the Court) guessing whether the 34 pages are authentic or fabricated/altered emails, and to leave them room simultaneously to disavow the Disclosed PDFs as fake while asserting privilege vigorously over the same contents.

62, 67; *see also* Gov't's Opp'n at 6.  With respect to the grand jury subpoenas, the government

directed the Subjects to produce non-privileged documents that were outside the scope of the

warrants but within the scope of the subpoenas.  Gov't's Opp'n at 6.  Subject 2 has produced no

records in response to the subpoenas, and Subject 1 continues to produce responsive, non-

privileged documents.  *Id.*; H'rg Tr. at 60:12–61:7.

The following month, in August 2018, the government executed a search warrant on an

e-discovery and forensic consulting vendor engaged by Subject 1, seizing "forensic images and

copies of numerous digital devices, email servers, and email accounts belonging to ▮▮▮▮

▮▮▮▮ and [the Subjects]."  Gov't's Opp'n at 6; Subjects' Mem. at 9.[10]

Following the execution of the search warrants, the government engaged in extensive

discussions with the Subjects' counsel, Lawyer B, to facilitate compliance with the grand jury

subpoenas.  In connection with these discussions, the government obtained court authorization to

disclose the 2018 Order to the Subjects, *see* Order (Aug. 15, 2018), ECF No. 13, which order

was provided to the Subjects on August 27, 2018, *see* Gov't's Opp'n at 6; Subjects' Mem. at 1

n.2, and then to disclose a redacted version of the 2018 Decision, *see* Order (Oct. 22, 2018),

which redacted decision was provided to the Subjects on October 25, 2018, *see* Subjects' Mem.

at 1; Lawyer B Decl. ¶ 15.[11]

Almost two months later, on December 21, 2018, the Subjects filed the instant motion,

which was fully briefed over the following three months in accordance with the schedule agreed

to by the parties.  *See* Min. Order (Dec. 27, 2018).  Upon review of the voluminous briefing and

---

[10]    The consulting vendor is ▮▮▮▮▮▮▮.  *See* Subjects' Mem. at 9.
[11]    The government sought partial unsealing of the 2018 Decision as to two categories of factual information:
(1) information related to subject matters that would be publicly disclosed through the filing of a civil forfeiture
complaint and through the guilty plea of another individual; and (2) information already known to Subjects due to
their previous interactions with the FBI.  Gov't's Opp'n at 7.  The Subjects correctly observe that the "redactions
obscured almost entirely the Court's basis for its crime-fraud ruling but revealed the majority of the Court's basis for
its waiver ruling."  Subjects' Mem. at 1–2.

exhibits, totaling over 600 pages, submitted in connection with the pending motion and the

hearing held on April 2, 2019, the Subjects' motion is now ripe for resolution.

## II.   STANDARD OF REVIEW

The parties do not address the standard of review applicable to the unusual procedural

posture of the Subjects' request for review, pre-indictment, of the government's judicially

sanctioned access to otherwise privileged material in the Disclosed PDFs.  Federal Rule of

Criminal Procedure 12(b)(3) requires that certain pretrial motions be raised "if the basis for the

motion is then reasonably available and the motion can be determined without a trial on the

merits," including for "suppression of evidence," FED. R. CRIM. P. 12(b)(3)(C), but appears to

contemplate that a criminal proceeding is pending, which is not the situation here.  *See* FED. R.

CRIM. P. 12(b)(1) (noting that, "[i]n [g]eneral," a "*party* may raise by pretrial motion . . .")

(emphasis added).  Although providing scant guidance, case law suggests that pre-indictment

review is only available in unique circumstances.  *See United States v. Search of Law Office*, 341

F.3d 404, 409, 414 (5th Cir. 2003) (holding that courts have a "unique power" to order

suppression or return of unlawfully seized property prior to return of an indictment, but that

"such jurisdiction should be exercised with caution and restraint, and subject to equitable

principles," requiring "at the very least, a substantial showing of irreparable harm"); *see In re

Berkley & Co. Inc.*, 629 F.2d 548, 550 (8th Cir. 1980) (discussing a prior remand to the district

court to reconsider its pre-indictment privilege decision *de novo* in light of additional documents

not previously available to it).

Although the precise standard for review of the Subjects' reconsideration motion is

neither clear nor elucidated by the parties, the subject matter waiver ruling is reviewed *de novo*,

informed by the Subjects' recitation of the events leading to the Disclosed PDFs' provision to the

FBI.  *See* H'rg Tr. at 13:14–17:7 (Subjects' counsel arguing for a *de novo* standard of review);

15

*id.* at 40:6–25 (government counsel agreeing that the standard of review should be *de novo*).

Further, as in analogous, pre-indictment circumstances, where "the party claiming

[attorney-client] privilege bears the burden of proving that the communications are protected," *In

re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998), the Subjects bear the burden of establishing

that their asserted privileges persist. *See In re Grand Jury Investigation*, 974 F.2d 1068, 1070

(9th Cir. 1992) (in grand jury investigation context, "[t]he party asserting the attorney-client

privilege has the burden of proving that the privilege applies to a given set of documents or

communications"); *see also Search of Law Office*, 341 F.3d at 413–14 (holding that a movant's

pre-indictment Federal Rule of Criminal Procedure 41(g) motion offered merely "vague

allegations that the government viewed extensive amounts of privileged information" and failed

to offer proof substantiating his assertions).

## III.    DISCUSSION

The Subjects challenge the 2018 Decision's waiver ruling on a number of grounds and

seek access to the reasoning and materials underlying the crime-fraud ruling in order to challenge

that part of the decision more fully.  Predicated on the Subjects' view that both the waiver and

crime-fraud ruling are not sound, they also seek to quash the subpoenas issued against them and

a protective order sealing "all documents and materials the government has obtained that contain

or purport to reflect the [Subjects'] privileged materials until after [Subjects] have had a full and

fair opportunity to persuade the Court to reconsider its *ex parte* crime-fraud ruling," Subjects'

Mem. at 3, as well as "prohibiting the government from further accessing or using their

privileged materials or information . . . pending a fully contested hearing," *id.* at 23.  The

Subjects' arguments are examined below.

### A.   No Subject Matter Waiver From Disclosed PDFs

The Subjects characterize the 2018 Decision's waiver holding as "erroneous as a matter of law." *Id.* at 2.  The Subjects' position as to why the waiver holding is erroneous has evolved over the course of the briefing and hearing in this matter.  The Subjects initially insisted that the Disclosed PDFs remain privileged, arguing that: (1) theft by a third party does not operate as a waiver, Subjects' Mem. at 16–17; and (2) the Subjects deserve the protections of both the Cybersecurity Information Sharing Act of 2015, 6 U.S.C. §§ 1501–1510 and the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(8), *see* Subjects' Mem. at 18–20, 25–26; Subjects' Reply at 9–13.  At the same time, the Subjects disavowed that any privilege even attached to the Disclosed PDFs since the Disclosed PDFs were created by third parties and did not represent the Subjects' authentic documents.  Subjects' Mem. at 13–15.

Perhaps recognizing that the record posed significant obstacles for each of these arguments, the Subjects pivoted at the hearing, and now disclaim any privilege in the Disclosed PDFs, merely seeking reconsideration of the *scope* of the waiver ruling.  *See* H'rg Tr. at 18:2–13 (Subjects' counsel clarifying that "[w]hat we care about is the finding of subject matter waiver. . . . [i]f . . . the Court says: As to the [Disclosed PDFs], whatever privilege there is is waived, I have no objection.  I don't believe there is a privilege as to them anyway.  They are stolen documents that you can get off Google right now today. . . . [w]e can't assert privilege over those, and we don't.  What I care about are the thousands and thousands of other documents that this ruling says has no privilege when, in fact, we didn't produce them to the Government intentionally"); *id.* at 30:2–13 (Subjects' counsel reiterating "we are not primarily concerned with these documents.  Any human being can go get these documents off of Google. . . . [w]hat I am concerned with are all of the privileged documents that [Lawyer A] acted appropriately to on [April 4, 2018] and said: No, there are lots of privileged documents here; we are not giving them

17

to you. There [are] no circumstances under which we should be found under those facts to have

waived the subject matter of this issue; I think that's the key point.").

At the hearing, the government expressed surprise that the focus of the Subjects'

reconsideration motion had shifted to the scope of the subject matter waiver, rather than the

privileged status of the Disclosed PDFs. *See* H'rg Tr. at 56:5–8 ("[T]his is, essentially, the first

time that the Government has heard [the Subjects'] claim that this is all about the subject matter

waiver that would apply to other documents."). Understandably so, given what the government

rightly characterizes as the "scattershot" nature of the Subjects' arguments. Gov't's Opp'n at 17.

Indeed, although the Subjects briefly mention subject matter waiver in their motion, they made

no mention of Federal Rule of Evidence 502, concerning waiver, until their reply. *See* Subjects'

Mem. at 13; Subjects' Reply at 3–7. Even then, the Subjects insisted that any waiver was

inadvertent, citing only to Federal Rule of Evidence 502(b). *See* Subjects' Reply at 3–7. The

true aim of the Subjects' motion—or at least their most viable argument—did not fully come into

focus until the hearing. In the context of this ongoing, time-sensitive grand jury investigation,

the Subjects' determination to preserve any possible argument has obscured rather than bolstered

their claim to relief and hindered rather than aided resolution of their motion.

Now that the Subjects disclaim any privilege in the PDFs, only their subject matter

waiver argument merits attention. The Subjects claim that any intentional disclosure and

concomitant waiver as to the Disclosed PDFs does not constitute a subject matter waiver under

Federal Rule of Evidence 502(a) because: (1) the Subjects continuously warned the FBI that

privileged communications were involved and took steps to maintain that privilege, such as

refusing to provide undisclosed versions of their communications; (2) removal or redaction of

any privileged information in the Disclosed PDFs was not possible without jeopardizing the

forensic evidence related to the cyberattack or otherwise corrupting the files, particularly in light

of representations from the FBI that original documents were necessary to investigate the

cyberattack against them; and (3) alleged government misconduct demonstrates that the

government has taken unfair advantage of the Subjects in order to gain access to privileged

material.

The Subjects' insinuations of government misconduct are unsupported by the record

since the government has scrupulously protected the Subjects' privileged communications and

appropriately sought judicial guidance and authority to access that material.  Upon

reconsideration, however, the Court concludes that the Subjects' voluntary disclosure of the

Disclosed PDFs, while an intentional waiver as to any privileged material contained in those

PDFs, did not operate as a waiver, under Rule 502(a), with respect to other, undisclosed

privileged communications on the same subject matter.  This narrowed waiver ruling has limited

impact since the 2018 Decision's crime-fraud ruling remains intact and vitiates the Subjects' and

any co-conspirators' privileges with respect to undisclosed communications, obtained through

means other than disclosure of the Disclosed PDFs, among the Subjects and/or those

co-conspirators to the extent those communications furthered the ███████████████████

████████ schemes, in violation of  18 U.S.C. §§ 371, ████ and 22 U.S.C. §§ 611–21, for which

the government had sustained its *prima facie* burden in the *ex parte* application.  *See* H'rg Tr. at

58:8–18 (government counsel agreeing that "the bulk of the subject matter at issue here is

covered by the crime-fraud exception . . . . [but] a sliver of material . . . would fall outside of the

crime-fraud ruling [and] would still be subject to the attorney-client ████████ waiver and to

subject matter waiver related to" the disclosure of the Disclosed PDFs).

1.     **Privilege Principles**

The legal principles underlying waiver of the attorney-client privilege are set out in the

2018 Decision, *see* 2018 Decision at 18–23, and will be only briefly summarized here.

The attorney-client privilege may be waived when the client discloses communications

with his or her attorney to a third party and, further, such voluntary disclosure of otherwise

privileged communications to one third party amounts to waiver as to all such communications

on the subject matter disclosed. *See, e.g.*, *Williams & Connolly v. SEC*, 662 F.3d 1240, 1244

(D.C. Cir. 2011); *United States v. Williams Cos., Inc.*, 562 F.3d 387, 394 (D.C. Cir. 2009); *In re

Sealed Case*, 29 F.3d 715, 719 (D.C. Cir. 1994); *In re Sealed Case*, 877 F.2d 976, 980–81 (D.C.

Cir. 1989); *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. Cir. 1981). The D.C.

Circuit "adheres to a strict rule on waiver of [the] privilege[]," requiring a privilege holder to

"zealously protect the privileged materials" and "tak[e] all reasonable steps to prevent their

disclosure." *SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) (citing *In re Sealed Case*, 877

F.2d at 980).

Adoption in 2008 of Federal Rule of Evidence 502 "modified this Circuit's previously

strict rule on subject matter waiver." *Hughes v. Abell*, No. 09-0220 (JDB), 2012 WL 13054819,

at *5 (D.D.C. Mar. 7, 2012). Specifically, Rule 502(a) directs that waiver of the attorney-client

privilege by intentionally disclosing a privileged communication "in a federal proceeding or to a

federal office or agency" serves as a subject matter waiver as to other undisclosed

communications or information only if: "(1) the waiver is intentional; (2) the disclosed and

undisclosed communications or information concern the same subject matter; and (3) they ought

in fairness to be considered together." FED. R. EVID. 502(a). Thus, "Rule 502 does not change

the important premise that the disclosure of one communication waives the privilege with respect

to other communications concerning the same subject matter when 'they ought in fairness be

considered together,' FED. R. EVID. 502(a)(3), 'in order to prevent a selective and misleading

presentation of evidence to the disadvantage of the adversary,' FED. R. EVID. 502 explanatory

note." *Hughes*, 2012 WL 13054819, at *5.  By contrast, "an inadvertent disclosure of

[privileged] information can never result in a subject matter waiver," FED. R. EVID. 502

explanatory note, and does not even result in a waiver as to the disclosed information if the

privilege holder "took reasonable steps to prevent disclosure" and "promptly took reasonable

steps to rectify the error." FED. R. EVID. 502(b).  Rule 502(b) was intended to "reject[]"

precedent in the D.C. Circuit holding that "inadvertent disclosure of documents during discovery

automatically constituted a subject matter waiver." FED. R. EVID. 502 explanatory note (stating

that "[t]he rule rejects the result in *In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989), which held

that inadvertent disclosure of documents during discovery automatically constituted a subject

matter waiver"); *see also Williams v. District of Columbia*, 806 F. Supp. 2d 44, 48 (D.D.C. 2011)

(observing that "[i]n this Circuit, it used to be the case that virtually any disclosure of a

communication protected by the attorney-client privilege, even if inadvertent, worked a waiver

of the privilege" and explaining that "Congress partially abrogated this relatively strict approach

to waiver by enacting Rule 502(b) of the Federal Rules of Evidence").

### 2.   Analysis

As the Subjects now recognize, their most—and only—viable argument for

reconsideration of the waiver ruling is whether the Subjects' disclosure of the Disclosed PDFs

constituted a subject matter waiver as to undisclosed emails on the same topics under Rule

502(a).  Nevertheless, in light of the Subjects' vacillations, some discussion of why the

Disclosed PDFs are no longer privileged is warranted.

> a.     **The Subjects Intentionally Waived Privilege Over the
> Disclosed PDFs by Voluntarily Disclosing Them to the FBI**

As noted, Rule 502(a) instructs that when a disclosure is made to a federal office or

agency and that disclosure waives attorney-client privilege, the waiver only extends to an

undisclosed communication if: (1) the waiver was intentional; (2) the disclosed and undisclosed

communications or information concern the same subject matter; and (3) they ought in fairness

to be considered together.  FED. R. EVID. 502(a).[12]  This rule does not alter well-settled law that

intentional disclosure of a privileged communication generally results in a waiver of the

privilege.  *Id.* explanatory note ("[T]he rule does not purport to supplant applicable waiver

doctrine generally."); *see also In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir.

1984) ("As stated by this court in *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C.

Cir. 1981) (quoting *United States v. American Telephone & Telegraph*, 642 F.2d 1285, 1299

(D.C. Cir. 1980)), 'any voluntary disclosure by the holder of such a privilege is inconsistent with

the confidential relationship and thus waives the privilege.'" (alteration omitted) (citing

*generally* 8 J. Wigmore, Evidence §§ 2327–28 (McNaughton rev. 1961); McCormack on

Evidence § 93 (Cleary ed. 1972)).  Here, the Subjects' provision of the Disclosed PDFs to the

FBI constituted an intentional waiver under Rule 502(a)(1) of any privilege attached to

communications or information of the contents of those electronic files.

To avoid this well-settled legal principle, the Subjects initially raised several arguments

insisting that they retained privilege over those communications.  None of those arguments has

---

[12]     The federal rules of privilege apply to grand jury proceedings, even though other evidentiary rules do not.
*See* FED. R. EVID. 1101(d)(2); *In re Grand Jury Subpoena*, 909 F.3d 26, 29 (4th Cir. 2018) ("While the federal rules
of evidence generally do not apply to grand jury proceedings, an exception exists for privilege rules."); *In re Grand
Jury 16-3817 (16-4)*, 740 F. App'x 243, 244–46 (4th Cir. 2018) (considering, in a grand jury context, the application
of a Rule 502(e) agreement preserving privilege); *In re Impounded*, 241 F.3d 308, 313 n.3 (3d Cir. 2001) ("[Federal
Rule of Evidence] 1101(d)(2) provides that the rules on privileges articulated by [Federal Rule of Evidence] 501 are
applicable to grand jury proceedings.").

merit. First, they contended that any waiver must be classified as inadvertent and analyzed under FED. R. EVID. 502(b). *See* Subjects' Mem. at 14; Subjects' Reply at 5–6. This argument is belied by the record since "disclosure to the FBI was initiated, authorized, and executed by the privilege holders themselves." Gov't's Opp'n at 8. The Subjects rightly abandoned this argument by now clarifying that they only challenge the subject matter waiver ruling and are therefore proceeding under Rule 502(a).[13]

Second, although the Subjects correctly observe that a privilege-holder who takes proper precautions to ensure the confidentiality of her communications is not held to have waived attorney-client privilege when those communications are stolen, *see* Subjects' Mem. at 16–17 (citing, *e.g.*, *Dukes v. Wal-Mart Stores, Inc.*, No. 01-CV-2252 CRB (JSC), 2013 WL 1282892, at *4–6 (N.D. Cal. Mar. 26, 2013) (citing *In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 468, 470 (S.D. Ohio 1984))), a privilege-holder who intentionally discloses confidential information *in response* to the theft of her confidential materials, as the Subjects did here, may be held to have waived the privilege.[14] In the course of disclosing the Disclosed PDFs to the FBI, the Subjects' counsel conceded that at least some of the PDFs included "legitimate emails." *See*

---

[13] The Subjects' attempt to shoehorn their delivery of the Disclosed PDFs to the FBI into the inadvertent waiver prong of Federal Rule of Evidence 502(b) was strained at best, and thoroughly undermined by their counsel's declarations concerning the disclosure. By his own account, the Subjects' Lawyer A engaged in extensive discussions about materials that would not be disclosed to the FBI on account of privilege concerns, *see, e.g.*, Lawyer A Decl. ¶¶ 18–20, 26–27, but he nevertheless handed over the Disclosed PDFs to the FBI. He was certainly in the best position to understand which of the Disclosed PDFs contained privileged material. *See* Subjects' Mem. at 20 (conceding that "the proponent[s] of the privilege. . . . [are] the 'one[s] with superior access to the evidence and in the best position to explain things.'" (quoting *Matter of Feldberg*, 862 F.2d 622, 625–26 (7th Cir. 1988))). At the hearing, the Subjects wisely pivoted from arguments based on Federal Rule of Evidence 502(b) to arguments based on Federal Rule of Evidence 502(a). *See* H'rg Tr. at 17:8–15, 18:16–22, 29:17–30:1, 30:15–19, 64:5–65:6.

[14] The *Dukes* case, relied upon by the Subjects, illustrates precisely this point. In *Dukes*, a confidential memo related to ongoing litigation was leaked to the *New York Times*, which reported on some of the document's findings but did not publish the actual memo. 2013 WL 1282892, at *1–2. The *Dukes* plaintiff argued that the defendant affirmatively waived privilege by offering a public response to the *New York Times* article. 2013 WL 1282892, at *6. The *Dukes* Court held that while generic responses to the article did not waive privilege as to the entire memo, the defendant's counsel's statement to the *New York Times* disclosing contents of the privileged memo that had not already been published waived the privilege as to that disclosed information. *Id.* at *7–8.

May 18, 2018 FBI 302, at 3.  Accordingly, although the initial hacking and dissemination of the

Subjects' emails did not waive the Subjects' privilege, the Subjects' voluntary disclosure,

through Lawyer A, of the Disclosed PDFs to the FBI was a separate, voluntary waiver as to

whatever privilege existed in those Disclosed PDFs.

Third, the Subjects claim the protection of the Cybersecurity Information Sharing Act of

2015 ("CISA"), 6 U.S.C. §§ 1501–1510, which provides that sharing "cyber threat indicators"

with the federal government does not operate as a waiver of privilege.  *See* 6 U.S.C.

§ 1504(d)(1); Subjects' Mem. at 18–20.[15]  Yet, protection of privilege is not automatic under

CISA.  Instead, CISA "requires a non-federal entity to remove any information from a cyber

threat indicator or defensive measure that it knows at the time of sharing to be personal

information of a specific individual . . . that is not directly related to a cybersecurity threat before

sharing that cyber threat indicator or defensive measure with a federal entity."  Dep't of

Homeland Security & Dep't of Justice, Guidance to Assist Non-Federal Entities to Share Cyber

Threat Indicators and Defensive Measures with Federal Entities Under the Cybersecurity

Information Sharing Act of 2015, 8 (June 2016); *see also* 6 U.S.C. § 1503(d)(2)(A).

In other words, CISA is not an open invitation to share all documents or information

connected in any way to a cybersecurity breach without regard to risk of privilege waiver.  Here,

the Subjects took no steps to remove personal information that was not directly related to the

cyberattack prior to sharing the Disclosed PDFs.  *See* Gov't's Opp'n at 11 ("[G]iven that the . . .

---

[15]    CISA defines a "cyber threat indicator" as "information that is necessary to describe or identify," *inter alia*, "malicious reconnaissance," "a security vulnerability," "the actual or potential harm caused by an incident, including a description of the information exfiltrated as a result of a particular cybersecurity threat," "any other attribute of a cybersecurity threat," or "any combination [of such information]."  6 U.S.C. § 1501(6).  The Subjects assert that the Disclosed PDFs meet CISA's definition of a cyber threat indicator, Subjects' Mem. at 18–19, and the government does not argue otherwise, Gov't's Opp'n at 10–11.  The government maintains, however, that regardless of whether the Disclosed PDFs qualify as "cyber threat indicators," the Subjects failed to comply with CISA's requirement that they conduct a mandatory review for and removal of personal information prior to sharing the Disclosed PDFs with the FBI.  *See id.* (citing 6 U.S.C. § 1503(d)(2)).

PDFs are full of 'information that identifies' a number of 'specific individuals,' it is apparent that

[Subjects] did not comply with this provision of the CISA."  (internal alteration omitted)); H'rg

Tr. at 51:1–6 (government counsel making same point).[16]  Most telling, the Subjects made clear

that the 34 privileged pages at issue, though "broadly scattered," did not appear in all of the

45 PDFs, H'rg Tr. at 24:16–25:2, and thus Lawyer A could have turned over to the FBI for

forensic purposes only those Disclosed PDFs without any privileged contents, but this is not

what happened.[17]

Then, in an about-face from asserting they retained privilege in the Disclosed PDFs, the

Subjects disavow the "authenticity" of the contents of the Disclosed PDFs, reasoning that only

the holder of the privilege can waive the privilege, and because the Disclosed PDFs are primarily

documents "created by Qatari-linked cyber-criminals," and "are not the [Subjects'] authentic

documents," they are not really the Subjects' documents at all, so the Subjects could not have

waived any privilege by providing the files to the FBI. Subjects' Mem. at 13–14.[18]  The Subjects

---

[16]      Even assuming the Subjects are correct that the Disclosed PDFs could not be modified in any way without
sacrificing their value as evidence of the cyberattack, *see* Subjects' Reply at 7–8, 11–13, nothing in the record
suggests that the Subjects contemplated the provisions of CISA when providing the Disclosed PDFs to the FBI or
discussed with the FBI whether partial production of those PDFs or partial redactions of personal information or
privileged information offered a way to provide solely "information . . . directly related to a cybersecurity threat."
6 U.S.C. § 1503(d)(2)(A).

[17]      In any event, CISA does not require the FBI or other law enforcement agency to ignore evidence of any
other crime—aside from the cyberattack—that may arise in the course of investigating a cyberattack. Indeed, other
provisions of CISA suggest that criminal investigations override CISA's protections, where necessary. *See* 6 U.S.C.
§ 1507(n) ("Nothing in this subchapter shall be construed to prevent the disclosure of a cyber threat indicator or
defensive measure shared under this subchapter in a case of criminal prosecution, when an applicable provision of
Federal, State, tribal, or local law requires disclosure in such case.").

[18]      Relatedly, the Subjects claim that any purported waiver by Subject 2, an attorney, cannot operate to waive
████ *clients'* privilege over any of the materials provided. *See* Subjects' Mem. at 17–18. This "elementary" tenet of
the attorney-client privilege doctrine, *id.* at 17, is undisputed and entirely irrelevant here since the 2018 Decision's
waiver ruling pertained only to emails in which (1) Subject 1, or Subject 1 and Subject 2 together, communicated
with attorneys; or (2) Subject 1 and Subject 2 communicated only with one another. 2018 Decision at 18. As the
holders of the attorney-client ████ privileges at issue, only the Subjects—and not Subject 2's clients—were
covered by the waiver part of that decision. *See* Gov't's Opp'n at 8 ("The government's argument and this Court's
holding regarding the waiver of privilege by [Subjects] was limited only to the privileges— attorney-client ██
████—belonging to [Subjects]."). At the same time, any communications between or among the Subjects and/or
any co-conspirators, to the extent those communications furthered the ████████████████████
schemes, in violation of 18 U.S.C. §§ 371, ████ and 22 U.S.C. §§ 611–21, for which the government had sustained

double-down on this point by contending that had contents of the Disclosed PDFs been authentic, a number of steps would have been taken to "fulfill[] basic production parameters," such as providing a unique identifier for each page. *Id.* at 14 n.10. Such steps were not taken, however, "[i]n order to preserve the integrity of the [documents] as evidence of [cyberattacks]." *Id.* "The implication is clear," according to the Subjects, Law Firm A "was willing to provide criminally-sourced, purported communications to the government, but not to produce the [Subjects'] authentic communications potentially protected by privilege." *Id.* at 15; *see also* Subjects' Reply at 1 (arguing that production of documents that "had, in turn, apparently [been] received . . . from third parties who had compiled and, in some cases, altered ostensible reproductions of the [Subjects'] stolen documents. . . . did not knowingly waive privileges that protect any of their authentic documents that might have been reflected (accurately or not) in the stolen documents"); *id.* at 4 (same).

Despite blowing much smoke about the authenticity of the Disclosed PDFs, the record, again, belies the Subjects' efforts to raise questions about the genuineness of the contents of the vast majority of those files. Even if compiled by third, unknown parties, the contents of most of those PDFs are comprised of the Subjects' stolen emails, as they themselves have attested in concurrent civil litigation claiming harm from the dissemination of their private, personal emails. *See, e.g.*, Gov't *Ex Parte* App., Ex. 35, Subjects' Compl. ¶¶ 85, 109, 135; *id.*, Ex. 36, Subjects' FAC ¶¶ 15, 117, 119. Moreover, although Lawyer A now claims that he raised questions as to the authenticity of some of the contents of the Disclosed PDFs with the FBI throughout the

---

its *prima facie* burden in the *ex parte* application, are subject to the crime-fraud exception, which vitiates any attorney-client ▆▆▆▆ privileges that may otherwise attach. *See* 2018 Decision at 24 n.2 (holding although "ample reason [exists] to believe that [Subject 2's] purported attorney-client relationships were, in fact, sham relationships set up to allow the participants to rely on the protections of the attorney-client privilege. . . . a determination that these relationships were sham relationships is not necessary in this case as the crime-fraud exception is applicable to the relevant communications").

course of his conversations with law enforcement agencies, *see* Lawyer A Decl. ¶ 32, he also

affirmed to the FBI which emails were "legitimate," May 18, 2018 FBI 302, at 3.  The fact that

these Disclosed PDFs contained authentic personal emails is also confirmed by Lawyer B's

careful redactions of potentially privileged material in a production to the OSC.[19]

In sum, the Subjects' voluntary disclosure to the FBI of the 45 PDFs containing

privileged communications and information constituted an intentional waiver as to the

communications contained in the Disclosed PDFs under Rule 502(a)(1).  Thus, the Subjects have

correctly disclaimed privilege in the Disclosed PDFs, despite citing the wrong reasons.  As for

the consideration, under Rule 502(a)(2), whether "the disclosed and undisclosed communications

or information concern the same subject matter," the Subjects, despite their coyness in

acknowledging the authenticity of the contents of the Disclosed PDFs, obviously wish to

preserve privilege as to some undisclosed communications on the same subject matter as those

contained in the Disclosed PDFs.  The final prong of Rule 502 is addressed next.

> **b.    The Subjects' Disclosure Does Not Operate as a Subject
> Matter Waiver with Respect to Undisclosed Communications Under
> Federal Rule of Evidence 502(a)(3)**

What remains for consideration is Federal Rule of Evidence 502(a)(3), which asks

whether the undisclosed and disclosed communications on the same subject matter "ought in

fairness to be considered together."  Reconsideration turns on this factor.

---

[19]    The Subjects' effort, under the guise of a reconsideration motion, to attack the authenticity of the Disclosed
PDFs may simply serve as a strategy to undermine the crime-fraud ruling.  *See* Subjects' Mem. at 21 (complaining
that "it is impossible to determine . . . the exact nature of the criminal or fraudulent acts alleged").  This effort is
both misguided and premature, as the crime-fraud ruling was not based on the Disclosed PDFs, and, as discussed
*infra* Section III.B, the Subjects have no right to delay the grand jury further by challenging the crime-fraud ruling at
this procedural juncture.  Moreover, parsing now which contents of the Disclosed PDFs are authentic is unnecessary,
when the Subjects have muddied the issue with a veritable cacophony of arguments as to why they retain privilege
in the Disclosed PDFs.

The Subjects have now shared additional factual detail concerning the disclosure of the PDFs, including that the Disclosed PDFs—created by unknown third parties and compiled from the Subjects' stolen emails (which were, in some instances, modified)—were turned over at the request of the FBI in order to relay forensic data significant to the cybersecurity investigation; and that the Subjects denied the FBI's request for access to the Subjects' email accounts and computer systems in order to preserve the confidentiality of the Subjects' communications and information. These circumstances alter the analysis as to whether undisclosed and disclosed communications ought in fairness be considered together. While the Subjects' voluntary disclosure of the Disclosed PDFs constituted a waiver as to those PDFs, this disclosure does not operate as a subject matter waiver of attorney-client privilege over the Subjects' undisclosed communications under Rule 502(a).

As recounted at length, the Subjects' actions with respect to the Disclosed PDFs' disclosure demonstrated that they did not intend to waive their privilege over undisclosed communications on the same subject matter, and this background illustrates why fairness does not require a subject matter waiver. Law Firm A advised the California USAO and FBI "on multiple occasions . . . that materials from the [Subjects] that cyberattackers had accessed and stolen were confidential and highly sensitive." Lawyer A Decl. ¶ 18. On a March 28, 2018 call, Law Firm A "expressly refused to provide access to compromised computer systems and other evidence containing internal communications. . . . explain[ing] that the content of these systems included privileged, confidential, and otherwise sensitive communication and documents." *Id.* ¶ 20. When the FBI requested that the Subjects, "through counsel at [Law Firm A], share copies of the [Disclosed PDFs]," *id.* ¶ 22, and indicated that it planned to dispatch FBI forensic investigators to copy all evidence from the Subjects' computers, Law Firm A initially reiterated

28

that it would not provide the content of the emails stolen in the cyberattack, *id.* ¶¶ 25–26 ("[Law Firm A] . . . ma[de] clear that any information provided would exclude any content information such as email text." (internal quotation marks and alteration omitted)). These actions demonstrate that the Subjects "did not intend to waive any privilege attaching to . . . the confidential records that were kept in the ordinary course of business." *Id.* ¶ 33.

Further, the Subjects emphasize that any actions taken with respect to the Disclosed PDFs must be viewed within the context of the ongoing criminal investigation into the cyberattack. *See* Subjects' Mem. at 18–20. Since original copies of the Disclosed PDFs may have contained forensic information vital to the cyberattack investigation, Lawyer A Decl. ¶ 23, and in light of the FBI's statement that "original evidence is best," *id.* ¶ 21, the Subjects suggest that they essentially had no way of ensuring that the FBI had the best evidence to pursue the cyberattack investigation without giving them the unaltered Disclosed PDFs. *See also id.* ¶ 29 ("The [California] USAO and FBI conveyed through their actions and statements that the only way for a criminal prosecution to occur on behalf of the [Subjects] was through the FBI's independent review of . . . PDFs containing stolen documents that were unlawfully disseminated to members of the media."). This context, the Subjects suggest, militates against a ruling that the undisclosed and disclosed communications "ought in fairness to be considered together." FED. R. EVID. 502(a)(3); *see id.* explanatory note ("[S]ubject matter waiver . . . is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary.").[20] The Court agrees.

---

[20]   Federal Rule of Evidence 502, by its terms, only applies to attorney-client privilege but its logic, in the circumstances of this case, extends to ▮▮▮▮▮▮ as well.

Although the Disclosed PDFs were voluntarily provided to the FBI and are purportedly on the same subject matter as undisclosed communications of interest to law enforcement, the circumstances regarding their disclosure weigh against finding that the disclosed and undisclosed communications "ought in fairness to be considered together." FED. R. EVID. 502(a)(3). The Subjects acceded to the FBI's request for forensic evidence in the cybersecurity investigation by providing the Disclosed PDFs, which had been passed along by media sources to the Subjects and were unredacted to preserve forensic evidence, but the Subjects denied the FBI's request for additional access to their email accounts and computer systems to protect undisclosed communications. Under these circumstances, waiver as to the Disclosed PDFs does not operate as a waiver as to undisclosed communications and information on the same subject matter.

### c.   The Subjects' Insinuations of Government Misconduct Are Unsupported by the Record

Only brief discussion of the Subjects' insinuations of government misconduct in connection with the Subjects' provision of the Disclosed PDFs to the FBI is warranted. In support of their claim for reconsideration and other relief, the Subjects allege that the government's conduct in this matter violated the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(8) ("CVRA"), which guarantees victims "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy," and exceeded the scope of the 2018 Decision. *See* Subjects' Mem. at 23–26. Neither contention is supported by the record or is grounds for further relief.

The Subjects allege that the government violated the CVRA by using "[d]eceit and gamesmanship" to siphon information volunteered by the Subjects as victims of a cyberattack to other FBI agents who viewed the Subjects as suspects in a criminal investigation. *See id.* at 25–26. This claim ignores the timing of the events at issue: the California prosecutors and FBI

30

agents were unaware of any other investigation into the Subjects in early April 2018, when they

requested and received the Disclosed PDFs. *See* Gov't's Opp'n at 4.[21]  Although the Subjects

protest that the California prosecutors and FBI agents continued to interview and work with the

Subjects even after learning that they were being investigated on other grounds, *see* H'rg Tr. at

63:12–22, they also note that "consistent with our desire not to produce any privileged

documents, [the FBI] got nothing more [from us] than the [Disclosed PDFs]," *id.* at 63:19–24.

Moreover, the Subjects point to no provision of the CVRA, or of any other policy, that would

require law enforcement to notify subjects, represented by counsel, of an ongoing grand jury

investigation into their conduct simply because those same subjects have contacted law

enforcement on an unrelated matter.  Thus, although the Subjects fault the government for being

"wholly silent" on its alleged violation of the CVRA, *see* Subjects' Reply at 10 (suggesting such

silence is tantamount to a concession), they fail to acknowledge that they briefed their CVRA

claims only in one footnote and two pages of their opening brief, *see* Subjects' Mem. at 6 n.5

(indicating that Subjects "reserve all rights" with respect to alleged government misconduct), *id.*

at 25–26, and that their argument is based on a misperception of the government's conduct and

responsibilities.

---

[21]   The Subjects suggest that "[t]o the extent that the Los Angeles DOJ's and FBI's repeated requests for the
[Disclosed PDFs] were motivated by other ongoing investigations rather than, as stated, to permit investigation of
the Qatari attacks on the Subjects—an investigation that was inexplicably put on hold and then discontinued—the
requests smack of bad faith and may implicate constitutional rights." Subjects' Mem. at 6 n.5.  The government
responds that "[t]he agents and prosecutors investigating the conduct that is the subject of the current grand jury
investigation did not become aware of the existence of the hacking investigation until after the [Disclosed PDFs]
were provided to the Los Angeles FBI Agents." Gov't's Opp'n at 4.  This timing is borne out by documentation of
an April 25, 2018 meeting between FBI agents concerning the Subjects' emails. *See id.*, Ex. 6, FBI Exchange of
Subjects' Emails (May 4, 2018) at 3, ECF No. 26-8.  This meeting took place weeks after the Subjects provided the
Disclosed PDFs to the FBI. *See also* H'rg Tr. at 45:21–46:16 (government counsel explaining that the East Coast
team investigating the Subjects learned of the Disclosed PDFs' disclosure to the California cyberattack team via a
third-party FBI agent who was not on the case team for either investigation).  Accordingly, the Subjects' insinuations
of bad faith are flatly contradicted by the record.

In one such misperception, the Subjects make much of the fact that the 2018 Decision, in its concluding paragraphs, allowed the government to confront subjects with the communications, *see* 2018 Decision at 31, but did not explicitly direct it to "take any other investigative steps needed to complete its investigation," as the government had originally sought. *See* Subjects' Reply at 14–17; 2018 Decision at 2. In particular, the Subjects apparently take umbrage that the government, in the course of investigating "layered international and domestic wire transfers of tens of millions of dollars to pay for undisclosed foreign-directed lobbying of the most powerful members of our government," Gov't's Opp'n at 1, has used the fruits of its investigation to secure a guilty plea against a defendant whose conduct contributed to the finding of the crime-fraud exception, and to file a civil forfeiture complaint related to that guilty plea, *see id.* at 7; *see also* Lawyer B. Decl., Ex. 9, Civil Action No. 18-cv-2795, Verified Compl. for Forfeiture In Rem (D.D.C. Nov. 30, 2018), at 72, ECF No. 16-1; Subjects' Mem. at 23 (complaining that the "government has referred to and relied on materials the [Subjects] contend are privileged in a recent civil forfeiture complaint"); Subjects' Reply at 14–17. Nothing about the 2018 Decision—or indeed the standard practice of federal criminal investigations—prevented the government from pursuing these steps. *See* H'rg Tr. at 54:14–17 (government counsel pointing out that 18 U.S.C. § 3322 specifically authorizes the government to use grand jury information in any civil or criminal forfeiture action). After appropriately seeking and receiving judicial guidance as to whether privileges remained intact, the government did not need to seek further judicial permission to resume its investigation, including to follow any leads from evidence uncovered upon the execution of lawfully issued search warrants or from the guilty plea of a defendant.

\*     \*     \*

The 2018 Decision's waiver ruling is narrowed to find that the Subjects' provision of the

Disclosed PDFs to the FBI did not amount to a subject matter waiver of the Subjects'

attorney-client ██████████ privilege as to the matters discussed in the 34 pages of otherwise

privileged emails contained in the Disclosed PDFs.  This narrowed ruling has no effect on any

communications, between or among the Subjects and/or any co-conspirators to the extent those

communications furthered the ██████████████████████████ schemes, in violation of

18 U.S.C. §§ 371, ████ and 22 U.S.C. §§ 611–21, for which the government had sustained its

*prima facie* burden in the *ex parte* application.  *See* 2018 Decision at 25–27, 31.

### B.  The Subjects Are Not Entitled To Further Unsealing of 2018 Decision

The Subjects ask for full unsealing of the 2018 Decision, as well as the government's *ex*

*parte* application, exhibits and any transcripts, to allow a "fair opportunity to litigate fully the

issues underlying it," Subjects' Mem. at 22–23, including the basis for finding that the

government made a *prima facie* showing that the crime-fraud exception vitiated the

attorney-client privilege with respect to "any and all communications, past and future, made in

furtherance of the crimes and schemes [violations of 18 U.S.C. §§ 371, ████ and 22 U.S.C.

§§ 611–21]" between and among the Subjects, their co-conspirators, and "others known to be

involved in the conspiracy."  2018 Decision at 27.  That request is denied.  Indeed, the Subjects

appear to have conceded at the hearing that the better time to challenge the crime-fraud

exception would be after the grand jury had "run its course."  H'rg Tr. at 20:24–21:18.

The Subjects do not dispute that *ex parte*, *in camera* proceedings are a well-established

process to resolve privilege disputes in time-sensitive and secretive grand jury matters.  *See*

Subjects' Mem. at 20–21; *United States v. Zolin*, 491 U.S. 554, 568–69 (1989); *In re Grand Jury*

*Subpoena*, 912 F.3d 623, 632 (D.C. Cir. 2019) ("We have repeatedly approved the use of [*ex*

*parte*] information when 'necessary to ensure the secrecy of ongoing grand jury proceedings.'"

(quoting *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1075 (D.C. Cir. 1998)).  This process is

designed to protect grand jury secrecy and to prevent "interruptions and delays in the grand jury

process that skilled defense counsel might exploit to 'try the prosecution' even before an

indictment could issue."  *In re Sealed Case*, 877 F.2d at 982.  Any other process would risk

"saddl[ing] a grand jury with mini-trials and preliminary showings [that] would assuredly

impede its investigation and frustrate the public's interest in the fair and expeditious

administration of the criminal laws."  *Id.* (internal quotation marks omitted) (quoting *United

States v. Dionisio*, 410 U.S. 1, 17 (1973)); *see also Costello v. United States*, 350 U.S. 359, 363

(1956).  The D.C. Circuit has made plain that "[w]hen a grand jury's subpoena is at stake, the

standard for evaluating an exception argument must be simple enough for courts to administer

swiftly and efficiently, without obstructing the grand jury's mission or squandering judicial

resources."  *In re Sealed Case*, 676 F.2d at 814.  Moreover, in making this determination, courts

"will not be able to receive a complete adversary presentation of the issues. . . . [a]ny system that

requires courts to make highly refined judgments—perhaps concerning volumes of documents—

will most likely collapse under its own weight."  *Id.*

    Notwithstanding the weight and import of this precedent, the Subjects press for an

opportunity, pre-indictment, to challenge the merits of the crime-fraud exception ruling.  They

assert that: (1) secrecy concerns are lessened because they are already aware from their grand

jury subpoenas of the substance of the grand jury investigation, *see* Subjects' Mem. at 21–22;

(2) allowing the government to make a *prima facie* showing presupposes that the Subjects will

eventually have a chance to rebut the showing, *id.* at 20; and (3) due process requires giving the

Subjects an opportunity, pre-indictment, to "raise any factual or legal arguments or defenses" to

the crime-fraud exception, *id.* at 22.  None of these arguments warrants the relief sought.

First, the portions of the 2018 Decision that the Subjects seek to unseal describe a grand

jury investigation that, according to the government, *see* Gov't's Opp'n at 1, is ongoing and

continues to be protected by the secrecy attached to grand jury proceedings. *See McKeever v.*

*Barr*, No. 17-5149, 2019 WL 1495027, at *2 (D.C. Cir. Apr. 5, 2019) (noting that "[t]he

Supreme Court has long maintained that 'the proper functioning of our grand jury system

depends upon the secrecy of grand jury proceedings.'" (quoting *Douglas Oil Co. v. Petrol Stops*

*Nw.*, 441 U.S. 211, 218 (1979))). As the government points out, the Subjects' "claim that their

receipt of a grand jury subpoena vitiates the need for grand jury secrecy. . . . is unsupported and

illogical, as it would subsume the centuries' old protection of grand jury material." Gov't's

Opp'n at 14. The government effectively illustrates this point with the rhetorical question of

"How could a grand jury operate effectively if their mere issuance of a subpoena vitiated the veil

of secrecy?" *Id.* (noting that the Subjects rely on cases which "all relate to the enforcement of

grand jury subpoenas against parties . . . that were nonetheless denied access to the government's

*ex parte*, *in camera* evidentiary submissions because of the need to maintain the secrecy of the

grand jury proceedings"). Even if the Subjects have some notion now about the matters under

investigation since they have been directed by the grand jury subpoenas to produce records

related to those matters, this falls far short of demonstrating their entitlement to be privy to the

full scope of those matters or the evidence collected and relayed to the Court in the *ex parte*

application and exhibits, and described in the redacted portions of the 2018 Decision.

Second, the Subjects posit that since the government has had the chance to meet its *prima*

*facie* burden that the crime-fraud exception applies, the Subjects, as privilege-holders, should

now have their turn, despite the grand jury context, to intervene, obtain the underlying evidence,

and litigate the vitiation of their privileges. This is simply not the governing law. *See Zolin*, 491

U.S. at 563 n.7 (noting that use of the phrase '*prima facie*' "has caused some confusion" since "the standard is used to dispel the privilege altogether *without* affording the client an opportunity to rebut the *prima facie* showing" (quoting Note, 51 Brooklyn L. Rev. 913, 918–19 (1985) (emphasis in original))). The D.C. Circuit, in *In re Sealed Case*, 676 F.2d at 814–17, for example, instructed that "[b]ecause of the need for speed and simplicity at the grand jury stage, courts should not employ a standard that requires them to hear testimony or to determine facts from conflicting evidence." *Id.* at 815 n.88. The Fourth Circuit follows a similar approach. *See, e.g.*, *In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 n.2 (4th Cir. 2005) ("[W]e have explicitly held that the necessary secrecy of the grand jury process prevents the party asserting the privilege from viewing the government's *in camera* evidence."); *In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 351–53 (4th Cir. 1994) (rejecting, "[h]owever appealing it may sound," the argument that *in camera* submissions forming the basis of a crime-fraud ruling be released to privilege-holders who are otherwise "completely unable to answer or to refute the government's allegations" because "the government has the right to preserve the secrecy of its submission because it pertains to an on-going investigation").[22]

In urging that they be afforded the opportunity now to rebut the government's *prima facie* case, the Subjects protest that they should not be forced to wait, because "it would be ironic indeed if one who contests the lawfulness of a search and seizure were always required to acquiesce in a substantial invasion of those [privacy] interests simply to vindicate them."

---

[22]    As support for their contention that they should be granted a pre-indictment opportunity to rebut the government's *prima facie* evidence, the Subjects rely on an out-of-circuit case, which expressly noted a difference in practice from that of the D.C. Circuit. *See* Subjects' Mem. at 20 (citing *Matter of Feldberg*, 862 F.2d 622, 625–26 (7th Cir. 1988) (distinguishing *In re Sealed Case*, 676 F.2d at 814–15 & n.88)). Obviously, this Court is bound by the D.C. Circuit's practice and not that of the Seventh Circuit.

Subjects' Mem. at 26 (alteration in original) (quoting *United States v. Hubbard*, 650 F.2d 293,

321 (D.C. Cir. 1980)); Subjects' Reply at 8 (same). The Subjects' reliance on *Hubbard* is

misplaced, because the "substantial invasion" of privacy interests at stake in *Hubbard* was the

imminent *public* release of private documents, rather than use of confidential documents in an

ongoing secret grand jury investigation. In *Hubbard*, the D.C. Circuit ruled that documents

introduced by defendants in a Rule 41 proceeding "for the sole purpose of demonstrating the

unlawfulness [under the Fourth Amendment] of [a] search and seizure," where such documents

"were not determined by the trial judge to be relevant to the crimes charged . . . were not used in

the subsequent trial . . . [and] were not described or even expressly relied upon in . . . [the]

decision on the suppression motion," should remain sealed. 650 F.2d at 321 (internal quotation

marks omitted). The "irony inherent in the [district court's] decision to unseal [those]

documents," *id.* at 322, was that individuals who wished to challenge a search and seizure as

overbroad would be forced to submit documents, and have those documents potentially released

to the public, in order to vindicate their right to keep such documents private. *See id.* at 321

("[T]he act of attempting to show the excesses of the search by the extent of the documents

seized . . . [will] impair the very privacy rights they seek to vindicate."). No such inherent irony

exists here, as the 2018 Decision did not release the Subjects' communications to the public and

they remain subject to grand jury secrecy. In the event either of the Subjects is indicted, they

will have the opportunity, at a later stage of the proceedings, to attempt to vindicate any

remaining privilege concerns.

Finally, in addition to arguing that the time is now ripe for the Subjects to challenge the

crime-fraud exception, the Subjects contend that "[t]hey are entitled to this opportunity, as a

matter of due process, particularly in the context of a crime-fraud determination of apparently

sweeping scope and breadth." Subjects' Mem. at 22. The D.C. Circuit has expressly held "without merit" the notion that Subjects have a due process entitlement to the "secret evidentiary submissions in support of the enforcement of . . . subpoenas." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1150 (D.C. Cir. 2006). As in *In re Grand Jury Subpoena, Judith Miller*, the Subjects here "have offered nothing to take the present grand jury investigation outside the general rule [of secrecy], let alone elevate their objections to constitutional due process status." *Id.* at 1151. The Subjects' due process argument is therefore unavailing, as "nothing in the law of the District of Columbia Circuit requires or has ever required a district court to interrupt the grand jury while a recalcitrant witness enjoys a series of mini trials over his access to materials cloaked by grand jury secrecy." *Id.*

The Subjects have failed to show that the 2018 Decision represents any deviation from the well-established process for determining whether the crime-fraud exception applies, or to offer any reason to depart from the Supreme Court and D.C. Circuit's admonitions not to "saddle a grand jury with mini-trials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *In re Sealed Case*, 877 F.2d at 982 (quoting *Dionisio*, 410 U.S. at 17). Unsealing the crime-fraud ruling and materials now would not only jeopardize the secrecy of the ongoing grand jury investigation, but would further prolong and obstruct that time-sensitive work. "Should an indictment ultimately be returned against [Subjects], [they] may seek the exclusion of improperly obtained evidence" or pursue any credible claim of prosecutorial misconduct. *In re Sealed Case*, 877 F.2d at 982 (citing *United States v. Calandra*, 414 U.S. 338, 354 n.10 (1974)).

IV.     **CONCLUSION**

For the foregoing reasons, the Subjects' pending motion is granted in part and denied in

part. The Subjects' motion for reconsideration of the 2018 Decision's ruling that the Subjects'

disclosure of the Disclosed PDFs constituted a subject matter waiver of their attorney-client ▮▮

▮▮▮▮▮▮ privileges as to undisclosed communications on the same subjects as in the otherwise

privileged 34 pages of emails contained in the Disclosed PDFs is granted and that portion of the

ruling is vacated. Likewise, the Subjects are entitled to a protective order barring the

government from reviewing communications or information, other than the Disclosed PDFs,

between the Subjects or between the Subjects, alone or together, with their counsel, except to the

extent that such communications or information are subject to the crime-fraud exception. The

Subjects' motion is otherwise denied.

The government and the Subjects are directed, within 30 days of the return of an

indictment against either of the Subjects, a declination decision, or a lapse in the statute of

limitations period, whichever occurs earliest, to confer and to submit a joint report advising

whether any portions of either the 2018 Decision or this Memorandum Opinion may be unsealed

to the public in whole or in part and, if so, proposing any redactions.

An appropriate order accompanies this Memorandum Opinion.

Date: April 18, 2019

_Beryl A. Howell_
_____
BERYL A. HOWELL
Chief Judge

39

ATTACHMENT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THREE ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1344 | Misc. Action No. 18-sc-322 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**FILED UNDER SEAL** |

## ORDER

Upon consideration of the Motion for Reconsideration Of *Ex Parte* Ruling, Unsealing and Production of Materials, Sealing, and to Quash, ECF No. 16, submitted by Elliott Broidy, individually and as a representative for Broidy Capital Management, LLC and Circinus, LLC, and ▉▉▉▉▉▉, individually and on behalf of ▉▉▉▉▉▉▉ (collectively, the "Subjects"), the memoranda and exhibits submitted in support and opposition, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Subjects' motion is GRANTED IN PART and DENIED IN PART; and it is further

**ORDERED** that the Subjects' motion to reconsider the June 26, 2018 *ex parte* ruling ("2018 Decision") that their waiver of attorney-client and spousal privileges with respect to the communications contained in 45 PDF-formatted files that they voluntarily disclosed to the FBI in April 2018 ("Disclosed PDFs") operated as a subject matter waiver as to undisclosed privileged communications on the same subjects is GRANTED and that subject matter waiver portion of the 2018 Decision is VACATED; and it is further

**ORDERED** that the Subjects' motion for a protective order is GRANTED with respect to undisclosed privileged communications on the same subject matter as the Disclosed PDFs, but

only to the extent that those undisclosed privileged communications are not subject to the 2018

Decision's crime-fraud exception ruling; and it is further

**ORDERED** that the Subjects' motion, in all other respects, is DENIED; and it is further

**ORDERED** that the government and the Subjects are DIRECTED within 30 days of the

return of an indictment against either of the Subjects, a declination decision, or a lapse in the

statute of limitations period, whichever occurs earliest, to confer and submit a joint report

advising whether any portions of either the 2018 Decision or the April 18, 2019 Memorandum

Opinion accompanying this Order may be unsealed in whole or in part and, if so, proposing any

redactions.

**SO ORDERED.**

Date: April 18, 2019

BERYL A. HOWELL
Chief Judge