# Exhibit 6

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Orin Snyder
Direct: +1 212.351.2400
Fax: +1 212.351.6335
OSnyder@gibsondunn.com

September 23, 2020

VIA ELECTRONIC MAIL

Filberto Agusti, Esq.
Steptoe & Johnson LLP
1330 Connecticut Ave NW
Washington, DC 20036

Re:   *Elliott Broidy, et al., v. Global Risk Advisors LLC, et al*., Case No. 19-cv-11861-MKV (S.D.N.Y.)

Dear Mr. Agusti:

We write in response to your September 9, 2020 letter.

As you know, the identified basis for the purported conflict asserted in your August 26, 2020 letter is false. You said in that letter that during her tenure in the Special Counsel's office, Ms. Ahmad "participated in [an] interview of Rick Gates, which focused extensively on Mr. Broidy, and in particular on issues that became public" when Mr. Broidy's "private emails were hacked and leaked to the media." Aug. 26 Ltr. at 1. As I explained in my September 2 letter, that is incorrect on multiple levels. The interview of Mr. Gates on March 18, 2018 to which you referred in your August 26 letter was conducted not by Ms. Ahmad, but by other members of the Special Counsel's office. The memorandum of that interview has since been released by the FBI and shows that Ms. Ahmad was not even present during the interview. You would have known this if you had conducted even a basic investigation.

Unfortunately, instead of acknowledging that the conflict manufactured in your August 26 letter was based on a falsehood, your September 9, 2020 letter doubles down on that position based on a series of mischaracterizations, baseless speculation, and more outright falsehoods. As discussed below, your September 9 letter further confirms that any attempt to disqualify Ms. Ahmad or Gibson Dunn as counsel in this matter would be without a good faith basis in fact or law, and transparently tactical.

*First*, with respect to the March 18, 2018 Gates interview referenced in your August 26 letter:  Even assuming (as you speculate in your letter) that that there may be "details" from that interview that were "not captured in" the interview memorandum that has been released by the FBI (Sept. 9 Ltr. at 2), Ms. Ahmad was (again) *not even present* during that interview. As such, any "uncaptured details" from that interview cannot be "imputed" to Ms. Ahmad

**GIBSON DUNN**

Filberto Agusti, Esq.
September 23, 2020
Page 2

under Rule 1.11(c).* *See* N.Y. Rule Prof. Conduct 1.11(c) cmt. 8 (explaining that the rule only applies where the lawyer has "actual knowledge of the information" and rejecting the "imput[ation]" of such knowledge). Nor is there any basis to infer that a *separate* interview of Mr. Gates that also took place on March 18, 2018 in which Ms. Ahmad *did* participate related to Mr. Broidy. Indeed, the publicly-available information regarding that separate interview—including the fact that a different FBI agent attended that separate interview and prepared the memorandum of the interview (which has since been released by the FBI in redacted form)—support the opposite inference. In any event, to be clear, Ms. Ahmad did not interview Mr. Gates (or participate in an interview of Mr. Gates) in which she obtained "confidential government information" about Mr. Broidy—on March 18, 2018 or at any other time—during her tenure at the Department of Justice.

*Second*, and relatedly, your repeated assertions that Ms. Ahmad personally "investigated Mr. Broidy" and/or "participated in a government investigation of Mr. Broidy" are false and supported by nothing in either your August 26 or September 9 letters. *See* Sept. 9 Ltr. at 1, 3; *see also id.* at 1 (purporting to decry the idea that you "should stay silent upon discovering that an adversary was previously part of a government team investigating the lawyer's client"). This newfound characterization of the Special Counsel's investigation also directly contradicts your and your client's numerous prior statements on this topic. *See, e.g.*, Aug. 26 Ltr. at 1 (asserting that Mr. Broidy "was never a target of the Mueller investigation"); Compl. ¶ 321 (alleging that Mr. Broidy "was never interviewed by Mueller's team" and "does not appear once in the Mueller Report"); Pls.' Opp'n to Defs.' Mot. to Dismiss [Dckt. 43] at 19 & 118 n. 299, *Broidy Capital Mgmt. v. Muzin,* No. 19-cv-00150 (D.D.C. June 4, 2019) (asserting that "Mr. Broidy had nothing to do with the events which the Special Counsel investigated" and "was never a target nor a subject of the investigation and was not contacted by FBI or Justice Department officials acting as part of that investigation").

*Third*, you resort to hypotheticals, conjecture, and rank speculation throughout your September 9 letter as to other possible ways that Ms. Ahmad could have learned of confidential government information regarding Mr. Broidy and/or the alleged hack of his information—including, among other examples, by virtue of Ms. Ahmad's "well-known cyber background" and her "long working relationships" with "prosecutors and FBI agents . . . throughout DOJ." Sept. 9 Ltr. at 2. These musings utterly fail to satisfy the burden to

---

* Contrary to the characterization in your September 9 letter, I did not contend in my September 2 letter that the March 18, 2018 Gates interview "could not" constitute confidential government information "because there are notes of the interview that have since been made public." Sept. 9 Ltr. at 2. Rather, I noted—correctly—that "any *information in memoranda* from interviews with Mr. Gates *that have been released pursuant to FOIA and made public*" cannot constitute "confidential government information" under Rule 1.11(c). Sept. 2 Ltr. at 2.

**GIBSON DUNN**

Filberto Agusti, Esq.
September 23, 2020
Page 3

establish a conflict under Rule 11.1(c). *See, e.g.*, *Pu v. Greenthal Mgmt. Corp.*, No. 08-CIV-10084, 2009 WL 648898, at *4 (S.D.N.Y. Mar. 10, 2009) ("[M]otions for disqualification require a high standard of proof by the moving party, and mere speculation will not suffice.") (internal quotations, citations, and alterations omitted); *see also, e.g.*, *United States v. Rasco*, No. CR408-100, 2009 WL 2341435, at *3 & n.7 (S.D. Ga. July 29, 2009) (evidence suggesting that "AUSAs and federal case agents have a general practice of divulging confidential information to" other AUSAs who were not "responsible for the relevant cases" was insufficient to establish that attorney acquired confidential government information under Georgia's equivalent to New York Rule 1.11(c)).

*Fourth*, it is telling that like your August 26 letter, your September 9 letter makes no attempt to identify what information Ms. Ahmad could possibly have acquired during her government service that could be used to Mr. Broidy's "material disadvantage" in this litigation. N.Y. Rule Prof. Conduct 1.11(c). Indeed, even if it were true as you originally alleged—and it is not—that Ms. Ahmad acquired confidential government information through an interview of Mr. Gates regarding "issues that became public" (such as the 1MDB matter) when Mr. Broidy's "private emails were hacked and leaked to the media," you have not identified how any such information could be relevant to the *circumstances of the hacking itself*—and more specifically, Mr. Broidy's (baseless) claims in this litigation that the GRA defendants participated in and were responsible for the alleged hacking of Mr. Broidy's information.

*Finally*, your September 9 letter recycles the baseless accusations that the GRA defendants chose to engage Ms. Ahmad and Gibson Dunn to defend them in this action—as opposed to any of the other "tens of thousands of legal options in New York"—because Ms. Ahmad had "previously investigated Mr. Broidy." Sept. 9 Ltr. at 1; *see also id.* ("We doubt this is a coincidence."). This notion is just as false and unprofessional as the similar accusations in your August 26 letter. As I told you in my September 2 letter, I was retained to represent the GRA defendants based on (among other things) my prior relationship with Mr. Chalker, whom I first met in early 2019 in connection with unrelated matters. Your purported "understanding"—for which you identify no basis or source—"that Ms. Ahmad has known Kevin Chalker personally for many years" is also false: Ms. Ahmad met Mr. Chalker for the first time early this year.[†]

\* \* \*

---

[†] Also false is your allegation—for which you again identify no basis or source—that "Mr. Chalker and his associates . . . provided materials hacked from Mr. Broidy to the Department of Justice in early 2018." Sept. 9 Ltr. at 3.

**GIBSON DUNN**

Filberto Agusti, Esq.
September 23, 2020
Page 4

In light of the foregoing, there is little question that your letters asserting a purported conflict related to Ms. Ahmad's government service are "motivated not by a fine sense of ethics," as you purport to profess at the outset of your September 9 letter, "but, bluntly, by a desire to achieve a tactical advantage." *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 41 (D.D.C. 1984). Particularly given the utter lack of support for or merit to the purported conflict you assert, there is no justification for the further interrogation of Ms. Ahmad demanded in your September 9 letter. *See* Sept. 9 Ltr. at 2 (demanding, among other things, that Ms. Ahmad disclose whether she has had any discussion relating in any way to Mr. Broidy or the alleged hack, "whether during her government service or afterwards," and regardless of whether any such discussions constitute "confidential government information").

Gibson Dunn and the GRA defendants continue to reserve all rights and remedies, under Rule 11 and otherwise.

Sincerely,

*/s/ Orin Snyder*

Orin Snyder

cc:   Gwendolyn Prothro Renigar, Esq.
      Charles Michael, Esq.
      Jason C. Schwartz, Esq.
      Zainab N. Ahmad, Esq.
      Paul J. Kremer, Esq.