**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELLIOTT BROIDY and<br>BROIDY CAPITAL MANAGEMENT, LLC,<br><br>                      Plaintiffs,<br><br>        v.<br><br>GLOBAL RISK ADVISORS LLC,<br>GRA QUANTUM LLC,<br>GRA RESEARCH LLC,<br>GLOBAL RISK ADVISORS EMEA<br>LIMITED,<br>GRA MAVEN LLC,<br>QRYPT, INC.,<br>KEVIN CHALKER,<br>DENIS MANDICH,<br>ANTONIO GARCIA, and<br>COURTNEY CHALKER<br><br>                    Defendants. | Case No. 1:19-CV-11861 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SANCTIONS**

Dated: February 23, 2023

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ..................................................................... 4

I.      Plaintiffs Raise Ms. Ahmad's Conflict with Gibson Dunn .................................. 5

II.     Plaintiffs Obtain Evidence of Ms. Ahmad's Investigation of Mr. Broidy ...................... 8

III.    Plaintiffs Attempt to Resolve the Issue Without Court Intervention .......................... 10

ARGUMENT ................................................................................. 11

I.      Gibson Dunn Had a Disqualifying Conflict of Interest ................................... 12

        A.      Ms. Ahmad Acquired Confidential Government Information About
                Plaintiffs ..................................................................... 14

        B.      Ms. Ahmad's Knowledge of this Confidential Information Could Have
                Been Used to Materially Disadvantage Plaintiffs ................................ 15

        C.      Gibson Dunn Failed to Screen Ms. Ahmad ........................................ 17

II.     Gibson Dunn Should be Sanctioned ..................................................... 17

CONCLUSION .............................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Ed. Of City of New York v. Nyquist*,
   590 F.2d 1241 (2d Cir. 1979)...............................................................................3

*Broidy Cap. Mgmt., LLC v. State of Qatar*,
   No. 2:18-CV-02421-JFW-E (C.D. Cal.)...............................................................3

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
   No. 18-md-02843-VC, ECF 1104 (N.D. Cal. Feb. 9, 2023).......................... *passim*

*Gen. Motors Corp. v. City of New York*,
   501 F.2d 639 (2d Cir. 1974)................................................................................13

*Green v. City of New York*,
   No. 1:10 Civ. 8214 (PKC), 2011 WL 2419864 (S.D.N.Y. June 7, 2011) ..............13

*Heyliger v. Collins*,
   No. 3:11 Civ. 1293, 2014 WL 910324 (N.D.N.Y. Mar. 10, 2014).........................17

*Kronberg v. LaRouche*,
   No. 1:09-CV-947 AJT/TRJ, 2010 WL 1443934 (E.D. Va. Apr. 9, 2010)..................15, 16, 17

*Leopold v. United States Dep't of Just.*,
   487 F. Supp. 3d 1 (D.D.C. 2020).........................................................................15

*Madison 92nd Street Assocs., LLC v. Marriott Int'l, Inc.*,
   No. 13 Civ. 291 (CM), 2013 WL 5913382 (S.D.N.Y. Oct. 31, 2013),
   *aff'd*, 603 F. App'x 19 (2d Cir. 2015)..............................................................19, 20

*Merck Eprova AG v. ProThera, Inc.*,
   670 F. Supp. 2d 201 (S.D.N.Y. 2009).................................................................13

*In re Nat'l Prescription Opiate Litig.*,
   No. 1:17-MD-2804, 2019 WL 1274555 (N.D. Ohio Mar. 20, 2019) ................16, 17

*Offor v. Mercy Med. Ctr.*,
   No. 17 Civ. 1872 (NRB), 2018 WL 3364389 (S.D.N.Y. July 10, 2018).................18

*THOIP v. Walt Disney Co.*,
   No. 08 Civ. 6823 (SAS), 2009 WL 125074 (S.D.N.Y. Jan. 20, 2009).............12, 18

*United States v. Davis*,
   845 F.3d 282 (7th Cir. 2016) ..............................................................................14

*United States v. Gates*,
No. 17 Crim. 201-2 (ABJ), ECF 643 (D.D.C. Dec. 10, 2019) .................................................8

*United States v. Shulaya*,
No. 1:17 Cr. 00350-LAP, ECF 819 (S.D.N.Y. June 11, 2018) ...............................................14

*United States v. Trujillo*,
136 F.3d 1388 (10th Cir. 1998) ...............................................................................14

**Statutes**

22 N.Y.C.R.R. § 1200.0, R. 1.11(a)..........................................................................13

22 N.Y.C.R.R. § 1200.0, R. 1.11(b) .............................................................13, 17, 19

22 N.Y.C.R.R. § 1200.0, R. 1.11(c).................................................... 12, 15, 16, 17, 19

28 U.S.C. § 1927.............................................................................................*passim*

Plaintiffs Elliott Broidy and Broidy Capital Management, LLC respectfully submit this memorandum of law in support of their motion for sanctions against Defendants' former counsel Gibson, Dunn & Crutcher LLP ("Gibson Dunn").[1]

## **PRELIMINARY STATEMENT**

This motion arises from Gibson Dunn's egregious failure, contrary to Rule 1.11 of the Rules of Professional Conduct, to screen from this case a former prosecutor at the Office of the Special Counsel ("OSC"), Zainab Ahmad—who, as a member of Special Counsel Robert Mueller's team before joining Gibson Dunn in July 2019, had investigated Plaintiff Elliott Broidy and obtained confidential information concerning Mr. Broidy and the hacking at the center of this case. In the years since, when Plaintiffs' counsel has raised Ms. Ahmad's government employment as a disqualifying conflict of interest under Rule 1.11, Gibson Dunn's Orin Snyder and its general counsel have repeatedly and flatly denied that Ms. Ahmad was involved in any way in investigating Mr. Broidy while she was at the OSC or that she had any confidential government information concerning Mr. Broidy stemming from her employment there—they accused Plaintiffs' counsel of relying on "falsities"[2]—even in the face of a sworn declaration from a witness with personal knowledge that Ms. Ahmad had in fact investigated Mr. Broidy.

*The one thing, however, that Gibson Dunn has not done is provide a declaration from Ms. Ahmad herself*, notwithstanding Plaintiffs' request that it do so and notwithstanding this Court's observation at the October 11, 2022 pre-motion conference that only Plaintiffs had

---

[1] Submitted herewith in support of the motion are the Declaration of Elliott Broidy, dated February 23, 2023 ("Broidy Decl."), and the Declaration of Daniel R. Benson, dated February 23, 2023, with supporting exhibits ("Benson Decl."). Unless otherwise indicated, emphasis in quotations herein has been added, and internal citations and quotations omitted.

[2] Benson Decl., Ex. K at 2.

submitted admissible evidence on the disqualification issue.  The only inference that can be drawn from Ms. Ahmad's refusal to provide a declaration is that she was in fact involved in investigating Mr. Broidy, she should have been screened and Gibson Dunn must be sanctioned.

Rule 1.11 is intended to prevent government lawyers from leveraging the vast prosecutorial and investigatory powers of the government to gain an unfair and improper advantage in private litigation.  But that is what Gibson Dunn plainly sought to do here.  In May 2020, Gibson Dunn appeared in this action as counsel for Defendants, but instead of screening Ms. Ahmad from its work on this matter, as any prudent law firm would have done, it assigned her to the matter as one of its principal lawyers representing Defendants.

When, more than two years ago, Plaintiffs' former counsel raised with Gibson Dunn this disqualifying conflict of interest under Rule 1.11, Mr. Snyder, its lead lawyer on this action, responded with "his typical bombast," *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, Case No. 18-md-02843-VC, ECF 1104, at 39 (N.D. Cal. Feb. 9, 2023) ("*Facebook Sanctions Order*") (sanctioning Gibson Dunn for "egregious" misconduct by Mr. Snyder and others "reflecting a sustained, concerted, bad-faith effort to throw obstacle after obstacle in front of plaintiffs"), denying that Ms. Ahmad had had anything to do with Mr. Broidy while she was at the OSC and accusing Plaintiffs' counsel of misconduct and threatening sanctions if they pursued the matter.[3]  Gibson Dunn, a very large law firm with many highly experienced litigators, continued to insist that Ms. Ahmad remain one of its lead lawyers—as it did even when current counsel later presented it with clear and uncontradicted evidence of its conflict.

Plaintiffs' current counsel raised the conflict issue again, in May 2022, this time with direct evidence, including a sworn declaration from a witness.  Counsel obtained, and, before

---

[3] A copy of the *Facebook* Sanctions Order is attached to the Benson Decl. as Exhibit A.

bringing the matter to the Court's attention, provided Gibson Dunn with, a sworn declaration from Richard Gates, a target of the OSC's investigation—whose cooperation with the OSC received the highest praise from prosecutors at his sentencing—contradicting Gibson Dunn and Mr. Snyder's unsupported conclusory denials that Ms. Ahmad, while at the OSC, had anything to do with any investigation of or confidential information about Mr. Broidy. In particular, Mr. Gates attested that during the meeting with Ms. Ahmad, he was questioned about Mr. Broidy and the hacking that is subject of this action.[4]

Gibson Dunn's Mr. Snyder again responded—*not with any contrary evidence*—but again with bluster and threats, refusing to provide its own declaration from Ms. Ahmad or any other evidence disputing Mr. Gates's declaration and again threatening Plaintiffs' counsel with sanctions if Plaintiffs moved to disqualify the firm. Gibson Dunn then abruptly withdrew from the action days before Plaintiffs' disqualification motion was due.

As this Court observed at the October 11, 2022 pre-motion conference, Gibson Dunn's conduct "doesn't smell good." Gibson Dunn's imprudent, reckless and seemingly inexplicable conduct gives rise to only one inference—it and its clients sought not to ensure that it complied with the Rules of Professional Conduct but instead to leverage Ms. Ahmad's government experience with and knowledge of the subject matter of this action. This is reflected not just by the firm's insistence that she be one of its lead lawyers on the action, but also by the circumstances under which Gibson Dunn was retained in the first place. Plaintiffs first brought the claims raised here against Defendants Kevin Chalker and his firm Global Risk Advisors ("GRA") in March 2018 in the Central District of California, where Defendants were represented

---

[4] A copy of the Declaration of Richard W. Gates, III, dated May 13, 2022 ("Gates Decl."), is attached to the Benson Decl. as Exhibit B.

by attorneys from Wilmer Hale's New York office. Wilmer Hale successfully obtained the dismissal of those claims on personal jurisdiction grounds, but when Plaintiffs re-filed the claims in this Court in December 2019, Defendants instead retained Gibson Dunn, with Mr. Snyder and Ms. Ahmad as their lead counsel. The intervening change was Gibson Dunn's hiring of Ms. Ahmad.

As a result of Gibson Dunn's misconduct—"using delay, misdirection, and frivolous arguments to make litigation unfairly difficult and expensive for their opponents," *Facebook* Sanctions Order at 1—Plaintiffs have incurred and continue to incur hundreds of thousands of dollars in fees investigating and litigating Gibson Dunn's conflict. Gibson Dunn, not Plaintiffs, should bear those expenses.

## FACTUAL BACKGROUND

Plaintiffs originally filed, in March 2018 in the Central District of California, an action against Defendants and others arising from the Qatar-sponsored hacking of their confidential information. *See Broidy Cap. Mgmt., LLC v. State of Qatar*, No. 2:18-CV-02421-JFW-E (C.D. Cal.) ("California Action"). Defendants GRA and Kevin Chalker were represented in the California Action by attorneys from Wilmer Hale's New York office and Cozen O'Connor's Los Angeles office. (California Action, ECF No. 115.) In August 2018, the California Action was dismissed against GRA and Chalker for lack of personal jurisdiction. (*Id.*, ECF No. 212.) In July 2019, Ms. Ahmad left the OSC and joined Gibson Dunn. (*See Former Special Counsel Prosecutor Zainab Ahmad to Join Gibson Dunn as a Partner in New York* (July 10, 2019), https://www.gibsondunn.com/former-special-counsel-prosecutor-zainab-ahmad-to-join-gibson-dunn-as-partner-in-new-york/).[5]

---

[5] Before joining the OSC, Ms. Ahmad had worked as an Assistant U.S. Attorney at the U.S. Attorney's Office in the Eastern District of New York, including as Deputy Chief of the National Security and Cybercrime section. (*See id.*).

In December 2019, Plaintiffs filed this action. (ECF No. 1.) Although Wilmer Hale had represented them in the California Action arising from the same events, and had successfully gotten the case dismissed, GRA and Chalker changed counsel and hired Gibson Dunn, of which Ms. Ahmad was now a partner, to represent them in this case. Ms. Ahmad was one of the principal Gibson Dunn partners, along with Mr. Snyder, representing Defendants from at least May 2020, when the firm appeared (*see* ECF No. 36), until July 2022, when Gibson Dunn withdrew and was replaced by Hughes Hubbard & Reed (*see* ECF No. 137).

## I.  Plaintiffs Raise Ms. Ahmad's Conflict with Gibson Dunn

Plaintiffs came to suspect that at the OSC, Ms. Ahmad had access to and acquired confidential government information about Plaintiffs. Plaintiffs' suspicion was based on the March 2020 release of a redacted FBI Form FD-302 ("302") memorializing a March 18, 2018 interview with Richard Gates, a target of the investigation. (*See* Benson Decl., Ex. C.) According to the 302, DOJ attorneys Andrew Weissmann and Greg Andres conducted the interview and spent a significant amount of time investigating issues related to Mr. Broidy. (*See id.*) The 302 then notes that Ms. Ahmad and an unnamed FBI agent "joined the meeting," and "[a]t this point, SSA [REDACTED] took notes of the interview and it will be documented in a separate 302." (*Id.* at 4.) This supposedly "separate" interview, according to the 302, lasted an hour and a half, at which point Ms. Ahmad and the unnamed FBI agent who arrived with her "left the interview and SSA [REDACTED] resumed taking notes." (*Id.*)

After learning about the March 2018 interview, Plaintiffs' prior counsel at Steptoe & Johnson LLP, in August 2020, brought to Gibson Dunn's attention Ms. Ahmad's potential

<hr>

At the U.S. Attorney's Office, "she worked closely with the FBI, U.S. intelligence community, the Department of State and the Department of Defense, and she traveled to Europe, the Middle East and West Africa seeking evidence, testimony and extradition assurances." (*Id.*)

disqualifying conflict of interest under Rule 1.11, and asked Gibson Dunn "to investigate her role, what consent (if any) she received from the government to work on the above matter, how she was not timely screened from the case, and whether your firm intends to withdraw from the matter." (Benson Decl., Ex. D at 2.) In response, on September 2, 2020, Mr. Snyder denied that there was any conflict, asserting that "Ms. Ahmad did not acquire any 'confidential government information' during her tenure at the Department of Justice that could be used to Mr. Broidy's 'material disadvantage' in this litigation, and nothing in your letter credibly suggests otherwise." (Benson Decl., Ex. E at 2-3.) Mr. Snyder, "with his typical bombast" (*Facebook* Sanctions Order at 39), accused *Plaintiffs* of misconduct in raising the conflict: "[I]t is clear that the purpose of your August 26 letter…is to distract from the lack of merit to Mr. Broidy's claims against GRA in this litigation, and to improperly exert pressure on GRA by impugning its chosen counsel and her more than a decade of distinguished government service." (Benson Decl, Ex. E at 3.)

Steptoe then wrote to Gibson Dunn again on September 9, 2020 in response to Mr. Snyder's "needless and false personal attacks," noting that it was their "duty and responsibility to act in the face of troubling and potentially unethical conduct." (Benson Decl., Ex. F at 1.) Steptoe stated that Mr. Snyder's representation concerning Ms. Ahmad "suggests that Ms. Ahmad may have acquired 'confidential government information' about Mr. Broidy, but your firm has made a subjective judgment—based on an assessment of facts nowhere in your letter— that the information could not materially disadvantage Mr. Broidy in this case." (*Id.* at 2.) Steptoe also pointed out that it was unlikely to be a coincidence that GRA had switched from Wilmer Hale to Gibson Dunn and "just happened to hire one of a handful of former [DOJ] attorneys who had participated in a government investigation of Mr. Broidy that appears to have

been triggered by the hacking scheme underlying the civil case." (*Id.* at 1.) Steptoe requested that Gibson Dunn inform them if "1) Ms. Ahmad had ever participated in any witness or source interview or otherwise discussed Mr. Broidy or the hack-and-smear campaign targeting him with any DOJ officials (including prosecutors and FBI agents), whether during her government service or afterwards, and 2) if, in fact, the representations in your September 2 letter are indeed based on weighing what may or may not disadvantage Mr. Broidy, and, if so, the basis for your conclusion that the information would not materially disadvantage Mr. Broidy in the civil case." (*Id.* at 2.)

On September 23, 2020, Mr. Snyder responded with more "bombast" and threats: "Unfortunately, instead of acknowledging that the conflict manufactured in your August 26 letter was based on a falsehood, your September 9, 2020 letter doubles down on that position based on a series of mischaracterizations, baseless speculation, and more outright falsehoods. As discussed below, your September 9 letter confirms that any attempt to disqualify Ms. Ahmad or Gibson Dunn as counsel in this matter would be without a good faith basis in fact or law, and transparently tactical." (Benson Decl, Ex. G at 1.) Mr. Snyder also asserted that "Ms. Ahmad did not interview Mr. Gates (or participate in an interview of Mr. Gates) in which she obtained 'confidential government information' about Mr. Broidy—on March 18, 2018 or at any other time—during her tenure at the Department of Justice." (*Id.* at 2.) Mr. Snyder further claimed that Gibson Dunn was retained by Defendants "based on (among other things) my prior relationship with Mr. Chalker, whom I first met in early 2019 in connection with unrelated matters." (*Id.* at 3.)

On October 4, 2020, after they had spoken by phone, Gibson Dunn's general counsel wrote to Steptoe's general counsel, stating that "Ms. Ahmad did not investigate Mr. Broidy, or

acquire any confidential government information regarding Mr. Broidy, during her tenure in the Special Counsel's office or any other part of the Department of Justice." (Benson Decl., Ex. H at 2.) Based on Gibson Dunn's express representations, Steptoe did not raise the issue with the Court at that time.

## II. Plaintiffs Obtain Evidence of Ms. Ahmad's Investigation of Mr. Broidy

In May 2022, Plaintiffs obtained a declaration from Richard Gates, a target of the OSC's investigation who cooperated with the OSC prosecutors. In requesting a downward departure from the sentencing guidelines, the Government described how Mr. Gates "provid[ed] truthful information to the Special Counsel's Office and several other prosecuting offices of the Department of Justice." *United States v. Gates*, No. 17 Crim. 201-2 (ABJ), ECF 643, at 1 (D.D.C. Dec. 10, 2019). As the Government put it, Mr. Gates's assistance was "extraordinary." *Id.*

Mr. Gates's declaration sets forth that, as part of this cooperation, he was interviewed with Ms. Ahmad present on at least three occasions in 2018, during which he was asked numerous questions about Mr. Broidy. The first interview with Ms. Ahmad and others occurred on March 18, 2018.[6] Mr. Gates attests that during this interview with Ms. Ahmad, he was "asked a series of questions pertaining to topics associated with Mr. Broidy. . . ." (Gates Decl. ¶ 12.)

At the outset of the interview, Mr. Gates was asked, "[a]re you aware that Elliott Broidy's emails were hacked?" (*Id.* ¶ 13.) When Mr. Gates answered affirmatively, he was asked if he knew who hacked Mr. Broidy's emails, and "[d]o you know how [Mr. Broidy's] emails were hacked?" (*Id.* ¶¶ 14-15.) Mr. Gates explained that he believed that agents of Qatar conducted

---

[6] Mr. Gates recalls that there were two distinct interviews on March 18, rather than an interview with Ms. Ahmad that took place in the middle of the interview with the other OSC attorneys, as described in the 302. Mr. Gates attests that Ms. Ahmad attended the second meeting, and that was when he was asked questions concerning Mr. Broidy. (*See* Gates Decl. ¶¶ 6-11.)

the hack, but that he did not have any knowledge of how the hacking was carried out. (*See id.*) He was then shown a wide variety of documents described in his declaration, many of which were not from his devices, including screenshots of WhatsApp messages that Mr. Broidy exchanged with others, and personal emails including an email between Mr. Broidy and his wife. (*See id.* ¶¶ 24-25.)

Mr. Gates realized soon after that at least some of the documents Ms. Ahmad and her colleagues had shown him were part of the materials stolen from Mr. Broidy in the hacking. (*See id.* ¶ 22.) However, to Plaintiffs' knowledge, none of Mr. Broidy's WhatsApp messages have ever been disseminated publicly to the media or otherwise. (Broidy Decl. ¶ 7.) Indeed, to Plaintiffs' knowledge, no media outlet reported on any content from Mr. Broidy's WhatsApp messages, and no reporters ever inquired of Mr. Broidy or his representatives about any of his WhatsApp messages. (*Id.* ¶¶ 7-8.) Accordingly, it is apparent that Ms. Ahmad and the OSC obtained them from some non-public source.[7]

On March 20, 2018, Mr. Gates had another interview with Ms. Ahmad and Mr. Weissmann, during which he was asked a number of questions relating to "Mr. Broidy's activities" (Gates Decl. ¶ 33) and was shown emails and screenshots of WhatsApp messages between Mr. Broidy and other individuals that he had never seen before (*id.* ¶ 40). On October

---

[7] As of March 18, 2018, Mr. Broidy had voluntarily provided to DOJ only one PDF file of hacked materials that he had received from a reporter, which did not include any WhatsApp messages, and only a very limited number of the emails related to the topics that Mr. Gates was asked about during his interview with Ms. Ahmad. (Broidy Decl. ¶ 5.) To Mr. Broidy's knowledge, DOJ also had not seized any documents or communications from him at that time, as DOJ executed the first search warrants on Mr. Broidy and his companies in the summer of 2018. (*Id.* ¶ 6.)

29, 2018, Mr. Gates was interviewed for a third time by Ms. Ahmad and others and was again asked questions regarding Mr. Broidy. (*See id.* ¶¶ 43-44.)

## III. Plaintiffs Attempt to Resolve the Issue Without Court Intervention

Given this new information, Plaintiffs' counsel contacted Gibson Dunn on May 16, 2022, and provided a copy of the Gates Declaration to Gibson Dunn on May 17. (Benson Decl. ¶ 11.) Gibson Dunn responded with a lengthy letter on May 18. (*See id.*, Ex. I.) Gibson Dunn's primary response was to impugn the veracity of Mr. Gates's sworn statements, deny that Ms. Ahmad had been present when Mr. Gates was interviewed about Mr. Broidy on March 18, 2018, and speculate, based on redactions in the 302s, about what was discussed during the other two interviews. Gibson Dunn also denied that there was any confidential government information at issue, falsely claiming that all of the materials stolen from Mr. Broidy are now publicly available (*id.* at 6) and accused Plaintiffs' counsel of improper delay: "We are confident that the court will not look kindly on your clear attempt to strongarm opposing counsel in this matter, and that will be compounded by Mr. Broidy's years-long tactical delay in asserting this alleged conflict of interest, which in any event is independently fatal to his argument." (*Id.* at 8.)

Meanwhile, as part of their ongoing investigation, Plaintiffs also obtained a corroborating written statement from Thomas C. Green, Mr. Gates's counsel during his interviews with the OSC, who stated that he was present at the March 18, March 20, and October 29, 2018, interviews detailed in Mr. Gates's declaration and that "when Ms. Ahmad was present [he] believe[s] the interrogations related to Mr. Broidy and other matters." (Benson Decl., Ex. J.)

Plaintiffs informed Gibson Dunn that they had obtained corroboration of Mr. Gates's declaration and requested that Ms. Ahmad provide a declaration of her own, which Plaintiffs would consider before raising the issue with the Court. (Benson Decl., Ex. K at 5.) Gibson Dunn refused to provide any declaration and declined to withdraw as counsel, instead threatening

Plaintiffs' counsel again with a sanctions motion: "Gibson Dunn and the GRA defendants continue to reserve all rights, especially in the event you proceed with a patently strategic and baseless motion based on falsities.  To be clear, we will ask the Court to hold you and your client accountable for filing a disqualification motion on this record."  (*Id.* at 2; *see also* Benson Decl., Ex. L.)

Plaintiffs then filed a letter with the Court on June 27, 2022, requesting a pre-motion conference concerning their anticipated disqualification motion.  (ECF No. 131.)  Gibson Dunn failed to timely respond to Plaintiffs' letter, and at 11:57 pm on June 30—three minutes before its response was due—emailed the Court, stating that "we plan to file our response" by noon the next day "[b]ecause of unforeseen delays."  (Benson Decl., Ex. M.)  On July 1, the Court granted Plaintiffs leave to file their motion, with a filing deadline of August 1.  (ECF No. 132.)  More than three weeks later, on July 25, as Plaintiffs were drafting their motion, Gibson Dunn was abruptly replaced by Hughes Hubbard as Defendants' counsel.  (ECF No. 137.)

Given the time and resources expended in connection with investigating and litigating Gibson Dunn's conflict, on August 1, 2022, Plaintiffs filed their pre-motion conference letter in connection with this motion for sanctions.  (ECF No. 138.)  On October 11, 2022, the Court held a pre-motion conference.  Noting that "it doesn't smell good," the Court set a briefing schedule for Plaintiffs' motion for sanctions.  (ECF No. 148.)

## ARGUMENT

Plaintiffs bring this motion for sanctions under 28 U.S.C. § 1927 and the Court's inherent power to recover their attorneys' fees and their expenses incurred in investigating and litigating Gibson Dunn's conflict of interest.  Section 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy

personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Similarly, this Court has the "inherent power to impose attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . ." *THOIP v. Walt Disney Co.*, No. 08 Civ. 6823 (SAS), 2009 WL 125074, at *4 (S.D.N.Y. Jan. 20, 2009) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)).

Gibson Dunn's unreasonableness, vexatiousness, and bad faith here are evident. The firm had a conflict of interest under the Rules of Professional Conduct, which was grounds for disqualification. Instead of screening Ms. Ahmad from the case from the outset, or withdrawing when Plaintiffs raised the issue, Gibson Dunn responded with bluster, including false denials and threats that it would seek sanctions against Plaintiffs' counsel—but no evidence—until the firm ultimately withdrew days before Plaintiffs were going to file their motion to disqualify. Gibson Dunn's bad faith conduct has unreasonably delayed, and to the extent Defendants have improperly gained confidential government information has tainted, these proceedings, causing Plaintiffs to incur entirely unnecessary expenses.

## I. Gibson Dunn Had a Disqualifying Conflict of Interest

The conflict of interest arising out of Ms. Ahmad's involvement in the OSC's investigation of Mr. Broidy was grounds for disqualification of the firm, because Ms. Ahmad has knowledge of confidential government information that could have been used to Plaintiffs' material disadvantage in these proceedings. *See* New York Rules of Prof'l Conduct, 22 N.Y.C.R.R. § 1200.0, R. 1.11(c) (prohibiting former government lawyers "having information that the lawyer knows is confidential government information about a person, acquired when the lawyer was a public officer or employee" from representing "a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person."). For purposes of Rule 1.11(c), "confidential government

information" means information "obtained under governmental authority and that, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, and that is not otherwise available to the public." *Id.* A firm with which such a former government lawyer is associated is also prohibited from the representation unless "the disqualified lawyer is timely and effectively screened from any participation in the matter." 22 N.Y.C.R.R. § 1200.0, R. 1.11(b).[8]

The concern in this situation is "that the former Government attorney might in the later private action use information with respect to the matter in issue which was gained in confidence as a public employee and was unavailable to the other side." *See Gen. Motors Corp. v. City of New York*, 501 F.2d 639, 652 (2d Cir. 1974) *as discussed in Bd. of Ed. Of City of New York v. Nyquist*, 590 F.2d 1241, 1247 n.1 (2d Cir. 1979) (Mansfield, J., concurring). As explained in comment 4 to Rule 1.11, "where the successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client." 22 N.Y.C.R.R. § 1200.0, R. 1.11, comment 4.

However, while courts in this Circuit in deciding disqualification motions look to the state disciplinary rules and the American Bar Association's Model Rules for guidance, "disqualification may be justified even in the absence of a clear ethical breach." *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 208 (S.D.N.Y. 2009). The touchstone is whether the violation or "an attorney's conduct tends to taint the underlying proceedings." *Id.*

---

[8] If Ms. Ahmad was "personally and substantially" involved in investigating the hacking of Mr. Broidy specifically while at the OSC, disqualification would have also been separately warranted under Rule 1.11(a)(2), which provides that a lawyer who served as an employee of the government "shall not represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation." 22 N.Y.C.R.R. § 1200.0, R. 1.11(a)(2); *see Green v. City of New York*, No. 10 Civ. 8214 PKC, 2011 WL 2419864, at *2 (S.D.N.Y. June 7, 2011). (disqualifying former city attorneys where "the scope of the representation in the first matter included advice on subjects highly relevant to the second matter").

## A. Ms. Ahmad Acquired Confidential Government Information About Plaintiffs

The Gates Declaration directly refutes Gibson Dunn's unsupported assertion that "Ms. Ahmad did not investigate Mr. Broidy, or acquire any confidential government information regarding Mr. Broidy" (Benson Decl., Ex. H), and makes clear that the opposite is the truth. During each of his three interviews with Ms. Ahmad, Mr. Gates was asked numerous questions about Mr. Broidy and was shown a variety of documents relating to Mr. Broidy, including certain documents that were stolen from Plaintiffs by the hackers. Indeed, at the beginning of the March 18 interview, the OSC prosecutors asked Mr. Gates if he knew about the hacking, including who had carried it out and how. (*See* Benson Decl., Ex. B ¶¶ 13-15.)[9]

The full scope of the documents related to Plaintiffs that Ms. Ahmad and the OSC acquired remains unknown, but it is evident that Ms. Ahmad possesses confidential government information about Mr. Broidy and about the workings of the conspiracy targeting Mr. Broidy that is the subject of this action. At a minimum, Ms. Ahmad has non-public information about what

---

[9] Gibson Dunn has disputed Mr. Gates's sworn statements—but with no sworn statement or other reliable evidence of its own—that there were two separate meetings on March 18, 2018, and that Ms. Ahmad attended the second meeting in which topics related to Mr. Broidy were discussed, although it has failed to provide any sworn testimony in support. Instead, Gibson Dunn's sole basis for this argument has been the March 18 302, which was not drafted until April 2, 2018 and not entered until April 25, 2018. (*See* Benson Decl., Ex. C at 1.) Gibson Dunn has argued that the 302 indicates there was a 90-minute side meeting with Ms. Ahmad, which would be memorialized in a separate 302, and thus Mr. Gates's recollection must be wrong. But the 302 Gibson Dunn has pointed to as documenting the side meeting is entirely redacted, appears to be only one paragraph long and lists two different dates for the interview it is purportedly memorializing. (*See* Benson Decl., Ex. H at 10.) Moreover, 302s are not made under oath, are not reviewed for accuracy by the interviewed witness, and are far from infallible. As courts have acknowledged, 302s are not reliable evidence and are generally considered inadmissible hearsay. *See, e.g.*, *United States v. Shulaya,* No. 1:17-cr-00350-LAP, ECF 819, at 5 (S.D.N.Y. June 11, 2018) (Benson Decl., Ex. M); *see also United States v. Davis*, 845 F.3d 282, 292 n.4 (7th Cir. 2016); *United States v. Trujillo*, 136 F.3d 1388, 1396 (10th Cir. 1998); *see also generally* John Reed Stark, *"Time to Replace FBI Interview Memos With Digital Recordings,"* https://www.law360.com/articles/1378709/time-to-replace-fbi-interview-memos-with-digital-recordings (Apr. 26, 2021) (describing "the inherent evidentiary weaknesses of the 302" and explaining how 302s "can unintentionally create a materially misguided, mistaken, incomplete and wholly unreliable evidentiary record"; Arseneault & Fassett, LLC, *"The FBI 302: An Archaic, and Sometimes a Truth-Altering, Law Enforcement Device,"* https://www.af-lawfirm.com/blog/2020/may/the-fbi-302-an-archaic-and-sometimes-a-truth-alt/ (May 22, 2020) (explaining numerous difficulties with the "archaic practice" of 302s that "guarantee[] inaccuracy and invite[] manipulation, resulting in unfairness and injustice").

specific materials were obtained by the OSC (some of which may not even be known to Plaintiffs to have been stolen in the hacking), how the OSC got these materials, whether the OSC showed the materials to other witnesses in addition to Mr. Gates, and what information the OSC obtained from those witnesses about Plaintiffs and the hacking. In addition, if Ms. Ahmad or the OSC obtained these materials from the hackers themselves or someone else affiliated with or connected to the Qatar-funded hacking conspiracy, she would possess additional factual information relevant to this case and could even be a percipient witness.

This information plainly constitutes "confidential government information" for purposes of Rule 1.11(c). The Government has withheld and maintains privilege over much of this information, having only disclosed certain interview memos with substantial redactions. *See Leopold v. United States Dep't of Just.*, 487 F. Supp. 3d 1, 9, 20 (D.D.C. 2020) (upholding DOJ's claims of privilege over this information); Benson Decl., Ex. C. Even if some of the documents shown to Mr. Gates were also released to the public by Defendants and their co-conspirators, the government records regarding these meetings remain at least partially redacted, and therefore Plaintiffs would have established a *prima facie* showing for disqualification. *See Kronberg v. LaRouche*, No. 1:09-CV-947 AJT/TRJ, 2010 WL 1443934, at *3 (E.D. Va. Apr. 9, 2010) (disqualifying former AUSA pursuant to Rule 1.11(c) and finding "at least some information . . . remains confidential government information" where government records remain redacted and/or classified). And, the crucial circumstances of how and from whom the OSC and Ms. Ahmad came into possession of the hacked materials remain confidential.

## B. Ms. Ahmad's Knowledge of this Confidential Information Could Have Been Used to Materially Disadvantage Plaintiffs

The confidential government information about Plaintiffs that Ms. Ahmad obtained and reviewed as a federal prosecutor, including information relating to the hacking at issue in this

case and the hacked documents themselves, unquestionably could have been used to the material disadvantage of Plaintiffs in this action.  For purposes of this analysis, it is not necessary that the current and the governmental matters be the same, nor is it necessary to determine whether Gibson Dunn in fact used any of the confidential information in this case, as "Rule 1.11(c) prohibits representation when the information *could* be used to the material disadvantage" of Plaintiffs here.  *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 1274555, at *5 (N.D. Ohio Mar. 20, 2019) (disqualifying a former federal prosecutor and her law firm from representing defendants under Rule 1.11(c) based on her participation on a government task force during which she obtained confidential government information about plaintiff municipalities that "may go to the heart of Plaintiffs' damages claims").

The evidence shows that Ms. Ahmad obtained confidential government information through the OSC's investigation concerning the hacking at the heart of this case, as well as relating to Plaintiffs' business activities.  Ms. Ahmad and her colleagues asked Mr. Gates about a variety of documents in the Government's possession, including screenshots of WhatsApp messages exchanged by Mr. Broidy with others, and emails, including one solely between Mr. Broidy and his wife, both *victims* of the hacking alleged in this case.  (Benson Decl., Ex. B ¶¶ 24-25.)

Ms. Ahmad's knowledge of *how* these documents were obtained by DOJ, *from whom* they were obtained, and any information about the hacking provided by other witnesses implicates issues at the center of this case.  Such confidential government information is not otherwise available to any of the parties, and therefore stood to provide Defendants with an unfair advantage.  As the court in *Kronberg* observed, there is no way to mentally "segregate" or

"differentiate" such information, which "could be triggered as the case progresses by witness interviews or document review." *Kronberg*, 2010 WL 1443934, at *4.

### C. Gibson Dunn Failed to Screen Ms. Ahmad

Disqualification of Gibson Dunn was warranted because it failed to promptly and effectively screen Ms. Ahmad from the case. *See* 22 N.Y.C.R.R. § 1200.0, R. 1.11(b)-(c). To the contrary, Gibson Dunn resolutely insisted on Ms. Ahmad's continued active participation in this matter, even after Plaintiffs first raised concerns. Disqualification of Gibson Dunn therefore would have been necessary to preserve the integrity of the adversary process and "maintain the highest standards of the profession." *Heyliger v. Collins*, No. 3:11–CV–1293 (NAM/DEP), 2014 WL 910324, at *2, 5 n.6 (N.D.N.Y. Mar. 10, 2014) (disqualifying law firm where "no screening procedures . . . would be effective in eliminating the appearance of impropriety"); *see also In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *5 (noting "[t]here is no way . . . to timely screen . . . at this point, almost two years later").

## II. Gibson Dunn Should be Sanctioned

The facts here demonstrate that Gibson Dunn's conduct was without merit and Plaintiffs should be awarded their attorneys' fees. Gibson Dunn "unreasonably and vexatiously" multiplied these proceedings by repeatedly and unequivocally denying that there was any conflict and denying the information within its knowledge about Ms. Ahmad's direct involvement in the OSC's investigation into issues relating to Mr. Broidy. *See* 28 U.S.C. § 1927. Even when presented with sworn testimony to the contrary, Gibson Dunn insisted there was no conflict but provided no evidence of its own. (*See* Benson Decl., Exs. I, K.) Gibson Dunn went so far as to blame Plaintiffs for raising this issue again, despite the fact that Plaintiffs had obtained new evidence contradicting Gibson Dunn's representations upon which Plaintiffs' prior counsel had understandably relied, since Gibson Dunn possessed all of the relevant facts. *See*

*Offor v. Mercy Med. Ctr.*, No. 17 Civ. 1872 (NRB), 2018 WL 3364389, at *5 (S.D.N.Y. July 10, 2018) (granting motion for sanctions in part and noting "[c]ounsel is entitled to rely upon the factual representations of his adversary, particularly where, as here, the representations were repeated, clear, and unequivocal."); *see also Facebook* Sanctions Order at 48-49 ("It's worth remembering that Facebook and Gibson Dunn had superior access to all of the evidence needed in this case."). "It's almost as if . . . Gibson Dunn spent the better part of three years trying to gaslight their opponents. . . ." *Id.* at 2.

While blaming Plaintiffs for the conflict of its own making, Gibson Dunn simultaneously refused to provide any evidence directly from Ms. Ahmad—or anyone else—in response to the Gates Declaration. Gibson Dunn's denials were asserted in bad faith in an effort to conceal the fact that Ms. Ahmad had obtained confidential information about Plaintiffs while at the OSC— which was apparently the very reason Defendants hired Gibson Dunn to represent them in this case—and that disqualification of Gibson Dunn was therefore warranted. This is not the first time that Mr. Snyder has engaged in such misconduct. In the *Facebook* Sanctions Order, the Court specifically noted that "Orin Snyder, who served as lead counsel when Gibson Dunn's conduct was at its worst, should consider himself lucky that he has not been sanctioned personally. Presumably this ruling will help ensure that he will not be so lucky if he acts this way again." *Facebook* Sanctions Order at 37 n.10.

Gibson Dunn's intransigence forced Plaintiffs to expend resources investigating and preparing to file their disqualification motion, before Gibson Dunn ultimately withdrew. Noting that "[t]he purpose of § 1927 is to ensure that those who create unnecessary costs also bear them," this court awarded attorneys' fees under this provision in a similar situation, where, as here, counsel was forced to prepare a motion to disqualify because opposing counsel refused to

acknowledge its conflict of interest. *Madison 92nd Street Assocs., LLC v. Marriott Int'l, Inc.*, No. 13 Civ. 291 (CM), 2013 WL 5913382, at *12 (S.D.N.Y. Oct. 31, 2013) (McMahon, J.), *aff'd*, 603 F. App'x 19 (2d Cir. 2015). In *THOIP*, 2009 WL 125074, at *4, this court likewise awarded attorneys' fees under § 1927 and, alternatively, the court's inherent power, where the defendant's attorney failed to inform the plaintiff's counsel that he was planning to withdraw until the day the plaintiff's motion to disqualify was due.

Had Gibson Dunn screened Ms. Ahmad from this matter in accordance with the Rules of Professional Conduct at the outset—or even after Plaintiffs' prior counsel first raised the conflict with Mr. Snyder—Plaintiffs' attorneys' fees subsequently incurred in investigating and litigating that conflict (as well as in bringing this motion) could have been avoided. *See* 22 N.Y.C.R.R. § 1200.0, R. 1.11(b)-(c). Instead, Gibson Dunn simply denied that Ms. Ahmad had obtained confidential government information that could be used to Plaintiffs' disadvantage here, and resolutely insisted on Ms. Ahmad's continued active participation in the case, causing Plaintiffs to needlessly incur expenses to investigate and litigate Gibson Dunn's conflict. It is Gibson Dunn, and not Plaintiffs, that should bear the burden of those expenses.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Sanctions and issue an order awarding Plaintiffs their attorneys' fees and expenses incurred in connection with investigating and litigating Gibson Dunn's conflict of interest, including those associated with this motion, in an amount to be determined by the Court upon submission of Plaintiffs' invoices.[10]

---

[10] Plaintiffs will submit the invoices reflecting the amount of fees and expenses incurred in investigating and litigating Gibson Dunn's conflict of interest and this motion at the appropriate time, as directed by the Court. *See,*

Dated: February 23, 2023

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: /s/ Daniel R. Benson
  Daniel R. Benson
  Sarah Gibbs Leivick
  1633 Broadway
  New York, New York 10019
  Tel.: (212) 506-1700
  dbenson@kasowitz.com
  sleivick@kasowitz.com

*Counsel for Plaintiffs Elliott Broidy and Broidy Capital Management, LLC*

---

*e.g.*, *Madison 92nd St. Assocs.*, 2013 WL 5913382, at *15 (granting motion for sanctions and directing the submission of "time records within ten days of this decision.").