# EXHIBIT B

**DECLARATION OF RICHARD W. GATES, III**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. On February 23, 2018, I entered into a plea agreement with the United States Government (USG) in relation to an investigation established by the Department of Justice (DOJ) through a special counsel.
2. Subsequently, I met with the DOJ primarily through the special counsel appointed to investigate interference in the 2016 U.S. presidential election. In total I met with the USG and its agencies for approximately 1,000 hours during the period 2/27/18 – 10/30/19.
3. My meetings with the Office of the Special Counsel (OSC) commenced on February 27, 2018 and focused on a broad array of topics.
4. Two such meetings occurred on Sunday, March 18, 2018, at the OSC's office in the Patriot Plaza I building located at 325 E Street SW, Washington, DC, in the 5th floor conference room, which consisted of two large conference tables.
5. In response to FOIA requests from CNN and Buzzfeed, DOJ released over twenty tranches of Mueller investigation-related "302" forms, which are generally the recording of notes taken by the FBI during interviews to document the discussions.
6. One of the "302" forms released during this process purported to document one interview that I had with OSC on Sunday, March 18, 2018. Several important details of that "302" form, however, conflict with my notes and my clear recollection of what occurred that day.
7. The publicly-released "302" form, for example, states that Senior Assistant Special Counsel Zainab Ahmad entered at some point during a meeting that I was having with two other OSC attorneys, and that my meeting with those other attorneys continued after Ms. Ahmad left.
8. On Sunday, March 18, 2018, there were two distinct meetings that I had with OSC attorneys. The meetings were sequential, so the second meeting occurred only after I completed the first meeting.
9. Additionally, much of the contents from the last few pages of the publicly-released "302" form, which was almost five pages total, were discussed during the second meeting on March 18, 2018, with Ms. Ahmad and two others, which will be discussed in more detail below.
10. During the first meeting on Sunday, March 18, 2018—which was the only one scheduled in advance—I met with Special Counsel attorney Greg Andres to provide information pertaining to questions about DMP International's work with Pericles LP, a private investment fund set up with the support of Oleg Deripaska and on matters pertaining to my international political work.
11. The scheduled meeting with Mr. Andres ultimately lasted a couple of hours. Rather than leaving the building, I was then asked to meet with Zainab Ahmad (Senior Assistant Special Counsel), Andrew Weissmann (Senior Assistant Special Counsel), and Omer Meisel (FBI Supervisory Agent in Charge) to discuss several issues pertaining to Elliott Broidy. This second meeting on March 18, 2018 was not originally scheduled, and it

resulted in me providing an overview of several topics that involved Mr. Broidy and several of his business projects.

12. Throughout the second meeting on March 18, 2018 with Ms. Ahmad and others, I was asked a series of questions pertaining to topics associated with Mr. Broidy, including background and how we met, Malaysia/1MDB, FARA, Romania (vis-à-vis Circinus), UAE, Qatar and the hacking of Mr. Broidy's emails among others.

13. At the outset of this second meeting on March 18, 2018 with Ms. Ahmad and other members of the OSC, one of the initial questions I was asked at the start of our discussions was, "Are you aware that Elliott Broidy's emails were hacked?"

14. When I answered in the affirmative that I was aware that Mr. Broidy had been hacked, Ms. Ahmad and Mr. Weissmann asked me follow-up questions. One such question was, "Do you know who hacked his [Mr. Broidy's] emails?" My response was, "Yes, I believe it was done by agents of the State of Qatar."

15. One of the other follow-up questions during this interview that was asked was, "Do you know how his [Mr. Broidy's] emails were hacked?" My understanding regarding this question was that Ms. Ahmad and the other members of the OSC wanted to know if I had any understanding of how the hacking was carried out. I did not have any such knowledge, and I told them that I did not know anything about how the hacking was conducted.

16. Even though the second meeting on Sunday, March 18, 2018 with Ms. Ahmad and others was not scheduled in advance, Mr. Weissmann on March 9, 2018 emailed a file to my attorney called "Rex Tillerson.pdf."

17. This PDF file sent by Mr. Weissmann contained 22 pages of emails and memos that ultimately appeared to originate from the computer or server used by Mr. Broidy. The materials had a distinctive look to them, and they were different in appearance from similar emails and documents printed out from forensic collection software.

18. During the second interview on Sunday, March 18, 2018, Ms. Ahmed and her two colleagues showed me materials from "Rex Tillerson.pdf," the file Mr. Weissmann had sent to my attorney on March 9, 2018. But I was also shown a substantial amount of other material which was not contained in that file.

19. During the second meeting on Sunday, March 18, 2018, I was shown a wide variety of documents. I was typically shown a piece of material (email, text, document, or other item), asked to read the introduced communication, and then asked a series of questions related to the given item.

20. It is unlikely that any of the materials that I was shown during the second meeting on Sunday, March 18, 2018 could have come from any of my accounts or devices. Many of the materials were documents that had never been shared with me and the majority of the communications were messages that I had neither sent nor received. But even for documents and communications that were in my possession, those materials were not among those that the OSC had obtained from me via search warrants as of the time of the second interview on March 18, 2018.

21. Approximately two hours after the end of that second interview on Sunday, March 18, 2018, Mr. Weissmann sent an email to my attorney at 5:03 PM EST, requesting permission to search accounts that they had not yet searched because of the "potential

relevance of some of the emails to other avenues of our investigation." Shortly thereafter, at 5:41 PM EST, Mr. Weissmann followed up on his own email, explicitly stating that he specifically wanted permission to search the account which contained my communications with Mr. Broidy.

22. Soon afterwards, I learned through media reports and other sources that the contents of the materials shown to me were referenced or quoted in multiple media stories. According to what the reporters wrote, these articles were based on the hacked materials taken from Mr. Broidy, and yet, these materials somehow had been in OSC's possession.

23. In addition to what I saw published in news articles, several reporters contacted me in 2018 – 2019 with inquiries related to the contents of Mr. Broidy's hacked materials. For example, Paul Blumenthal of the *Huffington Post* contacted me on March 22, 2018, asking questions based on what appeared to be at least some of the very same emails involving Mr. Broidy's business interests related to Romania. This was very surprising to me, given that it was the first time to my knowledge that the media was reporting based on Mr. Broidy's hacked emails related to Romania, and the questions were quite similar to those that Ms. Ahmad and Mr. Weissmann had asked me just days earlier, on March 18, 2018.

24. The documents and communications shown to me during the second meeting on Sunday, March 18, 2018 included:
    a. Communications from WhatsApp messages pertaining to 1MDB, talking points related to the Malaysian Prime Minister, how to possibly resolve the 1MDB situation within DOJ, and my involvement in providing Mr. Broidy with information on President Trump's travel to various foreign regions.
    b. Screenshots of WhatsApp messages that I had never seen, did not necessarily pertain to me directly, and which had never been in any of my accounts or stored on any of my devices. The screenshots contained portions of WhatsApp message threads Mr. Broidy had exchanged with various other individuals, including numerous people whom I was unaware that he dealt with on the matters discussed in the given communications.
    c. Emails regarding Mr. Broidy's work in Romania with Circinus and efforts with the U.S. Department of Commerce.
    d. Materials related to Guo Wengui, including pictures and emails between Mr. Broidy and me.
    e. Emails related to Mr. Broidy's pursuit of opportunities and contracts in Gabon, Malaysia, UAE and Romania.
    f. Information pertaining to my contract with Mr. Broidy and various issues on which we had collaborated.

25. One email shown to me during the second meeting on March 18, 2018 was an email between Mr. Broidy and his wife, in which my name appeared in the body of the email. The fact that I was shown an email between Mr. Broidy and his wife was very surprising to me, and I specifically recall that I did not see any other recipients on the email between Mr. Broidy and his wife.

26. The screenshots of WhatsApp messages Ms. Ahmad and Mr. Weissmann showed me during the second meeting on March 18, 2018 had the distinctive appearance of messages viewed within WhatsApp on a device.  Further, the WhatsApp messages they showed me did not contain detailed metadata, such as the phone numbers of each party or the precise date and time of each message sent.
27. A follow-up interview was scheduled for two days later, on Tuesday, March 20, 2018, wherein I was to meet with Ms. Ahmad and Mr. Weissmann to further discuss several of the primary issues that they had raised with me in the March 18 meeting in greater detail, as well as new issues.
28. The March 20, 2018 meeting started with questions about the operations and inner workings of the Trump campaign.
29. Ms. Ahmad focused on fundraising efforts involving several individuals, including Steven Mnuchin, Michael Cohen, Erik Prince, and Mr. Broidy.  Ms. Ahmad and Mr. Weissmann were interested in Donald Trump's initial plan to self-finance his primary campaign, but then turned to a series of specific questions about president-elect Trump's inaugural committee.
30. Ms. Ahmad and Mr. Weissmann were interested in the process used by the committee to solicit donations and support for the inaugural committee. The process historically used by inaugural committees, regardless of political party affiliation, typically involves offering "packages" to encourage prospective involvement financially.
31. Ms. Ahmad and Mr. Weissmann were keenly interested in any possible foreign sourced donations which is a violation of campaign finance laws.
32. I was asked if, to my knowledge, there were any foreign donations made by Americans acting as "straw donors."  I was asked if Mr. Broidy or any other individual had acted in this manner. My response to all of these questions was "no."
33. Following a series of questions on the Trump campaign and inauguration, the questions then focused on Mr. Broidy's activities related to specific countries, including Malaysia, Romania and several in the Middle East (including Saudi Arabia, UAE and Qatar).
34. Much of the initial focus in the March 20 meeting was on Mr. Broidy's interest in potential contracts to open an Open-Source Intelligence center in Malaysia, his efforts to help arrange for the Prime Minister to play a round of golf with then-President Trump, his attempts to possibly resolve the 1MDB issue, and his meetings and/or contact with White House officials, including Reince Priebus, John Kelly, Jared Kushner, and President Trump.
35. During the March 20, 2018 interview, I was questioned about any knowledge in regard to Mr. Broidy registering under FARA for any of his work. I was then asked if I registered under FARA for my work on behalf of Mr. Broidy.
36. In that same meeting with Ms. Ahmad and Mr. Weissmann, I was asked if I had been involved in helping Mr. Broidy regarding potential business in the Middle East, specifically Saudi Arabia and UAE.  I was also asked about Mr. Broidy's efforts to raise concern with the Administration about Qatar's support for terrorism.
37. Also during that March 20, 2018 meeting, Ms. Ahmad and Mr. Weissmann showed me emails, documents and text messages regarding Mr. Broidy's interest in information related to the Trump Administration's visit in May 2017 to Saudi Arabia for a regional

4

counterterrorism conference. I was also asked if I was aware of any of his contacts or relationships in the Gulf region.
38. In this same interview, Ms. Ahmad and Mr. Weissmann showed me a picture of George Nader, a person of interest to the Office of the Special Counsel at that time. I told them truthfully that I had never met Nader. They also asked me about a company in Canada called Xiemen Investments.
39. Ms. Ahmad and Mr. Weissmann further asked me during the March 20, 2018 interview about Mr. Broidy's efforts related to raising awareness of Qatar's support for terrorism and how Qatar's sponsorship of the Muslim Brotherhood and various terrorist groups was harming U.S. national security.
40. Much like they had done in the first interview two days prior, Ms. Ahmad and Mr. Weissmann during the March 20, 2018 meeting also showed me emails and screenshots of WhatsApp messages that I had never seen and which had never been in any of my accounts or stored on any of my devices.  These communications were between Mr. Broidy and various other individuals, including numerous people whom I was unaware that he dealt with on the matters discussed in the given communications.
41. Just as during the meeting two days earlier, the screenshots of WhatsApp messages Ms. Ahmad and Mr. Weissmann showed me on March 20, 2018 had the distinctive appearance of messages viewed within WhatsApp on a device, and these messages also did not contain detailed metadata, such as the phone numbers of each party or the precise date and time of each message sent.
42. In the March 20, 2018 interview, I was also asked about Mr. Broidy's involvement with any Congressional officials with respect to his anti-Qatar advocacy efforts and any other topics related to the Middle East that might involve Mr. Broidy.
43. On October 29, 2018, I was interviewed for a third time by Ms. Ahmad, who was joined by Mr. Weissmann, and others.  This meeting took place in a conference room at my attorneys' law firm, in their Washington DC office.  A redacted version of the "302" form for this meeting was made public pursuant to the FOIA requests mentioned above.
44. Most of the "302" report from the October 29, 2018 meeting has been released without redactions, though not entirely.  Even though the unredacted portions of the "302" form for this meeting do not give any such indication, a significant portion of that interview focused on issues related to Mr. Broidy.
45. As an example, one issue that I was asked about by Ms. Ahmad and the others on October 29, 2018 was the fundraising structure of the campaign and its relationship with the Republican National Committee (RNC). In addition, I was asked about key fundraisers to the campaign, including Mr. Broidy, and the amounts of money he brought into the campaign. This included questions about his donors making contributions and whether any were foreign sources specifically focusing on Malaysia, UAE, Saudi Arabia, Qatar, and Romania.
46. Over the course of my meetings with OSC, the U.S. Attorney's Office for the Southern District of New York, and the FBI, I attest that I met with Ms. Ahmad on at least three occasions, all during 2018: March 18, March 20, and October 29.

47. In each of these three meetings in which Ms. Ahmad participated, I was asked numerous questions about and/or related to Mr. Broidy. Mr. Weissmann also participated in each of these three meetings.
48. The topics Ms. Ahmad discussed with me across the three meetings included, but were not limited to, Malaysia, 1MDB, Saudi Arabia, UAE, Gabon, Romania, contact with Trump Administration officials, Presidential campaign and Inauguration-related fundraising, Mr. Broidy's anti-Qatar advocacy, and the hacking of Mr. Broidy's emails that had resulted in numerous stories in the *New York Times* and other media outlets.
49. Based on a review of "302" forms supposedly documenting interviews with me that were released to the public, my attorney identified an unusual pattern in the production of the "302" forms created, reviewed and approved by the OSC. The OSC did not adhere to standard FBI protocols. For example, several of the reports contain significant gaps of time from the original date of a given interview to when its "302" form report was reviewed, finalized and ultimately approved by the designated official at the Department of Justice.
50. Following the close of the investigation, the DOJ/OSC told my attorney and me that they would provide us copies of the "302" reports of my interviews with the OSC. Despite their initial assurances, they later refused to provide us with those "302" reports.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 13th day of May, 2022 at Richmond, Virginia.

By: _____
RICHARD W. GATES, III

6