# EXHIBIT I

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Martin A. Hewett
Partner, Deputy Gen'l Counsel
Direct: +1 202.955.8207
Fax: +1 202.530.9520
MHewett@gibsondunn.com

May 18, 2022

VIA ELECTRONIC MAIL

Daniel Benson
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019

Re:     *Elliott Broidy, et al., v. Global Risk Advisors, LLC, et al.*, Case No. 19-cv-11861-MKV (S.D.N.Y.)

Dear Mr. Benson:

I am writing regarding the purported conflict you have asserted regarding the former government service of Zainab Ahmad, one of the attorneys representing the GRA defendants in the above-captioned action (the "Litigation").  As you know, you contacted Gibson Dunn on Monday, May 16, and during our conversation you stated that you had "developed" new "evidence" showing that Ms. Ahmad had a conflict of interest, and you indicated that you planned to file a letter with the court within a matter of hours.  You later identified that new "evidence" as a declaration by Rick Gates, a political consultant and former official with the Trump campaign who pleaded guilty to charges of conspiracy and making false statements to the Special Counsel's Office in February 2018.  Although you initially declined to provide the declaration to us, you ultimately provided us a copy at approximately 3 pm on Tuesday, May 17, and requested our position on your threatened disqualification motion by 3 pm today.

We have now reviewed the contents of the declaration, and suffice it to say we strongly disagree that it establishes that Ms. Ahmad or Gibson Dunn has a conflict of interest.  Even assuming the truth of Mr. Gates's assertions—and, as discussed below, there is substantial reason to believe that Mr. Gates either misremembers or has intentionally misstated facts in the declaration—at best he claims that Ms. Ahmad was present for a very small number of interviews conducted by the Special Counsel's Office ("SCO") in 2018 during which issues or events in which Mr. Broidy was also involved may have been discussed.  But even if that is true, it would not create a conflict of interest under New York Rule of Professional Conduct 1.11(c), both because none of the information you or the declaration remains confidential, and because it in any event cannot be used to Mr. Broidy's material disadvantage in the Litigation.  It is also obvious from the face of the declaration that it

# GIBSON DUNN

Daniel Benson
May 18, 2022
Page 2

suffers from glaring holes and inconsistencies, and it is contradicted in material respects by the contemporaneous and official record of the SCO's many interviews with Mr. Gates.

Unfortunately, it is apparent that the declaration you specifically sought and obtained from Mr. Gates is nothing more than a ploy to further the same baseless conspiracy theory that Mr. Broidy asserted vis-à-vis Ms. Ahmad nearly two years ago.  As you know, Mr. Broidy's former counsel at Steptoe & Johnson LLP ("Steptoe") asserted the *exact same conflict* against Ms. Ahmad in 2020, claiming that she had been privy to unspecified confidential government information regarding Mr. Broidy during her service with the SCO.  While that claim was obviously known to him years ago, Mr. Broidy's decision to strategically wait *years* to reveal this purported new evidence—and in no coincidence, until after the GRA defendants had filed their motion to dismiss the amended complaint—is part of an unfortunate pattern of his bad faith in this case.

The primary basis for Mr. Broidy's asserted conflict is Ms. Ahmad's alleged participation in a March 18, 2018 interview of Mr. Gates during which Mr. Gates was asked about an individual's attempts to improperly influence the ongoing Department of Justice investigation into the 1MDB scandal.  We now know that Mr. Broidy is likely the individual referenced in the FBI's official notes of that interview because Mr. Broidy has since pleaded guilty to one count of conspiracy to violate the Foreign Agents Registration Act relating to the 1MDB scandal.[1]  *See* Press Release, Department of Justice, Elliott Broidy Pleads Guilty to Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Chinese Foreign National (Oct. 20, 2020).  But Ms. Ahmad was not involved in that investigation of Mr. Broidy and did not participate in that March 18 interview, and so the entire premise of the alleged conflict appears based on Mr. Broidy's infatuation with attacking Ms. Ahmad.[2]  And more importantly, even assuming that Mr. Gates's declaration is accurate, ***it does nothing to establish that Ms. Ahmad acquired any "confidential government information" about Mr. Broidy that remains confidential today, much less confidential information that could be sued to Mr. Broidy's "material disadvantage" in this lawsuit.***

While not intended to be a fulsome recitation of all of the problems with the declaration and your apparent position on this issue given the artificially (and strategically) short timeframe you have given us to engage with you, this letter identifies some of those issues and responds

---

[1]  As you also know, Mr. Broidy was later pardoned by President Trump shortly before he left office.

[2]  Indeed, as part of his previous attempt to get Ms. Ahmad and Gibson Dunn out of this case, Mr. Broidy previously asserted that "Ms. Ahmad has known Kevin Chalker personally for many years" and suggested that Gibson Dunn was hired based on that personal relationship.  Sept. 9, 2020 Ltr. at 3.  That was recklessly and demonstrably false, and it reflects the lengths to which Mr. Broidy appears to be willing to go to invent accusations against Ms. Ahmad and Gibson Dunn.

**GIBSON DUNN**

Daniel Benson
May 18, 2022
Page 3

to the limited information you have provided us.  In short, seeking Ms. Ahmad's or Gibson Dunn's disqualification on the bases you have identified to us, including the Gates declaration, would be both legally and factually baseless.

**The Gates Declaration**

At the outset, your accusation that Gibson Dunn's "prior representations to Steptoe were, to put it mildly, inaccurate," is untrue and does not appear to have resulted from a good-faith investigation.  While Steptoe's original letter suggested broadly that Ms. Ahmad "acquired information under governmental authority about Mr. Broidy," it identified a single potential source of that information:  the "public information that Ms. Ahmad participated in the interview of Rick Gates, which focused extensively on Mr. Broidy."  Aug. 26, 2020 Ltr. at 1. Gibson Dunn responded that "[a]lthough [the] letter d[id] not identify the date of this interview," we "assume[d] that [Steptoe] was referring to an interview of Mr. Gates on March 18, 2018 during which," according to the publicly available memorandum of that interview, Mr. Gates "discussed efforts by an individual whose name is redacted in the memorandum to influence the Department of Justice's investigation into the 1MDB scandal." We explained that Ms. Ahmad did not participate in that interview, and pointed out that "the memorandum from that interview reflects that Ms. Ahmad *was not present* during the portion of the interview in which Mr. Gates discussed the individual's activities to influence the 1MDB investigation."  Sept. 2, 2020 Ltr. at 2.  This was (and is) true, and as described further below, Mr. Gates's years-late claim that Ms. Ahmad was, in fact, present for that interview is contradicted by the memorandum of the interview and plain common sense. And while Mr. Gates's declaration states that Ms. Ahmad was present for three of his reportedly more than fifty interviews with the SCO, Gibson Dunn never said anything to the contrary; in fact, we explained that while Mr. Gates was interviewed "dozens of times," "Ms. Ahmad was not in attendance for the vast majority of those interviews."  Sept. 2, 2020 Ltr. at 2 n.\*.  That is true and entirely consistent with the contents of the declaration.

Additionally, based on even a quick review of the contents of Mr. Gates's declaration, it is apparent that it is riddled with numerous inaccuracies and falsehoods and cannot form the basis of any good-faith motion.  First, while Mr. Gates claims that Ms. Ahmad was present for the March 18, 2018 interview in which Mr. Broidy and his attempts to improperly influence the ongoing 1MDB investigation were discussed.  As Mr. Gates admits, however, he participated in "[t]wo … meetings" covering different topics on March 18.  Decl. ¶¶ 3, 4. Mr. Gates does not dispute that Ms. Ahmad participated only in the second of those interviews, but he (incorrectly) claims that the lengthy discussion of Mr. Broidy and his conduct took place during that second interview with Ms. Ahmad.  This assertion is inconsistent with the entire record.  The official memorandum of the interview in which Mr. Broidy was discussed notes that Ms. Ahmad was *not present* for that interview, and that

**GIBSON DUNN**

Daniel Benson
May 18, 2022
Page 4

instead her interview with Mr. Gates took place separately and for a short period of time. *See* Ex. 1 at 4.  This is consistent with Mr. Gates's admission that Ms. Ahmad participated in a different interview with him on March 18, as well as the fact that this other interview was documented by a separate interview memorandum based on notes taken by a different notetaker.  *See id*; *see also* Ex. 2 (separate 302 for that separate meeting).  Moreover, that separate memorandum  reflecting Ms. Ahmad's interview with Mr. Gates is almost entirely redacted.  While that redacted memorandum of course does not show on its face what was discussed, the fact that it was redacted at all—and that the memorandum of the other interview from that day was largely not redacted, including the portions that appear to describe Mr. Broidy and his conduct—means that the interviews necessarily could not have covered the same topics.  The only reasonable conclusion is that, as Mr. Gates admits, he participated in two interviews on March 18:  first, one longer interview summarized by a largely unredacted memorandum which notes that Ms. Ahmad was not present for it, and second, one shorter interview with Ms. Ahmad on a different topic.  Virtually everything that Mr. Gates contends he discussed with the SCO, including the emails and communications he was shown during that interview, is reflected in the *first* interview memorandum—i.e., the interview in which Ms. Ahmad was not present.  In short, Mr. Gates's belated claim that Ms. Ahmad participated in the March 18 interview with him in which he was asked about, *inter alia*, "[c]ommunications … pertaining to 1MDB," "how to possibly resolve the 1MDB situation within DOJ," and "[i]nformation pertaining to [his] contract with Mr. Broidy and various issues on which [they] had collaborated" (Decl. ¶ 24)—all topics which are described in the notes of the first interview—is completely undone by the contemporaneous record.

Mr. Gates's declaration is also contradicted by the government's interview memoranda and is internally inconsistent in other material respects.  To name just a few examples:

- The interview memorandum for the first March 18 interview reflects that Mr. Andrew Weissmann was present at the start of the interview, which would be consistent with Mr. Gates's claim that Mr. Weissman had emailed his attorney a file with documents they would review a few days before the March 18 interview.  Despite this, Mr. Gates contends that Mr. Weissmann only participated in the second, allegedly impromptu meeting.  That makes no sense.  Moreover, the filename of the materials sent to Mr. Gates's lawyer in advance by Mr. Weissmann—"Rex Tillerson.pdf"—presumably matches the questions asked of Mr. Gates *during the first interview* regarding efforts to schedule a meeting with Mr. Tillerson regarding the 1MDB investigation.  *See* Ex. 1 at 3.

- Mr. Gates asserts that the first interview was only about the Pericles fund and that it lasted "a couple of hours."  Decl. ¶¶ 10-11.  He acknowledges that the interview memorandum from that first interview summarizes the discussion regarding Pericles

**GIBSON DUNN**

Daniel Benson
May 18, 2022
Page 5

in a few short paragraphs, but claims that the remainder of the notes in that interview memorandum are actually from the separate, second interview that included Ms. Ahmad. *Id.* ¶ 9. But that makes no sense because there is a separate interview memorandum—*prepared by a different notetaker*—that covers that separate interview with Ms. Ahmad, so there is no reason information from the second interview would be in the notes from the first.

- Moreover, Mr. Gates's claim that he discussed the Pericles fund for multiple hours is belied by the fact that the interview memorandum covers that section of the interview in a few short paragraphs (which do not reflect the review of any documents). Based on this, it is inconceivable that the hours-long first interview was limited to this one short topic, and the only reasonable conclusion is that the first interview happened as the official notes say it did: a longer interview involving Mr. Weissmann—but not Ms. Ahmad—during which Mr. Gates was asked about Mr. Broidy's attempts to influence the 1MBD investigation.

- Mr. Gates contends that the second interview, in which Ms. Ahmad participated, concluded around 3 pm. Decl. ¶ 21. This is consistent with the time stamps of the interview memorandum of the first interview, which notes that Ms. Ahmad's interview began at 1:13 pm and concluded at approximately 2:40 pm. It is inconceivable, however, that Ms. Ahmad could have participated in the wide-ranging and document-heavy interview that Mr. Gates contends happened in such a short amount of time.

- Mr. Gates claims that Ms. Ahmad was present for his interview on March 18 which, according to the official memorandum summarizing that meeting, in part focused on the 1MDB scandal (in connection with which Mr. Broidy later pleaded guilty). But Ms. Ahmad is not listed as one of the attorneys who worked on the investigation of Mr. Broidy on the press release accompanying Mr. Broidy's guilty plea, and consistent with that Ms. Ahmad did not attend other interviews at which 1MDB was discussed. *See, e.g.*, Oct. 10, 2018 302 Memorandum (reflecting that DOJ attorneys James Mann, Nicole Lockhart, and Ryan Ellersick, the same attorneys listed in the press release, attended the interview, but not identifying Ms. Ahmad as a participant).

Second, Mr. Gates's claims that the two other interviews in which Ms. Ahmad participated—the March 20 and October 29 interviews—also touched on issues involving Mr. Broidy are similarly undercut by the actual record. The unredacted portion of the memorandum of the March 20 interview, for example, reflects that it focused on fundraising activities by the Trump campaign. The remainder of the interview memorandum has been redacted, but if it were true that the March 20 interview involved "several of the primary issues that they

# GIBSON DUNN

Daniel Benson
May 18, 2022
Page 6

[SCO] had raised with [Mr. Gates] in the March 18 meeting" (Decl. ¶ 27), and that that first March 18 meeting had covered Mr. Broidy, then those issues would presumably receive the same treatment in the March 20 interview memorandum—i.e., they would not be redacted. But that is not the case, which means that they must have covered different topics. And the October 29 interview memorandum, which is largely unredacted, tells a similar story: the interview primarily concerned the Trump campaign and its fundraising efforts. Mr. Gates acknowledges as much but suggests that, "even though the unredacted portions of the '302' form for this meeting do not give any such indication," a "significant portion" of the interview "focused" on Mr. Broidy. This assertion cannot be reconciled with the actual record. In short, Mr. Gates's suggestion that Ms. Ahmad extensively debriefed him on multiple occasions about Mr. Broidy is contradicted by all the available evidence.

## There Is No Conflict or Any Basis for Disqualification

During our conversation, you represented to us that the conflict of interest you intend to assert is a violation of New York Rule of Professional Conduct 1.11(c), which provides in relevant part that a lawyer with information that he or she "knows is confidential government information about a person, acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person." As we have explained on multiple occasions, however, Ms. Ahmad has not violated this rule and is not in possession of any "confidential government information" which could be used to the "material disadvantage" of Mr. Broidy in the Litigation. Mr. Gates's declaration does not provide any basis for a conclusion to the contrary.

First, as we explained nearly two years ago, even assuming that Ms. Ahmad was privy to information relating to issues or events in which Mr. Broidy was also involved during her tenure with the SCO, none of that information remains confidential today. All of the information you contend constitutes "confidential government information" has been made public, whether by the alleged hacking and release of Mr. Broidy's emails, the publication of the government's interview memoranda with Mr. Gates, and now Mr. Gates's declaration itself. Nor are the fruits of the government's labor still confidential: Mr. Broidy long ago entered a *public guilty plea* relating to his attempts to improperly influence the 1MDB investigation, and circumstances surrounding that guilty plea have been publicly reported for years. The relevant rule makes clear that "confidential government information" is strictly limited to information that (i) "has been obtained under governmental authority" and that (ii) "at the time this Rule is applied," (iii) the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, and that is not otherwise available to the public." N.Y. Rule Prof. Conduct 1.11(c). The information Mr. Broidy has suggested is the purported basis of Ms. Ahmad's conflict is inherently not confidential, and so there is no

**GIBSON DUNN**

Daniel Benson
May 18, 2022
Page 7

good-faith basis to assert a conflict based on any of the information to which you contend Ms. Ahmad may have been exposed because none of it remains confidential today.

Second, even assuming *arguendo* that Ms. Ahmad does possess government information that remains confidential about Mr. Broidy, that information would *still* not present a good-faith basis to assert a conflict here because it cannot be used to Mr. Broidy's "material disadvantage" in the Litigation.  The only remotely possible connection between Mr. Gates's interviews and the Litigation is his unsupported contention that he was asked all of three questions in one of the March 18 interviews regarding the alleged hacking of Mr. Broidy's materials.  *See* Decl. ¶¶ 13-15.  But as described above, not only did Ms. Ahmad not participate in that particular interview, Mr. Gates in any event admits that he had *no information* regarding the alleged hacking besides his own "belie[f]" about who might have been responsible.  *Id.* ¶ 15.  In fact he confirmed that he "did not have any … knowledge" regarding how the alleged hacking had been carried out, and he claims he told the SCO attorneys that he "*did not know anything about how the hacking was conducted.*"  *Id.* (emphasis added).  Mr. Gates's declaration also speculates that the Department of Justice could have been in possession of hacked materials from Mr. Broidy, noting that he "learned through media reports and other sources that the contents of the materials shown to me were referenced or quoted in multiple media stories" which themselves were "based on the hacked materials taken from Mr. Broidy."  Decl. ¶ 22.  But even if that were true and the Department of Justice was in possession of hacked materials from Mr. Broidy that had been publicly released and extensively reported on, it is inconceivable that those materials could somehow be used to Mr. Broidy's material disadvantage in this case because no one can know the contents of his own emails better than he does.[3]

More broadly, the declaration does nothing to establish any actual connection between the confidential information Mr. Broidy contends Ms. Ahmad might have learned about him during the interviews of Mr. Gates and the circumstances of the alleged hacking of Mr. Broidy's materials, which is what forms the basis of Mr. Broidy's claims in the Litigation.  In fact, even assuming that all of what Mr. Gates says is true (and there is substantial reason to believe that is not the case), he suggests that he provided an "overview" on a veritable laundry list of topics in which Mr. Broidy may have been involved in some form or fashion, ranging from Mr. Broidy's efforts to undermine the 1MDB investigation to "background and how [they] met."  Decl. ¶¶ 11-12.  This is clearly not information that could be used to Mr. Broidy's "material disadvantage" in the Litigation, and any suggestion to the contrary would be speculation that would fail to satisfy your burden to establish a conflict under Rule 1.11(c).  *See, e.g.*, *Pu v. Greenthal Mgmt. Corp.*, No. 08-CIV-10084, 2009 WL 648898, at *4 (S.D.N.Y. Mar. 10, 2009) ("[M]otions for disqualification require a high standard of proof by

---

[3]  Nor would such publicly available and reported-on materials be "confidential," as explained above.

# GIBSON DUNN

Daniel Benson
May 18, 2022
Page 8

the moving party, and mere speculation will not suffice.") (internal quotations, citations, and alterations omitted).

*     *     *

Unfortunately, based on our communications it appears that you are determined to file your motion on the same baseless theory that Mr. Broidy raised in this case nearly two years ago. Nothing in Mr. Gates's declaration or anything you have described to us is new information; indeed, the voluntary declaration you have now secured from Mr. Gates recycles the same argument Mr. Broidy asserted several years ago, and that "evidence" was equally available to Mr. Broidy in 2020.  In light of this, the only reasonable conclusion is that your belated assertion of this conflict—more than two years after Gibson Dunn and Ms. Ahmad first appeared in this litigation, months after you started representing Mr. Broidy in the case, and conveniently after Gibson Dunn filed its motion to dismiss the Second Amended Complaint—is motivated "by a desire to achieve a tactical advantage." *Laker Airways Ltd. v. Pan Am. World Airways*, 103 F.R.D. 22, 41 (D.D.C. 1984); *see also 29 Beekman Corp. v. Wansdown Properties Corp. N.V.*, 2021 WL 4481006, at *7 (S.D.N.Y. Sept. 29, 2021) ("[P]recedent uniformly supports the view that disqualification motions which are made solely for a tactical advantage are disfavored.").  We are confident that the court will not look kindly on your clear attempt to strongarm opposing counsel in this matter, and that will be compounded by Mr. Broidy's years-long tactical delay in asserting this alleged conflict of interest, which in any event is independently fatal to his argument.  *See United States v. Newman*, 534 F. Supp. 1113, 1127 (S.D.N.Y. 1982) (noting that "[u]nder appropriate circumstances, laches will bar an effort to disqualify the adversary's counsel" and rejecting disqualification motion targeting government attorney based on two-year delay).

Gibson Dunn and the GRA defendants reserve all rights and remedies, under Rule 11 and otherwise.

Sincerely,

*Martin A. Hewitt*

Martin A. Hewett

# Exhibit 1

FD-302 (Rev. 5-8-10)

**b7A**
**b7E**

OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/25/2018

Richard William Gates III, previously identified, was interviewed by Supervisory Special Agent (SSA) [ ] ASAC [ ] Senior Special Counsel Attorney Andrew Weissmann and Senior Special Counsel Attorney Greg Andres. After being advised of the identities of the interviewing parties and the nature of the interview, Gates provided the following information:

**b6**
**b7C**

Pericles Fund

The first time Gates traveled to Russia was in late 2007 or early 2008. Gates traveled from the U.S. to Moscow and stayed there for approximately two days. At Paul Manafort's direction, Gates traveled to meet [ ] and B-Invest employees in Moscow regarding the Pericles investment. This meeting was scheduled soon after Oleg Deripaska and Manafort decided to create and fund Pericles. [ ] was responsible for organizing logistics related to Gates' meeting with B-Invest. However, [ ] did not attend the meeting. Manafort purposefully excluded [ ] from the meeting because [ ] was not aware of the amount of money which was invested in the Pericles, and Manafort wanted a wall between his political work portfolio and his financial work portfolio.

**b6**
**b7A**
**b7C**

Gates met with the following B-Invest employees at their Moscow office: [ ] The purpose of the meeting was to discuss the Pericles investment strategy. The following investment sectors were considered: (1) telecom; (2) real estate – focus on Odessa; (3) pharmaceuticals; (4) agriculture; and (5) media companies.

Approximately two to three month later, a second meeting was held in Moscow which Gates attended. Gates speculated that he traveled from Ukraine to Moscow for this meeting. The purpose of this meeting was to finalize their investment strategy, pick the top five investment targets and agree on funding for Pericles. The same people from B-Invest who attended the first meeting attended this meeting. Gates did not meet [ ] during this trip.

**b6**
**b7A**
**b7C**

At approximately the end of 2008, Manafort directed Gates to attend a third meeting with B-Invest representatives in Moscow. At this meeting, Gates was advised by B-Invest that the Perciles was being put on hold and that no capital contributions were going to be made by Deripaska. Gates assumed Manafort had already heard this from Deripaska.

Ukraine

Investigation on   03/18/2018   at   Washington, District Of Columbia, United States (In Person)

File # [ ]

Date drafted   04/02/2018

by [ ]

**b6**
**b7A**
**b7C**
**b7E**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b6
b7A
b7C

   When Manafort met with [                    ] it was
usually at a hotel in Kiev, and usually nobody else attended these meetings.

<u>After the November 2016 Election</u>

b6
b7A
b7C

   Gates sent talking points to [        ] on how to respond to media inquiries
regarding Manafort/Gates/DMP's work in Ukraine, [                    ]

b6
b7C

[                    ] had business interests in Malaysia and a preexisting
relationship with the Malaysian Prime Minister.

   Gates understood that [      ] had business interests in Malaysia and that he had     b6
a relationship with the Malaysia Prime Minister which dated back to at least 2012          b7C
when Trump played golf with the Malaysian Prime Minister.

   In 2012, the Malaysian Prime Minister played golf with Donald Trump. In late
January 2018 or February 2018, [      ] had a conversation with Trump where Trump
stated that maybe he would play golf with the Prime Minister in the summer of 2018.

   Gates advised that [      ] asked Gates to help him resolve the 1MDB issue
between the Malaysian government and the U.S. government. [      ] stated that he
was going to be meeting with President Trump, on various topics including 1MDB,
and asked for Gates' advice on the best way to deal with Trump. [      ] was
concerned that he might not have an opportunity to discuss the 1MDB issue with
Trump because of the other topics he was going to be discussing with him.

   After the election,, [      ] met with Trump and discussed the 1MDB issue with     b6
him. Trump told [      ] that the issue would be resolved. Gates stated that Trump     b7C
did not expound on what that meant. However, based on Gates' experience working
with Trump he assessed that indicated that Trump was aware and understood the

issue. The [ ] Trump meeting lasted approximately 20 minutes and it was part
of a larger meeting. Gates recalled that General Kelly attended the meeting and
the first issue discussed at the meeting was whether Secretary of State Tillerson
should be fired.

b6
b7C

Gates was shown an email between him and [ ] dated 01/05/2018 which had
talking points regarding 1MDB. Gates first learned about the 1MDB issue from
[ ] in September 2017. At the time, Gates was working with [ ] on other
business interests. Later, [ ] told Gates that the Malaysian Prime Minister was
coming to Washington, D.C. and that that the Prime Minister and [ ] were
supposed to meet with Trump. [ ] asked Gates to help him resolve the 1MDB case
because of Gates' history and knowledge of how to deal with Trump and he wanted
Gates' advice on who else within the Trump administration they should talk to
regarding the 1MDB case. [ ] suggested meeting with the National Security
Advisor, H.R. McMaster, but Gates did not think [ ] could get a meeting with
McMaster prior to [ ] meeting with President Trump. [ ] also suggested
meeting with the Secretary of State, Rex Tillerson, but Gates advised that it
would be a waste of time to talk to Tillerson because Trump did not include him in
foreign delegation meetings.

b6
b7C

Gates was shown an email from [ ] dated 07/08/2017, subject "Malaysia
Talking Points *Final*". Gates stated he has never seen this email
before. Regarding bullet point 4, Gates stated he was not aware of any attempt by
[ ] to communicate with Secretary Wilbur Ross. Gates stated that Ross had a
strong relationship with Trump from their previous business relationship. Ross
served and played a prominent role on the Campaign's Business Advisory
Council. Gates was not aware that Ross was [ ]
[ ] Gates was not aware of any relationship between Ross and Manafort.

b6
b7C

Gates was shown an email dated 01/05/18 tilted "PM: Rick Gates: Talking
Points". Gates advised that [ ] wanted to understand the Department of Justice
(DOJ) interest in the 1MDB case now that there was a new administration. Gates
first learned of the issue between 1MDB and the DOJ from [ ] in September
2017. During this time period, Gates was working with [ ] on other business
interests and [ ] told him that the Malaysian Prime Minister was in town to
meet with Trump. [ ] wanted Gates' advice on how they should deal with Trump
and whether they should talk to anyone else in the administration, such as H.R.
McMaster. Gates advised [ ] that he did not think he would be able to meet
with McMaster prior to the meeting with Trump. [ ] asked if he should try to
schedule a meeting with Rex Tillerson. Gates advised that it would be a waste of
time because Tillerson was not involved in foreign delegation meetings. Gates
stated he did not have any specific knowledge of DOJ's, or any other department or
person in the Trump administration, position regarding 1MDB. Rather, this was
Gates' assessment based on internet research he conducted on 1MDB. Gates never
spoke to anyone in the administration or even attempted to reach out to anyone in
the administration about 1MDB. [ ] was the person Gates reached out to
obtain information about DOJ .

b6
b7C

Regarding the "Talking Points" in the 01/05/18 email, Gates stated he drafted the talking points in consultation with [        ]  Regarding bullet point number 1, Gates stated he was not actually working with anyone at DOJ or the NSC, and that the entirety of this bullet was false.

b6
b7C

[At 13:13, SSA [        ] and Special Counsel Attorney Zainab Ahmad joined the interview.  At this point, SSA [        ] took notes of the interview and it will be documented in a separate 302.  At 14:40, SSA [        ] and Ahmad left the interview and SSA [        ] resumed taking notes.]

Gates advised that contrary to the statement in bullet number 1, there was no real strategy in place to contact parties at the DOJ or the NSC to find a resolution. [        ] told Gates that the National Security Division (NSD) of DOJ was responsible for handling this issue.  Regarding the "NSC" statement in the email, [        ] advised that McMaster attended the meeting between Trump and the Malaysian Prime Minister and they assumed that he would be the contact at the NSC.

b6
b7C

Regarding the statement in bullet point 2 " meeting with the assistant attorney general", this was a reference to Rachel Brand.  Gates stated he never really had access to Brand and never contacted her.

Regarding bullet point 3, Gates stated that it was accurate that he had discussions with the president about 1MDB and the president stated he was committed to getting the issue resolved.

Regarding bullet point 4, Gates stated that [        ] told him that the president told the Malaysian Prime Minister that he wanted to see him re-elected and wanted the 1MDB issue resolved.  Gates advised that if the 1MDB issue was not resolved it could pose a problem for the Prime Minister's re-election.  Gates stated that he understood that the Prime Minister reached out to [        ] for assistance with the 1MDB issue.  Gates did not know if [        ] was being paid by the Prime Minister for his assistance with the 1MDB issue.

b6
b7C

Regarding the reference to [        ] in bullet point 5, Gates stated that was a reference to [        ] general counsel, [        ] had a contact at [        ] who potentially had access to [        ] but the statement [        ] was an overstatement.

b6
b7A
b7C

Gates advised that [        ] was a big fundraiser for Trump and that is why he was able to schedule personal meetings with Trump. [        ] was also close to [        ] who helped [        ] obtain access to Trump. [        ] was [        ] Vice Chairman on the Republican National Committee (RNC).

b6
b7C

In approximately February 2018, [        ] told Gates that he was no longer pursuing the 1MDB issue with Trump or the "Talking Points" plan that he and Gates

drafted. _____ stated that he never heard anything more from Trump on the 1MDB issue and gave up on pursuing it any further.

Gates did not know if _____ had any discussions with Attorney General Sessions regarding 1MDB.

Gates has an agreement with _____ whereby _____ pays Gates a monthly retainer for his services. Gates is providing _____ with advice on how "things work within the Trump administration."  The advice Gates provided _____ related to 1MDB was part of the services he provided _____.

b6
b7C

Gates stated he never had any conversations with _____ regarding FARA or its requirements.

Gates knew that _____ had previously plead guilty in a criminal case but he did not obtain or discuss any specifics with _____ about his criminal acts or how _____ did provide Gates with advice on how he would be able to recover professionally from pleading guilty in a criminal case.

# Exhibit 2

FD-302 (Rev. 5-8-10)

**b7A**
**b7E**



UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/23/2018

On 03/18/2018, Richard GATES was interviewed, which was documented in an FD-302, Serial 445 of captioned investigation.

**b6**
**b7A**
**b7C**

UNCLASSIFIED//~~FOUO~~

**b3**
**b6**
**b7A**
**b7C**
**b7E**

Investigation on  04/17/2018  at  Washington, District Of Columbia, United States (In Person)

File #

Date drafted  04/17/2018

by

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2470