UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                      :

ELLIOTT BROIDY and BROIDY CAPITAL    :
MANAGEMENT, LLC,                          :
                                        :
              Plaintiffs,                :
                                          :
          - against -              :                Case No. 19-cv-11861-MKV
                                        :
GLOBAL RISK ADVISORS LLC, GRA MAVEN  :              **Oral Argument Requested**
LLC, GRA QUANTUM LLC, GLOBAL RISK    :
ADVISORS EMEA LIMITED, GRA RESEARCH  :
LLC, QRYPT, INC., KEVIN CHALKER, DENIS  :
MANDICH, ANTONIO GARCIA, and COURTNEY :
CHALKER,                                :
                                        :
              Defendants.          :
                                        :
------------------------------------------------------------------x

## GIBSON, DUNN & CRUTCHER LLP'S MEMORANDUM OF LAW <u>IN OPPOSITION TO MOTION FOR SANCTIONS</u>

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................. 5

    I.    Plaintiffs' First Counsel Raises Potential Conflict in 2020 And Summarily Drops Allegation ............................................................................................................ 6

    II.    Shortly After Hiring Its Third Set Of Attorneys, Plaintiffs Resurface Their Alleged "Conflict" Claim Two Years Later ......................................................... 8

    III.    Defendants Replace Gibson Dunn For Reasons Having Nothing To Do With The Alleged Merits Of The Disqualification Allegations ................................. 10

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT .................................................................................................................... 11

    I.    Plaintiffs Cannot Meet Their Burden Of Proving That Gibson Dunn's Decision Not to Immediately Withdraw Was "Entirely Without Color" ......................... 12

        A.    Plaintiffs' Claim Of Conflict Is Meritless ............................................. 13

            1.    It Is Pure Speculation That Ms. Ahmad Had Confidential Government Information About Mr. Broidy Relating To The Alleged Hacking ..................... 14

            2.    Speculation And Conjecture Do Not Support A Disqualification Claim ............. 19

        B.    No Confidential Government Information Allegedly Obtained By Ms. Ahmad Could Have Been Used To Plaintiffs' Material Disadvantage .................. 22

    II.    Plaintiffs Cannot Meet Their Burden Of Proving Gibson Dunn's Bad Faith ............. 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.I. Credit Corp. v. Providence Wash. Ins. Co.*,
  No. 1997 WL 231127 (S.D.N.Y. May 7, 1997)......................................................21

*All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund*,
  2010 WL 2243351 (E.D.N.Y. June 1, 2010) ...............................................14, 17

*Arroyo v. City of Buffalo*,
  2017 WL 3085835 (W.D.N.Y. July 20, 2017).......................................................23

*Babineaux v. Foster*,
  2005 WL 711604 (E.D. La. Mar. 21, 2005) .........................................................20

*Baide-Ferrero v. Ercole*,
  2010 WL 1257615 (S.D.N.Y. Mar. 31, 2010) ......................................................16

*Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*,
  805 F.2d 49 (2d Cir. 1986)......................................................................................17

*Bridgeway Corp. v. Citibank*,
  201 F.3d 134 (2d Cir. 2000)....................................................................................17

*Bulkmatic Transp. Co. v. Pappas*,
  2001 WL 504841 (S.D.N.Y. May 11, 2001) ........................................................23

*Colandrea v. Town of Orangetown*,
  490 F. Supp. 2d 342 (S.D.N.Y. 2007)..........................................................14, 23

*Ello v. Singh*,
  2006 WL 2270871 (S.D.N.Y. Aug. 7, 2006) .......................................................14

*Evans v. Artek Sys. Corp.*,
  715 F.2d 788 (2d Cir. 1983)....................................................................................14

*In re Facebook, Inc. Consumer Privacy User Profile Litigation*,
  Case No. 18-md-02843-VC, ECF 1104 (N.D. Cal. Feb. 9, 2023)...........................2

*Fischer v. Verizon N.Y., Inc.*,
  2020 WL 5117913 (S.D.N.Y. Aug. 31, 2020)......................................................13

*Gelicity UK Ltd. v. Jell-E-Bath, Inc.*,
  2014 WL 1330938 (E.D.N.Y. Apr. 1, 2014) ................................................12, 24

*Green v. City of N.Y.*,
  2011 WL 2419864 (S.D.N.Y. June 7, 2011) .......................................................20

i

*Keller v. Mobil Corp.*,
   55 F.3d 94 (2d Cir. 1995)..................................................................................................25

*Kronberg v. LaRouche*,
   2010 WL 1443934 (E.D. Va. Apr. 9, 2010) ......................................................................22

*Madison 92nd Street Associates, LLC v. Marriott International, Inc.*,
   2013 WL 5913382 (S.D.N.Y. Oct. 31, 2013) ....................................................................25

*Murray v. Metro. Life Ins. Co.*,
   583 F.3d 173 (2d Cir. 2009).............................................................................................24

*Pagan v. C.I. Lobster Corp.*,
   549 F. Supp. 3d 356 (S.D.N.Y. 2021)...............................................................................13

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
   2006 WL 6846702 (E.D.N.Y. Aug. 7, 2006)...............................................................20, 22

*Picard v. Sage Realty*,
   2021 WL 6052422 (S.D.N.Y. Dec. 21, 2021) ...................................................................17

*Revson v. Cinque & Cinque, P.C.*,
   221 F.3d 71 (2d Cir. 2000)...........................................................................................1, 13

*Rothberg v. Phil's Main Roofing, LLC*,
   2016 WL 2344882 (S.D.N.Y. May 2, 2016) .....................................................................23

*Schlaifer Nance & Co. v. Est. of Warhol*,
   194 F.3d 323 (2d Cir. 1999).........................................................................................12, 13

*Sekisui Am. Corp. v. Hart*,
   15 F. Supp. 3d 359 (S.D.N.Y. 2014).................................................................................11

*Streichert v. Town of Chester, N.Y.*,
   2021 WL 735475 (S.D.N.Y. Feb. 25, 2021).......................................................5, 6, 7, 8, 21

*Tour Tech. Software, Inc. v. RTV, Inc.*,
   2018 WL 3682483 (E.D.N.Y. Aug. 2, 2018)......................................................................21

*United States v. Gates*,
   2018 WL 1027204 (D.D.C. Feb. 23, 2018) (.......................................................................9

*United States v. Prevezon Holdings, Ltd.*,
   305 F. Supp. 3d 468 (S.D.N.Y. 2018)......................................................11, 12, 13, 24, 25

*Vegetable Kingdom, Inc. v. Katzen*,
   653 F. Supp. 917 (N.D.N.Y. 1987) ...................................................................................13

*W. T. Grant Co. v. Haines*,
    531 F.2d 671 (2d Cir. 1976)................................................................................................23

**Statutes**

28 U.S.C. § 1927...........................................................................................................1, 2, 11

**Rules**

Fed. R. Evid. 803(8).............................................................................................................17

New York Rules of Professional Conduct Rule 1.11 ........................2, 3, 11, 14, 18, 19, 20, 21, 24

## PRELIMINARY STATEMENT

Plaintiffs Elliott Broidy and Broidy Capital Management, LLC have filed a publicity-driven motion seeking to impose sanctions against Defendants' former counsel Gibson Dunn & Crutcher LLP ("Gibson Dunn") based on little more than innuendo and speculation regarding a supposed "conflict of interest" involving a highly-respected Gibson Dunn partner, Zainab Ahmad, and her prior service at the U.S. Department of Justice as a prosecutor in the Office of Special Counsel (the "OSC"). Sanctions are an *extraordinary* remedy that necessarily require an *extraordinary* burden of proof. The standard to succeed on a motion for sanctions under 28 U.S.C. § 1927 or under the Court's inherent authority—a standard never once mentioned in Plaintiffs' Motion—is exceedingly high: it requires Plaintiffs to introduce "clear evidence" that the challenged action—here, Gibson Dunn's assertion that there was no disqualifying conflict—was both (1) "*completely without merit*" and (2) "undertaken for some improper purpose." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78–79 (2d Cir. 2000) (emphasis in original). Plaintiffs have not come close to meeting this heavy burden—they do not even try.

No court has ever found Gibson Dunn had a conflict of interest here. And no motion for disqualification has ever been filed (much less briefed). Plaintiffs have never put forward any credible evidence that Ms. Ahmad obtained confidential government information about Mr. Broidy that could have been used to his material disadvantage in the pending litigation—the actual standard for asserting a conflict here. Ms. Ahmad did not obtain any confidential information and has submitted a sworn declaration attesting to that fact in opposition to Plaintiffs' motion. There was never a basis to disqualify Gibson Dunn, which is why Plaintiffs' two predecessor counsel of record, Steptoe & Johnson LLP ("Steptoe") and McGuire Woods LLP, never pursued it. In the end, however, Gibson Dunn's clients simply chose to hire new counsel rather than belabor the issue, for business reasons that have nothing to do with the false allegations raised by Plaintiffs. The email in which Gibson Dunn's clients explain their reasons for bringing in a new law firm is submitted with this opposition, and the Court can see for itself

1

that Gibson Dunn did not withdraw because it believed there was any merit to Plaintiffs' allegations. Ascher Decl., Ex. B.[1]   Plaintiffs must know there is no merit to their allegations because they keep changing the theory on which they seek sanctions.  Plaintiffs now also attempt to bolster their motion by falsely besmirching the reputation of former lead counsel, Orin Snyder, another highly-respected lawyer and former federal prosecutor himself with a 37-year career of excellence, with repetitive and irrelevant quotes from an appealable order of another court in another case for another client about discovery, which is not only wrong, but has nothing to do with the issues here.[2]  Hart Decl., Ex. L.  These character attacks and smears that Plaintiffs have made a centerpiece of their motion are not only entirely inappropriate but do not support their motion in any event.

As described by leading legal ethics expert Professor Roy Simon, "Mr. Broidy has failed to establish that Gibson Dunn had a disqualifying conflict of interest under Rule 1.11 at any time," and also "cannot satisfy the two elements (lack of a colorable argument, and bad faith conduct) that he would need to establish to merit sanctions under § 1927 or the Court's inherent authority."  Simon Decl. ¶ 68.  Yet, two years after Plaintiffs' original counsel first raised then summarily dropped any notion of a conflict, Plaintiffs' new counsel (their third in this case), Kasowitz Benson & Torres LLP ("Kasowitz"), threatened to file a motion for disqualification supposedly based on "new evidence," *i.e.*, a declaration they went out and got from Rick Gates, a convicted liar with close financial ties to Mr. Broidy.  Ascher Decl. ¶ 3; *see* Hart Decl., Ex. K.  There was never a basis for disqualification, and Mr. Gates's self-serving declaration—created more than ***four years*** after the facts at issue—changed nothing.  But

---

[1] Citations to "Ascher Decl." refer to the Declaration of Brian C. Ascher; citations to "Simon Decl." refer to the Declaration of Prof. Roy D. Simon, Jr; citations to "Hart Decl." refer to the Declaration of Nancy E. Hart; and citations to "Ahmad Decl." refer to the Declaration of Zainab N. Ahmad, all of which are filed concurrently. Citations to "Mot." are to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Sanctions, ECF 163.

[2] Plaintiffs' attempt to seize upon a district court's sanctions order entered in a different proceeding on different facts is inappropriate and clearly has no proper purpose.  *See* Mot. at 2, 4, 6, 18 (citing *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 18-md-02843-VC, ECF 1104, at 39 (N.D. Cal. Feb. 9, 2023)).  Gibson Dunn vehemently disagrees with that order (which did not sanction Mr. Snyder) and it is wholly irrelevant here.

Plaintiffs' litigation gambit succeeded in that they forced Defendants to make a business decision—as is a client's absolute right—to replace Gibson Dunn rather than engage in a protracted and distracting disqualification fight, despite the lack of merit to Plaintiffs' allegations.

Plaintiffs' Motion must be denied for the following reasons:

***No conflict***.  Gibson Dunn did not have and never had a conflict of interest.  When prior counsel first raised and quickly dropped this issue in 2020, Gibson Dunn asserted, correctly and in the utmost good faith, that no conflict existed.  In his declaration, Mr. Gates claims four years after the fact that he now has a crystal clear memory that Ms. Ahmad was present during three of Gates's interviews with the OSC (of which he had more than 50) and that during one interview, he was allegedly asked three anodyne questions regarding the alleged hacking of Mr. Broidy (to which he had no substantive response). Plaintiffs' and Gates' belated account is flatly contradicted not only by Ms. Ahmad's own sworn testimony, but by contemporaneous FBI records of those meetings which confirm that Ms. Ahmad was not even present at the OSC interview when the alleged hack of Mr. Broidy was discussed.

***No Confidential Information***.  Mr. Gates does not identify ***anything*** confidential that was disclosed in those alleged meetings that—as required to establish a conflict under New York Rules of Professional Conduct Rule 1.11—remains confidential to this day and that could be used to Plaintiffs' "material disadvantage" in this case.  Indeed, Mr. Gates admits that "the contents of the materials shown to me were referenced or quoted in multiple media stories" at the time.  ECF 165-2 ¶ 22.  This is evidenced by contemporaneous reporting by major media outlets that included detailed descriptions or even screenshots of the allegedly hacked communications involving Mr. Broidy.  *See* Hart Decl., Exs. A & B.  And of course, the scores of emails, text messages, and meetings underlying Mr. Broidy's October 2020 indictment and guilty plea for conspiracy to act as an unregistered agent for Chinese and Malaysian interests have been exhaustively detailed and disclosed in public filings.  *Id.*, Exs. G & H.

3

Faced with this fatal defect in their motion, Plaintiffs put forward a new declaration from Mr. Broidy who now claims that "to his knowledge" none of his WhatsApp text messages—presumably including those that were allegedly shown to Mr. Gates—have been publicly disseminated. Mr. Broidy does not claim, however, that his WhatsApp text messages had anything to do with this case, *i.e.*, the alleged hack of these materials, or contain confidential information. In fact, Mr. Broidy *admits* that he voluntarily produced nearly 100 pages of documents to the Department of Justice on March 12, 2018 and that he subsequently had search warrants issued against himself and his companies, presumably in connection with the investigation conducted by the Office of the Inspector General's Cyber Investigations Office and the FBI that led to his conviction. Further, unsealed public records make express reference to a "log of WhatsApp messages exchanged between Broidy" and others, describe the content of those messages, as well February 2018 search warrants executed on third parties, and contain multiple "screenshots" of messages. Hart Decl., Ex. E, Attach. A at 12; ECF 166 ¶ 5. Tellingly, Plaintiffs have failed to identify even a single WhatsApp or other text message that they claim contains non-public confidential information.

***Pure Speculation***. Plaintiffs' entire "conflict" theory piles speculation upon surmise upon innuendo. They theorize that because Mr. Gates was asked a grand total of three questions regarding Mr. Broidy and was allegedly shown WhatsApp messages involving him, the OSC ***could have*** also been investigating Broidy (despite the fact that Mr. Broidy has affirmatively alleged that he was never a target of the OSC or ever interviewed by the OSC team, *see* ECF 57 ¶ 321; ECF 1 ¶ 2; ECF 116 ¶ 300); that Ms. Ahmad ***could have*** been part of that investigation or had non-public information as to how the OSC allegedly obtained these materials; and that during the course of this imagined investigation, Ms. Ahmad ***could have*** obtained confidential information about the alleged hack of Mr. Broidy that remains confidential to this day and ***could have*** been used to his material disadvantage in this litigation. This

speculation does not come close to meeting the standard for disqualification under Rule 1.11(c) of the New York Rules of Professional Conduct.  "Mere speculation will not suffice to meet this high standard." *Streichert v. Town of Chester, N.Y.*, 2021 WL 735475, at *5 (S.D.N.Y. Feb. 25, 2021); *see also* Simon Decl. ¶ 62 ("[A] law firm is not required to withdraw if its internal inquiry into an alleged conflict reveals no conflict and the party alleging a conflict fails to offer specific evidence of the alleged conflict.").  And Ms. Ahmad has flatly denied having any such knowledge or involvement in any investigation (and is aware of none) regarding the alleged hacking.  Ahmad Decl. ¶ 6.

*No Bad Faith*.  Plaintiffs cannot show, as they must, that Gibson Dunn's actions in not immediately withdrawing upon receipt of Mr. Gate's declaration were taken in bad faith.  After the potential conflict was raised and the Gates declaration provided, Gibson Dunn investigated the allegations and responded truthfully, before withdrawing weeks later at its clients' request for independent business reasons.  The notion that there was something nefarious in not privately providing Mr. Broidy a declaration by Ms. Ahmad is absurd: Ms. Ahmad was always prepared to provide a declaration in the context of a court filing—and has submitted one now that a motion has actually been filed.  Nothing in Ms. Ahmad's declaration is inconsistent with the information provided to Plaintiffs from the inception by Mr. Snyder, and Plaintiffs do not point to a single statement suggesting that he—or anyone at Gibson Dunn—did anything even remotely improper whatsoever.  On the contrary, Gibson Dunn acted at all times responsibly, in good faith, and according to its ethical responsibilities to its client.

Plaintiffs' vexatious motion should be denied.

## BACKGROUND

Plaintiffs brought this lawsuit in 2019, represented at that time by Steptoe, alleging that Defendants hacked Mr. Broidy's emails and leaked them to smear his reputation by exposing his lobbying efforts, ECF 1 ¶¶ 1–2—unlawful lobbying on behalf of foreign nationals from Malaysia and China, to which Mr. Broidy later pleaded guilty, *see* Hart Decl., Exs. G–J.  Plaintiffs accused Defendants

of "creat[ing] the false impression, repeated in multiple media stories, that Mr. Broidy was a target of special counsel Robert Muller's investigation, when in fact he was never contacted by Mr. Mueller's office and his name appears nowhere in the Mueller Report." *Id.* ¶ 2.  After Defendants moved to dismiss, Plaintiffs filed a First Amended Complaint in June 2020; again, they denied that Mr. Broidy was a target of the OSC investigation.  ECF 57 ¶ 321.

## I.     Plaintiffs' First Counsel Raises Potential Conflict in 2020 And Summarily Drops Allegation

On August 26, 2020, Plaintiffs' attorneys at Steptoe sent a letter to Gibson Dunn's General Counsel alleging that Ms. Ahmad had "participated in at least one investigation in which she acquired confidential government information that could be used to the material disadvantage of GRA's adversary."  ECF 165-4, at 1.  Although Steptoe did not identify any specific government information allegedly in Ms. Ahmad's possession, it claimed that "it is public information that Ms. Ahmad participated in the interview of Rick Gates, which focused extensively on Mr. Broidy," and, therefore, it was "likely" that she "obtained additional confidential information concerning Mr. Broidy as part of the overall investigation."  *Id.*

Gibson Dunn responded the following week, pointing out that Plaintiffs failed to identify "*any* specific 'confidential government information' regarding Mr. Broidy that [they] believe[d] Ms. Ahmad may have acquired during her government service, nor how any such information could be used to Mr. Broidy's 'material disadvantage' in this litigation," given that the OSC's "investigation had nothing to do with the circumstances of the alleged hacking of Mr. Broidy's information." ECF 165-5, at 1.  Gibson Dunn deduced that Steptoe was referring to a March 18, 2018 interview of Rick Gates by the OSC.  *Id.* at 2.  But, as Gibson Dunn pointed out, that interview was memorialized in an FBI "302" memorandum (the "2456 Memo"), which made clear that Ms. Ahmad *was not present when Mr. Broidy's emails were discussed*.  *Id.* at 2.  Gibson Dunn unequivocally affirmed that "Ms. Ahmad did not acquire 'any

confidential government information' during her tenure at the Department of Justice that could be used to Mr. Broidy's material disadvantage' in this litigation." *Id.* at 2–3.  Gibson Dunn also made clear that even if Ms. Ahmad had acquired "confidential government information" about Mr. Broidy while she was in the OSC (which she did not), that would not create a conflict because the emails referenced in the interview memorandum were public.  *Id.* at 2.

Steptoe responded on September 9, 2020, explaining that its accusation of a conflict was premised on its alleged discovery "that [Ms. Ahmad] was previously part of a government team investigating [Mr. Broidy]," and that it felt there was no coincidence Defendants hired "one of a handful of former Department of Justice attorneys [] who had participated in a government investigation of Mr. Broidy."  ECF 165-6, at 1.  Steptoe made these claims notwithstanding that it had filed two successive pleadings *expressly denying* that Mr. Broidy was the target of *any* investigation by the OSC, much less one in which Ms. Ahmad "participated."  Steptoe also observed that the 2456 Memo "indicate[s] that that portion of the interview [in which Ms. Ahmad participated] would be 'documented in a separate 302,'" which, to Steptoe's knowledge, "either was never created or never made public."  *Id.* at 2.

Gibson Dunn wrote back two weeks later, on September 23, 2020, with a point-by-point rebuttal to Plaintiffs' allegations.  ECF 165-7.  *First*, Gibson Dunn reiterated that Ms. Ahmad was not present for the portion of the March 18 interview during which Mr. Broidy was discussed.  *Id.* at 1–2.  Gibson Dunn directed Plaintiffs to the recently released "2470 Memo," which related to the portion of the interview in which Ms. Ahmad *did* participate and did not reflect any information about Mr. Broidy.  *Id.* at 2.  Gibson Dunn again made clear that Ms. Ahmad "did not interview Mr. Gates (or participate in an interview of Mr. Gates) in which she obtained 'confidential government information' about Mr. Broidy—on March 18, 2018 or at any other time—during her tenure at the Department of Justice."  *Id.  Second*, Gibson Dunn refuted Plaintiffs' baseless accusation that Ms. Ahmad "personally 'investigated Mr. Broidy,'"

noting this claim was unsupported by any evidence and in fact contradicted by Plaintiffs' own allegations. *Id.* *Third*, Gibson Dunn responded to Plaintiffs' suggestion that Ms. Ahmad might have learned of confidential information regarding Mr. Broidy through other, unspecified means, citing precedent holding that disqualification for an alleged conflict cannot be based on mere speculation. *Id.* at 2–3. *Fourth*, Gibson Dunn again pointed out that Plaintiffs had not identified any specific confidential government information Ms. Ahmad possessed, noting that all of Mr. Broidy's private emails discussed during the March 18 interview had been made public. *Id.* at 3. And *fifth*, Gibson Dunn explained how it had come to be hired for this matter—namely, that Mr. Snyder has known Qrypt founder and CEO Kevin Chalker since early 2019, after the California action was filed, *see* ECF 163 ("Mot.") at 3–4, but before this case was, and was retained through that connection. Defendants did not hire Ms. Ahmad because of her work in the OSC; rather, Ms. Ahmad was brought on to the team after Mr. Snyder was hired. ECF 165-7, at 3.

The parties spoke about Plaintiffs' allegations on September 30, 2020. *See* ECF 165-8 at 2. Gibson Dunn followed up with an email attaching both memos again and reaffirming that "Ms. Ahmad did not investigate Mr. Broidy, or acquire any confidential government information regarding Mr. Broidy, during her tenure in the Special Counsel's office or any other part of the Department of Justice." *Id.* at 3. Based on Gibson Dunn's thorough debunking of the supposed conflict, Steptoe was satisfied and did not pursue the issue further. *See* Mot. at 8. When new counsel from McGuire Woods LLP substituted in as Plaintiffs' counsel in February 2021, they never raised any alleged conflict.

## II.   Shortly After Hiring Its Third Set Of Attorneys, Plaintiffs Resurface Their Alleged "Conflict" Claim Two Years Later

On March 31, 2021, the Court granted Defendants' motion to dismiss the First Amended Complaint without prejudice, identifying several pleading deficiencies. ECF 89. With leave of the Court, Plaintiffs filed a Second Amended Complaint on March 1, 2022. ECF 116. On the same day, Plaintiffs

moved to substitute their attorneys again, this time bringing in the law firm of Kasowitz Benson Torres LLP ("Kasowitz")—their third law firm.  ECF 115.

On May 16, 2022—two weeks after Defendants moved to dismiss Plaintiffs' Second Amended Complaint, ECF 123—Kasowitz emailed Gibson Dunn's General Counsel regarding an unspecified "Potential motion" and requested a call.  Ascher Decl., Ex. A.  Gibson Dunn promptly contacted Kasowitz, who advised that Plaintiffs had purportedly "developed evidence" that Gibson Dunn's representations to Steptoe about a conflict were untrue, and that they intended to file a pre-motion letter seeking to disqualify Gibson Dunn as counsel.  *Id.*  Gibson Dunn asked to see that new "evidence."  *Id.* Kasowitz originally refused, but eventually produced to Gibson Dunn a declaration signed by Mr. Gates—himself a convicted fraudster.  *See, e.g.*, *United States v. Gates*, 2018 WL 1027204 (D.D.C. Feb. 23, 2018) (Gates pleading guilty to "conspiracy against the United States" and "making a false statement to the Special Counsel's Office").

Mr. Gates alleged that the 2456 Memo was inaccurate, that Ms. Ahmad was present during the portion of the interview on March 18, 2018 in which certain of Mr. Broidy's emails were discussed, and that Ms. Ahmad participated in other interviews in which information about Mr. Broidy completely unrelated to the allegations in this case was discussed.  ECF 165-2 ¶¶ 6–9, 27.  Mr. Gates also described documents purportedly shown to him during the March 18 meeting, which he speculated consisted of "hacked materials taken from Mr. Broidy." *Id.* ¶ 22.  Gibson Dunn responded on May 18, 2022 with a detailed letter, discussing the inaccuracies in the Gates declaration and the legal basis for its position that disqualification was unwarranted.  ECF 165-9.  The parties continued to correspond about these issues over the next several weeks, with Gibson Dunn emphasizing in a June 22, 2022 letter that if Plaintiffs believed the analysis in its May 18 letter was "incorrect in any respect," it was "incumbent upon" Plaintiffs to inform Gibson Dunn so it could "consider [Plaintiffs'] position and engage in a meaningful

9

meet-and-confer." ECF 165-12, at 2.  Instead of doing so, Plaintiffs unilaterally declared that "any further meet and confer would not be productive," and insisted on taking the matter to Court.  ECF 165-11, at 1, 3.

## III. Defendants Replace Gibson Dunn For Reasons Having Nothing To Do With The Alleged Merits Of The Disqualification Allegations

On June 27, 2022, Plaintiffs filed a pre-motion letter regarding their anticipated motion for disqualification of Gibson Dunn as counsel for Defendants, ECF 131, and the Court thereafter entered a briefing schedule.  ECF 132.  Gibson Dunn was fully prepared to oppose the motion to defend itself against Plaintiffs' baseless attack and devoted time and resources to working on an opposition with the full support of Defendants.  On July 21, 2022, however, *before* Plaintiffs filed their motion, Defendants shifted course and advised Gibson Dunn that they preferred to substitute counsel rather than oppose the disqualification motion.  Ascher Decl., Ex. B.  As set forth in Defendants' correspondence with Gibson Dunn, their rationale was purely based on their own business interests and had nothing to do with the merits of any purported conflict.  *Id*.  After Defendants exercised their unequivocal right to hire new counsel, Gibson Dunn promptly filed a stipulation of withdrawal, and new counsel appeared on July 25, 2022.

That should have been the end of the matter.  Having sat on the alleged conflict for almost two years before tactically raising the issue just two weeks after Gibson Dunn filed Defendants' second motion to dismiss, Plaintiffs got exactly what they were after from the start: Gibson Dunn's withdrawal.  Rather than take "yes" for an answer, Kasowitz advised Gibson Dunn and Defendants that it intended to file a pre-motion letter for sanctions that same day, and did so.  Ascher Decl. ¶ 7 & Ex. C; ECF 138 at 3.  The Court granted leave and Plaintiffs' Motion was filed on February 23, 2023.  ECF 163.

## LEGAL STANDARD

A party seeking sanctions under either 28 U.S.C. § 1927 or the Court's inherent authority faces

an extraordinarily high bar.  In either case, the moving party bears the burden of showing that "(1) the offending party's claims were entirely without color, *and* (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay."  *United States v. Prevezon Holdings, Ltd.*, 305 F. Supp. 3d 468, 478–79 (S.D.N.Y. 2018) (quotation marks omitted).  "[A]ll doubts" must be resolved in favor of the attorneys against whom sanctions are sought.  *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 382 (S.D.N.Y. 2014).

## ARGUMENT

Plaintiffs come nowhere close to meeting their exceptionally high burden.  They cannot prove that Gibson Dunn's representations that there was no disqualifying conflict were "entirely without color" when (1) the only factual support for their rank speculation is a made-for-litigation declaration from a convicted liar that is squarely at odds with the contemporaneous evidence of what took place during the March 18 interview; (2) Ms. Ahmad has testified she has no confidential information and was not involved in any investigation (nor is she aware of any) regarding the alleged hacking; (3) Plaintiffs point to no information that Ms. Ahmad supposedly had that was confidential at the time of the alleged interview, much less that it remains confidential now, as Rule 1.11(c) of the New York Rules of Professional Conduct requires; and (3) Plaintiffs suffered no material disadvantage from any alleged access to allegedly confidential information, as Rule 1.11(c) also requires.  The evidence, properly weighed, flatly contradicts Plaintiffs' conspiracy theories, and the law would not have supported disqualification here even if every one of Plaintiffs' fabrications were true.  *See* Simon Decl. ¶ 4.

Nor is there any evidence of bad faith.  Just the opposite—all of the evidence shows that Gibson Dunn acted professionally, ethically, and promptly.  *See id.* ¶ 56–58.  After Steptoe, and then two years later, Kasowitz contacted Gibson Dunn regarding a purported conflict: Gibson Dunn evaluated the evidence presented by Plaintiffs, consulted with Ms. Ahmad and its clients, and explained to Plaintiffs in detail the reasons why it believed there was no conflict.  While Gibson Dunn was more than willing to

defend itself had a motion for disqualification even been filed (and it was not), once the Defendants exercised their right to substitute counsel (for their own independent business reasons), Gibson Dunn promptly withdrew.

The motion should be denied and the sideshow to this case finally brought to a close.

## I.   Plaintiffs Cannot Meet Their Burden Of Proving That Gibson Dunn's Decision Not to Immediately Withdraw Was "Entirely Without Color"

To meet their burden on a motion for sanctions, Plaintiffs must prove that Gibson Dunn's decision not to immediately accede to Plaintiffs' withdrawal demand—and instead take some time to consider Mr. Gates's declaration, engage in discussions with opposing counsel about a potential resolution, and consult with its clients, before withdrawing weeks later at its clients' request for independent business reasons—was so beyond the pale as to be "entirely without color." *Prevezon Holdings*, 305 F. Supp. 3d at 478–79 (S.D.N.Y. 2018); *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999) ("[J]udgment as a matter of law against a claim is a necessary, but not sufficient, condition for a finding of a total lack of a colorable basis."). In other words, Plaintiffs must prove that there was no legal or factual basis whatsoever for Gibson Dunn to refuse to immediately abandon its clients upon first receiving Plaintiffs' new counsel's renewed demand—almost two years after prior counsel dropped a similar request. Plaintiffs come nowhere close to satisfying this requirement. To the contrary, it is the opinion of leading legal ethicist Professor Simon that "Gibson Dunn had sound reasons for not withdrawing until its own client instructed Gibson Dunn to withdraw and switched to different counsel." Simon Decl. ¶ 34.

"[T]he threshold for colorability is low." *Gelicity UK Ltd. v. Jell-E-Bath, Inc.*, 2014 WL 1330938, at *3 (E.D.N.Y. Apr. 1, 2014). A claim or argument "is entirely without color when it lacks *any* legal or factual basis," the question being "whether a reasonable attorney . . . could have concluded that facts supporting the claim *might be established*, not whether such facts actually *had been*

*established*." *Prevezon Holdings*, 305 F. Supp. 3d at 479 (emphasis in original); *see also Fischer v. Verizon N.Y., Inc.*, 2020 WL 5117913, at *6 (S.D.N.Y. Aug. 31, 2020) ("A claim is colorable (*i.e.* defensible) when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim.") (quoting *Revson*, 221 F.3d at 78–79). It is not enough that the party's argument was "meritless"—the court "must find that the motion was made without plausible legal or factual basis and is completely lacking in justification before sanctions may be imposed." *Vegetable Kingdom, Inc. v. Katzen*, 653 F. Supp. 917, 926 (N.D.N.Y. 1987); *accord Schlaifer Nance & Co.*, 194 F.3d at 337 (2d Cir. 1999).

As described below, the evidence is overwhelming that Plaintiffs' conflict argument was fatally defective; but Gibson Dunn need offer only a "thin reed" of support for an argument to establish colorability. *Pagan v. C.I. Lobster Corp.*, 549 F. Supp. 3d 356, 362 (S.D.N.Y. 2021) (two text messages sufficient to render argument colorable). The testimony of Ms. Ahmad, the FBI's 302 memos that are consistent with that testimony, the absence of evidence that Ms. Ahmad in fact obtained any confidential government information relevant to this matter, the lack of any specificity from Plaintiffs as to what information Ms. Ahmad is alleged to possess, and Plaintiffs' failure to identify any "material disadvantage" Ms. Ahmad's representation may have posed to them, certainly provide far more than a "thin reed" on which Gibson Dunn could have staked its decision not to immediately withdraw.[3]

### A. Plaintiffs' Claim Of Conflict Is Meritless

The standard for disqualifying counsel is exceptionally high. "Because motions to disqualify counsel can often be tactically motivated, cause delay and additional expense, and disrupt attorney-client relationships, the movant must meet a high standard of proof to disqualify the non-movant's counsel."

---

[3] Plaintiffs fail to even argue—let alone prove—that Gibson Dunn had no colorable basis to refuse to immediately withdraw upon receiving Mr. Gates's declaration from Kasowitz. To the contrary, Gibson Dunn indisputably had an ethical obligation not to immediately abandon its clients before undertaking an investigation and consulting with its clients.

*Ello v. Singh*, 2006 WL 2270871, at *2 (S.D.N.Y. Aug. 7, 2006) (citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)); *see also All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund*, 2010 WL 2243351, at *4 (E.D.N.Y. June 1, 2010) ("The Second Circuit disfavors disqualification and therefore requires the party seeking disqualification to satisfy a high standard of proof in order to succeed."). "Disqualification of an attorney is only appropriate where there has been a clear violation of the Code of Professional Responsibility leading to a significant risk of trial taint." *Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 352 (S.D.N.Y. 2007).

Plaintiffs' proposed disqualification motion rested entirely on their theory that Ms. Ahmad's representation of Defendants breached Rule 1.11(c) of the New York Rules of Professional Conduct, regarding representations in private practice by former government attorneys. Mot. at 1–2. To establish a breach of Rule 1.11(c), Plaintiffs would have needed to prove both (1) that Ms. Ahmad is in possession of "confidential government information" concerning Mr. Broidy that *remains confidential today* and (2) that such information could be used to Plaintiffs' "material disadvantage" in this litigation. N.Y. R. Pro. Conduct 1.11(c). Plaintiffs could not establish either element. *See* Simon Decl. ¶¶ 3, 42.

### 1. It Is Pure Speculation That Ms. Ahmad Had Confidential Government Information About Mr. Broidy Relating To The Alleged Hacking

Plaintiffs' asserted basis for disqualification is that, while at the OSC, Ms. Ahmad investigated the hacking of Mr. Broidy and, therefore, "possesses confidential government information about Mr. Broidy and about the workings of the conspiracy targeting Mr. Broidy." Mot. at 14. Plaintiffs' baseless theory is foreclosed by their *own* repeated assertions in this litigation that Mr. Broidy was never a target of the OSC investigation, "was never interviewed by Mueller's team[,] and does not appear once in the Mueller Report." ECF 57 ¶ 321; *accord* ECF 1 ¶ 2; ECF 116 ¶ 300. Now, Plaintiffs claim on the basis of a declaration by a convicted liar that Ms. Ahmad attended a portion of a meeting with Mr. Gates on March 18, 2018, and that during other portions of that interview *other* attorneys asked a total of three

questions about the hacking of Mr. Broidy's emails, and that that somehow proves that Ms. Ahmad had confidential government information regarding Mr. Broidy. Mot. at 14–15. It proves no such thing.

> ### a.   Ms. Ahmad Was Not Present At Any Interview About The Hacking Of Mr. Broidy's Emails

As a threshold matter, Ms. Ahmad did not participate in the portion of the March 18, 2018 interview regarding Mr. Broidy's emails. Ms. Ahmad has submitted a declaration unequivocally stating that she was *not* in the room with Mr. Gates when the alleged hacking of Mr. Broidy's emails were briefly raised in three questions. Ahmad Decl. ¶ 6. Ms. Ahmad does not dispute that Mr. Broidy was at times mentioned during her handful of other interviews of Mr. Gates, *see id.*, but makes clear that she never obtained any confidential information about the alleged hacking of Mr. Broidy's emails, *id.* ¶¶ 7–8. Nor is she aware of *anyone* at the OSC investigating the hacking, *id.* ¶ 6.[4]

Ms. Ahmad's sworn testimony is corroborated by contemporaneous summaries of the interviews with Mr. Gates, prepared by FBI agents in the ordinary course of their duties—the now-public 302 Memos. In particular, the 2456 Memo explains that on March 18, Mr. Gates was interviewed by Special Counsel Attorneys Andrew Weissman and Greg Andres, with two FBI agents present, on a number of topics. *See* Ahmad Decl., Ex. A. One such topic was Mr. Gates's involvement with Mr. Broidy seeking to have the Department of Justice terminate the 1MDB investigation. *Id.* at 2–5. In the middle of that interview, at 1:13 PM, Ms. Ahmad and another FBI agent joined the meeting. *Id.* at 4. The discussion while Ms. Ahmad was present constituted a separate interview, documented "in a separate 302," *i.e.*, the 2470 Memo. *Id.* The 2470 Memo is almost completely redacted, strongly suggesting that the substance differed from that of the 2456 Memo, which largely did not redact the relevant portions of the discussion

---

[4] Plaintiffs try to impugn Ms. Ahmad for not providing a declaration earlier in the proceedings. Mot. at 1–3, 10, 18–19. Ms. Ahmad was always prepared to submit a declaration in response to a motion filed with the Court—this is the first one to have been filed, as no motion for disqualification was ever made. And of course, her sworn testimony is consistent with the express representations previously made by Gibson Dunn to Steptoe and Kasowitz regarding her knowledge.

regarding Mr. Broidy. *Compare* Ahmad Decl., Ex. B, *with id.*, Ex. A. The 2456 Memo then states that Ms. Ahmad and the FBI agent left the meeting at 2:40 PM. Ahmad Decl., Ex. A at 4. After Ms. Ahmad left, the conversation regarding 1MDB and Mr. Broidy—that is, the initial interview that had been interrupted—then continued. *Id.* In short, Ms. Ahmad was *not* present for the conversation about Mr. Broidy on March 18. Ms. Ahmad was present only for the portion of the interview on March 18 that had nothing to do with the alleged hacking of Mr. Broidy's emails at issue in this case. *See* Ahmad Decl. ¶¶ 4–6.

In response, Plaintiffs offer only Mr. Gates's declaration, which was signed more than ***four years*** after the March 18 interview and is flatly contradicted by the FBI records in numerous ways. First, Mr. Gates implies that only Mr. Andres was present for the first portion of the meeting, *see* ECF 165-2 ¶ 10, but the 2456 Memo states that Mr. Weissman and *two* FBI agents were also present at that time, *see* Ahmad Decl., Ex. A at 1. Next, Mr. Gates claims there were "sequential" meetings on March 18, *see* ECF 165-2 ¶¶ 8–11, while the 2456 Memo explains that the interview that began before Ms. Ahmad joined the meeting was resumed after she left, *see* Ahmad Decl., Ex. A at 4. Finally, Mr. Gates claims that Ms. Ahmad was present for the "second" meeting at which, he says, Mr. Broidy and the hacking of his emails were briefly discussed, *see* ECF 165-2 ¶¶ 9, 12–15. But Ms. Ahmad was not present for that portion of the meeting according to the 2456 Memo. Ahmad Decl., Ex. A at 4–5.[5]

For Plaintiffs to have prevailed on their disqualification motion, they would have had to convince the Court that the official record of the March 18 interview, prepared by FBI agents, was inaccurate; that the sworn testimony of a respected former prosecutor is false; and that Mr. Gates's account of the details

---

[5] Plaintiffs claim that Mr. Gates's testimony is "corroborat[ed]" by the statement from his attorney during his OSC interviews, Thomas C. Green. Not so. Mot. 10. Mr. Green does not affirm Mr. Gates's account of the March 18 meeting, nor does he say Ms. Ahmad was present when the hacking of Mr. Broidy's emails were discussed. He says only that "when Ms. Ahmad was present [he] believe[s] the interrogations related to Mr. Broidy and other matters." ECF 165-10. Mr. Green's failure to attest to any of the material assertions in Mr. Gates's testimony is telling. *Cf. Baide-Ferrero v. Ercole*, 2010 WL 1257615, at *12 (S.D.N.Y. Mar. 31, 2010) (holding that a "failure to testify to a fact which would naturally have been mentioned is legally as inconsistent as a specific prior statement to the opposite effect").

of what took place on March 18, as he recalled them four years later, is the *only* reliable account. Conflicting testimony between two sources (one of whom here is a felon convicted for **making false statements**) cannot satisfy the "high standard of proof" required for courts in this Circuit to grant disqualification motions. *All Star Carts & Vehicles*, 2010 WL 2243351, at *4. No trier of fact could find in Plaintiffs' favor on this sparse record.

Plaintiffs try to discredit the 302 memos by arguing that such memos are generally considered inadmissible hearsay and have been deemed unreliable. *See* Mot. at 14 n.9. But those cases address only whether a 302 memo is admissible for the purposes of establishing the testimony given at the time by the witness under questioning—and not, as is the issue here, which individuals were in the room at what times.[6] And for *that* purpose, the 302 memos fall squarely within the exceptions to hearsay for public records created while under a legal duty to report, *see* Fed. R. Evid. 803(8), or for records of a regularly conducted activity, *see id.* 803(6).[7] *See, e.g.*, *Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 805 F.2d 49, 54 (2d Cir. 1986) (holding that FBI reports were admissible as a public record and that "these reports were especially reliable since they were prepared by the FBI in a criminal investigation which was only tangentially related to this civil action"); *Picard v. Sage Realty*, 2021 WL 6052422, at *3 (S.D.N.Y. Dec. 21, 2021) ("The 302 Report . . . is admissible at trial as a public record under Fed. R. Evid. 803(8)."); *see generally Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) (noting that Rule 803(8) "is based upon the assumption that public officers will perform their duties, [and] that they lack motive to falsify").

---

[6] Plaintiffs fail to cite a *single* case from within the Second Circuit in support of their contention that 302s "are generally considered inadmissible hearsay." Mot. at 14 n.9. And the articles Plaintiffs cite make clear that 302s *are* routinely considered by courts. *See, e.g.*, John Reed Stark, "Time to Replace FBI Interview Memos With Digital Recordings," https://tinyurl.com/4bs7pnve (Apr. 26, 2021) (302s "play[] . . . a prominent role in federal investigations and prosecutions" and "Judges might review 302s during motion and trial proceedings. Juries might review 302s when deliberating.").

[7] Plaintiffs challenge the reliability of the 2456 Memo because it was drafted on April 2, 2018, two weeks after the interview of Mr. Gates, Mot. at 14 n.9—yet rest their allegations on Mr. Gates's recollection more than *four years* later.

> **b.**   **Plaintiffs Fail To Identify *Any* Confidential Information Allegedly Known By Ms. Ahmad**

In any event, whether Ms. Ahmad was present or not for the portion of the March 18 interview during which Mr. Broidy's emails were discussed (and she was not), Plaintiffs do not even claim that anything confidential was discussed at that session—much less information relating to the alleged hack of Mr. Broidy.  Mr. Gates ***acknowledges*** that "the contents of the materials shown to [him on March 18] were referenced or quoted in multiple media sources." ECF 165-2 ¶ 22; *see also* Hart Decl., Exs. A–D. Plaintiffs could not have established a violation of Rule 1.11(c) for that independent reason.  Rule 1.11(c) applies only to confidential government information "that, *at the time this Rule is applied*, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, *and that is not otherwise available to the public*."  N.Y. R. Pro. Conduct 1.11(c) (emphases added).  In other words, even if a government attorney acquires confidential information, there is no violation if the information is public as of the time disqualification is sought.

Plaintiffs do not claim that anything discussed at the March 18 interview with respect to Mr. Broidy was "confidential" at the time of the interview, and certainly not that it remains "confidential" today.  Nor could they—the hacked emails and texts concerned Mr. Broidy's unlawful lobbying on behalf of China and Malaysia in connection with the 1MDB investigation, which is publicly known and was the subject of his conviction years ago in federal court.  Indeed, the 31-page Information filed in 2020 exhaustively details dozens of Mr. Broidy's emails and text messages (as well as meetings) relating to his extensive dealings with 1MDB, members of the Chinese government, and the Malaysian Prime Minister, among others.  *See* Hart Decl., Exs. G & H.  And the documents discussed during the March 18, 2018 interview had already been circulated to various news organizations before the March 18 meeting: screenshots of documents purported to be emails between Mr. Broidy and others were published or described in the Huffington Post and other publications weeks *before* the interview.  *See* Hart Decl.,

Exs. A & B.  Mr. Broidy indeed *admits* that, on March 12, 2018, he "voluntarily provided" to DOJ nearly 100 pages of documents that he received from a reporter and that contained emails "related to the topics" that Mr. Gates was allegedly asked about.  ECF 166 ¶ 5.  According to judicial opinions unsealed in December 2020 relating to DOJ's investigation of Broidy, on April 12, 2018, counsel for Broidy transmitted to the FBI a further "41 PDFs that were provided to [them] by members of the media" and the government had obtained additional Broidy-related documents from other parties pursuant to a February 2018 search warrant.  Hart Decl., Ex. E, Attach. A  at 17–18.  Public reporting further indicates that the press had "[h]undreds of pages" of documents allegedly hacked from Mr. Broidy.  *See* Hart Decl., Ex. D at 2.

Plaintiffs attempt to manufacture intrigue out of the purported WhatsApp messages between Mr. Broidy and other individuals that Mr. Gates alleges he was shown during his interview, Mot. at 9. Plaintiffs do not claim that these WhatsApp messages contain any non-public confidential information and do not submit any such confidential messages as sealed exhibits to their filing.  And in any event, it beggars belief that any WhatsApp messages shown to Mr. Gates (if indeed, any were) are not public given the extensive disclosures of Mr. Broidy's text messages (*i.e.*, WhatsApp messages) in his criminal indictment and guilty plea, as well as an unsealed June 2018 court opinion in a separate proceeding that specifically references "a log of WhatsApp messages" and "screenshots" of messages between Broidy and others and details the contents of those messages.  Hart Decl., Ex. E, Attach. A at 12.

## 2.   Speculation And Conjecture Do Not Support A Disqualification Claim

Setting aside all the factual defects in Plaintiffs' theory, Plaintiffs' effort to support their disqualification claim with unreasonable inferences and speculation is foreclosed by law—*and directly refuted by Ms. Ahmad herself in sworn testimony*.  Unlike other rules regarding conflicts arising from prior representations, Rule 1.11(c) "operates only when the lawyer in question has *actual knowledge* of the information.  It does not operate with respect to information that merely could be imputed to the

lawyer." N.Y. R. Pro. Conduct 1.11(c) cmt. 8 (emphasis added); *see also Green v. City of N.Y.*, 2011 WL 2419864, at \*2 (S.D.N.Y. June 7, 2011) ("[T]he imputation rules of Rule 1.10, N.Y. Rules, do not apply to a circumstance arising under Rule 1.11, N.Y. Rules."). Courts applying Rule 1.11(c) or its analogue in other jurisdictions accordingly have rejected motions for disqualification based on an attorney's alleged *access* to confidential information, instead demanding evidence that the attorney *actually has* confidential government information relating to an adversary. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2006 WL 6846702, at \*21 (E.D.N.Y. Aug. 7, 2006) ("There is nothing about the fact that the attorney at issue may once have had access to information that supports a presumption that she actually has such information now . . . ."); *see also Babineaux v. Foster*, 2005 WL 711604, at \*7 (E.D. La. Mar. 21, 2005) (rejecting movant's contention that "it can be presumed that other confidential communications transpired during [the attorney's prior] representation").

Yet Plaintiffs' theory of disqualification is premised entirely on a string of speculation about what might or could in theory have happened—not on what Ms. Ahmad actually knew or did. *See* Mot. at 2 (admitting their theory is based on "inference"). Plaintiffs hypothesize that because the OSC allegedly asked Mr. Gates *three* questions on March 18 related to Mr. Broidy's hacked emails—which he concedes he had no non-speculative information about—(1) the OSC *could have* investigated the hacking of Mr. Broidy (despite the fact that he affirmatively alleged *numerous times* in this litigation that he was never a target of the OSC or interviewed by the OSC, *see* ECF 1 ¶ 2; ECF 57 ¶ 321; ECF 116 ¶ 300); (2) Ms. Ahmad *could have* been involved in that investigation; and (3) Ms. Ahmad *could have* obtained confidential government information about Mr. Broidy material to this litigation in the course of that investigation. Mot. at 14–15.

Plaintiffs next argue that because Mr. Broidy claims to be unaware of press reporting on his

WhatsApp messages and claims not to have personally produced such material to the DOJ in advance of the March 18, 2018 meeting, then any WhatsApp message Mr. Gates claims he was shown must have been obtained through other means.   From there, Plaintiffs ask this Court to speculate (1) that how the OSC allegedly obtained those materials *might* shed light on the alleged hacking; (2) that Ms. Ahmad *might* know how these messages were allegedly obtained by the OSC; and (3) that Ms. Ahmad *might* have shown these messages to other unknown witnesses who *might* have provided other non-public confidential information relating to the alleged hack.   There is not a shred of evidence to support these incredible leaps.   Ms. Ahmad—putting forward the only non-speculative evidence on this point—has *expressly refuted* that she has any such knowledge of "an investigation with regard to any alleged hacking," or "any confidential information regarding any issue relevant to this pending litigation, including in connection with the alleged hacking or otherwise."   Ahmad Decl. ¶¶ 6–7.

"[M]ere speculation regarding the reasons supporting disqualification are insufficient, and a motion for disqualification should only be granted if the facts present a real risk that the trial will be tainted." *Tour Tech. Software, Inc. v. RTV, Inc.*, 2018 WL 3682483, at *2 (E.D.N.Y. Aug. 2, 2018); *see also Streichert*, 2021 WL 735475, at *5 (same); *A.I. Credit Corp. v. Providence Wash. Ins. Co.*, No. 1997 WL 231127, at *2 (S.D.N.Y. May 7, 1997) (same); Simon Decl. ¶ 62 ("[A] law firm is not required to withdraw" where "the party alleging a conflict fails to offer specific evidence of the alleged conflict."). Under Rule 1.11(c), the fact that colleagues of Ms. Ahmad's at the OSC could conceivably have learned of some confidential information regarding the hacking of Mr. Broidy's emails is irrelevant to whether *Ms. Ahmad* possessed such information.   *See* N.Y. R. Pro. Conduct 1.11(c) cmt. 8.   Plaintiffs' musings about what additional information the OSC *might* have had, or how it obtained it, and which of that information Ms. Ahmad *might* have had access to by virtue of her role at the OSC, cannot satisfy their high burden as a matter of law.

**B.      No Confidential Government Information Allegedly Obtained By Ms. Ahmad Could Have Been Used To Plaintiffs' Material Disadvantage**

Separate and apart from the deficiencies above, an attorney's possession of confidential government information is relevant only if the attorney is seeking to "represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person."  N.Y. R. Pro. Conduct 1.11(c).  Assuming, counterfactually, that Ms. Ahmad had obtained any confidential government information related to Mr. Broidy while at the OSC, Plaintiffs fail to satisfy their burden to demonstrate how this unspecified, hypothetical information could be used to their "material disadvantage" in ***this matter***.[8]

As noted previously, the contents of the documents shown to Mr. Gates on March 18 according to the contemporaneous 302 memo are public and thus any such documents obtained by Ms. Ahmad while at OSC could not be used to the "material disadvantage" of Plaintiffs here.  *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2006 WL 6846702, at *24 (no material disadvantage where there was "a considerable degree of overlap between the information" at issue and what was "in the public domain").[9]  Regardless, even if Ms. Ahmad had access to the purportedly non-public documents Plaintiffs cite, such as "screenshots of WhatsApp messages that Mr. Broidy exchanged with others," Mot. at 9, those documents were necessarily already in Mr. Broidy's own possession.  *See* Hart Decl., Ex. H.  Thus, there is thus no risk that Ms. Ahmad could have used information from those documents (which are not probative whatsoever of who did the hacking or how it was done) to blindside

---

[8] Plaintiffs' contention that any information Ms. Ahmad purportedly had could have been used to their material disadvantage, *see* Mot. at 16, is squarely at odds with *their own allegations* that Defendants "broke into the email servers of Mr. Broidy, his wife, his executive assistant, and BCM" and had essentially "complete visibility" into "Plaintiffs' private communications, emails, [and] documents." ECF 57 ¶¶ 3, 5, 29, 68–105.

[9] That "the government records regarding these meetings remain at least partially redacted" in no way supports the inference that the redacted portions state what information OSC obtained, if any, about Plaintiffs and the hacking. *See* Mot. at 15. Plaintiffs' case is wholly inapposite. In *Kronberg v. LaRouche*, 2010 WL 1443934 (E.D. Va. Apr. 9, 2010), the attorney in question "concede[d]" that he "had actual knowledge of confidential government information related to [the defendant]" and the question was whether that information remained confidential given the time that had passed. *Id.* at *3.

Plaintiffs—and indeed, there is no suggestion that Gibson Dunn did so during its limited representation at the pleading stage.

As for Plaintiffs' speculation that Ms. Ahmad may have come into possession of other, unspecified confidential "materials," Mot. at 14–15, even if the Court were to accept Plaintiffs' hypothesis, that would not establish that such confidential information could be used *against* Mr. Broidy here.  Plaintiffs have suggested the alleged prejudice only in the most abstract terms.  *See* Mot. at 16 ("Ms. Ahmad's knowledge of how these documents were obtained by DOJ, from whom they were obtained, and any information about the hacking provided by other witnesses implicates issues at the center of this case . . . and therefore stood to provide Defendants with an unfair advantage.").  Such "hypothetical scenarios of conflict"—particularly given Ms. Ahmad's express refutation of having such knowledge—do not begin to justify disqualification. *Bulkmatic Transp. Co. v. Pappas*, 2001 WL 504841, at *3 (S.D.N.Y. May 11, 2001); *see also Rothberg v. Phil's Main Roofing, LLC*, 2016 WL 2344882, at *2 (S.D.N.Y. May 2, 2016) ("The Court does not regard these hypothetical scenarios of conflict as sufficient for [the defendant] to meet its high burden of demonstrating the necessity of disqualification.") (quoting *Bulmatic Transp. Co.*, 2001 WL 504841, at *3).

Disqualification requires "a *clear* violation of the Code of Professional Responsibility" resulting in "a significant risk of trial taint." *Colandrea*, 490 F. Supp. 2d at 352 (emphasis added); *see W. T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976) ("[A] violation of professional ethics does not . . . automatically result in disqualification of counsel.").  Plaintiffs have failed to establish how Ms. Ahmad's conduct could have possibly "taint[ed]" an eventual trial.  Rather, Plaintiffs' two-year delay in requesting disqualification suggests their true motive was not to prevent trial taint, but "to gain an improper advantage."  *Arroyo v. City of Buffalo*, 2017 WL 3085835, at *13 (W.D.N.Y. July 20, 2017) ("Substantial, 14-month delay in seeking . . . disqualification also weighs against disqualification")

(cleaned up); *see Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 180 (2d Cir. 2009) ("lengthy and unexcused delay in bringing . . . motion to disqualify weighs against disqualification").

## II.    Plaintiffs Cannot Meet Their Burden Of Proving Gibson Dunn's Bad Faith

Plaintiffs also cannot establish that Gibson Dunn's decision not to immediately withdraw was made in "bad faith," as required to obtain sanctions. *See Prevezon Holdings*, 305 F. Supp. 3d at 479. "Bad faith" is "restrictively interpreted" and "not easily satisfied." *Gelicity UK Ltd. v. Jell-E-Bath, Inc.*, 2014 WL 1330938, at *6 (E.D.N.Y. Apr. 1, 2014). Instead, it lies only when an attorney intentionally advances a baseless contention for "improper purposes such as harassment or delay." *Prevezon Holdings*, 305 F. Supp. 3d at 478–79, 483.

Plaintiffs fail to articulate what Gibson Dunn allegedly did to cause harassment and delay. It is not credible that a firm withdrawing before a motion was even filed could be accused of vexatious delay. Plaintiffs appear to believe that Gibson Dunn ought to have withdrawn the moment Kasowitz suggested it, Mot. at 11, 18, rather than a few weeks later. Nothing about the timing of withdrawal, however, was "unreasonable[]" or "vexatious." *Id.* at 12. Gibson Dunn was fully prepared to oppose a disqualification motion, Ascher Decl. ¶ 4; there was nothing "false" about its denial of a conflict, Mot. at 12.[10] It withdrew when it did solely at the direction of its clients, who made the request for the first time just days prior. Ascher Decl. ¶ 5–6. Defendants ultimately chose to substitute counsel—not because of any concern about a genuine conflict, but because of their unrelated business interests, regardless of how unsubstantiated Plaintiffs' claim was. Ascher Decl., Ex. B. Gibson Dunn then withdrew without delay.[11] *See* Simon Decl. ¶ 55 (stating that "Gibson Dunn acted in good faith" by remaining as counsel to its client

---

[10] Ms. Ahmad was not conflicted so there was no reason to screen her from the matter. *See* Rule 1.11(b)–(c). Plaintiffs' cited case *Heyliger v. Collins*, is inapposite. Mot. at 17. There, the court disqualified a former prosecutor where he had been "in charge of prosecuting plaintiff on the dismissed criminal charges which gave rise to this civil action" and had "participated personally and substantially as a public officer" in the matter at issue. 2014 WL 910324, at *4 (N.D.N.Y. Mar. 10, 2014).

[11] Plaintiffs make much of this Court's statement that Gibson Dunn's withdrawal "doesn't smell good." Mot. at 3, 11. The timing of Gibson Dunn's withdrawal was dictated by its clients' decision.

"while Plaintiffs were preparing their pre-motion letter").

Plaintiffs' cases only underscore the lack of conflict or bad faith here.  In *Madison 92nd Street Associates, LLC v. Marriott International, Inc.*, 2013 WL 5913382 (S.D.N.Y. Oct. 31, 2013), a law firm was sanctioned for representing a client in litigation against a former client that related to that prior representation, presenting a textbook conflict of interest that a "first year law student on day one of an ethics course should be able to spot."  *Id.* at *1.  *THOIP v. Walt Disney Co.* likewise involved a paradigmatic conflict, where defendant's attorney had an "existing attorney-client relationship with both [plaintiff's] parent company . . . and [plaintiff's] affiliate," and the conflicted counsel failed to timely withdraw and failed to notify plaintiff's counsel it was substituting counsel until after it filed its motion for disqualification.  2009 WL 125074, at *1–4 (S.D.N.Y. Jan. 20, 2009).  Here, there was no conflict. Gibson Dunn investigated the allegation, described its rationale in detail to Plaintiffs, and withdrew before any motion for disqualification was filed when the client decided to substitute counsel.

Gibson Dunn's good-faith basis for wanting to defend the integrity of its partner and respected former prosecutor is self-evident.  *See generally Prevezon Holdings*, 305 F. Supp. 3d at 484 (no sanctions where "[n]othing in the record suggest[ed] that [counsel] adopted a legal position to harass [the opposing party], delay this case, or otherwise improperly engage the legal process").  There is no basis for sanctions on this record.  *See, e.g.*, *Keller v. Mobil Corp.*, 55 F.3d 94, 100 (2d Cir. 1995) (vacating sanctions award because however "frustrating [counsel's] manner of conducting negotiations may have been," it did not rise "to a level of bad faith warranting a sanction").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for sanctions.

Dated:   New York, New York
           March 6, 2023

                          GIBSON, DUNN & CRUTCHER LLP

                       By: */s/ Nancy E. Hart*

                           Nancy E. Hart
                           Brian C. Ascher
                           200 Park Avenue
                           New York, NY 10166-0193
                           Tel.: (212) 351-4000
                           Fax: (212) 351-4035
                           nhart@gibsondunn.com
                           bascher@gibsondunn.com

                           James Fogelman
                           333 South Grand Avenue
                           Los Angeles, California
                           Tel.:  (213) 229-7234
                           Fax:  (213) 229-6234
                           jfogelman@gibsondunn.com

                           *Attorneys for Gibson, Dunn & Crutcher LLP*