# Exhibit G

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. |
| | ) | |
| v. | ) | Count 1:  18 U.S.C. § 371 |
| | ) | (Conspiracy) |
| ELLIOTT BROIDY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CRIMINAL INFORMATION

The United States of America charges:

### INTRODUCTION

1.     At all times relevant to this Information:

2.     From no later than March 2017 to at least in or about January 2018, ELLIOTT BROIDY agreed with Nickie Lum Davis and Person A to act as agents of Foreign National A in exchange for millions of dollars which was not disclosed.  BROIDY specifically agreed to lobby the Administration of the President of the United States ("Administration") and the United States Department of Justice ("DOJ") to drop or otherwise favorably resolve its matters against Foreign National A for his role in the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia.  As part of their efforts, BROIDY, Davis, and Person A willfully failed to disclose to the Administration and DOJ officials that BROIDY was acting on behalf of Foreign National A.  Ultimately, BROIDY, Davis, and Person A were unsuccessful in their efforts to have the 1MDB matters dropped or otherwise favorably resolved for Foreign National A.

3.     During the same approximate period, BROIDY, Davis, and Person A also agreed to lobby the Administration and DOJ to arrange for the removal and return of People's Republic

of China ("PRC") National A—a citizen of the PRC living in the United States—all on behalf of Foreign National A. This involved, among other things, advocating for meetings between PRC Minister A and United States government officials. Here too, BROIDY, Davis, and Person A were ultimately unsuccessful.

4. To further the interests of Foreign National A, BROIDY, aided by Davis and Person A, attempted to facilitate a meeting between Malaysian Prime Minister A and the President in September 2017, in part to allow Malaysian Prime Minister A to raise the resolution of the 1MDB matter with the President.

5. BROIDY, Davis, and Person A also met with PRC Minister A in the PRC and agreed that BROIDY, assisted by Davis and Person A, would lobby the Administration to return PRC National A to the PRC. BROIDY, Davis, and Person A, for the express purpose of providing PRC Minister A an opportunity to discuss the removal of PRC National A with high-level United States officials, also agreed to and attempted to facilitate meetings between PRC Minister A and top officials in the Administration, at DOJ, and at the United States Department of Homeland Security ("DHS"), during PRC Minister A's visit to the United States in May 2017.

<u>Criminal Prohibitions on Acting as an Agent of a Foreign Principal or Government</u>

6. The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, was and is a disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political or public relations efforts or lobbying on behalf of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within DOJ. It is a crime to knowingly and willfully fail to register, and to make

2

false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

7.     The purpose of FARA is to prevent covert influence by foreign principals.  Proper registration under the statute allows the United States government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals. Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

## RELEVANT PARTIES & ENTITIES

8.     The defendant, ELLIOTT BROIDY, served as Deputy Finance Chair of a national political committee from approximately 2017 to April 2018.  BROIDY raised large political contributions from donors, organized political fundraising events, and coordinated fundraising strategies with the campaign of a candidate for the Office of the President of the United States during the 2016 election cycle.  In his role as Deputy Finance Chair, BROIDY maintained access to, and contact with, high-ranking officials in the Administration, including the President himself. Over the same period, BROIDY owned and operated several domestic and international businesses.

9.     Nickie Mali Lum Davis was and is a United States citizen, businesswoman, and consultant with personal and business relationships with BROIDY and Person A.  On August 31, 2020, Davis pleaded guilty in the United States District Court for the District of Hawaii to a one-count Information charging aiding and abetting a violation of FARA.

10.    Person A was and is a United States citizen, businessperson, and entertainer with international ties, including ties to Foreign National A.

11.    Foreign National A was a wealthy businessperson living in East Asia who has been charged separately for his role in orchestrating and executing a multi-billion-dollar embezzlement scheme from 1MDB.

12.    Company A was a limited liability company formed by Person A to receive wire transfers from Foreign National A, and was used by Person A to pay BROIDY, Davis, and others for their lobbying efforts.

13.    George Higginbotham was an associate of Person A and was a licensed attorney employed by DOJ. On November 20, 2019, Higginbotham pleaded guilty in the United States District Court for the District of Columbia to a one-count Information charging conspiracy to make false statements to a financial institution.

14.    Law Firm A was a law firm operated by Person C and controlled by BROIDY and Person C.

15.    PRC National A was a citizen of the PRC, living in the United States on a temporary visa. The government of the PRC, including PRC Minister A and the President of the PRC, were seeking the removal of PRC National A from the United States back to the PRC.

16.    In late 2016 through 2019, DOJ was actively investigating transactions of Foreign National A allegedly associated with laundered proceeds of the 1MDB embezzlement scheme. In July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds. On November 1, 2018, DOJ filed a criminal indictment charging Foreign National A and others with conspiring to launder

4

billions of dollars embezzled from 1MDB and conspiring to violate the Foreign Corrupt Practices

Act by paying bribes to various Malaysian and United Arab Emirates ("UAE") officials.

**COUNT ONE**
**18 U.S.C. § 371**
**(Conspiracy to Serve as an Unregistered Agent of a Foreign Principal)**

17.    Paragraphs 1 through 16 are realleged and incorporated herein by reference.

18.    From no later than March 2017 to at least in or about January 2018, the defendant,

**ELLIOTT BROIDY,**

knowingly conspired with others known and unknown, to:

> a.    knowingly and willfully act as an agent of a foreign principal,
> specifically, Foreign National A with respect to the 1MDB matters and
> the removal of PRC National A, without registering with the Attorney
> General, in violation of 22 U.S.C. §§ 612 and 618.

**Objects of the Conspiracy**

19.    It was an object of the conspiracy for BROIDY, Davis, Person A, and Foreign

National A to orchestrate back-channel, unregistered campaigns to lobby the Administration and

DOJ to: (1) end the 1MDB matters or otherwise resolve the matters favorably for Foreign National

A; and (2) remove PRC National A from the United States and send him back to the PRC.

20.    It was an object of the conspiracy for BROIDY, Davis, and Person A to make

millions of dollars by leveraging BROIDY's access to and perceived influence with the President

and his Administration in order to secure payments from Foreign National A.

21.    It was an object of the conspiracy for BROIDY, Davis, and Person A to conceal

BROIDY's contacts with and payments from Foreign National A to maintain BROIDY's

credibility with United States officials and to further the illegal advocacy scheme.

### Manner and Means of the Conspiracy

22.     The manner and means by which BROIDY and others carried out the conspiracy included, but were not limited to, the following:

#### International Travel to Meet with Foreign Principals and Government Officials

23.     BROIDY, Davis, Person A, and Higginbotham, in various combinations, traveled to Thailand, Malaysia, and the PRC for the purpose of meeting with Foreign National A, PRC Minister A, and others to negotiate and discuss the arrangement by which BROIDY would lobby the Administration and DOJ—outside of official channels—in exchange for millions of dollars.

#### Meetings and Contacts with United States Officials

24.     BROIDY, both directly and through intermediaries, facilitated and attempted to facilitate meetings and other efforts to influence officials at the highest levels of the United States government, including the President and the Attorney General, for the benefit of PRC Minister A and Foreign National A.

25.     BROIDY, both directly and through intermediaries, contacted high-level officials in the United States government to arrange meetings for foreign government officials, including PRC Minister A and the Malaysian Prime Minister A, to provide opportunities for these foreign officials to formally request favorable governmental action, including the favorable resolution of the 1MDB matters and the removal of PRC National A.

#### Concealment

26.     BROIDY, Davis, and Person A agreed to conceal BROIDY's agreement to lobby on behalf of Foreign National A, in his individual capacity and as an intermediary for PRC Minister A.  BROIDY, Davis, and Person A did not disclose and agreed not to disclose to United States government officials and the public BROIDY's financial arrangement with and payments from

Foreign National A. In extensive contacts, communications, and documents drafted in furtherance of the conspiracy, BROIDY, Davis, Person A, and Higginbotham were secretive and anonymized references to Foreign National A. Further, BROIDY, Davis, and Person A often used encrypted applications when communicating about Foreign National A and PRC National A to conceal their conduct and connection to Foreign National A. Finally, BROIDY, Davis, and Person A agreed, implicitly or explicitly, not to register under FARA to conceal their arrangement with Foreign National A.

### Overt Acts

27.     In furtherance of the conspiracy, BROIDY and others committed the following overt acts, among others, in the District of Columbia and elsewhere.

**I.     Campaign to Resolve 1MDB Civil Forfeiture Cases**

**A. BROIDY Agrees to Lobby for Foreign National A for $8 Million Retainer**

28.     In or about March 2017, Person A contacted Davis in an effort to locate someone with close ties to the Administration to help a foreign client. Davis in turn told BROIDY that she had a possible client in Malaysia who could use help with a forfeiture matter.

29.     On or about March 7, 2017, Person A requested that Davis send him BROIDY's biography describing BROIDY's relationship with high-level officials in the Administration and photographs of BROIDY and the President. On or about March 7, 2017, BROIDY's assistant, at Davis's request, emailed photographs to Davis featuring BROIDY and the President. Person A said that he wanted the photographs so that Person A could highlight for Foreign National A BROIDY's close access to the Administration.

30. On or about March 8, 2017, Davis texted BROIDY, "Are you in la to meet on the 16th w [Person A] prior to his travel that weekend to Asia?" BROIDY responded, "I think so. Let's speak later."

31. On or about March 13, 2017, BROIDY met with Davis and Person A to discuss Foreign National A and 1MDB. At the meeting, Person A described his relationship with Foreign National A to BROIDY, and asked if BROIDY could help with the civil forfeiture cases involving Foreign National A. Person A said he would speak with Foreign National A about the possibility of BROIDY helping with the civil forfeiture cases. That same day, BROIDY texted Davis in part, "I'm excited about our business prospects."

32. On or about March 13, 2017, Davis forwarded to Person A a "Retainer and Fee Agreement – Litigation Services" between Law Firm A and Foreign National A so that Person A could present the agreement to Foreign National A. The "Retainer and Fee Agreement" stipulated that Foreign National A would pay an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days. The draft agreement included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture proceedings. BROIDY, Davis, Person A, Law Firm A, and Person C provided no litigation services or legal advice to Foreign National A. The true purpose of the retention agreement was to secure BROIDY's services to lobby the Administration and DOJ on Foreign National A's behalf based on BROIDY's political connections.

33. Despite their knowledge of the requirement to register as agents of a foreign principal, at no time did BROIDY, Davis, or Person A register with the FARA Unit regarding their work as agents of Foreign National A.

8

## B. BROIDY, Person A, and Davis Meet Foreign National A in Bangkok

34.     In or about April 2017, Davis relayed Person A's request for BROIDY to travel to Bangkok, Thailand to meet with Foreign National A. BROIDY told Davis to tell Person A that he would go only if he were paid $1 million, and that he wanted to be paid by Person A from "untainted" funds. BROIDY was assured that Person A would personally pay $1 million in exchange for BROIDY traveling to Bangkok.

35.     On or about April 28, 2017, BROIDY texted Davis advising, "I would like the funds to go to [Law Firm A.]" That same day, Davis responded, "Ok[.]"

36.     On or about April 29, 2017, BROIDY and Davis exchanged text messages regarding their upcoming meeting with Foreign National A and Person A. Among those text messages, BROIDY asked in reference to Foreign National A, "Does the principal want us in a particular hotel in either location?" Davis responded, "Call me when u can talk[.]"

37.     On or about May 1, 2017, Davis emailed BROIDY and his assistant a link to the Shangri-La Hotel in Bangkok, and wrote, in part, "Please send me the hotel confirmation for both Elliott's room and mine once you get it online and I will forward." That same day, Davis separately emailed Person A telling him to book a room at the Shangri-La Hotel and to send her the confirmation. Person A responded, "[Foreign National A] is booking our hotel," and later followed up with, "Also send me Elliott's wire info." Davis replied by providing the wire information for an account in the name of Law Firm A.

38.     On or about May 2, 2017, Davis emailed BROIDY stating in part, "Since u land earlier – [Person A] and I will see you at arrivals. . . . Thanks and bon voyage – here's to the start of an exciting and prosperous adventure!"

39.     On or about May 2, 2017, BROIDY, Davis, and Person A arrived in Bangkok. During the trip, BROIDY, Davis, and Person A met with Foreign National A in a hotel suite. BROIDY and Foreign National A spoke about the 1MDB matters. BROIDY agreed to help Foreign National A attempt to resolve the matter. Foreign National A agreed to pay BROIDY an $8 million retainer and wanted BROIDY to contact the Attorney General of the United States to get DOJ to drop the 1MDB matter. BROIDY agreed to lobby the Administration and DOJ for a favorable result for Foreign National A while concealing the fact that he was working on Foreign National A's behalf. During the meeting or shortly thereafter, Davis and BROIDY discussed the possibility of assisting in getting PRC National A removed from the United States. With respect to payment, BROIDY stated that the money should not come directly from Foreign National A and should be "clean." Foreign National A identified a friend who could pay BROIDY and others. BROIDY, Person A, and Davis agreed that the money would first be routed through Person A and then be paid to BROIDY through Law Firm A. BROIDY and Davis agreed that BROIDY would pay Davis a percentage of what BROIDY received. Person A also agreed to pay Davis a percentage of the funds that Person A received. Person A told BROIDY and Davis that Person A's friend, Higginbotham, was verifying the legitimacy of the funds. Higginbotham did not actually perform any such review. BROIDY never met or spoke with Higginbotham.

### C.     Person A Receives $8.5 Million from Foreign National A; BROIDY is Paid $6 Million; Davis is Paid $1.7 Million

40.     Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Company A received a wire transfer directed by Foreign National A for approximately $2.8 million from an entity in Hong Kong. That same day, Person A obtained a cashier's check from the Company A account for $702,000 payable to Law Firm A, which was immediately credited to Law Firm A's account. Person A also made a separate wire transfer of $48,000 to Law Firm A

from the Company A account.  Also that same day, a third-party company transferred $250,000 to the Law Firm A account at Person A's direction, bringing the total amount deposited into the Law Firm A account to $1 million.  Within several days, approximately $900,000 of the $1 million transferred into the Law Firm A account on or about May 8, 2017, was transferred from the Law Firm A account to one of BROIDY's business accounts.

41.    On or about May 8, 2017, Davis texted BROIDY, "Both wires in [Law Firm A] are from [Person A].  The remaining balance was dropped to your office 20 minutes ago -".  Davis then added, "702 total cashier check[.]"

42.    On or about May 17, 2017, Foreign National A caused an international wire to be sent to Company A from a Hong Kong company.  That same day, Person A transferred $3 million from Company A to Law Firm A.  On or about May 18, 2017, Law Firm A transferred $600,000 to one of BROIDY's business accounts and $900,000 to an account for a business entity associated with Davis.  On or about May 18, 2017, Law Firm A transferred $500,000 to one of BROIDY's business accounts.  Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of BROIDY's business accounts.

43.    On or about May 17, 2017, BROIDY and Davis exchanged text messages regarding the payments from Foreign National A to BROIDY through Person A and BROIDY's payment of a percentage to Davis.  Among the text messages, Davis asked, "Did you get it?"  BROIDY responded, "Yes.  Sent you Wickr[.]  Sending wire to you in morning."  Wickr is a messaging application that allows for end-to-end encryption and content expiration.  BROIDY later added, "Did you get 2nd confirm?"  Davis responded, "When Asia opens. . . . Baby steps at least moving forward now."  BROIDY responded, "Yes.  Hammer them for the next 2 wires."  BROIDY later

added in part, "Assuming second 3 is in and confirmation that last 2 is being sent. Please ask [BROIDY's assistant]."

44.    On or about May 25, 2017, Foreign National A caused a third transfer to be made to Company A, this time in the amount of approximately $2.7 million. On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A in partial satisfaction of the $8 million retainer to which BROIDY and Foreign National A agreed in return for BROIDY's assistance with the 1MDB civil forfeiture cases. That same day, $600,000 was transferred from Law Firm A's account to a business account associated with Davis. On or about May 26, 2017, Law Firm A transferred $1 million to an account controlled by Person C. In or about early June 2017, Law Firm A transferred $650,000 to one of BROIDY's business accounts.

### D. BROIDY Facilitates and Attempts to Facilitate Meetings for Malaysian Prime Minister A and Efforts to Resolve the 1MDB Cases

45.    On or about June 5, 2017, BROIDY texted Person D, a political consultant and former campaign aide for the President, and requested that Person D work with the Administration to set up a visit for Malaysian Prime Minister A: "Asian country is very motivated re July meeting. Hoping we can confirm date etc asap." Pursuant to a consulting agreement, BROIDY had agreed to pay Person D $25,000 per month for advice and guidance with respect to navigating the Administration.

46.    The same day, BROIDY and Davis exchanged text messages regarding Foreign National A. Among those messages, Davis wrote, "Please call before u go to bed … [Foreign National A] keeps calling for news[.]" BROIDY responded, "Yes. Will call you. I am heading to D.C. Tonight to work on [Foreign National A] and Asian country[.]"

47.    On or about June 15, 2017, at Person A's request, Davis texted BROIDY, "Hey he'd like to speak w you this evening. Are u able?"  Davis added, "Principal", which was a reference to Foreign National A.  That same day, BROIDY responded, "Yes[.]"

48.    On or about June 17, 2017, BROIDY and Davis discussed Malaysian Prime Minister A.  In or about June 2017, BROIDY asked the President if he would play golf with Malaysian Prime Minister A.  BROIDY and Davis believed that this would please Foreign National A and would allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter. BROIDY also hoped to secure additional business with the government of Malaysian Prime Minister A and hoped that arranging golf with the President would further his business interests.

49.    On or about June 19, 2017, Davis texted BROIDY a link to an article about the Malaysian Prime Minister A's office criticizing the 1MDB forfeiture action in the United States.

50.    On or about June 29, 2017, BROIDY sent a text message to a high ranking official in the White House in an effort to arrange a golf outing between Malaysian Prime Minister A and the President:  "Hi [Person E], As I mentioned, POTUS agreed to play a round of golf in DC or Bedminster in late July or early August with [Malaysian Prime Minister A].  Thank you very much for getting back to me with the date.  Also a letter went to the state dept. for a meeting some weeks ago."

51.    On or about June 30, 2017, BROIDY sent another text message to Person E regarding the golf outing:  "Hope we can speak this morning on [PRC National A] and golf date with POTUS for [Malaysian Prime Minister A]."  Later that day, BROIDY followed up with, "[Person E], as discussed, hoping we can get these items completed today.  Please call me anytime."

52.     On or about July 3, 2017, BROIDY again texted Person E regarding the golf date for Malaysian Prime Minister A and the President: "Good morning [Person E]. It would be extremely helpful to me if you could confirm the golf date today with POTUS for [Malaysian Prime Minister A.] POTUS told me he is glad to play at Bedminster or DC. After we spoke, I mentioned to [Malaysian Prime Minister A] that he would have the date last week. Thank you very much! Regards, Elliott." Later that day, BROIDY texted Person E again: "[Person E], I'm following up. Please send me the date and time for the [Malaysian Prime Minister A] golf with POTUS. Thank you!"

53.     On or about July 5, 2017, BROIDY exchanged messages with Person E regarding the golf outing. Among other messages, BROIDY texted, "[Person E], just left you a message. It's been a week. Can you send me the date today? Best, Elliott[.]" Person E responded, "It's with the NSC[.] They coordinate and negotiate – I'm sure it will get done[.]"

54.     On or about July 11, 2017, relaying a message from Person A, Davis texted BROIDY, "Wickr[.] It's 5pm … I think we need to make a move. Date and otherwise. We're getting killed." These messages referred to confirming a date for Malaysian Prime Minister A to play golf with the President and Foreign National A's displeasure because no date had been confirmed. Davis continued, "Please call because we need to strategize – I'm getting inundated[.]" BROIDY responded, "See wikr[.]" The following day, BROIDY texted Davis, "Send me text on wikr. I'm taking off and need to get to WH[.] Taking off. Need now[.]" Davis responded, "Done[.]" BROIDY responded, "Got it. Thx[.] Trying to get [Person F] to do call asap[.]" Person F was then a high-ranking official on the National Security Council.

14

55.     On or about July 13, 2017, Davis texted BROIDY, "Please call when u can so we can talk- we gotta handle this so pls pls go to D.C.  And sit at WH until u get it.  I will keep u company if u worry about being lonely!"

56.     On or about July 13, 2017, BROIDY texted Person E again regarding the golf date: "Hi [Person E], It's been 2 weeks.  Checking again on date for golf for [Malaysian Prime Minister A] with POTUS.  Can you text me date today?  Thank you.  Best, Elliot[.]"  Person E responded, "I'll check now again[.]  These things go through a process -".  BROIDY responded "Thank you!!"  Person E replied, "NSC is on it and coordinating[.]"  BROIDY responded, "Can we get date today?"  Person E replied, "They're working directly with the Malaysians.  NSC is coordinating a date."

57.     On or about July 15, 2017, BROIDY texted Davis, "Working on getting meetings for tomorrow."

58.     On or about July 17, 2017, conveying urgency expressed by Person A on behalf of Foreign National A, Davis texted BROIDY, "[Person E] needs to give u this date now and ask him for update on other thing.  We look impotent[.]"  This text referred both to setting up a meeting between the President and Malaysian Prime Minister A and to the matter involving PRC National A.  BROIDY responded, "Agree.  Hammering away[.]"

59.     On or about July 18, 2017, BROIDY and Davis exchanged several text messages about setting up a meeting between the President and Malaysian Prime Minister A.  Among the messages, Davis wrote, "Can u check Wikr[.]  Really really need that date.  It's been crazy for me all day w this.  He's panicking[.]"  Davis followed up with, "This date is mandatory today- we're getting creamed."  According to Person A, Foreign National A was panicking because no meeting had yet been scheduled.  BROIDY responded, "Calling [Person E] now[.]"  Davis replied in part,

"Call everyone so they know u are raging mad[.]   Call [Person G] too.   We need this today[.]"
Person G was an administrative assistant to the President.   BROIDY replied, "Doing it now."

60.     On or about July 19, 2017, Davis texted BROIDY in reference to scheduling a date
for a meeting between Malaysian Prime Minister A and the President, "Secondly we need this date
bad[.]"   BROIDY responded the following day, "Please bear with me.   Getting some info on
mtg[.]"

61.     On or about July 21, 2017, BROIDY texted Person E regarding the golf outing:
"[Person E], The Malaysians have heard nothing from NSC.   POTUS said he would play golf with
[Malaysian Prime Minister A] in late July or early August.   POTUS said he was happy to do it.
You said it would be scheduled in a day or two.   We're in the 4th week.   I know you are busy and
procedures apply but I've been more than patient.   Instead of being positive, this is now causing
me damage.   I would truly appreciate it if you could get back to me today with a date.   Thank you!
Elliott."

62.     On or about July 24, 2017, BROIDY texted Person D, "Received golf date in NJ in
Sept. Sat before the UN General Assembly. Finally!   Crossed off my list!   Thank you also for
helping!"   Person D responded, "Let's follow through and make sure the date is confirmed by the
NSC.   Did he tell you who gave him the date?"   BROIDY replied, "'Thank you!! Fantastic.   Given
to [Person H] by [Person E]."

63.     On or about July 27, 2017, BROIDY texted Person D, "Just checked again with
Malaysians.   Their Amb to US and Foreign Minister have heard nothing.   Please check asap.   Best,
Elliott."   BROIDY followed up with, "Hi [Person D]- Can you call NSA for me re Malaysians
receiving official word.   Still no contact from NSC to Malaysian Amb on meeting.   Thank you.
Best, Elliott."   Person D responded, "E- will call again this morning."

16

64.     On or about July 27, 2017, BROIDY emailed a high-level official from the National Security Council in an attempt to arrange a golf game between Malaysian Prime Minister A and the President.

65.     On or about July 29, 2017, Davis texted BROIDY in reference to the meeting between Malaysian Prime Minister A and the President, "They were told 12 sept is mtg. That's day that un general assembly stars- it's a Tuesday???? No golf??" Davis immediately followed by texting "Wickr[.]" BROIDY responded, "May be two mtgs. Amb should ask. Golf at Bedminster on Sat and tues at WH?"

66.     On or about August 7, 2017, BROIDY sent his assistant an email with the subject, "Malaysia Talking Points *Final*", which contained the purported talking points of Malaysian Prime Minister A intended for an upcoming meeting between the United States Secretary of State and Malaysian Prime Minister A. Davis had received the talking points from Person A—who provided them on behalf of Foreign National A—and Davis relayed them to BROIDY. The talking points mentioned, among other things, BROIDY's ongoing relationship and work with Malaysia, and identified 1MDB as a "[p]riority[.]" The talking points noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians[.]".

67.     On or about August 7, 2017, BROIDY also sent these talking points to Person D, immediately followed by a message explaining, "Above is attachment from Malaysian PM of his talking points. You can share with [staff assistant who works for the Secretary of State]." BROIDY also sought to obtain details about the timing of a meeting in Malaysia between Malaysian Prime Minister A and the Secretary of State.

17

68.     Later on or about August 7, 2017, BROIDY messaged Person D, "[Secretary of State] is meeting with [Malaysian Prime Minister A] on 8th and deputy PM on 9th. Let's get a plug in my name. They know my name and might not immediately recognize Circinus name. Thank you!" Person D responded, "Definitely important to make this connect. It will not likely be part of the formal meetings but will work to get a plug during their conversations."

69.     On or about August 9, 2017, Foreign National A caused a Hong Kong company to transfer approximately $12.8 million to Company A. Person A then transferred $3 million to Law Firm A. This was the final payment made to BROIDY. In total, BROIDY was paid $9 million. On or about the next day, Law Firm A transferred $900,000 to a business account associated with Davis. In the ensuing days, Law Firm A transferred hundreds of thousands of dollars to accounts belonging to BROIDY

70.     On or about August 10, 2017, BROIDY texted Person D regarding the meeting between Malaysian Prime Minister A and the Secretary of State: "Heard from Malaysia that meetings went very well. They were happy with [Secretary of State]. My name was not mentioned – no plug. ;- . . . ."

71.     On or about August 19, 2017, BROIDY texted Person D, "Any update on Malaysia? Person D responded, "As of now it is going to be in DC. And hard to do golf due to schedule but I am working on it. Might have to go to [Person I] directly on this and use the history of the two of them playing golf." BROIDY responded, "Yes. If you think it would help I could directly call one of [Person I] deputies or [Person I]. Also need to add time to meetings. I would like to discuss details with you. Please let me know what is best." Person I was then a high-ranking official at the White House.

72. On or about August 31, 2017, BROIDY drafted and sent an email to Person 1 attempting to arrange a golf game between Malaysian Prime Minister A and the President.

73. On or about September 11, 2017, Davis typed a letter to be sent from BROIDY to the President in anticipation of Malaysian Prime Minister A's meeting with the President and provided the letter to BROIDY. The letter included several positive developments in the relationship between Malaysia and the United States. The letter was never provided to the President.

74. Following BROIDY's repeated efforts to schedule a golf game between the President and Malaysian Prime Minister A, Malaysian Prime Minister A met with the President at the White House on or about September 12, 2017. Although BROIDY contacted high-ranking officials in the Administration to arrange a golf meeting between the President and Malaysian Prime Minister A in addition to the official meeting, no golf game between Malaysian Prime Minister A and the President took place.

75. On or about October 6, 2017, BROIDY met with the President at the White House. BROIDY did not raise the 1MDB matters during the meeting but represented to Davis that he had, understanding that Davis would communicate that information to Person A and Foreign National A.

76. On or about January 5, 2018, BROIDY drafted talking points related to 1MDB to demonstrate to Foreign National A the efforts that BROIDY had undertaken on his behalf. Among other things, the talking points provided: "1. We are working with the DoJ to counter the previous Administration's case against 1MDB in Malaysia. I have put a strategy in place to contact parties both at DoJ and the NSC to find a resolution to this issue. 2. I am in the process of scheduling a meeting with the assistant attorney general [] who has the oversight for the Malaysia case. She is

a [presidential] appointee and can be helpful. . . . 3. As I informed you earlier, in my discussion with the President, he committed to getting this issue resolved. It is important that I take his lead but will continue to communicate the importance of this issue." These representations were false.

## II. Campaign to Remove PRC National A from the United States

### A. BROIDY Travels to China to Meet with PRC Minister A

77.     In or about May 2017, following the trip to Bangkok, BROIDY agreed to travel to Hong Kong to meet again with Foreign National A. Prior to the trip, Davis and BROIDY discussed that it was important to Foreign National A that PRC National A be deported from the United States. The purpose of the trip to Hong Kong was to meet with Foreign National A and a foreign government official of the PRC to discuss PRC National A.

78.     On or about May 15, 2017, Davis emailed BROIDY's assistant regarding travel arrangements and the itinerary for the trip to Hong Kong. The same day, Davis also emailed BROIDY and Person C banking information for Davis's company.

79.     On or about May 18, 2017, BROIDY, Davis, and Person A traveled to Hong Kong and were transported to Shenzhen, China, where they met with Foreign National A and PRC Minister A in a hotel suite. PRC Minister A spoke to BROIDY about PRC National A and his alleged crimes, and stated that the PRC government wanted PRC National A to be returned to the PRC. PRC Minister A asked BROIDY to use his influence with high-ranking United States government officials to advocate for PRC National A's removal and return to the PRC. They also discussed the potential return to the United States of Americans then being held prisoner by the PRC. PRC Minister A also stated that he would be visiting Washington, D.C. soon and was having trouble scheduling meetings with certain high-ranking United States government officials.

## B. BROIDY Lobbies Top U.S. Officials for the Removal of PRC National A

80.     On or about May 20, 2017, during the return trip from China, BROIDY texted Davis, "I'll try to make this a big week for us with [the Attorney General.]"

81.     On or about May 21, 2017, BROIDY texted Person D regarding his meeting with Foreign National A and PRC Minister A: "[Person D]- Just returned. Huge opportunity. Can we meet Monday morning at 9:30 a.m. at [hotel]? Elliott."

82.     On or about May 22, 2017, BROIDY texted Person D, "I will need to meet with [Attorney General] asap. We will discuss." BROIDY followed up with, "I am emailing you a memo. We will discuss." Later the same day, Person D responded, "Have a request into [Attorney General] for mtg."

83.     On or about May 22, 2017, BROIDY sent an email to Person D with the subject, "Opportunity for Significantly Increased Law Enforcement Cooperation between US and China[.]" BROIDY attached to the email a memorandum from BROIDY addressed to the Attorney General, intending that Person D would then provide the memorandum to the Attorney General. The content of the memorandum had been provided to BROIDY by Davis, and the content originated from PRC Minister A and Foreign National A. Upon receipt, BROIDY and Person C revised the memorandum.

84.     In the memorandum, BROIDY mischaracterized the reason for his trip to China and the circumstances leading to his meeting with PRC Minister A. BROIDY did not disclose his contact with Foreign National A and did not disclose Foreign National A's role in setting up the meeting between BROIDY and PRC Minister A. BROIDY also did not disclose the $4 million that he had been paid by Foreign National A. BROIDY also did not disclose that his lobbying

efforts with respect to PRC National A were, at least in part, pursuant to his financial arrangement with Foreign National A and could potentially result in additional payment.

85.     In the memorandum, BROIDY stated, "I was told by [PRC Minister A] that China would like to significantly increase bi-lateral cooperation with the US with respect to law enforcement including cyber security." BROIDY wrote about PRC Minister A's upcoming trip to Washington, D.C., in which PRC Minister A and his delegation planned to meet with several high-ranking United States government officials. BROIDY indicated that it would be productive for the Attorney General to meet with PRC Minister A. BROIDY also noted several items that China, according to PRC Minister A, would be willing to do to improve law enforcement relations between the United States and China. BROIDY then added:

> According to my conversation with [PRC Minister A], the one request China will make is that [PRC National A], who China alleges has conspired with others who have been arrested and charged with violations of numerous criminal laws of China (including kidnapping and significant financial crimes be deported (his Visa ends within the next month or so) or extradited (Interpol has issued a Red Notice with respect to him which is attached for your reference) as soon as possible from the US to China so he can be charged with these violations and go through regular criminal proceedings in China with regard to these allegations.

BROIDY appended an Interpol Red Notice for PRC National A to the memorandum.

86.     On or about May 23, 2017, BROIDY texted Person D, "Hi [] Is meeting set for tomorrow? Has my memo been sent to [Attorney General]? Please update Thanks Elliott[.]" Person D responded, "Elliott- letter was delivered yesterday. Pls see the final version with changes. Working on mtg for tomorrow but shooting for early afternoon. Will call you later today. I am now on redeye tonight so I can get back to DC early." BROIDY responded, "Great. Thank you []. Also try to determine if his mtg was set or if we can set for thurs or in Alabama on fri or sat." The following day, on or about May 24, 2017, Person D responded, "[W]aiting to hear from

DoJ on mtgs – ours and [PRC Minister A]. let me know when you are free and we can meet up to go over other issues. thanks."

87.      On or about May 24, 2017, Person D texted BROIDY, "Just got a call from [Attorney General] office and he cannot do tonight. But I got a text back from him directly that said he would call me later."

88.      On or about May 25, 2017, BROIDY texted Person D, "The meetings are at Justice at 10:00 am this morning. Then FBI and DHS tomorrow. Perhaps I could tell my contact to get there 10 min early and a brief meeting could occur. And then have meet with [] one on one to discuss more details. Please try to see [Attorney General] first thing today. Really important that we pull it off. I need to speak with my contact this morning. Thank you. E[.]" Person D responded, "E- working on it. [Attorney General] is not in the office this morning but trying to see what time he is returning. Stand by." Later the same day, BROIDY texted Person D, "Detail is that the 3 things in my memo are only for [Attorney General]. [PRC Minister A] wants to tell [Attorney General] directly. Mine is legitimate back channel. [PRC Minister A]'s boss wants confirmation that [Attorney General] heard the 3 things which really help US[.]" Later that day, Person D responded, "E- actually just got off the phone with [Attorney General]. Not great news. Let me know when you are free to talk. Thanks."

89.      On or about May 26, 2017, referencing meetings for PRC Minister A, BROIDY texted Person D, "10 am head of ICE 11:30 FBI Perhaps a play at DHS would save situation. Fly by [Person I]. The three items can be shared." BROIDY followed up with, "Please call me" and "I'm trying to do damage control and need to speak with you. Best is pull aside with [Person I]." Person I was a senior official in DHS at the time.

23

90.     On or about May 28, 2017, after Davis transcribed correspondence to BROIDY, BROIDY emailed Person D, "transcribed correspondence to and from [the Attorney General] and the Chinese Ambassador to the US." BROIDY noted, "I believe there is an excellent opportunity for [the Attorney General] to further US interests. I added comments below. Can we discuss asap? There is another matter of interest that the AG should be made aware of." Later that same day, BROIDY and Person D exchanged emails to schedule a time to discuss the email and its content.

91.     On or about May 30, 2017, Davis texted BROIDY with respect to PRC Minister A's meeting with United States government officials, "Check Wickr- all clear now for meetings[.]" BROIDY responded, "Yes. All set[.]" Davis replied, "He got his Mtgs reinstated[.]"

92.     In or about May 2017, Davis, at Person A's request, asked BROIDY to meet with PRC Minister A in Washington, D.C.

93.     On or about May 30, 2017, BROIDY met with PRC Minister A at a hotel in Washington, D.C. BROIDY also asked Person D if Person D could help PRC Minister A arrange meetings with high-ranking United States government officials.

94.     On or about May 31, 2017, BROIDY texted Person D:

> I met with the VM last night. He is on a 4 pm flight back this afternoon. The FBI had him meeting with very low level people and had the person he was to meet with meet with Vietnam instead. His superiors told him to come home unless meeting with [Attorney General] or [Person I]. He is happy meeting with [Person I]. . . . So far, he has delivered a pregnant woman and the next 2 will be sent shortly. He will accept 60 Chinese Nationals for deportation but only if he has a proper "short meeting". This is a big win for the admin that can be publicized. It is the result of Mara Largo meeting between the two presidents. Please call me and I will tell you more specifics. Thank you.

95.     Person D responded, "E-got the info. I will call in a few mins." BROIDY replied, "If you get the meeting, can we have the political WH liaison meet the VM at DHS? He can

mention my name. Also try to get [Person I] to warm up situation. Mention me as well. Thank you! Fingers crossed."

96. On or about May 31, 2017, Davis texted BROIDY with respect to PRC Minister A's purported meeting with, Person I, "In principal [Person I] us ok- just a schedule issue?" BROIDY responded, "Just a short notice scheduling issue. Still might hear in next hour or so. There is no issue with [PRC Minister A]." BROIDY later continued, "Please pass along my good wishes to the VM. Wait a little while longer." Davis responded, "Yes, I'm telling him that." BROIDY replied, "Tell him I'm telling WH and [Attorney General] what happened." Davis then texted, "Isn't [Person I] scheduled to be in Haiti this afternoon?" BROIDY responded, "Scheduler did not mention this?? Are you sure? Neither did [Attorney General] people[.]" Davis responded, "It's on the DHS website[.] He's there for the afternoon[.] Just spoke to VM and he sounded like he was crying[.]" BROIDY responded, "Terrible. What a mess. Bottom line not our fault. Normally their Amb would handle. This is a cluster f[*]ck." Davis replied, "Wickr."

97. On or about June 9, 2017, Davis texted BROIDY a news article titled "china-cranks-up-heat-on-exiled tycoon-[PRC National A.]"

98. On or about June 27, 2017, BROIDY texted Person H's spouse regarding the removal of PRC National A. BROIDY knew that Person H, an internationally successful businessman and frequent contributor to political campaigns with close access to the President, had immediate access to and influence with the President and could be effective in seeking the removal of PRC National A. BROIDY texted Person H's spouse, "On another note, I would like to meet with [Person H] tomorrow morning and on important and sensitive matter. Is there a time tomorrow morning that would be convenient or perhaps for lunch? Looking forward to seeing you at the [] Hotel! Regards, Elliott[.]" BROIDY later continued:

Hi [], [Person H] asked me to send this information to you via text. I have a number of items I will be sending to you regarding the fugitive is [PRC National A]. The first is an Interpol red notice. . . . The highly time sensitive matter is that [PRC National A]'s visa to stay in the US expires on June 30th. It is critically that his new visa application he immediately denied. He must also be placed on the DHS no fly list. . . . This order would need to come from the very top as [PRC National A] is well connected with former FBI who are on his private security detail. [The President of the PRC] mention to [the President] at Mar-A-Lago that he would like [PRC National A] returned. [PRC Minister A] met with me and requested help with regard to [PRC National A]. . . . He promised to return certain US citizens held hostage by China and would accept a very large number of Chinese illegal immigrants for deportation back to China. Finally he offered new assistance with regard to North Korea.

99. On or about June 28, 2017, BROIDY met with Person H and his spouse at a social gathering. After the meeting, BROIDY exchanged text messages with Person H's spouse regarding PRC National A: "Hi [], it was great to see you and [Person H] tonight! I just heard from [PRC Minister A] again. He would like to know the status of [PRC National A]'s VISA as time is of the essence. -Was the VISA issued already or did we deny it? Can we confirm that [PRC National A] is on the DHS no fly list? [PRC Minister A] is very concerned that [PRC National A] will flee the US this week. I hope we can confirm and move to deportation. This will be an incredible step for our two countries. [PRC Minister A] says they are grateful for your help." Person H's spouse responded, "This is with the highest levels of the state department and the defense department. They are working on this."

100. On or about June 29, 2017, BROIDY and Davis exchanged text messages regarding PRC National A's visa application. BROIDY texted, "Is rejection or acceptance letter already generated?" Davis responded, "I have no idea." BROIDY replied, "Sorry always generated. In others words each applicant eventually re wives a yes or no in writing[?] Sorry receive a yes or no in writing[?]" Davis responded, "Yes[.] Check Wickr[.]"

101. On or about June 30, 2017, Davis, in reference to their efforts to facilitate the removal of PRC National A and the potential return of United States citizens held in the PRC, texted BROIDY, "Wickr. You are the man right now. They are going to give you the President's medal of freedom award after what you will accomplish for this country this July 4th[.]" BROIDY responded, "I am going to slam until it's done[.]" Davis replied, "Let's make sure part 1 happens today. And date for m[.] Don't leave that dude until we do it." BROIDY responded, "Agree." Davis continued, "Let him know – if we get the letter confirming the denial today by close of business (as u need workers to generate that letter) then we will get the 2 Americans home by July 4[.] After other phase 2- we can do the 60 take back[.]" BROIDY responded, "Sounds good. [Person H] calling me back shortly. On a call."

102. On or about June 30, 2017, BROIDY and Davis exchanged several text messages about PRC National A. BROIDY texted, "Heard from [Person H]. He reiterated to POTUS." BROIDY followed up with, "Separately, [Person E] texted me that he got tied up but is on top of it." That same date, Davis replied, "Can we get proof today about revoke?" Davis later specified, "From [Person E]?"

103. On or about July 1, 2017, BROIDY texted Davis, "Spoke to [Person E] at length. Call me when you can[.]" BROIDY did not speak with Person E but had exchanged text messages with him about PRC National A's visa application. BROIDY did not disclose the true nature of his relationship with PRC Minister A to Person E.

104. On or about July 2, 2017, BROIDY and Davis exchanged text messages regarding PRC National A and his visa application. Based on public reporting, Davis texted, "There is a call Scheduled for today Sunday with [President of the PRC] about n Korea. He can ask and confirm about package. He can even say he heard from [Person H.]"

105. On or about July 3, 2017, again based on public reporting, Davis texted BROIDY: "[President] leaves D.C. Wednesday for Europe[.]" Davis then followed up: "July 5. Scheduled to meet in person w [President of the PRC][.]"

106. On or about July 10, 2017, Person A emailed himself copies of the Red Notice for PRC National A, images of PRC National A's passport and identity card, and other documents related to PRC National A and the alleged crimes committed by PRC National A.

107. In or about July 2017, Person A requested that Higginbotham meet with the PRC Ambassador to the United States at the PRC Embassy in Washington, D.C. The purpose of the meeting was to convey a message to the PRC Ambassador about PRC National A. On or about July 16, 2017, Higginbotham went to the PRC Embassy in Washington, D.C. and met with the Ambassador. During the meeting, Higginbotham told the Ambassador that United States government officials were working on the extradition of PRC National A and that there would be additional information in the future concerning the logistics of the extradition. Following the meeting, Higginbotham reported to Person A what had occurred, and Person A said he would inform Foreign National A. Person A later told Higginbotham that Foreign National A was happy with the meeting and that it had given Foreign National A credibility with the PRC.

108. On or about July 18, 2017, BROIDY emailed Davis the contact information for Person H. Davis connected multiple calls between PRC Minister A and Person H in furtherance of the lobbying campaign to remove PRC National A.

109. On or about July 26, 2017, BROIDY and Davis exchanged text messages regarding PRC National A and his removal from the United States to the PRC. Among the messages, Davis wrote, "Really need confirm it was officially transmitted. At this point – he says no[.]" BROIDY

responded, "Asked 3 different people to follow up[.]" BROIDY later added, "Called [Person E]. Seeing [Person H] in an hour."

110. On or about July 26, 2017, BROIDY texted Person H to meet at a hotel in Washington, D.C., to discuss PRC National A: "Hi [Person H], I understand from staff that you're in DC, as am I, staying at the [hotel]. Would you like to have a cup of coffee today? Regards, Elliott." Later the same day, Person H's spouse texted BROIDY, "Hi Elliot. Can you text me the details again of the Chinese man you texted previously thank you[.]" BROIDY responded, "Hi [], You are referring to [PRC National A] or [PRC Minister A]? Best, Elliott[.]" Person H's spouse replied, "[PRC National A]." BROIDY then resent the message that he previously sent on June 27.

111. On or about July 27, 2017, BROIDY and Davis exchanged text messages regarding PRC National A. Davis texted BROIDY, "Any word on embassy??" Davis later added, "Hey any update about formal notice?" BROIDY responded, "I'm dealing with people in NSC. Emailing directly. Awaiting response[.]"

112. On or about August 19, 2017, BROIDY texted Davis several times. Among those messages, BROIDY wrote, "Urgent. Call me. Good news[.]" BROIDY later added, "im with [Person H]. have break thru opportunity[.]"

113. On or about August 19, 2017, BROIDY met with Person H on Person H's yacht. During their time together, BROIDY asked Person H about the matter involving PRC National A. Person H, in BROIDY's presence, then called the President, asking about PRC National A's status within the United States.

114.     On or about September 13, 2017, BROIDY texted Davis, "Please text me asylum article. And other article[.]" That same day, Davis texted BROIDY links to articles about PRC National A.

115.     On or about October 2, 2017, BROIDY texted Davis a link to article about PRC National A.

116.     On or about January 5, 2018, BROIDY texted Davis, "Send me more info on [PRC National A] involved in funding Dem politicians, . . . ASAP[.]"

All in violation of 18 U.S.C. § 371.

## FORFEITURE ALLEGATION

1.     The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Count One, in violation of Title 18, United States Code, Section 371, the defendant, ELLIOTT BROIDY, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s). Notice is further given that, upon conviction, the United States intends to seek a judgment against BROIDY for a sum of money representing the property described in this paragraph.

3.     If any of the property described above, as a result of any act or omission of the defendant:

        a.     cannot be located upon the exercise of due diligence;
        b.     has been transferred or sold to, or deposited with, a third party;
        c.     has been placed beyond the jurisdiction of the court;
        d.     has been substantially diminished in value; or

       e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

DATED:  September 30, 2020

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

/s/ *John D. Keller*
By: John D. Keller
Principal Deputy Chief
Sean F. Mulryne
Deputy Director, Election Crimes Branch
Nicole R. Lockhart
James C. Mann
Trial Attorneys
Public Integrity Section