# Exhibit H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.  Criminal Case: 20cr210 (CKK)

ELLIOTT BROIDY

**FILED**

**OCT 20 2020**

Clerk, U.S. District and
Bankruptcy Courts

**STATEMENT OF OFFENSE**

1. From no later than March 2017 to at least in or about January 2018, ELLIOTT BROIDY agreed with Nickie Lum Davis and Person A to act as agents of Foreign National A, a wealthy businessperson living in East Asia, in exchange for millions of dollars which was not disclosed. BROIDY specifically agreed to lobby the Administration of the President of the United States, and the United States Department of Justice ("DOJ") to drop or otherwise favorably resolve its matters against Foreign National A for his role in the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia. Ultimately, BROIDY, Davis, and Person A were unsuccessful in their efforts to have the 1MDB matters dropped or otherwise favorably resolved for Foreign National A.

2. During the same approximate period, BROIDY, Davis, and Person A also agreed to lobby the Administration and the DOJ to arrange for the removal and return of People's Republic of China ("PRC") National A—a citizen of the PRC living in the United States—on behalf of Foreign National A. This involved, among other things, advocating for meetings between PRC Minister A and United States government officials. Here too, BROIDY, Davis, and Person A were ultimately unsuccessful.

3. Despite their knowledge of the requirement to register as agents of a foreign principal, at no time did BROIDY, Davis, or Person A register under the Foreign Agents Registration Act ("FARA") regarding their work as agents of Foreign National A.

1

I. **Campaign to Resolve 1MDB Civil Forfeiture Cases**

   A. **BROIDY Agrees to Lobby for Foreign National A for $8 Million Retainer**

   4. In or about March 2017, Person A contacted Davis in an effort to locate someone with close ties to the Administration to help a foreign client. Davis in turn told BROIDY that she had a possible client in Malaysia who needed help with a forfeiture matter.

   5. On or about March 3, 2017, Davis asked BROIDY's assistant for photographs of BROIDY and the President, and on or about March 7, 2017, BROIDY's assistant sent photographs to Davis.

   6. On or about March 9, 2017, Person A instructed Davis to share with BROIDY parameters for a potential contract relating to Foreign National A and 1MDB, whereby BROIDY, Davis, and Person A agreed to propose that BROIDY would lobby the Administration and DOJ on behalf of Foreign National A for a favorable result in the 1MDB civil forfeiture matters in exchange for an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days. BROIDY, Davis, and Person A agreed that the payments to BROIDY would be directed to Law Firm A, a law firm controlled by BROIDY and Person C. Ultimately, however, BROIDY, Davis, Person A, Law Firm A, and Person C provided no litigation services or legal advice to Foreign National A.

   B. **BROIDY, Person A, and Davis Meet Foreign National A in Bangkok**

   7. In or about April 2017, Davis relayed Person A's request for BROIDY to travel to Bangkok, Thailand to meet with Foreign National A, which BROIDY told Davis to tell Person A that he agreed to do if he were paid $1 million. BROIDY specified that he wanted to be paid by

Person A from "untainted" funds. BROIDY was assured that Person A would personally pay $1 million in exchange for BROIDY traveling to Bangkok.

8. On or about May 2, 2017, BROIDY, Davis, and Person A arrived in Bangkok to meet with Foreign National A. During the trip, BROIDY and Foreign National A spoke about the 1MDB matters, and BROIDY agreed to lobby the Administration and DOJ for a favorable result for Foreign National A. Foreign National A agreed to pay BROIDY an $8 million retainer. BROIDY stated that the money should not come from Foreign National A and should be "clean." Foreign National A identified a friend who could pay BROIDY. BROIDY, Person A, and Davis agreed that the money would first be routed through Person A and then be paid to BROIDY through Law Firm A. BROIDY and Davis agreed that BROIDY would pay Davis a percentage of what BROIDY received. Person A told BROIDY and Davis that Person A's friend, Higginbotham, a DOJ attorney, was verifying the legitimacy of the funds. BROIDY never met or spoke with Higginbotham.

9. During the meeting or shortly thereafter, Davis and BROIDY discussed the possibility of assisting in getting PRC National A removed from the United States.

### C. BROIDY is Paid $6 Million; Davis is Paid $1.7 Million

10. Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Person A obtained a cashier's check from a bank account for Company A, a company created by Person A, for $702,000 payable to Law Firm A, which was immediately credited to Law Firm A's account. Person A made a separate wire transfer of $48,000 to Law Firm A from the Company A account. That same day, a third-party company transferred $250,000 to the Law Firm A account at Person A's direction, bringing the total amount deposited into the Law Firm A account to $1 million. Within several days, approximately $900,000 of the $1 million transferred into the Law

3

Firm A account was transferred from the Law Firm A account to one of BROIDY's business accounts.

11. On or about May 17, 2017, Person A transferred $3 million from Company A to Law Firm A. BROIDY understood that the source of the funds was a friend of Foreign National A from outside the United States. On or about May 18, 2017, Law Firm A transferred $600,000 to one of BROIDY's business accounts and $900,000 to a business account controlled by Davis. On or about May 18, 2017, Law Firm A transferred $500,000 to one of BROIDY's business accounts. Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of BROIDY's business accounts.

12. On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A. BROIDY understood that the source of the funds was a friend of Foreign National A from outside the United States. That same day, $600,000 was transferred from Law Firm A's account to a business account controlled by Davis. On or about May 26, 2017, Law Firm A transferred $1 million to an account controlled by Person C. In or about early June 2017, Law Firm A transferred $650,000 to one of BROIDY's business accounts.

### D. BROIDY Facilitates and Attempts to Facilitate Meetings for Malaysian Prime Minister A and Efforts to Resolve the 1MDB Cases

13. Between June and September 2017, BROIDY contacted high-level officials in the Administration, including the President, to attempt to arrange a golf game between Malaysian Prime Minister A and the President. The idea originated from a suggestion by an employee of BROIDY in or around May 2017 as a way to help generate business opportunities for his company, but BROIDY and Davis believed that this would please Foreign National A and would allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter. BROIDY also hoped to

secure additional business with the government of Malaysian Prime Minister A and hoped that arranging golf with the President would further his business interests.

14. As part of his efforts, BROIDY asked the President in or around June 2017 if he would be willing to play golf with Malaysian Prime Minister A. Additionally, BROIDY sought assistance from Person D, a former campaign aide for the President and political consultant retained by BROIDY, to arrange the golf game through high-level officials within the White House.

15. In or about June and July 2017, BROIDY contacted Person E, a high-level official in the White House, on numerous occasions to arrange for the golf game between Malaysian Prime Minister A and the President.

16. On or about July 27, 2017, BROIDY emailed a high-level official from the National Security Council to arrange a golf game between Malaysian Prime Minister A and the President.

17. On or about August 7, 2017, BROIDY sent his assistant an email with the subject, "Malaysia Talking Points *Final*", which contained the purported talking points of Malaysian Prime Minister A intended for an upcoming meeting between the United States Secretary of State and Malaysian Prime Minister A. Davis relayed them to BROIDY. The talking points mentioned, among other things, BROIDY's ongoing relationship and work with Malaysia, and identified 1MDB as a "[p]riority[.]" The talking points noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians".

18. On or about August 7, 2017, BROIDY sent these talking points to Person D, immediately followed by a message explaining, "Above is attachment from Malaysian PM of his talking points. You can share with [staff assistant who works for the Secretary of State]."

5

BROIDY also asked Person D to see if he could talk to someone to see if the Secretary of State would "plug in [his] name" during the meeting with Malaysian Prime Minister A to help boost BROIDY's business prospects with Malaysia.

19. On or about August 9, 2017, Person A transferred $3 million to Law Firm A. BROIDY understood that the source of the funds was a friend of Foreign National A from outside the United States. This was the final payment made to BROIDY. In total, BROIDY was paid $9 million. On or about the next day, Law Firm A transferred $900,000 to a business account associated with Davis. In the ensuing days, Law Firm A transferred hundreds of thousands of dollars to accounts belonging to BROIDY.

20. On or about August 10, 2017, BROIDY texted Person D regarding the meeting between Malaysian Prime Minister A and the Secretary of State: "Heard from Malaysia that meetings went very well. They were happy with [Secretary of State]. My name was not mentioned – no plug. ;- . . . ."

21. On or about August 31, 2017, BROIDY sent an email to Person I, a high-level official in the White House, to arrange a golf game between Malaysian Prime Minister A and the President. BROIDY sent several follow-up requests in or about September 2017.

22. Throughout this time period, BROIDY regularly communicated with Davis regarding his progress in arranging the golf game between Malaysian Prime Minister A and the President. Additionally, BROIDY assumed that Foreign National A and Person A regularly asked Davis to seek updates from BROIDY regarding his progress, which BROIDY provided to Davis. At times, Davis communicated to BROIDY that Foreign National A and Person A were upset about the lack of progress.

23. On or about September 11, 2017, Davis typed a letter to be sent from BROIDY to the President in anticipation of Malaysian Prime Minister A's meeting with the President and provided the letter to BROIDY. The letter included several positive developments in the relationship between Malaysia and the United States. The letter was never provided to the President.

24. Following BROIDY's repeated efforts to schedule a golf game between the President and Malaysian Prime Minister A, Malaysian Prime Minister A met with the President at the White House on or about September 12, 2017. No golf game between Malaysian Prime Minister A and the President took place.

25. On or about October 6, 2017, BROIDY met with the President at the White House. BROIDY did not raise the 1MDB matters during the meeting, but represented to Davis and others that he had, understanding that Davis would communicate that information to Person A and Foreign National A.

26. On or about January 5, 2018, BROIDY drafted talking points related to 1MDB to demonstrate to Foreign National A the efforts that BROIDY had undertaken on his behalf. Among other things, the talking points provided: "1. We are working with the DoJ to counter the previous Administration's case against 1MDB in Malaysia. I have put a strategy in place to contact parties both at DoJ and the NSC to find a resolution to this issue. 2. I am in the process of scheduling a meeting with the assistant attorney general [] who has the oversight for the Malaysia case. She is a [presidential] appointee and can be helpful. . . . 3. As I informed you earlier, in my discussion with the President, he committed to getting this issue resolved. It is important that I take his lead but will continue to communicate the importance of this issue." These representations were false.

7

## II. Campaign to Remove PRC National A from the United States

### A. BROIDY Travels to the PRC to Meet with PRC Minister A

27. In or about May 2017, following the trip to Bangkok, BROIDY agreed to travel to Hong Kong to meet again with Foreign National A. Also at the meeting was a foreign government official of the PRC. They discussed the removal of PRC National A from the United States and return to the PRC, as well as the potential return of several Americans to America then being held prisoner by the PRC.

28. On or about May 18, 2017, BROIDY, Davis, and Person A traveled to the PRC, where they met with Foreign National A and PRC Minister A. PRC Minister A asked BROIDY to use his influence with high-ranking United States government officials to advocate for PRC National A's removal and return to the PRC. PRC Minister A also stated that he would be visiting Washington, D.C. soon and was having trouble scheduling meetings with certain high-ranking United States government officials.

### B. BROIDY Lobbies Top U.S. Officials for the Removal of PRC National A

29. In or about May 2017, BROIDY sought assistance from Person D to transmit a memorandum to the Attorney General seeking the removal of PRC National A and to arrange a meeting between the Attorney General and PRC Minister A.

30. On or about May 22, 2017, BROIDY sent an email to Person D with the subject, "Opportunity for Significantly Increased Law Enforcement Cooperation between US and China[.]" BROIDY attached to the email a memorandum from BROIDY addressed to the Attorney General, intending that Person D would then provide the memorandum to the Attorney General. The content of the memorandum had been provided to BROIDY by Davis. Upon receipt, BROIDY and Person C revised the memorandum.

31. In the memorandum, BROIDY mischaracterized the reason for his trip to the PRC and the circumstances leading to his meeting with PRC Minister A. BROIDY did not disclose his contact with Foreign National A and did not disclose Foreign National A's role in setting up the meeting between BROIDY and PRC Minister A. BROIDY also did not disclose the financial arrangement with Foreign National A. BROIDY also did not disclose that his lobbying efforts with respect to PRC National A were, at least in part, pursuant to his financial arrangement with Foreign National A and could potentially result in additional payment.

32. In the memorandum, BROIDY stated, "I was told by [PRC Minister A] that China would like to significantly increase bi-lateral cooperation with the US with respect to law enforcement including cyber security." BROIDY wrote about PRC Minister A's upcoming trip to Washington, D.C., in which PRC Minister A and his delegation planned to meet with several high-ranking United States government officials. BROIDY indicated that it would be productive for the Attorney General to meet with PRC Minister A. BROIDY also noted several items that the PRC, according to PRC Minister A, would be willing to do to improve law enforcement relations between the United States and the PRC. BROIDY then added:

> According to my conversation with [PRC Minister A], the one request China will make is that [PRC National A], who China alleges has conspired with others who have been arrested and charged with violations of numerous criminal laws of China (including kidnapping and significant financial crimes be deported (his Visa ends within the next month or so) or extradited (Interpol has issued a Red Notice with respect to him which is attached for your reference) as soon as possible from the US to China so he can be charged with these violations and go through regular criminal proceedings in China with regard to these allegations.

BROIDY appended an Interpol Red Notice for PRC National A to the memorandum.

33. In the ensuing days, BROIDY sought Person D's assistance in arranging a meeting between PRC Minister A and the Attorney General and a meeting between PRC Minister A and a high-level official at the Department of Homeland Security ("DHS") to allow PRC Minister A the

opportunity to advocate for the removal of PRC National A and offer the return of Americans imprisoned in the PRC. Despite BROIDY's efforts, no such meetings took place.

34. During this time period, BROIDY regularly updated Davis regarding his progress in arranging the meetings. On or about May 30, 2017, BROIDY met with PRC Minister A at a hotel in Washington, D.C. at Davis's request to discuss BROIDY's efforts to arrange the meetings with DOJ and DHS for PRC Minister A.

35. Between in or about June 2017 and in or about October 2017, BROIDY sought the assistance of Person H, an internationally successful businessman and frequent contributor to political campaigns with close access to the President, to lobby the Administration for the removal of PRC National A.

   a. On or about June 27, 2017, BROIDY informed Person H of his desire that PRC National A's visa application be denied, that PRC National A be put on the DHS "no fly list," and "this order would need to come from the very top." BROIDY also sent Person H information about PRC National A, including the Interpol Red Notice for PRC National A's arrest.

   b. On or about July 18, 2017, at Davis's request, BROIDY emailed Davis the contact information for Person H to facilitate contact between PRC Minister A and Person H. Davis connected multiple calls between PRC Minister A and Person H in furtherance of the lobbying campaign to remove PRC National A.

   c. On or about August 19, 2017, BROIDY met with Person H on Person H's yacht. During their time together, BROIDY asked Person H about the matter involving PRC National A. Person H, in BROIDY's presence, then called the President, asking about PRC National A's status within the United States.

36. In or about June 2017 and July 2017, BROIDY contacted Person E regarding PRC National A's visa status. BROIDY did not disclose the true nature of his relationship with PRC Minister A to Person E.

37. Once again, BROIDY communicated regularly with Davis regarding his progress in seeking the removal of PRC National A from the United States, and Davis informed BROIDY that she regularly communicated concerns about the progress from Person A and Foreign National A.

By: *[signature]*
Elliott Broidy
Defendant

Attorneys for Elliott Broidy:

*[signature]*　　　*[signature]*　　　*[signature]*
William A. Burck　　George J. Terwilliger III　　Jeffrey H. Knox

Dated: September 30, 2020

11