# Exhibit K

**The New York Times** | https://www.nytimes.com/2018/07/24/us/politics/rick-gates-elliott-broidy-trump-payments.html

# *Two Trump Allies, Seeing Unlimited Opportunity, Instead Drew Scrutiny*

**By Kenneth P. Vogel, Mark Mazzetti, Maggie Haberman and David D. Kirkpatrick**

July 24, 2018

WASHINGTON — Early one morning in October, Rick Gates, a Washington lobbyist who had been a top official in the Trump campaign, emailed family and friends warning them that he was about to be indicted by the special counsel investigating Russian interference in the 2016 election. He declared himself innocent of "collusion with the Russians," and denounced the investigation as "highly politicized and an assault on those who helped elect a president that was not favored by many."

One recipient of the email, Elliott Broidy, a top fund-raiser for President Trump, responded quickly, expressing his condolences to Mr. Gates and adding that he and his family were "in my thoughts and prayers."

The warm response hints at the relationship that once existed between the two men as they worked together to pursue lucrative opportunities in Mr. Trump's Washington. Mr. Broidy was a client of Mr. Gates, and had paid him at least $125,000. For that money Mr. Gates advised Mr. Broidy on how to pursue both a contract for his business and appointments for his associates and provided insight into the new administration's foreign policy plans, according to interviews as well as internal emails and documents obtained by The New York Times.

Their financial arrangement, not previously reported, was emblematic of the way a small circle of Mr. Trump's associates at the beginning of his presidency aggressively marketed their administration access to well-paying clients, and sheds light on the activities of Mr. Gates, who has emerged as a key figure in the investigation of the special counsel, Robert S. Mueller III.

Those activities are detailed in a batch of Mr. Broidy's emails that was hacked and provided to The Times and other news outlets by an anonymous individual or group opposed to Mr. Broidy's work in Washington for foreign countries, including the United Arab Emirates. The emails detailing Mr. Gates's work with Mr. Broidy were corroborated by people familiar with the arrangement, as well as additional documents from other sources.

Mr. Gates has pleaded guilty to financial fraud and lying to investigators, and is also cooperating with Mr. Mueller's team. Paul Manafort, who was Mr. Trump's campaign chairman and was indicted together with Mr. Gates, is in jail awaiting trial.

Mr. Broidy has not been implicated by the authorities in any wrongdoing related to his work during the Trump era. But his associates have drawn legal scrutiny, bringing attention to his dealings.

A criminal investigation of Mr. Trump's personal lawyer, Michael D. Cohen, was made public in April, followed days later by the revelation that he had arranged a $1.6 million hush agreement with a former Playboy model who became pregnant during an affair with Mr. Broidy. Because of that, and revelations in Mr. Broidy's emails about his efforts to use his connections to Mr. Trump to help his business, his status in Washington has been diminished.

It is a marked contrast from the early days of the Trump administration, when there seemed to be unlimited clout — and earning potential — for those who helped elect the new president.

Mr. Gates was looking to re-establish himself as a Washington power broker after spending the better part of the decade before the 2016 campaign working with Mr. Manafort, his mentor and business partner, for Russia-aligned Ukrainian interests that paid them tens of millions of dollars.

Mr. Broidy, who had pleaded guilty in 2009 in a pension fund fraud case, was looking for help courting foreign government clients for a defense contractor he had purchased in 2015, and pushing for policies that favored clients and prospective clients.

Although Mr. Gates's role on Mr. Trump's presidential campaign had shrunk dramatically after Mr. Manafort resigned under pressure as its chairman months before the election, he maintained connections to numerous Trump advisers, including two key players in Mr. Trump's orbit with whom he had worked planning the presidential inauguration — Mr. Broidy, who was a vice chairman of the inaugural committee's finance team, and the billionaire California investor Thomas J. Barrack Jr., who served as chairman of the inaugural committee.

After the inauguration, Mr. Gates began receiving monthly consulting payments for help navigating the new administration from a company headed by Mr. Barrack, Colony NorthStar, which paid Mr. Gates $20,000 a month, and one owned by Mr. Broidy, which paid Mr. Gates $25,000 a month, according to documents and people familiar with the relationships, who requested anonymity to discuss private business arrangements.

The payments came despite the fact that Mr. Gates and Mr. Manafort were emerging as subjects of federal and congressional investigations looking into their lucrative Ukraine work, and any connections between the Trump campaign and Russia.

Other Washington consultants were puzzled by the willingness of clients to hire Mr. Gates or Mr. Manafort at a time when it seemed that the looming investigations would limit their effectiveness and access to Mr. Trump's advisers, some of whom had tried to bar Mr. Gates from working with the administration. Mr. Gates maintained at least some access, in part because he was seen as having the blessing of Mr. Barrack, a close friend and business associate of Mr. Trump's, according to a Trump associate.

But when Mr. Gates was indicted in October, Mr. Trump's allies began to further distance themselves. Colony NorthStar quickly terminated its arrangement with Mr. Gates, according to someone familiar with it.

Mr. Broidy's payments to Mr. Gates had begun in March 2017 and ran through that July, according to an associate of Mr. Broidy's, who requested anonymity to discuss private financial arrangements. The associate said that Mr. Broidy continued consulting with Mr. Gates after the payments ended, but that Mr. Broidy had stopped seeking advice before the indictment.

Mr. Gates submitted at least two invoices after July, including one sent three weeks after he was indicted. But those were not authorized or paid by Mr. Broidy, according to one of Mr. Broidy's lawyers, Christopher Clark, for whom Mr. Broidy unsuccessfully sought to secure a position as a United States attorney with help from Mr. Gates.

Elliott Broidy, a top fundraiser for President Trump, has not been publicly implicated in any wrongdoing related to his work during the Trump era, but has watched his dealings come under scrutiny.
David Karp/Raoul Wallenberg Committee of the US, via Associated Press

The invoices requested payments to a company owned by Mr. Gates called Konik Madison Group LLC, which had also received nearly $37,000 from the Trump campaign in the weeks before Election Day, according to Federal Election Commission filings. The campaign listed the payment as "strategic consulting," but a campaign official said Tuesday that Mr. Gates "was a volunteer" for the campaign, and that the payment was reimbursement for "travel, meals and other appropriate expenses."

Mr. Gates declined to comment through his lawyer. Mr. Broidy also declined to comment.

Mr. Broidy's work has made him enemies, as was evident when the anonymous person or group critical of American policy toward the United Arab Emirates began distributing tranches of his emails to news organizations.

Lawyers for Mr. Broidy have filed a lawsuit accusing Qatar of orchestrating the hacking in retaliation for his criticism of its policies, and they have accused numerous Washington consultants and former intelligence operatives of conspiring with Qatar in the effort.

On Monday, his lawyers also filed another lawsuit accusing Jamal Benomar, a former United Nations diplomat, of acting as an unregistered foreign agent for Qatar. In a statement, the lawyers accused him of "helping spearhead the operation to generate damaging media stories with PDF files and physical printouts sent to media outlets with cherry-picked, curated hacked emails."

Mr. Benomar declined to comment.

Qatar is a foe of the United Arab Emirates, which had awarded a $200 million contract to Mr. Broidy's Virginia-based defense firm, Circinus. Qatar has rejected Mr. Broidy's accusations. The F.B.I. has opened a criminal investigation into the hacking allegations.

In a letter to The Times this month, Filiberto Agusti, a lawyer for Mr. Broidy, called the leaked documents detailing Mr. Broidy's relationship with Mr. Gates "part of a foreign power's sophisticated campaign to smear a prominent U.S. citizen who has spoken out against its policies." Mr. Agusti added that the emails were "a carefully curated selection of Mr. Broidy's emails, designed to portray him in a false and unflattering light."

While documents and interviews show that Mr. Gates advised Mr. Broidy on numerous ventures, he appears to have had limited success delivering on Mr. Broidy's objectives.

In one instance, Mr. Broidy sought assistance from Mr. Gates in securing an endorsement from the Commerce Department for Circinus's efforts to win lucrative defense work from the Romanian government, in partnership with its state-owned defense company, Romarm.

Mr. Gates told Mr. Broidy and Circinus officials in an email that he intended to flag the request for "my contacts at Commerce," including "in the secretary's office." He relayed talking points about why Circinus deserved the endorsement to one such contact, Eric Branstad, who had served as senior White House adviser to the Commerce Department until January, and before that had worked on the inaugural committee with Mr. Gates.

Mr. Branstad, the son of the Trump administration's ambassador to China, Terry Branstad, relayed Circinus's request to the agency staff overseeing Romania, according to someone who worked with the agency.

The Commerce Department eventually provided an endorsement, which is commonly sought by American companies trying to do business with foreign governments. But it is unclear what role, if any, Mr. Gates's efforts played.

A person familiar with his involvement said Mr. Gates did not lobby the Romanian government or Romarm to award a contract to Circinus. Romarm said an active "cooperation agreement is in place" with Circinus, but the Broidy associate said no contracts have been awarded or are pending.

Mr. Gates also advised Mr. Broidy on how he might be able to secure a round of golf with Mr. Trump for Najib Razak, then the prime minister of Malaysia, from whose government Circinus planned to pursue a contract potentially worth more than $225 million. And he offered advice to Mr. Broidy on how to get his friends and business associates influential positions in the Trump administration.

Mr. Clark, the lawyer for Mr. Broidy, said Mr. Broidy sought similar help from many contacts who he believed might have influence in the appointment process. And the person familiar with Mr. Gates's involvement said he did not directly lobby the administration to hire people recommended by Mr. Broidy.

One associate recommended by Mr. Broidy for a top post in the Justice Department, Robert C. Riegle, said he was also recommended by several other people. Mr. Riegle had been hired in 2012 by Threat Deterrence, a company Mr. Broidy had started to provide training and technology to law enforcement agencies.

Mr. Riegle did not get the job for which Mr. Broidy had recommended him. Mr. Broidy "never mentioned" Mr. Gates's involvement, according to Mr. Riegle.

Mr. Gates's prospects for a lucrative Washington consulting practice, once seemingly limitless at the beginning of the Trump administration, had dried up by last fall amid intensifying scrutiny by Mr. Mueller's investigators. He appears to have lost paying clients, such as Mr. Broidy, while his legal bills mounted amid preparations for a potentially long and costly defense.

In February, he decided to plead guilty and cooperate with Mr. Mueller, citing the onerous costs and the "circuslike atmosphere of an anticipated trial."

"I will better serve my family moving forward by exiting this process," he said on the day of guilty plea.