UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELLIOTT BROIDY and BROIDY CAPITAL MANAGEMENT, LLC, <br><br> Plaintiffs, <br><br>—v.— <br><br> GLOBAL RISK ADVISORS, LLC, *ET AL.*, <br><br> Defendants. | Case No. 1:19-CV-11861 |

## DECLARATION OF PROFESSOR ROY D. SIMON, JR.

Roy D. Simon, Jr., a Distinguished Professor of Legal Ethics Emeritus at Hofstra University School of Law and an attorney admitted to practice law and in good standing in New York, under penalty of perjury, declares as follows:

### Introduction

1. The law firm of Gibson Dunn & Crutcher LLP ("Gibson Dunn" or the "Firm") has retained me as an expert in the field of professional responsibility for lawyers, and has asked for my objective evaluation, detailed analysis, and expert opinion regarding whether Gibson Dunn should be sanctioned pursuant to 28 USC § 1927 or the Court's inherent authority. Plaintiff Elliott Broidy and his company, Broidy Capital Management, LLC (together "Broidy" or "Plaintiffs") argue that Gibson Dunn should be sanctioned for refusing Broidy's request for Gibson Dunn to withdraw from representing GRA before Broidy filed a pre-motion letter seeking leave of court to file a motion to disqualify Gibson Dunn. This declaration states my opinion and my analysis.

### Brief Summary of My Opinion

2. In my opinion as an expert in the field of professional responsibility for lawyers, Gibson Dunn

should not be sanctioned pursuant to 28 USC § 1927 (hereinafter "§ 1927"), or pursuant to the Court's inherent authority, for refusing to withdraw from representing GRA before Broidy filed a pre-motion letter seeking leave to file a motion to disqualify Gibson Dunn. My opinion is based on several reasons.

3. First, it is my opinion that Gibson Dunn was not required to withdraw because the Firm did not have a disqualifying conflict of interest under Rule 1.11 of the New York Rules of Professional Conduct. The Firm did not have a disqualifying conflict under Rule 1.11 because Zainab Ahmad (the Gibson Dunn lawyer that Broidy identifies as the source of Gibson Dunn's alleged conflict of interest) either (a) never acquired "confidential government information" that could have been used to Broidy's material disadvantage in Broidy's underlying suit against GRA or (b) if Ms. Ahmad ever acquired such information, it was no longer confidential government information when Gibson Dunn refused to withdraw because (i) the information was available to the public and/or (ii) the information could no longer be used to Broidy's material disadvantage in the underlying matter.

4. Second, even assuming *arguendo* that this Court were to find that Gibson Dunn had a disqualifying conflict of interest under Rule 1.11 that required it to withdraw before Broidy filed a pre-motion letter seeking leave to file a motion to disqualify, it is my opinion that Gibson Dunn should not be sanctioned under § 1927 or the Court's inherent authority because Gibson Dunn had colorable reasons for not immediately withdrawing, and asserted those reasons in good faith.

### Documents Reviewed in Forming My Opinions

5. In forming my opinions, I reviewed all or parts of the documents listed in Exhibit A to this affirmation.

## My Qualifications as an Expert

6. My qualifications as an expert in the field of legal ethics and professional responsibility are set forth in my *curriculum vitae,* which is attached as Exhibit B to this affirmation. Briefly:

7. I am the author of SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED (Thomson Reuters, 22nd ed. 2022), a treatise that analyzes and annotates the New York Rules of Professional Conduct phrase by phrase.

8. I am also the co-author of thirty annual editions of a statutory supplement entitled REGULATION OF LAWYERS: STATUTES AND STANDARDS (originally published by Little Brown in 1989, later published by Aspen and then Wolters Kluwer). That publication included the ABA Model Rules of Professional Conduct and the New York Rules of Professional Conduct (or Code of Professional Responsibility).

9. I have served on multiple bar committees governing professional standards for New York lawyers, including (i) my current role as Chair of the New York State Bar Association Committee on Standards of Attorney Conduct ("COSAC"), (ii) my former role as Chair (2008 to 2011) of the New York State Bar Association Committee on Professional Ethics, on which I have been a member for more than 25 years, and (iii) three separate three-year terms on the New York City Bar Committee on Professional Ethics since 2002.

10. I was the Howard Lichtenstein Distinguished Professor of Legal Ethics at Hofstra University School of Law from 2003 until 2011. I am now a Distinguished Professor of Legal Ethics Emeritus.

11. I am an active member in good standing of the New York Bar. In my law practice, I frequently advise lawyers in New York and elsewhere regarding issues of professional conduct, including conflicts of interest, confidentiality, and related issues. I also sometimes serve as an expert consultant or expert witness regarding professional conduct, sometimes on behalf of lawyers and

other times adverse to lawyers.

12. I received my Bachelor of Arts degree *cum laude* in 1973 from Williams College and received my J.D. in 1977 from New York University School of Law, where I served as Editor-in-Chief of the *New York University Law Review*. I then clerked for the Hon. Robert R. Merhige, Jr. in the United States District Court for the Eastern District of Virginia and practiced law for five years in Chicago before becoming a full-time law professor.

13. Since January 1, 2023, I am being compensated at the rate of $1,780 per hour for my all of my work on this matter. (In 2022 my rate was $1,720 per hour.)

## Facts Considered in Forming My Opinions

14. I have no personal knowledge of the facts, but in forming my opinions, I have assumed for purposes of analysis that the facts set out in this section are true.

15. In August 2020, Plaintiffs' prior counsel (Steptoe) sent a letter to Gibson Dunn asserting that Gibson Dunn partner Zainab Ahmad acquired information about Mr. Broidy while serving in the Office of Special Counsel ("OSC") under Special Counsel Robert S. Mueller before joining Gibson Dunn, as asserting that Gibson Dunn had a conflict of interest as a result.

16. Specifically, Mr. Broidy asserts that Ms. Ahmad, while working at OSC, participated in a March 18, 2018 interview of Rick Gates, a former top adviser in former President Trump's presidential campaign who pled guilty in February 2018 to (among other things) lying to the OSC. Mr. Gates asserts in an affidavit that Mr. Broidy was discussed at his interview with Ms. Ahmad.

17. Plaintiffs claim that during that interview Ms. Ahmad acquired "confidential government information" within the meaning of Rule 1.11(c) of the New York Rules of Professional Conduct. Broidy's Memorandum of Law at 14. (All parties assume that the New York Rules of Professional

Conduct govern here.)

18. When Gibson Dunn received Steptoe's letter asserting that Gibson Dunn had a conflict, Gibson Dunn replied with its own letter stating that the factual premise for Plaintiffs' claims was wrong. Gibson Dunn told Steptoe that in fact Ms. Ahmad was not present for the portion of interview discussing Mr. Broidy, and that she instead had participated in a separate interview segment on the same day that was separately documented, as the official FBI 302 memoranda of the interviews made clear. Dkt. 139, Ex. 1 at 2; Ex. 6 at 1–2; see also Exs. 7, 8 at 1–2. Gibson Dunn also explained why the legal standard for disqualification under Rule 1.11(c) was not met.

19. After receiving Gibson Dunn's response to Steptoe's letter and some follow-up correspondence, Steptoe took no further action of any kind with respect to the alleged conflict.

20. On May 16, 2022, after Defendants had moved to dismiss Plaintiff's Second Amended Complaint, Plaintiffs' new counsel (Kasowitz Benson) renewed Plaintiffs' threat to disqualify Gibson Dunn. This threat was based on a new declaration by Mr. Gates, who asserted that Ms. Ahmad was present for his interview and had asked questions about Mr. Broidy and about the hacking of Mr. Broidy's confidential information.

21. Over the next several weeks, Gibson Dunn continued to investigate the factual and legal arguments that Kasowitz Benson had raised, and the parties engaged in an exchange of letters and emails. Specifically, Gibson Dunn responded to Kasowitz Benson by pointing out that the FBI's 302 form contradicted Mr. Gates. Gibson Dunn also asserted that Mr. Gates was not credible for other reasons, and Gibson Dunn re-asserted legal arguments it had made previously. Ex. 2.

22. Plaintiffs countered by claiming that Ms. Ahmad had personally participated in a government investigation specifically into the hacking of Mr. Broidy's materials. Ex. 3. Gibson Dunn responded to explain why this was false. Nevertheless, on June 27, 2022 Plaintiffs sent a pre-motion letter

seeking leave to file a motion to disqualify Gibson Dunn. Dkt. 131. On July 1, 2022, this Court granted Plaintiffs leave to file their motion, Dkt. 132, with a filing deadline of August 1.

23. Gibson Dunn began preparing an opposition to the motion to disqualify. On July 21, 2022, however, Defendants advised Gibson Dunn that they had decided to retain new counsel (Hughes Hubbard & Reed) to represent them in this case going forward. Consequently, on July 25, 2022 Gibson Dunn filed a stipulation to withdraw as counsel. Soon afterwards, Hughes Hubbard & Reed entered appearances on behalf of GRA. Dkts. 133–36. On August 1, 2022, the Court entered a stipulation permitting Gibson Dunn to withdraw as counsel for GRA. Dkt. 137.

24. In response to FOIA requests from CNN and Buzzfeed, the United States Department of Justice released multiple tranches of FBI 302 forms related to OSC's investigation. (302 forms summarize FBI interviews.) Ms. Ahmad did not participate in the interview memorialized in the "2456 Memo" and the 2456 Memo does not list Ms. Ahmad as one of the participants in that interview. Rather, as stated in the 2456 Memo, Ms. Ahmad participated in a separate interview of Mr. Gates, which was summarized in a separate 302 (the "2470 Memo").

25. In addition, anonymous hackers allegedly gained access to Mr. Broidy's emails and his wife's emails (as well as other communications with Mr. Broidy), and apparently shared the hacked documents with the press. The hacked documents and other information were reported in the Wall Street Journal, the HuffPost, and The New York Times.

26. On October 6, 2020, the United States publicly filed a 31-page Criminal Information that described and quoted the contents of many text messages, emails, and other communications to or from Mr. Broidy.

27. On October 20, 2020, the government filed a Statement of Offense describing the offenses to which Mr. Broidy pled guilty, and this document also disclosed various communications to and from Mr.

Broidy.

28. Through the release of the FBI 302 forms, and the widespread press coverage reporting on the hacked information, the Criminal Information, and the Statement of Offense, it appears that the information at issue here became "available to the public" within the meaning of Rule 1.11(c), and thus ceased to be "confidential government information." Plaintiffs have not identified any confidential information that was disclosed during Mr. Gate's interview that was not already available to the public or that was not later made available to the public before Gibson Dunn withdrew in July 2022.

## **Opinions and Reasoning**

29. Plaintiffs seek sanctions pursuant to 28 U.S.C § 1927 ("Counsel's liability for excessive costs"), which provides as follows:

    > Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case ***unreasonably and vexatiously*** may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct. [Emphasis added.]

30. Under longstanding Second Circuit law, to impose monetary sanctions under 28 U.S.C. § 1927 a court must find "clear evidence" of two elements: "(1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay." *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000), *quoted in Salameno v. Rawlings*, 2022 WL 16962822 (S.D.N.Y. Nov. 16, 2022) (denying motion for sanctions under § 1927).

31. Plaintiffs also seek sanctions pursuant to the Court's inherent power. The test for determining whether the Court should impose sanctions under its inherent power is the same as the test for

determining whether the Court should impose sanctions under § 1927. This was made clear in *United States v. Prevezon Holdings, Ltd.*, 305 F. Supp. 3d 468, 478 (S.D.N.Y. 2018), where the court compared § 1927 to inherent power as follows:

> The only difference between a sanctions award under § 1927 and a court's inherent power is that "awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." "As a consequence, requests for sanctions under Section 1927 and pursuant to the court's inherent authority may be decided in a single inquiry." [Citations omitted.]

32. The *Prevezon* court then said (with some citations omitted):

> … To impose sanctions under either § 1927 or this Court's inherent powers, there must be clear evidence that "(1) the offending party's claims were entirely without color, ***and*** (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay." *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (emphasis added [by the Court]).

33. Since the test under § 1927 is the same as the test under the Court's inherent power, I will not differentiate between the two. I will base my opinion on the two elements set out by the Second Circuit in *Eisemann v. Greene* – whether Broidy can demonstrate by "clear evidence" that (1) Gibson Dunn's refusal to withdraw was "entirely without color" and (2) Gibson Dunn's refusal to withdraw was "in bad faith." In my opinion as an expert on professional responsibility for lawyers, Plaintiffs have not met either element.

***Gibson Dunn's claims were not "entirely without color"***

34. Gibson Dunn's reasons for not withdrawing in response to Broidy's demands were not "entirely without color." On the contrary, Gibson Dunn had sound reasons for not withdrawing until its own client instructed Gibson Dunn to withdraw and switched to different counsel.

35. The main reason that Gibson Dunn did not withdraw before Broidy filed his pre-motion letter seeking leave to file a motion to disqualify is that Gibson Dunn did not have a conflict of interest under Rule 1.11 of the New York Rules of Professional Conduct, and therefore had no reason to

**Declaration of Professor Roy D. Simon, Jr.** 9

withdraw.

36. Broidy's counsel asserted in their letters that Ms. Ahmad prior service with the OSC created a conflict of interest for Gibson Dunn under New York Rule 1.11(c). New York Rule 1.11(c) provides, in part, as follows:

> (c) Except as law may otherwise expressly provide, ***a lawyer having information that the lawyer knows is <u>confidential government information</u> about a person***, acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which ***the information could be used to the <u>material disadvantage</u> of that person***. [Emphasis added.]

37. Comment [4A] to Rule 1.11 essentially paraphrases the rule, saying (in relevant part):

> [4A] … Paragraph (c) prohibits a lawyer who has information about a person acquired when the lawyer was a public officer or employee, that the lawyer knows is confidential government information, from representing a private client whose interests are adverse to that person in a matter in which the information could be used to that person's material disadvantage. …

38. An important limitation on the reach of Rule 1.11(c) appears in Comment [8] to Rule 1.11, a two-sentence Comment that says:

> [8] Paragraph (c) operates only when the lawyer in question has ***actual knowledge*** of the information. It does ***not*** operate with respect to information that merely could be ***imputed*** to the lawyer. [Emphasis added.]

39. The import of Comment [8] is that if others in the OSC acquired confidential government information about Mr. Broidy but Ms. Ahmad did not learn of that information herself (*i.e.,* if she did not personally gain "actual knowledge" of the information), then Rule 1.11(c) would not disqualify Ms. Ahmad.

40. Other important limitations on Rule 1.11(c) are set out in the remainder of paragraph (c), which defines the term "confidential government information" as follows:

> (c) … As used in this Rule [1.11(c)], the term ***confidential government information"*** means information that has been obtained under governmental authority and that, ***at the time this Rule is applied***, the government is prohibited by law from

>disclosing to the public or has a legal privilege not to disclose, and that is ***not otherwise available to the public***. … [Emphasis added.]

41. Thus, even if Ms. Ahmad actually acquired confidential government information about Mr. Broidy at OSC that could have been used to his material disadvantage in the Underlying Litigation at the time the Court would have "applied" the rule in deciding Broidy's motion to disqualify, that information would not have been disqualifying if the information was already "available to the public." In other words, if the information in question here was "available to the public" because the government, the press, or others had publicly disclosed the information, then Ms. Ahmad would not have been disqualified under Rule 1.11(c). And if Ms. Ahmad personally was not disqualified, then Gibson Dunn as a law firm was not disqualified by imputation, because there was no conflict to impute.

42. Mr. Broidy has not identified any specific confidential information Ms. Ahmad allegedly obtained during her time at the OSC. But in any event, the documents Mr. Gates appears to refer to in his declaration appear to have become "available to the public" within the meaning of Rule 1.11(c) in a number of different ways, including:

    a. The allegedly hacked information was circulated to various news organizations and was extensively reported on in the press, including in the Wall Street Journal and the Huffington Post, which revealed a number of Mr. Broidy's communications. *See* Bradley Hope, Tom Wright & Rebecca Ballhaus, *Trump Ally Was in Talks to Earn Millions in Effort to End 1MDB Probe in U.S.* (Wall Street J., March 1, 2018) (reporting on "a cache of emails from Mr. Broidy's and his wife's email accounts that were provided to the Journal"); *Leaked Emails Appear To Show A Top Trump Fundraiser Abusing His Power* (HuffPost, March 2, 2018) (reporting on "[e]mails and documents an anonymous group leaked to HuffPost"). These articles were published before the

        OSC's March 18, 2018 interviews of Rick Gates.

    b. Mr. Broidy's emails and other documents continued to receive national press coverage after the OSC's March 18, 2018 interviews. *See* David D. Kirkpatrick & Mark Mazzetti, *How 2 Gulf Monarchies Sought to Influence the White House* (N.Y. Times, March 22, 2018) (reporting on "previously undisclosed documents" about Broidy that had been "provided to The New York Times"); and Kenneth P. Vogel & David D. Kirkpatrick, *Fund-Raiser Held Out Access to Trump as a Prize for Prospective Clients* (N.Y. Times, March 25, 2018) (reporting that "[h]undreds of pages of Mr. Broidy's emails, proposals and contracts were provided to The Times by an anonymous group critical of Mr. Broidy's advocacy of American foreign policies in the Middle East").

    c. Government actions led to the disclosure of even more of Mr. Broidy's documents (and his wife's documents). On October 6, 2020, the United States publicly filed a 31-page Criminal Information, which described and quoted the contents of many text messages, emails, and other communications to or from Mr. Broidy.

    d. Mr. Broidy's communications were further disclosed when he pled guilty to the offenses described in a Statement of Offense filed on October 20, 2020.

    e. At some point before Broidy filed his pre-motion letter seeking leave to file a motion to disqualify Gibson Dunn in the Underlying Litigation, the FBI (in response to an FOIA request) released redacted 302 forms to the public.

43. Any information made public in the press, in the publicly filed Criminal Information charging Mr. Broidy with federal crimes, in the Statement of Offense describing the crimes to which Mr. Broidy pled guilty, or in the 302 memoranda summarizing interviews with Mr. Gates cannot constitute

"confidential government information" because Rule 1.11(c) defines confidential government information to exclude information "available to the public."

44. Thus, when Broidy asked Gibson Dunn to withdraw in July 2022, Broidy could not have established the elements of a disqualifying conflict under Rule 1.11(c). To establish a disqualifying conflict under Rule 1.11(c) in the Underlying Litigation, Mr. Broidy would have needed to show two things: (a) Ms. Ahmad possessed information that she *knew* to be "confidential government information" about Mr. Broidy "not otherwise available to the public," and (b) this confidential government information "could be used" to Broidy's "material disadvantage" in this litigation. I will examine both of these elements of the definition of "confidential government information."

45. As to the first element, in my opinion Broidy did not show prior to Gibson Dunn's withdrawal (and has not shown here) that Ms. Ahmad possessed "confidential government information." As Ms. Ahmad's affidavit states, while at OSC she never acquired (and does not currently possess) confidential government information about Mr. Broidy relevant to the issues in this litigation.

46. Ms. Ahmad's affidavit is consistent with the official FBI 302 forms. Those forms indicate that Mr. Broidy's name was not mentioned, and that the hacking of Mr. Broidy's devices (which is the central focus of the Underlying Litigation), was not discussed at the meetings Ms. Ahmad attended with Rick Gates. The 302 forms reflect that in the meetings attended by Ms. Ahmad Mr. Gates discussed the Trump presidential campaign, Cambridge Analytica, an investment fund known as 1MDB, and various other subjects, but none of those subjects appear to be related to the issues in the Underlying Litigation. Thus, it does not appear that the information could be used to Mr. Broidy's "material disadvantage" in the Underlying Litigation, which is a key element of Rule 1.11(c).

47. Moreover, in my opinion there is an inverse relationship between the amount and content of

information about a person that has been made "available to the public" and the likelihood that confidential government information (if any remains unavailable to the public) could be used to the "material disadvantage" of that person. Applying that concept here, the more information about Mr. Broidy that is available to the public, the less likely it is that any information that was not made available to the public could materially disadvantage Mr. Broidy.

48. Given the extensive national press coverage based on information hacked from Mr. Broidy and his wife, the publicly released redacted 302 forms, the extensive disclosures about Mr. Broidy's text messages, emails, and other communications in the Criminal Information filed against him in October 2020, and the additional disclosures about Mr. Broidy in the October 2020 Statement of Offense describing the conduct to which he pled guilty, in my opinion the chance that any confidential government information that was not available to the public by July 2022 could be used to Broidy's material disadvantage is low.

49. I recognize that Broidy has supported his position with an affidavit from Rick Gates claiming that Ms. Ahmad attended a portion of a March 18 meeting with him at which Mr. Broidy was discussed while Ms. Ahmad was present. I cannot assess the credibility of an affidavit from Mr. Gates or any other witness. But in my opinion Gibson Dunn was not required to give credence to Mr. Gates's affidavit because (a) Ms. Ahmad denied his assertions, (b) the FBI 302 form contradicted Mr. Gates's recollection, and (c) Mr. Gates himself had previously pleaded guilty to lying. All of these reasons gave Gibson Dunn good faith grounds to question the credibility of Mr. Gates.

50. In these circumstances, in my opinion as an expert on professional responsibility for lawyers, Gibson Dunn was entitled to weigh the available evidence, and was entitled to have its day in court regarding the motion to disqualify so that a court, not opposing counsel, could determine the contested facts and decide whether Gibson Dunn was required to withdraw. Given the high

standard of proof that Mr. Broidy would have been required to meet to prevail on his motion to disqualify, and given Gibson Dunn's awareness of evidence contrary to the evidence provided by Mr. Gates, in my opinion Gibson Dunn was well within its rights under Rule 1.11(c) and Rule 1.16(b)(1) to put Mr. Broidy's evidence to the test rather than withdrawing immediately in the face of untested assertions by Mr. Gates.

51. I am also aware that in June 2022, Mr. Broidy sent Gibson Dunn an unsworn Statement of Thomas C. Green, who identified himself as counsel for Mr. Gates during the time Mr. Gates pled guilty and cooperated with the OSC and the United States Department of Justice. (Exhibit B to Broidy's June 27, 2022 letter to Judge Vyskocil requesting a pre-motion conference.) Mr. Green says in his statement that, to the best of his recollection, he was present at various sessions when the OSC questioned Mr. Gates, that Ms. Ahmad was present at three of these sessions, and that when Ms. Ahmad was present he "believe[s]" that the interrogations "related to Mr. Broidy and other matters." But even if the Court accepts Mr. Green's assertions as true, for several reasons it was insufficient to require Gibson Dunn to withdraw. Mr. Green's statement has at least five shortcomings.

    a. First, Mr. Green's statement does not establish that the OSC's questions related to Mr. Broidy. It does not say that he "knows" the questions related to Mr. Broidy. Mr. Green simply says he "believes" they did.

    b. Second, Mr. Green's statement does not say that Mr. Gates actually answered any questions about Mr. Broidy or otherwise provided any information about Mr. Broidy. Mr. Green simply says that the "interrogations" related to Mr. Broidy.

    c. Third, Mr. Green's statement does not assert that any information Mr. Gates may have provided about Mr. Broidy is relevant to the issues in the Underlying

Litigation about the hacking of Mr. Broidy's devices or could be used to Mr. Broidy's disadvantage in the Underlying Litigation. In particular, Mr. Green does not mention hacking. Thus, even if portions of the OSC's interrogations "related to Mr. Broidy," that would not demonstrate that any information given to OSC by Mr. Gates "could be used to the material disadvantage of" Mr. Broidy in the Underlying Litigation.

d. Fourth, Mr. Green's statement does not say that the information in the declaration by Mr. Gates is accurate. (Mr. Green does not even indicate that he has seen the declaration by Mr. Gates.)

e. Fifth, Mr. Green's statement is not under oath and is not otherwise made under penalty of perjury.

52. It may be that Mr. Green could have submitted a sworn statement setting forth additional details to remedy these shortcomings, but he did not. Accordingly, when counsel for Mr. Broidy presented Mr. Green's statement to Gibson Dunn in June 2022 in an effort to persuade Gibson Dunn that the Rules of Professional Conduct compelled Gibson Dunn to withdraw from representing Mr. Broidy in the Underlying Litigation, in my opinion Gibson Dunn was not ethically compelled to withdraw.

53. I am also aware that Mr. Broidy claims that Ms. Ahmad may have obtained information about the hacking of Mr. Broidy's devices through sources other than her March 18 meeting with Mr. Gates, but I have seen no specific evidence to support that assertion, leaving it in the realm of speculation. Moreover, as mentioned above, Comment [8] to Rule 1.11 explains that Rule 1.11(c) "operates only when the lawyer in question has *actual knowledge* of the information" and "does *not* operate with respect to information that merely could be *imputed* to the lawyer." (Emphasis added.) Thus, in

my opinion, Gibson Dunn was entitled to reject Broidy's conjecture that Ms. Ahmad somehow obtained information about the hacking of Mr. Broidy's devices outside of her meetings with Mr. Gates *unless* Mr. Broidy offered strong evidence that Ms. Ahmad had "actual knowledge" of such evidence, not merely information "imputed" to her because *others* at OSC possessed such information. The record does not indicate that Broidy has offered such evidence.

54. In sum, given Ms. Ahmad's consistent denials that she had received confidential government information that could be materially damaging to Mr. Broidy, and given the gaps in the legal arguments and factual evidence submitted to Gibson Dunn to convince it to withdraw, in my opinion Gibson Dunn had far more than a "colorable argument" that Ms. Ahmad was not disqualified (and hence the firm was not disqualified) under Rule 1.11(c).

*Gibson Dunn did not act in bad faith*

55. In my opinion as an expert on professional responsibility for lawyers, Gibson Dunn did not act in bad faith in refusing to immediately withdraw while Plaintiffs were preparing their pre-motion letter. Rather, Gibson Dunn acted in good faith by remaining as counsel to GRA until GRA discharged Gibson Dunn in favor of new counsel.

56. Good faith is closely related to having a colorable argument about reasons for not withdrawing. As explained above, Gibson Dunn had good faith reasons for not immediately withdrawing. In addition, I have seen no evidence of bad faith.

57. The only purported evidence Mr. Broidy points to is his inference that the timing of Gibson Dunn's withdrawal, which occurred shortly after Mr. Broidy filed his pre-motion letter seeking leave to file a motion to disqualify. But in my opinion the timing of Gibson Dunn's withdrawal could as easily be seen as supporting Gibson Dunn's good faith.

58. Specifically, Gibson Dunn withdrew within a matter of weeks after Broidy revived his informal request for Gibson Dunn to withdraw and provided new evidence to Gibson Dunn (in the form of the declaration from Mr. Gates). Gibson Dunn analyzed the arguments and evidence and ultimately withdrew before Broidy even filed a motion to disqualify, despite Gibson Dunn's continuing belief that neither Ms. Ahmad nor Gibson Dunn had a disqualifying conflict. In my opinion, it was entirely appropriate, and consistent with good faith, for Gibson Dunn—rather than withdrawing immediately upon receiving a letter from Broidy's counsel—to engage in discussions with opposing counsel in an attempt to resolve the issue, to review and investigate Broidy's factual and legal allegations and arguments that Gibson Dunn had a disqualifying conflict, and to consult with its client. In my opinion, Gibson Dunn was entitled to take all of these steps rather than withdrawing immediately in response to Broidy's request. In any case, Gibson Dunn withdrew a number of weeks later, and before Broidy ever filed a motion to disqualify Gibson Dunn.

59. Mr. Broidy's inference based on the timing of Gibson Dunn's withdrawal also disregards the fact that Gibson Dunn's client (GRA) did not discharge Gibson Dunn as its counsel in the underlying litigation until a number of weeks after Broidy had filed his pre-motion letter seeking the Court's leave to file a motion to disqualify. Under Rule 1.16(b)(3), a lawyer is mandated to withdraw if "the lawyer is discharged," but not before, unless the Rules of Professional Conduct otherwise compel the firm to withdraw. For all of the reasons set out above in my discussion regarding the "colorable argument" of a motion for sanctions under § 1927 or the Court's inherent power, Gibson Dunn was not mandated to withdraw prior to being discharged by its client, and therefore did not act in bad faith by remaining in the case until discharged by its client.

60. Specifically, as discussed above, Gibson Dunn did not have a conflict of interest under Rule 1.11(c) because Ms. Ahmad told Gibson Dunn (and has now sworn in an affidavit) that she did not acquire

confidential government information about Mr. Broidy while she was a public officer or employee, and Mr. Broidy did not offer compelling evidence to the contrary, and has not identified any specific information about Mr. Broidy that it believes Ms. Ahmad possessed.

61. Moreover, even if Ms. Ahmad had acquired some information about Mr. Broidy while at OSC, Mr. Broidy did not explain to Gibson Dunn what information he believed Ms. Ahmad acquired while at the OSC, so Broidy's unsupported assertions that Ms. Ahmad acquired information that "could be used to the material disadvantage of" Mr. Broidy in the Underlying Litigation did not satisfy the elements of Rule 1.11(c).

62. In my opinion, a law firm is not required to withdraw if its internal inquiry into an alleged conflict reveals no conflict and the party alleging a conflict fails to offer specific evidence of the alleged conflict. Up to the time Gibson Dunn withdrew and Hughes Hubbard & Reed took over the representation in the Underlying Litigation, in my opinion Broidy had not presented persuasive evidence of a conflict under Rule 1.11(c). At the same time, Gibson Dunn's own investigation revealed evidence from Ms. Ahmad and from the FBI 302 forms that was contrary to Broidy's assertions. Accordingly, in my opinion, Gibson Dunn was not acting in bad faith when it credited Ms. Ahmad and the 302 forms over the assertions made by Mr. Gates in his declaration about a March 18, 2018 meeting.

63. Mr. Broidy apparently claims that even if Ms. Ahmad did not acquire confidential government information in her alleged meeting with Mr. Gates, she nevertheless acquired confidential government information about him from other sources at the OSC. I cannot evaluate whether that claim is true, but Broidy has presented no evidence of its truth. Instead, he has presented speculation based on Ms. Ahmad's background and expertise in cybersecurity. Gibson Dunn did not act in bad faith when it refused to immediately withdraw based on Mr. Broidy's speculation,

which he did not back up with any concrete proof.

64. Broidy also did not explain how any confidential government information supposedly acquired by Ms. Ahmad (and not otherwise available to the public) could have been used to his "material disadvantage" in the Underlying Litigation. Gibson Dunn did not and does not believe that Ms. Ahmad acquired any such information, and Gibson Dunn had both Ms. Ahmad's word and the FBI 302 forms to support its belief. Therefore, Gibson Dunn did not act in bad faith by refusing to withdraw immediately based on Broidy's unsupported inferences and speculation.

65. Even if Ms. Ahmad had acquired information that qualified as confidential government information within the meaning of Rule 1.11(c) at the time she obtained it (which she has consistently denied), Plaintiff has not identified any information that once qualified as confidential government information and has not been made available to the public. Once information has been made available to the public, it no longer fits within the definition of "confidential government information" in Rule 1.11(c), which does not cover information "otherwise available to the public" at the time Rule 1.11(c) is applied. The 302 forms, the Criminal Information, the Statement of Offense, and that detailed national press coverage citing information obtained from Mr. Broidy had already made the information at issue "available to the public" at the time the Court would have applied Rule 1.11(c) in deciding Broidy's motion to disqualify.

66. In sum, in my opinion, Gibson Dunn did not act in bad faith by refusing to withdraw immediately, given that Gibson Dunn's investigation indicated that Ms. Ahmad either never acquired confidential government information or that y such information had been made available to the public (and had thus lost its status as confidential government information) by the time Gibson Dunn withdrew.

67. Another reason that Gibson Dunn acted in good faith by not withdrawing immediately is Rule

1.3(c) of the New York Rules of Professional Conduct, which provides that a lawyer "shall not intentionally fail to carry out a contract of employment entered into with a client for professional services, but the lawyer may withdraw as permitted under these Rules." Consequently, Rule 1.3(c) encourages a law firm to remain in a representation as long as the firm's client wants the law firm to continue unless the Rules of Professional Conduct permit or compel the firm to withdraw. As shown above, Gibson Dunn had good faith reasons to believe it did not have a conflict of interest under Rule 1.11(c), so the Rules of Professional Conduct did not compel Gibson Dunn to withdraw until GRA discharged Gibson Dunn and substituted Hughes Hubbard & Reed.

### Conclusion

68. In my opinion, Mr. Broidy has failed to establish that Gibson Dunn had a disqualifying conflict of interest under Rule 1.11 at any time. At a minimum, Gibson Dunn had a colorable argument for refusing to withdraw, and Broidy failed to present specific evidence to show that Gibson Dunn acted in bad faith. In my opinion, Gibson Dunn had a good faith explanation for its decision to remain as counsel for GRA in the Underlying Litigation until GRA engaged Hughes Hubbard & Reed and discharged Gibson Dunn. Thus, in my opinion, Mr. Broidy cannot satisfy the two elements (lack of a colorable argument, and bad faith conduct) that he would need to establish to merit sanctions under § 1927 or the Court's inherent authority.

                                        Respectfully submitted,

                                        _____

                                        Roy D. Simon, Jr.

Cambridge, Massachusetts
March 6, 2023