**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELLIOTT BROIDY and <br> BROIDY CAPITAL MANAGEMENT, LLC, <br><br>          Plaintiffs, <br><br> v. <br><br> GLOBAL RISK ADVISORS LLC, <br> GRA QUANTUM LLC, <br> GRA RESEARCH LLC, <br> GLOBAL RISK ADVISORS EMEA LIMITED, <br> GRA MAVEN LLC, <br> QRYPT, INC., <br> KEVIN CHALKER, <br> DENIS MANDICH, <br> ANTONIO GARCIA, and <br> COURTNEY CHALKER, <br><br>          Defendants. | Case No. 1:19-CV-11861-MKV |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SANCTIONS**

Dated: March 20, 2023

# TABLE OF CONTENTS

| | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| ARGUMENT | 4 |
| CONCLUSION | 11 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arroyo v. City of Buffalo*,
 2017 WL 3085835 (W.D.N.Y. July 20, 2017)..................................................................5

*Benevida Foods, LLC v. Advance Magazine Publishers Inc.*,
 No. 15-CV-2729 (LTS) (DF), 2016 WL 3453342 (S.D.N.Y. June 15, 2016).........................3

*Gollomp v. Spitzer*,
 568 F.3d 355 (2d Cir. 2009)..............................................................................................2

*Handelman v. Weiss*,
 368 F. Supp. 258 (S.D.N.Y. 1973) .................................................................................7, 9

*Hull v. Celanese Corp.*,
 513 F.2d 568 (2d Cir. 1975)..............................................................................................2

*In re Initial Pub. Offering Sec. Litig.*,
 174 F. Supp. 2d 61 (S.D.N.Y. 2001)................................................................................10

*Madison 92nd Street Assocs., LLC v. Marriott Int'l, Inc.*,
 No. 13 Civ. 291 (CM), 2013 WL 5913382 (S.D.N.Y. Oct. 31, 2013) ................................2, 4

*In re McKesson HBOC, Inc. Secs. Litig.*,
 126 F. Supp. 2d 1239 (N.D. Cal. 2000) ...........................................................................10

*Melcher v. Greenberg Traurig LLP*,
 No. 650188/2007, 2017 WL 3506817 (N.Y. Sup. Ct. Aug. 16, 2017)...............................10

*Murray v. Metro. Life Ins. Co.*,
 583 F.3d 173 (2d Cir. 2009)..............................................................................................5

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
 2006 WL 6846702 (E.D.N.Y. Aug. 7, 2006).....................................................................7

*Raba v. Suozzi*,
 No. 06 Civ. 1109 (DRH) (AKT), 2006 WL 8435604 (E.D.N.Y. Nov. 17,
 2006) ..............................................................................................................................10

*Rothberg v. Phil's Main Roofing, LLC*,
 2016 WL 2344882 (S.D.N.Y. May 2, 2016) ......................................................................9

*United States v. Prevezon Holdings Ltd.*,
 839 F.3d 227, 241 (2d Cir. 2016)......................................................................................5

**Statutes**

28 U.S.C. § 1927 ............................................................................................................... 11

**Other Authorities**

Roy D. Simon, Jr., *Simon's N.Y. Rules of Prof. Conduct* § 1.11:23 ................................. 9

Roy D. Simon, Jr., *Simon's N.Y. Rules of Prof. Conduct* § 1.11:27 ................................. 5

Roy D. Simon, Jr., *Simon's N.Y. Rules of Prof. Conduct* § 1.11:28 ................................. 8

22 N.Y.C.R.R. § 1200.0, R. 1.11(b) ................................................................................... 9

22 N.Y.C.R.R. § 1200.0, R. 1.11(c) ............................................................................ 5, 8, 9

Plaintiffs Elliott Broidy and Broidy Capital Management, LLC respectfully submit this memorandum in reply to Gibson Dunn's memorandum (ECF No. 168 ("Gibson Mem.")) in opposition to their motion for sanctions (ECF Nos. 162, 163).[1]

## PRELIMINARY STATEMENT

Gibson Dunn's opposition to the motion only confirms that it could not have had a reasonable belief that it did not need to screen Ms. Ahmad from this matter—any reasonable law firm would have screened her as a matter of course. And it is not as if Gibson Dunn did not have other qualified attorneys—in the very press release it issued announcing that Ms. Ahmad had joined the firm, the firm boasted that its attorneys included "more than 50 former U.S. Department of Justice leaders and Assistant U.S. Attorneys."[2] Ms. Ahmad herself now at long last admits that she was, at a minimum, present when Mr. Broidy's name "came up" during the OSC investigation she worked on. Gibson Dunn's conduct—including its failure to disclose what Ms. Ahmad now admits and the blustery threats it directed at Plaintiffs' former and current counsel to try to head off their investigation of this matter—confirms that its decision not to screen her was in bad faith and for improper purposes. In fact, until now, Gibson Dunn, in disregard of its duties of candor under Rules of Professional Conduct 3.3, 3.4, and 4.1, did everything it could to impart the false impression to the Court and Plaintiffs, while trying to avoid directly saying so, that Ms. Ahmad had had nothing to do with Mr. Broidy at the OSC.[3]

---

[1] Submitted herewith is the Declaration of Sarah Gibbs Leivick, dated March 20, 2023 ("Leivick Decl."), and the Declarations of Matthew Grimes, dated March 9, 2023 ("Grimes Decl."), Richard W. Gates, III, dated March 20, 2023 ("Gates Reply Decl."), and Alvin Schmidt IV, dated March 19, 2023 ("Schmidt Decl."), attached as Exhibits 1, 2 and 3, respectively, to the Leivick Decl. Capitalized terms have the meanings assigned in Plaintiffs' initial memorandum (ECF No. 163 ("Pl. Mem.")). Unless otherwise indicated, all emphasis has been added and citations and quotations omitted.

[2] https://www.gibsondunn.com/former-special-counsel-prosecutor-zainab-ahmad-to-join-gibson-dunn-as-partner-in-new-york.

[3] *See, e.g.*, Letter Response to Motion addressed to Judge Mary Kay Vyskocil from Orin Snyder, dated Aug. 4, 2022, ECF No. 139.

Plainly, Gibson Dunn wanted Ms. Ahmad to work on this matter so that it could secure the business—the representation of Defendants—and draw on Ms. Ahmad's government work in defending the action, and then it vexatiously multiplied these proceedings to try to avoid the withdrawal it was ultimately compelled to undertake. Under the applicable legal standard in this Circuit, Gibson Dunn should be sanctioned for its misconduct.[4]

In October 2020, Gibson Dunn told Plaintiffs that "Ms. Ahmad did not investigate Mr. Broidy, or acquire any confidential government information regarding Mr. Broidy."[5] (Benson Decl., Ex. H at 2, ECF No. 165-8.) Based on this unequivocal representation, Plaintiffs did not bring the conflict issue to the Court's attention until they obtained, in May 2022, the Gates Declaration demonstrating that the representation was false, and they did so only after requesting that Gibson Dunn provide its own declaration—which Gibson Dunn refused to do.

Now, nine months later, Gibson Dunn has supplied one. But Ms. Ahmad's all too carefully drafted declaration—its omissions are as telling as what it now finally admits—only confirms that she *was* conflicted—she attests that she was not "involved in any investigation of Mr. Broidy," but admits that his name "came up" during her OSC employment. (ECF No. 169 ("Ahmad Decl.") ¶ 6.) Plaintiffs have now learned that one of the times Mr. Broidy's name

---

[4] *See Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009) (Section 1927 authorizes sanctions where "attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose, and upon a finding of conduct constituting or akin to bad faith."); *Madison 92nd Street Assocs., LLC v. Marriott Int'l, Inc.*, No. 13 Civ. 291 (CM), 2013 WL 5913382, at *15 (S.D.N.Y. Oct. 31, 2013) (sanctioning conflicted firm for failure to withdraw until faced with disqualification motion forcing opposing counsel "to leave no stone unturned in analyzing how a sophisticated law firm . . . could possibly have concluded, after an exhaustive investigation, that no conflict existed."). As the Second Circuit has made clear, district courts "bear[] the responsibility for the supervision" of attorneys appearing before them, and "any doubt is to be resolved in favor of disqualification." *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975).

[5] Plaintiffs' former counsel, Steptoe & Johnson LLP, had raised the issue, in part, because of media reports—six days before Ms. Ahmad's March 18, 2018 interview with Richard Gates during which he was questioned extensively about the hacked materials—that three Qatari sources confirmed that Qatar had compiled extensive espionage dossiers on Mr. Broidy. *See* Julia Ainsley et al., *Qataris opted not to give info on Kushner, secret meetings to Mueller*, NBC News (March 13, 2018, 11:12 AM), https://www.nbcnews.com/politics/national-security/qataris-opted-not-give-info-kushner-secret-meetings-mueller-n855326.

"came up" was during Ms. Ahmad's questioning before a grand jury of Matthew Grimes. Mr. Grimes attests in his declaration submitted herewith that Ms. Ahmad herself asked him questions about Mr. Broidy.[6] (Grimes Decl. ¶ 2.)

In contrast to Ms. Ahmad in her declaration, in which she, like Gibson Dunn has done since 2020, relies on carefully chosen words like "investigation," Mr. Grimes and Mr. Gates in their declarations attest to straightforward facts—that Ms. Ahmad questioned them about Mr. Broidy and, in Mr. Gates's case, about the hacking at the center of this action.[7] Ms. Ahmad conspicuously does not deny reviewing Plaintiffs' stolen hacked materials, and she plainly used those hacked materials in her interviews with Mr. Gates. Gibson Dunn's defense boils down to Ms. Ahmad's assertion in her declaration that, even though Mr. Broidy's name "came up," she did not learn any pertinent confidential information or, if she did learn confidential information, it is no longer confidential. That assertion should not be credited; in fact, under these circumstances, there clearly was critical information, including concerning, among other things, the hacking and dissemination of Plaintiffs' hacked materials—who did it, how it was done—which the OSC doubtlessly should and would have investigated, that remains confidential and, as Ms. Ahmad indicates (Ahmad Decl. ¶ 6), she was aware of all aspects of the OSC's investigation, which is no doubt why Defendants decided to replace Wilmer Hale with Gibson Dunn and Ms. Ahmad to handle this case.[8]

---

[6] Mr. Grimes also states that he does "not object to the release of limited portions of the transcript of my Grand Jury testimony reflecting Ms. Ahmad's questions and my answers relating to Mr. Broidy." (Grimes Decl. ¶ 3.) Plaintiffs are contemporaneously filing a motion for permission to serve limited discovery—a subpoena seeking Mr. Grimes's transcript insofar as it relates to the questions and answers concerning Mr. Broidy, and discovery concerning what information Ms. Ahmad learned while at the OSC concerning Mr. Broidy and what she conveyed to others.

[7] *See Benevida Foods, LLC v. Advance Magazine Publishers Inc.*, No. 15-CV-2729 (LTS) (DF), 2016 WL 3453342, at *3-4 (S.D.N.Y. June 15, 2016) (in disqualifying firm, court discredited testimony that "sought to minimize the importance of any information conveyed," and that was "more conclusory," and made "general, and seemingly absolute statements . . . without being fully forthcoming . . . of the details of those discussions.").

[8] For this reason, among others, Ms. Ahmad's statement that "no one at the OSC investigated the alleged hacking of Mr. Broidy" (Ahmad Decl. ¶ 6) strains credulity. The OSC, before using the hacked materials, would have at least tried to confirm their provenance, including that they were not illegally obtained by the government.

3

Gibson Dunn should be sanctioned for its vexatious conduct—its false and incomplete statements to Plaintiffs' former and current counsel (and the Court) concerning Ms. Ahmad's supposed lack of any involvement with Mr. Broidy, its baseless and egregious threats against counsel seeking to intimidate them into not pursuing this matter, its inexcusable failure to provide Ms. Ahmad's declaration to Plaintiffs or the Court nine months ago and, given the obvious appearance of impropriety and taint on the judicial process, its failure to screen Ms. Ahmad from the outset.

Gibson Dunn's conduct has been contrary to that of attorneys with nothing to hide. Everything that Plaintiffs now know about Ms. Ahmad's OSC work concerning Mr. Broidy has been revealed only as a result of their investigation in the face of Gibson Dunn's false and misleading denials and threats. Gibson Dunn has made clear that it does not like the inferences that arise from Defendants' switching to Gibson Dunn after the firm hired Ms. Ahmad, from its failure to screen her and from Defendants' firing of Gibson Dunn on the eve of the filing of the disqualification motion. But those kinds of inferences are precisely the reason law firms are obligated to screen potentially conflicted attorneys and the reason those that fail to do so must be disqualified. Had Gibson Dunn done so, all of this would have been avoided.

## ARGUMENT

Gibson Dunn astonishingly asserts that it should not be sanctioned because "[n]o court has ever found Gibson Dunn had a conflict of interest here" and "no motion for disqualification has ever been filed (much less briefed)." (Gibson Mem. at 1.) But that is true only because Gibson Dunn withdrew days before Plaintiffs were going to file the disqualification motion (which this Court granted leave to file based on Plaintiffs' pre-motion letter).[9] Had Gibson Dunn

---

[9] *See Madison 92nd Street Assocs.*, 2013 WL 5913382, at *15 (awarding sanctions where firm did not withdraw until presented with unfiled motion to disqualify). The purported delay in making the motion (Gibson Mem. at 23-

4

not withdrawn, Plaintiffs would have established that Gibson Dunn should have been disqualified to "preserve the integrity of the adversary process," *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 241 (2d Cir. 2016), because, as Mr. Gates's declaration confirms, Ms. Ahmad obtained confidential government information through her OSC employment, which could be used to Plaintiffs' material disadvantage. *See* 22 N.Y.C.R.R. 1200, Rule 1.11(c).

Ms. Ahmad now attests that she "was not involved in any investigation into Mr. Broidy." (Ahmad Decl. ¶ 6.) Ms. Ahmad does not define what she means by "involved in any investigation," but she admits that Mr. Broidy's name "came up" at various times at the OSC, in connection with, she says, matters unrelated to this litigation. (*Id.* ¶ 6.) Whatever Ms. Ahmad means by "investigation," it apparently does not include questioning witnesses concerning Mr. Broidy.[10] The Gates Declarations are clear that Ms. Ahmad asked Mr. Gates numerous questions about a wide variety of topics related to Mr. Broidy. (*See, e.g.*, Gates Reply Decl. ¶¶ 3-4.)[11]

Ms. Ahmad claims that, "[t]o the best of my knowledge and recollection," she was not present at the March 18, 2018 interview of Mr. Gates when Mr. Broidy was discussed, and

---

24) also was solely of Gibson Dunn's making including its false denials that Plaintiffs relied on in not moving for disqualification in October 2020. Plaintiffs moved promptly after obtaining the Gates Declaration in 2022, and Gibson Dunn's cases are inapposite. *See Murray v. Metro. Life Ins. Co.,* 583 F.3d 173, 180 (2d Cir. 2009) ("unexcused" nine-year delay in making disqualification motion on eve of trial suggested "opportunistic and tactical motives"); *Arroyo v. City of Buffalo,* 2017 WL 3085835, at *13 (W.D.N.Y. July 20, 2017) (unexcused delay suggested motion was made to gain unfair advantage).

[10] As Mr. Gates points out in refuting this and other Gibson Dunn misstatements, the government itself referred to what Ms. Ahmad was doing as an "investigation" of Mr. Broidy. (*See* Gates Reply Decl. ¶ 19 & Ex. A thereto.) Gibson Dunn calls him a "convicted liar" (Gibson Mem. at 2, 11, 14), but he has every motive to be truthful since at least as of his May 2022 declaration, he was still cooperating with the government in two sensitive investigations (Gates Reply Decl. ¶ 20); Gibson Dunn has no contrary evidence other than Ms. Ahmad's non-credible and non-specific declaration; Mr. Grimes's and Mr. Schmidt's declarations bolster his credibility, as does his attorney's statement; and his truthfulness and cooperation were highly praised by the government (Pl. Mem. at 8).

[11] Moreover, whether Ms. Ahmad "investigated" Mr. Broidy is not even the relevant question. As Professor Simon agrees, Rule 1.11(c) applies "even if the lawyer did no work at all on a matter and came across the confidential government information by chance, or over lunch, or by overhearing a conversation involving other government lawyers, or through personal but non-substantial participation in the matter, or in any other way." Roy D. Simon, Jr., *Simon's N.Y. Rules of Prof. Conduct* § 1.11:27.

instead attended a separate interview, which, she claims, was "summarized in a separate '302' (the 2470 Memo)." (Ahmad Decl. ¶ 5.) But the 2470 memo, even assuming it is admissible evidence, which it is not (Pl. Mem. at 14 n.9), could not have been a record of this purportedly "separate" interview, which Ms. Ahmad surely knows. As shown in the expert declaration of Mr. Schmidt, a former long-time FBI agent, the "'2470' FD-302 form on its face is not the memorialization of an interview *at all*, regardless of date" (Schmidt Decl. ¶ 15), and the "meaning of each date field on an FD-302 form, including 'Investigated on,' would be common knowledge and readily understood by federal prosecutors" (*id.* ¶ 11).[12] Mr. Schmidt concludes that the 2470 memo appears instead to document a different type of investigative activity—not an interview—that occurred on April 17, 2018 regarding the March 18, 2018 interview of Mr. Gates. (*Id*. ¶¶ 14, 37.)

Plaintiffs have now obtained evidence that Ms. Ahmad questioned yet another witness about Mr. Broidy. Matthew Grimes testified before a federal grand jury on March 23, 2018 and April 6, 2018. (Grimes Decl. ¶ 1.) He attests that during his grand jury testimony, he "was questioned by Zainab N. Ahmad, one of the prosecutors for the Office of Special Counsel, in which she asked several questions relating to Elliott Broidy." (*Id.* ¶ 2.)

Ms. Ahmad next attests that she "never learned any confidential information regarding *any issue relevant to this pending litigation*, including in connection with Mr. Broidy's alleged hacking or otherwise." (Ahmad Decl. ¶ 7.) Gibson Dunn argues that even if she had any confidential information, it is no longer confidential. (Gibson Mem. at 11.) Given their dissembling, Gibson Dunn and Ms. Ahmad's unilateral determination that confidential

---

[12] Moreover, the body of the 2470 memo is too short for it to have memorialized an 87-minute interview, and the preamble lacks key information that 302 interview memos are expected to include and that in fact was included in the contemporaneous 302 memos, such as the identification of the prosecutors who conducted the interviews, defense counsel who attended, and the location—all missing from the 2470 memo. (Schmidt Decl. ¶¶ 15-28.)

information she learned is not relevant lacks reliability, to say the least, and is in fact false. For example, although Ms. Ahmad attests that she did not participate in the March 18 Gates interview when Mr. Broidy was discussed, she makes no such representation with respect to the March 20 and October 29 interviews she attended, and Gibson Dunn does not (and cannot) dispute that Mr. Broidy was discussed during those interviews. (Gibson Mem. at 15.) Mr. Gates attests—and Ms. Ahmad does not deny—that during the March 20 interview, he was shown Plaintiffs' hacked documents and WhatsApp messages (Gates Decl. ¶ 40, ECF No. 165-2), and asked about Mr. Broidy's anti-Qatar advocacy, including "raising awareness of Qatar's support for terrorism" (*id.* ¶ 39; *see also id.* ¶¶ 33, 35, 36, 42)—matters directly relevant here and set forth in detail in Plaintiffs' complaint, as those efforts were Qatar's motive for its hack-and-dissemination campaign against Mr. Broidy. (ECF No. 116 ¶¶ 25-28, 39.) The information provided by OSC witnesses on these topics is certainly relevant here and remains confidential.

In speculating that information concerning Mr. Broidy that Ms. Ahmad learned is no longer confidential, Gibson Dunn focuses exclusively on Mr. Broidy's own documents shown to Mr. Gates. (Gibson Mem. at 3-4.) Again, Gibson Dunn misses or ignores the point. It is not that the contents of Mr. Broidy's own documents are necessarily confidential government information. Rather, the government information that remains confidential includes any information obtained by Ms. Ahmad concerning Mr. Broidy, the hack-and-dissemination campaign against Mr. Broidy, and how the OSC came into possession of hacked materials—in addition to any other confidential materials obtained from other witnesses or third parties of which Plaintiffs are not aware.[13] *See Handelman v. Weiss*, 368 F. Supp. 258, 263 (S.D.N.Y.

---

[13] Unlike the purportedly confidential documents at issue in *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.,* 2006 WL 6846702, at *24 (E.D.N.Y. Aug. 7, 2006), none of this information is in the public domain or would be available to Plaintiffs through discovery.

7

1973) (disqualifying attorney who previously represented government trustee because it "seems probable that in his investigations [he] was able to obtain information that he would have been unable to secure if he had been interviewing in a private capacity").

Ms. Ahmad notably does not deny handling, reviewing, utilizing or obtaining hacked materials stolen from Plaintiffs. She attests that she does not "have knowledge regarding whether the OSC obtained any *non-public* confidential materials relating to the alleged hacking of Mr. Broidy." (Ahmad Decl. ¶ 8.) But, tellingly, she does not say that she has no knowledge of, for example, how the OSC came into possession of *any* of the hacked materials, whether allegedly non-public or not.[14] She also does not attest that the documents described by Mr. Gates were obtained through search warrants of third parties, as Gibson Dunn speculates. (Gibson Mem. at 19.)[15]

With respect to the "material disadvantage" prong of Rule 1.11(c), Gibson Dunn dismisses as speculation Plaintiffs' arguments that the information obtained by Ms. Ahmad "could have" been used to Plaintiffs' material disadvantage here. (Gibson Mem. at 4.) In fact, as Professor Simon acknowledges in his treatise, that is the precise standard set forth in Rule 1.11(c), which does not require that the information was actually used. *Simon's N.Y. Rules of Prof. Conduct* § 1.11:28 (Rule 1.11(c) "applies if the information '*could be*' used against the person even if the former government lawyer's private law firm does not intend to use it or does

---

[14] Ms. Ahmad also does not confirm that—as Orin Snyder represented in his September 23, 2020 letter to Steptoe— she met Mr. Chalker for the first time in 2020. (*See* ECF No. 165-7, Benson Decl., Ex. G at 3.)

[15] Gibson Dunn's claim that Plaintiffs have tried to "manufacture intrigue" regarding Mr. Broidy's WhatsApp messages (Gibson Mem. at 19) misses the mark. Plaintiffs identified the WhatsApp messages as an example of information that has not been reported on by the media, but Plaintiffs are not contending that the messages themselves contain confidential government information. Rather, again, such facts as from whom and how the OSC got the messages are confidential. Gibson Dunn's argument that it supposedly "beggars belief" that these messages were not made public (*id.*)—in fact almost none of them were—and were obtained through a search warrant is entirely unsupported by Ms. Ahmad or anyone else and is pure speculation.

8

not use it in fact. The *potential* for material harm to the person is enough to trigger the rule."). Gibson Dunn again focuses on the documents that Mr. Gates was shown, arguing that all of these materials are public so there could be no disadvantage. (Gibson Mem. at 22.) Putting aside that Gibson Dunn cannot establish that the documents are all public, information such as where and how the OSC got them, and the information provided by witnesses concerning the documents, unquestionably could be used to Plaintiffs' material disadvantage.[16]

Any reasonable law firm would have screened Ms. Ahmad from this matter from the outset, and Gibson Dunn had no basis for not doing so. Perhaps, relying on grand jury secrecy, Gibson Dunn and Ms. Ahmad were confident that the truth would never be revealed. Perhaps, in their desire to secure and keep their representation of Defendants, Gibson Dunn chose to ignore or not properly investigate the facts, and the firm and Ms. Ahmad chose to dissemble about her involvement in interviews and testimony concerning Mr. Broidy. In any event, however, once Gibson Dunn failed to screen her, the conflict was imputed to the entire firm. *See* Rule 1.11(c). But, even worse, a Rule 1.11(c) conflict may be remedied by "timely and effective screening" (Rule 1.11(c))—but only if "there are no other circumstances in the particular representation that create an appearance of impropriety," Rule 1.11(b)(2)). As Professor Simon notes, the appearance of impropriety standard is a "catch-all formulation that gives courts virtually boundless discretion to disqualify former government lawyers *if anything in the circumstances makes the court uncomfortable.*" *Simon's N.Y. Rules of Prof. Conduct* § 1.11:23.[17] Here, the

---

[16] Unlike in concurrent representation cases with "hypothetical scenarios of conflict" (Gibson Mem. at 23), here, there was an actual, significant "risk of trial taint," *Rothberg v. Phil's Main Roofing, LLC,* 2016 WL 2344882, at *3 (S.D.N.Y. May 2, 2016), given the knowledge gained by Ms. Ahmad while at the OSC.

[17] As Professor Simon notes, the appearance of impropriety is "appropriate when assessing conflicts of lawyers who previously served in government because public values and public confidence in the fairness of government, rather than in private firms, are at stake." *Simon's N.Y. Rules of Prof. Conduct* § 1.11:23. *See also Handelman*, 368 F. Supp. at 264 (if conflicted attorney allowed to continue representation "there is a danger . . . the public confidence in the integrity of the judicial process would be undermined.").

9

circumstances have already made the Court uncomfortable—as the Court noted at the pre-motion conference, Gibson Dunn's conduct "doesn't smell good." The record since the Court made that comment has only gotten worse.

As for the Simon Declaration, essentially Gibson Dunn's memorandum in declaration form, it purports to opine (incorrectly) on an ultimate legal issue to be decided by this Court and should be excluded. "[T]his circuit is in accord with other circuits in *requiring* exclusion of expert testimony that expresses a legal conclusion." *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 63 (S.D.N.Y. 2001) (emphasis in original) (precluding testimony of judicial ethics professors).[18]

Gibson Dunn wants to reframe the basis for this motion as merely the firm's failure to withdraw immediately upon receiving the Gates Declaration. (Gibson Mem. at 12.) That was bad enough, but Gibson Dunn has vexatiously multiplied these proceedings since 2020 through this motion. Ms. Ahmad should have been screened from this matter at the outset, and Gibson Dunn's failure to do so, its repeated misrepresentations and lack of candor, not to mention its threats to intimidate Plaintiffs from pursuing this issue, and its refusal to supply a declaration when Plaintiffs requested one, all warrant sanctions. Gibson Dunn's belated withdrawal—which it now conclusorily claims was the result of Defendants' "unrelated business considerations" (ECF No. 70, Ascher Decl. ¶¶ 5-6), but in fact was related precisely to the prospect that Gibson Dunn would be disqualified—in no way absolves it of any of its misconduct.

---

[18] Professor Simon assumes Gibson Dunn's version of the facts to be true (Simon Decl. ¶¶ 14-28), which it plainly is not, and offers his inadmissible opinion on legal issues (*id.* ¶¶ 2-4). To the extent there are disputed facts, Professor Simon—unlike Mr. Schmidt—does not possess any specialized knowledge or experience qualifying him to opine on those facts, nor does he purport to do so. *See Raba v. Suozzi*, No. 06 Civ. 1109 (DRH) (AKT), 2006 WL 8435604, at *8 n.6 (E.D.N.Y. Nov. 17, 2006) (Professor Simon's opinion "not essential" to determination of motion to disqualify; *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1239, 1246-47 (N.D. Cal. 2000) (striking Professor Simon's declaration on "purely legal question" of propriety of firm's solicitation tactics); *Melcher v. Greenberg Traurig LLP*, No. 650188/2007, 2017 WL 3506817, at *1 (N.Y. Sup. Ct. Aug. 16, 2017) (excluding Professor Simon's testimony regarding attorney conduct as intruding on "areas reserved to the court").

## **CONCLUSION**

Plaintiffs' motion, under 28 U.S.C. § 1927 and this Court's inherent authority, for sanctions against Gibson Dunn should be granted.

Dated: March 20, 2023

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: /s/ Daniel R. Benson
    Daniel R. Benson
    Sarah Gibbs Leivick
    1633 Broadway
    New York, New York 10019
    Tel.: (212) 506-1700
    dbenson@kasowitz.com
    sleivick@kasowitz.com

*Counsel for Plaintiffs Elliott Broidy and Broidy Capital Management, LLC*