# EXHIBIT 2

# DECLARATION OF RICHARD W. GATES, III

I, Richard W. Gates, III, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. On May 13, 2022, I provided a declaration pertaining to three different interrogations during which Zainab Ahmad was involved in asking me questions on a multitude of topics related to Mr. Elliott Broidy. All three interviews took place in 2018: March 18, March 20, and October 29.

2. My declaration was supported by a June 9, 2022 statement submitted by my attorney, Thomas Green. Mr. Green confirmed the dates of my interrogations by Ms. Ahmad, and confirmed that he believed that Ms. Ahmad asked me questions regarding Mr. Broidy during those interrogations.

3. In their Memorandum of Law in Opposition to the Motion for Sanctions, Gibson Dunn mischaracterized my previous declaration, stating that "Mr. Gates was asked a grand total of three questions regarding Mr. Broidy." But in fact, Ms. Ahmad and her colleagues in her presence asked me *many* questions regarding Mr. Broidy. As I said in my previous declaration, "Throughout the second meeting on March 18, 2018 with Ms. Ahmad and others, I was asked a series of questions pertaining to topics associated with Mr. Broidy."

4. The process during these interviews included reviewing Mr. Broidy's communications with various people, both emails and screenshots of WhatsApp messages, shown to me by Ms. Ahmad and others. Specifically, I was asked questions concerning Mr. Broidy's interactions with Trump campaign and Trump Administration officials in 2016 –

2017, his efforts to expose Qatar's extensive support of terrorist groups, his business dealings related to Romania, Malaysia, UAE and other ventures, as well as my involvement in his business activities.

5. At the beginning of my first interview with Ms. Ahmad, which was on Sunday, March 18, 2018, I was specifically asked if I knew who had hacked Mr. Broidy, but answered that I did not have specific knowledge at that time beyond my belief that the State of Qatar was responsible for it.

6. In her declaration, Ms. Ahmad stated, "Whenever Mr. Broidy's name came up in my presence during my time at the OSC, it was in connection with investigations into other individuals." In my three interviews with her, it was Ms. Ahmad who was mostly responsible for bringing up "Mr. Broidy's name," and she did so repeatedly.

7. Further, while I did not witness her interviews of other subjects, in Ms. Ahmad's three interrogations with me, there was no indication that I can recall that her questions regarding Mr. Broidy were "in connection with investigations into other individuals." As mentioned in my previous declaration, I was shown Mr. Broidy's communications with an array of other people on a wide variety of topics. The only commonality was Mr. Broidy.

8. As I noted in my initial declaration, the emails and screenshots of WhatsApp messages shown to me in the two March 2018 interrogations with Ms. Ahmad had a "distinctive" and different look to them than those that I was shown in other OSC interrogations.

9. My belief is that although I was only asked some questions specifically *about* the hack in the first interview with Ms. Ahmad, the vast majority of the questions asked in her presence on March 18 and March 20, 2018 were on topics *based* on materials apparently derived from the hacking of Mr. Broidy.

10. My recollection of this meeting is clear due to two specific reasons. It was the first time I was introduced to a new OSC prosecutor, Ms. Ahmad, and it was the first time I was asked questions about Mr. Broidy.

11. Both of my first two interviews (March 18 and 20, 2018) with Ms. Ahmad were notable because those were the first interrogations during which I recall being shown Mr. Broidy's communications and being asked questions outside of the original scope of the OSC investigation.

12. To the best of my recollection, I was shown numerous emails and WhatsApp screenshots from Mr. Broidy's communications with me and other people during just my first two interviews on March 18 and March 20, 2018, with several lines of questioning following.

13. Based on my recollection of that day, the "2456 Memo" presented by Gibson Dunn as an exhibit to Ms. Ahmad's declaration conflates the two separate interrogations into a single, 5-page FD-302 document.

14. The "2456 Memo" described one interview with Special Counsel attorneys Greg Andres and Andrew Weissmann, with a separate interview lasting an hour and a half in the middle with Ms. Ahmad. But in reality, Mr. Andres was the only OSC prosecutor present during the first interview that day, as Mr. Weissmann left the first interview briefly after it

started. Mr. Weissmann and Ms. Ahmad were the only OSC prosecutors in the second interview, and they participated in it for its entirety.

15. Although the "2456 Memo" only captured a portion of what I recall discussing on March 18, 2018, it does contain notes reflecting conversations from both the earlier interview with Mr. Andres and the later one with Ms. Ahmad and Mr. Weissmann.

16. In her declaration, Ms. Ahmad stated that "no one at the OSC investigated the alleged hacking of Mr. Broidy." While I cannot speak to whether or not anyone at OSC investigated *the people responsible for the hacking*, I know that I was asked by Ms. Ahmad about the hacking during my first interview with her.

17. And as I stated in my earlier declaration, on March 22, 2018, I was contacted by Paul Blumenthal of Huffington Post about topics related to Mr. Broidy that had been raised during my two interviews just days earlier with Ms. Ahmad and Mr. Weissmann, but which no one in the media had previously discussed with me. It was my understanding that Huffington Post and other media publications based its reporting on materials hacked from Mr. Broidy.

18. With one exception, every Department of Justice or OSC interview in which I was asked about Mr. Broidy involved Ms. Ahmad and/or Mr. Weissmann. I do not recall discussing Mr. Broidy with any other Special Counsel prosecutor.

19. In Ms. Ahmad's declaration, she states that she "was not involved in any investigation into Mr. Broidy." But the government itself, in recognizing my cooperation and assistance, referred to what she, together with Mr. Weissmann, was doing in asking me questions about Mr. Broidy as an "investigation." In my 5K1.1 letter (filed under seal) issued

by the U.S. Government at the time of my sentencing, however, the Government specifically refers to assistance I provided to the investigations of, among others, Mr. Broidy. [See Exhibit A].

20. In its motion submitted on March 6, 2023, Gibson Dunn claimed that my declaration was a "made-for-litigation declaration from a convicted liar." In fact, at the time my declaration was submitted to Mr. Broidy's counsel, I was continuing to cooperate with the U.S Government on two current and ongoing sensitive and confidential matters. In addition, the U.S. Government stated in the letter that, "Gates provided the government with extraordinary assistance," and "worked assiduously to provide truthful, complete, and reliable information to any government investigators who have asked to speak with him." My willingness to submit my initial declaration was motivated solely by my desire for the truth to be known.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 20, 2023
Richmond, Virginia

_____
Richard W. Gates III

# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICHARD W. GATES III,<br><br>Defendant. | Crim. No. 17-201-2 (ABJ)<br><br>**FILED UNDER SEAL** |

### GOVERNMENT'S SUPPLEMENTAL MOTION FOR A DOWNWARD DEPARTURE

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully submits this supplemental sealed filing in support of its motion for a downward departure for the defendant, Richard W. Gates III, pursuant to Section 5K1.1 of the Sentencing Guidelines ("Guidelines"). In this submission, the government seeks to provide the Court with insight into Gates' extensive cooperation in sensitive and/or ongoing matters— cooperation above and beyond that which Gates has already provided and which is known to the Court. The United States believes that the following information further underscores the reasons for a substantial departure from Gates' advisory Guidelines range, and illustrates why the government does not oppose Gates' request for probation.

**I.  Gates' Cooperation in Sensitive and/or Ongoing Matters**

To date, Gates has provided important information relating to the following sensitive and/or ongoing investigations: (A) aspects of the Special Counsel's Office (SCO) investigation; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ D) SDNY's investigation into the Presidential Inaugural

Committee; ████████████████████████████████████████

████████████████████████████████████████████████ F) an investigation by the Public Integrity Section (PIN) of the Department of Justice into allegations relating to FARA violations; ████████████████████████████████████
████

### A. The SCO Investigation

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████
    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████
    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████















D. **The SDNY Presidential Inaugural Committee Investigation**

██████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████
████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████  ████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████

**F. The PIN Investigation**

Gates provided helpful evidence and information to the Public Integrity Section (PIN) of the Department of Justice in the course of PIN's ongoing investigation into allegations that Elliott Broidy conspired to violate FARA. In particular, Gates met with PIN prosecutors and provided them with information about Broidy's efforts to speak with President Trump and other high-ranking government officials about halting a Department of Justice investigation into 1Malaysia Development Berhad ("1MDB"), a government-run development fund in Malaysia. ████
██████████████████████████████████████████████████

10



██████
██

Respectfully submitted,

JESSIE K. LIU
United States Attorney
District of Columbia
D.C. Bar No. 472845

By: