# EXHIBIT 3

## DECLARATION OF ALVIN SCHMIDT IV

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. My name is Alvin Schmidt IV.  I was asked to review the declaration submitted by Zainab N. Ahmad to the Southern District of New York on March 6, 2023, as well as the two FD-302 forms that were attached as exhibits to her declaration.

<u>Background and Qualifications</u>

2. I am qualified to provide an assessment regarding the two FD-302 forms in question because of my career in the Federal Bureau of Investigations (FBI).  Following my service in the U.S. Marine Corps (USMC), I entered the FBI in July 1998, and retired from FBI in January 2022.  Because I was mobilized back into the USMC from 2002 to 2006, during which time I was deployed to Iraq and Afghanistan, my total tenure working as an FBI agent was approximately 19 years.

3. During my FBI career, I was involved in investigations concerning organized crime, violent crime, and international terrorism, and I led a multi-state investigation involving over 20 subjects, which included partnerships with federal, state, and local law enforcement agencies.  From my FBI experience, I am familiar with advanced investigation techniques.  In terms of experience directly relevant to the subject matter of this Declaration, I wrote hundreds of FD-302 forms and reviewed thousands more.

<u>Explanation of Analysis and Conclusion</u>

4. As part of my analysis, I reviewed the Memorandum of Law in Support of the Motion for Sanctions filed by Plaintiffs on February 23, 2023 (ECF No. 163), the Richard Gates Declaration ("Gates Declaration") that was attached to the Plaintiffs February 23, 2023 Motion (ECF No. 165-2), the Memorandum of Law in Opposition to the Motion for Sanctions filed by Gibson Dunn on March 6, 2023 (ECF No. 168), Ms. Ahmad's declaration and its attached FD-302 forms (ECF No. 169), which were also filed on March 6, 2023 as an attachment to Gibson Dunn's filing, and the other 82 FD-302 forms released in the same tranche as the two FD-302 forms at issue by the Department of Justice pursuant to FOIA requests in March 2020 ("March 2020 FOIA response").[1]

5. For reference purposes, I will be referring to the first attachment to Ms. Ahmad's declaration, the 5-page FD-302 form documenting an interview of Richard William Gates III on March 18, 2018 that is labeled Exhibit A, as the "2456" memo.  And I will be referring to the second attachment, labeled as Exhibit B, which is a one-page FD-302 with only paragraph of mostly redacted text in its body, as the "2470" memo.

---

[1] My review focused mostly on the first page of each FD-302 form in the March 2020 FOIA response, since the opening page is what contains the information necessary for most of my analysis.  Attached is a compilation of those opening pages (as Exhibit A).

6. My understanding from reading the Gates Declaration is that his written testimony is that there were two interviews conducted sequentially on Sunday, March 18, 2018, with the first involving Office of Special Counsel ("OSC") prosecutor Greg Andres and the second involving OSC prosecutors Andrew Weissmann and Ms. Ahmad for the entirety of the latter session. I further understand that Mr. Gates' written testimony is that he believes that "much of" the contents of *both* of these interviews were memorialized in the "2456" memo, and further, that there was no 87-minute interview-within-an-interview conducted by Ms. Ahmad that was "documented in a separate 302," as stated on page 4 of the "2456" memo.

7. For the reasons detailed below, it is my opinion, based on nearly two decades of experience as an FBI agent that the "2470" memo could *not* be the memorialization of an interview of Mr. Gates (or anyone else) conducted in compliance with FBI procedures, and the contents of the "2470" FD-302 form indicate that it was recording a non-interview investigative activity that occurred on April 17, 2018, one month after the March 18, 2018 interview of Mr. Gates.

<u>FD-302 Forms Serve Multiple Purposes</u>

8. The FD-302 form is the FBI report format used to memorialize interviews conducted by or involving the FBI. FD-302 forms can also be used for other purposes, however, such as documenting observations of an FBI agent, providing explanations regarding the logging of evidence into a given case file, or documenting the execution of a search or arrest warrant.

9. All FD-302 forms, whether used to memorialize interviews or for other investigative purposes, contain certain information, including the following: (1) the file number(s) associated with the pertinent case file(s), (2) the name of the FBI agent(s) who can attest to the truthfulness of the information included in the document, (3) a listing of persons involved in the investigative action, and (4) the dates relating to the investigative activity performed, the drafting of the FD-302 form, and its entry into Sentinel, the FBI's case management system.

<u>Date on "2470" Memo Indicates Investigative Activity Occurred on April 17, 2018</u>

10. The FD-302 template records three different dates, all on the first page: (1) "Date of entry," in the top right-hand side, just above the preamble, (2) "Date drafted," in the bottom, right-hand corner, and (3) "Investigated on," in the bottom left-hand corner, which is the date of the investigative activity being memorialized or documented in the given FD-302 form.

11. Based on my experience, the meaning of each date field on an FD-302 form, including "Investigated on," would be common knowledge and readily understood by federal prosecutors.

12. As an example, for the FD-302 of Mr. Gates' interview on March 20, 2018 (Exhibit B), it was entered into the Sentinel case management system ("Sentinel") on April 9, 2018 ("Date of entry"), the first draft of the FD-302 (typically based primarily on the notes taken during the interview) was typed up on March 20, 2018 ("Date drafted"), and the date of the interview memorialized by the form was conducted on March 20, 2018 ("Investigation on").

13. The contents of the "2470" FD-302 form show that it was entered into the Sentinel system on April 23, 2018 ("Date of entry"), the first draft of the information was typed up on April 17, 2018 ("Date drafted"), and the investigative activity being documented by the form occurred on April 17, 2018 ("Investigated on").

14. Thus, despite the one unredacted sentence in the body of the "2470" FD-302 form *referencing* an interview with Mr. Gates on "March 18, 2018," the date information contained in the "2470" memo indicates that this form is actually documenting an activity that occurred on a date almost one month *after* March 18, 2018.

Several Factors Indicate the "2470" Memo Does *Not* Document an Interview

15. Setting aside the date information, the "2470" FD-302 form on its face is not the memorialization of an interview *at all*, regardless of date, which I will explain below.

16. There are three factors indicating that the "2470" memo is not a memorialization of an interview: (1) the body of the memo is simply too short for it be an "interview 302" of an 87-minute interview, (2) the preamble does not contain key information that is found in the other 82 FD-302 forms from the March 2020 FOIA release, and (3) the one sentence of the paragraph that is not redacted actually indicates that the "2470" FD-302 is discussing or referencing an FD-302 form that memorialized the March 18, 2018 interview, as opposed to documenting the contents of some "separate" interview conducted on March 18, 2018.

17. In the "2470" memo, the entire contents of the body are all within one paragraph. An "interview 302" for a discussion of any meaningful length or detail would require multiple paragraphs. As discussed in more detail below, this is because standard procedure is that the opening paragraph of an FD-302 form memorializing an interview, known as the "preamble," provides necessary and relevant context regarding the others involved in the meeting, among other things.

18. The body of the "2470" memo is evidently only one paragraph because there is only one redaction box. If you look at the other FD-302 forms with significant redactions in the March 2020 FOIA response, it appears that each redacted paragraph receives its own redaction box. But even if the "2470" memo had another paragraph in addition to a preamble, it is highly unlikely that the memorialization of an 87-minute interview could be captured within a single paragraph.

Information Absent from Preamble of "2470" Memo

19. When an FD-302 form is used to memorialize an interview or a proffer session, there are certain common elements that are expected to be included in the preamble, such as the participants and the location.  Generally, the participants in an FBI interview fall into one of three broad categories: (1) the person interviewed, (2) the person(s) conducting interview, and (3) other person(s) present, such as defense counsel or a translator/interpreter.

20. For example, I reviewed the other 82 FD-302 forms released by the Department of Justice pursuant to FOIA requests in March 2020 ("March 2020 FOIA response") in the same tranche that included the two FD-302 forms that Gibson Dunn submitted as exhibits to the declaration of Zainab Ahmad.

21. All of the other 82 FD-302 forms in the March 2020 FOIA response were used to memorialize interviews.

22. Other than five "interview 302s" (which were among the sessions where no OSC prosecutor evidently participated), the preamble in those other FD-302 forms in the March 2020 FOIA response identified the name of the person being interviewed, as well as the names of the FBI personnel (with the relevant title followed by a redacted name), as well as any OSC prosecutors or other government personnel who also participated.

23. In the majority of those other 82 "interview 302s," counsel for the interviewee was referenced, mostly identified by title and name (which was sometimes redacted) and in several instances, noted as not being present.  In most, but not all, of the FD-302 forms in the March 2020 FOIA response, the location of the interview was also disclosed in the preamble.

24. In the five FD-302 forms mentioned above that did not identify the government officials participating in the interview in the opening paragraph, the location of the interview (or noting for one that it was conducted virtually over Microsoft Lync) *was* documented in the preamble in each of those five forms.  In these cases, the names of the FBI agents would still be easily ascertainable in the unredacted version of these five FD-302 forms, however, because the name(s) of the interviewing agent(s) would be listed in the "by" block at the bottom of the first page.

25. One of the reasons that it is standard procedure to identify all interview participants in the preamble who are not listed in the "by" block at the bottom of the first page is that those identities are significant for evidentiary purposes.  For example, when there is discovery production for prosecutions that proceed to trial, the preamble of the FD-302 forms allow discovery recipients to know who witnessed any given interview besides the investigative agents listed in the "by" block.

26. In the "2470" FD-302, the unredacted portion of the preamble does not identify Ms. Ahmad or any other government official.  In every FD-302 form contained in the March 2020 FOIA response that documented an interview in which a prosecutor was involved,

the title and name of each prosecutor is listed without redaction.  Additionally, the preamble of the "2470" FD-302 form does not reference the presence of Mr. Gates' attorney.

27. Thus, based on the pattern of redactions from the March 2020 FOIA response and my own experience and background from nearly two decades at the FBI, I would have expected Ms. Ahmad's title and name to appear in the unredacted portion of the preamble *if* the "2470" FD-302 form was, as Ms. Ahmad stated in her March 6, 2023 declaration, the memorialization of an interview that she participated in.  But neither Ms. Ahmad's title nor her name appears in the unredacted portion of the "2470" memo, which is another indication that it was *not* an "interview 302."

28. If the "2470" FD-302 form was actually the memorialization of an interview, I also would have expected a location to be mentioned in the unredacted portion of the preamble, even if the specific address was redacted or perhaps not listed.  But the fact that there is no mention of a location in the unredacted portion of the preamble is yet another indication that the "2470" FD-302 form is not the memorialization of an interview.

Reference to Serial Number in "2470"

29. The last factor indicating that the "2470" FD-302 form was not used to document an interview is the reference in the one unredacted sentence to "Serial 445 of captioned investigation."

30. While it is impossible to know what exactly is discussed in the redacted portion of the "2470" FD-302 form, the mention of "Serial 445" suggests that this form was created to document an investigative activity on April 17, 2018 that related to an interview of Mr. Gates one month earlier, on March 18, 2018.

31. As an example, it could be that this "2470" memo documented a request or comment from one of the prosecutors shared with the FBI agent in the "by" block in the bottom of the page, or it could be that the FD-302 form that memorialized the March 18, 2018 interview of Mr. Gates was added to or removed from a given case file.  But as already noted, it is impossible to know what investigative activity was documented without viewing the contents of the redaction block, other than that the "2470" memo was *not* the memorialization of an interview conducted in compliance with FBI procedures.

32. Although this is technical, it is potentially significant that the unredacted sentence in the "2470" FD-302 form states that the March 18, 2018 interview of Mr. Gates already had a Serial Number.  A piece of evidence is automatically assigned an FBI Serial Number *after* it is entered into Sentinel, and that Serial Number is its identifier within a given case file.

33. This is potentially important because the 5-page "2456" FD-302 form that documented Mr. Gates' March 18, 2018 interview could not have been assigned a Serial Number at

the time the "2470" FD-302 form was completed, since the "2456" form was entered into Sentinel on April 25, 2018, which is two days *after* the "2470" form had already been entered, on April 23, 2018.  (The "Date of entry" is automatically populated by Sentinel when an FD-302 form is entered into the system.)

34. It is possible that that the FBI agent who authored the "2470" form essentially guessed what Serial Number would be assigned to the "2456" form (since Serial Numbers are sequentially assigned in increasing chronological order), but in my experience, this would be highly unlikely and not considered acceptable practice by any FBI agent.

35. Once an FD-302 form is entered into Sentinel, its contents cannot be altered or edited in any way.  The only changes that can be made would be to add the form to a new case file (or files), to remove it from a given case file, or potentially to delete it from Sentinel entirely.  Either of the latter two actions require approval from the appropriate personnel at FBI Headquarters in Washington, D.C., which would mean that a record would exist of any such actions having been performed.  (I have personally never seen an FD-302 form deleted entirely from Sentinel, but I believe it is possible.)

36. Based on my nearly two decades of experience at the FBI, I believe that the "Serial 445" reference indicates one of three things: (1) that the author of the "2470" FD-302 guessed about the Serial Number that would be assigned to the "2456" form, (2) that there is another FD-302 of an interview of Mr. Gates on March 18, 2018, but which has not been made public yet (even in redacted form) pursuant to the FOIA requests submitted by media organizations, or (3) that the "2456" form was drafted to replace an earlier version of an FD-302 memorialization of the March 18, 2018 interview of Mr. Gates that was either moved to a different case file or potentially deleted from Sentinel.

37. Regardless, the reference to "Serial 445" is another indication that the "2470" memo form does *not* document any interview, but instead documents an investigative activity that occurred on April 17, 2018 regarding the March 18, 2018 interview of Mr. Gates.

Unusual Aspects of the "2456" Memo Not in Accordance with FBI Procedure

38. I believe it is important to address what I believe to be several highly unusual aspects of the "2456" memo that were not in accordance with FBI procedure.  In particular, I find to be of concern the following: (1) that Mr. Gates' attorney was not mentioned in the preamble of the "2456" memo, (2) that only three emails are discussed as having been shown to Mr. Gates, even though the Gates Declaration suggests that he was shown many more exhibits, and (3) the bracketed paragraph regarding Ms. Ahmad's purported arrival and departure is something I do not recall having seen in nearly 20 years in the FBI.

Mr. Gates' Attorney Not Listed in Preamble

39. As an initial matter, Mr. Gates' attorney Thomas Green, submitted his own signed statement in this litigation, in which his written testimony was that he was also present, and Ms. Ahmad did not dispute that Mr. Gates' attorney was present with him on Sunday,

March 18, 2018.  In the preamble of the "2456" memo, however, there was no mention of Mr. Green's participation.

40. While Mr. Green not being named in the preamble of the "2456" memo could have been an oversight, there are layers of protection to prevent against an accidental omission, including the FBI personnel in the "by" block at the bottom of the FD-302 form and the relevant supervisor needing to formally approve the veracity of the document before entering it into Sentinel.

How Emails Shown to Mr. Gates were Discussed

41. In terms of the content of the "2456" memo, the body's narrative discusses three emails being shown to Mr. Gates.  Although the discussion regarding Mr. Gates' responses to those three emails seems to be documented in accordance with standard procedure, the Gates Declaration suggests that he was shown dozens of exhibits in total, between emails and screenshots of WhatsApp messages.

42. Standard procedure would require that all such exhibits shown to Mr. Gates be not only included in the notes attached to the FD-302 form, but also identified in the body of the "interview 302" itself in a manner that, on request, they could be produced (this is particularly important when a large volume of material makes copying difficult).  And yet, the body of the "2456" memo mentions just three total emails, and no screenshots of WhatsApp messages, as having been shown to Mr. Gates.

43. For the sake of comparison, there are two "interview 302s" attached that were released in the March 2020 FOIA response that demonstrate the proper procedure, for Richard Hannah Davis on February 8, 2018 ("Davis 302," which is attached as Exhibit C) and for Thomas "Tad" Devine on July 6, 2018 ("Devine 302," attached as Exhibit D).

44. In the Davis 302, this is a partial, but sufficient example of how the body's narrative documented evidence being shown to Mr. Davis: "DAVIS was shown promissory notes from 2005 and 2007 from DMP to DAVIS (Exhibit 2). DAVIS did not recall executing promissory notes and did not know why he would have a promissory note. He does not recall receiving the money or the promissory note."

45. In the Devine 302, approximately half of the six-page body was the section called "Documents."  The section begins, "Devine was shown the following documents:," and it is followed by a list of 22 items, which included a detailed description of the exhibit in question and Mr. Devine's reaction and response to each.  For example, the first item states: "1. Consulting Agreements between Devine related entities and Paul Manafort. Devine stated these were standard contracts where there would have been schedules attached hereto. Document 009 would have been the contract for the 2010 Ukraine Presidential Campaign."  This is in accordance with proper FBI procedure.

46. At the end of the Devine 302 is the statement, "A copy of the above-referenced documents and interview notes have been attached for the file."  This is intended to help

facilitate the discoverability of the exhibits shown to Mr. Devine during the interview. This is in accordance with proper FBI procedure.

47. In the "2456" memo, however, only three emails are discussed, which is inconsistent at least with what was stated in the Gates Declaration. Further, there was no exhibit number assigned to any of those three emails, and there is no note in the body regarding these emails (or any other materials) being attached to the FD-302 form. Regardless, given the layers of approval needed to enter an FD-302 form into Sentinel (as described above), it is my professional opinion that the entire collection of exhibits shown to Mr. Gates on March 18, 2018 should be attached to the "2456" memo in Sentinel.

Highly Unusual Nature of Bracketed Paragraph

48. The most concerning aspect of the "2456" memo, though, is the highly unusual nature of the bracketed paragraph stating that there would be a "separate" FD-302 form documenting what it noted was an 87-minute interview-within-an-interview conducted by Ms. Ahmad and a Supervisory Special Agent (whose name is redacted), which is the second paragraph of page 4 of the "2456" memo.

49. In FD-302 forms used to memorialize interviews, FBI agents have significant latitude regarding the style and level of detail contained in the body of the document. Broadly speaking, however, FD-302 forms for interviews are intended to be concise summaries of a given interview.

50. Many FBI agents will organize the narrative of the interview in an FD-302 form by categorizing according to the subjects discussed, as opposed to a chronological recording of the interview. The author of the 5-page "2456" FD-302 form, for example, appears to have followed a subject-based structure, as opposed to a chronological ordering of the interview.

51. Thus, based on my experience, the bracketed paragraph on page 4 of the "2456" form regarding Ms. Ahmad's arrival and departure does not seem to fit within the format and structure of the narrative utilized by the authoring agent.

52. In "interview 302s" that are structured chronologically, I have on occasion seen comments inserted somewhere within the body of the narrative regarding things such as breaks or certain participants arriving or leaving.

53. For "interview 302s" following a subject-based structure, I do not recall ever seeing in nearly two decades at the FBI a bracketed comment somewhere within the body of the narrative stating the time of arrival and departure of a certain prosecutor or FBI agent mid-interview. The standard procedure in a subject-based structure is that such information regarding someone's partial participation would be noted in the preamble or at the end of the body of the narrative.

54. In my nearly two decades at the FBI, I do not recall ever seeing another FD-302 form that contained a similar bracketed paragraph inserted into the body's narrative in this fashion, nor do I recall ever seeing an FD-302 that explicitly stated that an interview-within-an-interview was conducted and that it would be "documented in a separate 302." I do not believe it would be appropriate to speculate why or how this paragraph appeared, but I do believe that any experienced FBI agent or federal prosecutor would be concerned about these irregularities in the "2456" memo. It is my professional opinion that further inquiry would be necessary to determine its accuracy.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 19, 2023
Boston, Massachusetts

Alvin Schmidt IV

# EXHIBIT A

b7E



FD-302 (Rev. 5-8-10)

- 1 of 12 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     02/26/2018

  RICHARD BURT, former United States (U.S.) Ambassador and current Board
of Directors member of CENTER FOR THE NATIONAL INTEREST (CNI), was
interviewed pursuant to a proffer agreement at Patriots Plaza I, 395 E
Street SW, Washington, DC 20546 by Special Agent (SA) [                    ] SA
[                    ] Intelligence Analyst (IA) [                    ] and
Assistant Special Counsel (ASC) Aaron Zelinsky. Accompanying BURT were
CNI's [                                                                    ]
[                    ] After being advised of the identities
of the interviewing officials and after reviewing the proffer agreement,
in the presence of his attorneys, BURT executed the proffer agreement,
whereupon he provided the following information:

b6
b7C

**b5 per DOJ/OIP**

b3
b6
b7C

**b5 per DOJ/OIP**

b6
b7C

Investigation on   02/09/2018   at   Washington, District Of Columbia, United States (In Person)

File # [                              ]       Date drafted   02/12/2018

by [                                                    ]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7E

FD-302 (Rev. 5-8-10)

- 1 of 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    09/29/2017

    JAMES JAY CARAFANO, date of birth (DOB)[                ]social security    **b6**
account number (SSAN)[            ]was interviewed on 09/11/2017 at his    **b7C**
office at The Heritage Foundation (Heritage), 214 Massachusetts Ave NE,
Washington, DC. CARAFANO's telephone number is[            ]and his email
address is[            ]

    After interviewing agents[            ]and[            ]advised    **b6**
CARAFANO they were seeking assistance with an investigation, CARAFANO    **b7C**
asked if this was regarding[            ]CARAFANO was informed
that it was not regarding[            ]
[            ]CARAFANO asked if that was the
[            ]and the agents replied
affirmatively.  CARAFANO explained he would need to consult with his
people first and would return shortly.

    CARAFANO returned to his office with[            ]    **b6**
[            ]for The Heritage Foundation,    **b7C**
telephone number[            ]email address[            ]
[            ]explained he was[            ]for Heritage and wanted to
know what this was about.  The agents advised that CARAFANO was not the
target of an investigation and the FBI was simply seeking his assistance
into an investigation, specifically regarding[            ]
[            ]inquired as to whether
Heritage was the target of an investigation.  The agents informed him that
Heritage was not the target of a case and no other Heritage employees were
[            ]CARAFANO confirmed[            ]
[            ]The agents confirmed they were working for the
Special Counsel's Office.

    [            ]explained that the agents would need to come back at a later    **b6**
scheduled time so[            ]could discuss the details with CARAFANO.  The    **b7C**
agents left their contact info with[            ]and CARAFANO who seemed
amenable to an interview of CARAFANO at a later date.

| | | |
|---|---|---|
| Investigation on  09/11/2017 | at | Washington, District Of Columbia, United States (In Person) |

File # [            ]    Date drafted  09/11/2017    **b6**
    **b7C**
by [            ]    **b7E**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2210



b7E

- 1 of 8 -

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/04/2018

SAMUEL HARVEY CLOVIS JR., date of birth (DOB [ ]) was interviewed on 10/26/2017 at the Federal Bureau of Investigation and Special Counsel Office located at 395 E Street SW, Washington, D.C.  Present for the interview were Agents [ ] and [ ] Special Counsel Attorneys JEANNIE RHEE, ANDREW GOLDSTEIN and AARON ZELINSKY.  CLOVIS also had his attorney, [ ] present.  CLOVIS provided the following information:

b6
b7C

b5 per DOJ/OIP

b5 per DOJ/OIP

b5 per DOJ/OIP

b5 per DOJ/OIP

b5 per DOJ/OIP

UNCLASSIFIED//~~FOUO~~

Investigation on  10/26/2017  at  Washington, District Of Columbia, United States (In Person)

b7E

File # [ ]                                         Date drafted  11/08/2017

by [ ]

b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2211

b7E

- 1 of 12 -



FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    12/01/2017

SAMUEL HARVEY CLOVIS JR., date of birth (DOB) [        ] was interviewed
on 10/03/2017 at his place of employment, U.S. Department of Agriculture,
1400 Jefferson Drive, Washington, DC.  After being advised of the identity
of interviewing Agents [                              ]
[          ] and the nature of the interview, CLOVIS provided the following
information:

b6
b7C

About one quarter of the way through the interview, CLOVIS was advised
that lying to the agents could constitute a federal offense.  He did not
indicate wanting to change any of his previous statements at that time.

Background

CLOVIS started off the interview by explaining that he hates Russia and
that should be clear throughout his interview.  CLOVIS was an Air Force
fighter pilot and worked at the Pentagon during the period 1984 to
1988.  CLOVIS described himself as a Sovietologist, acting as a think tank
for the chief of staff.  CLOVIS was an expert on Russia and Eastern Europe
with additional expertise in the Middle East.  CLOVIS was essentially a
wargame specialist on a red team.

CLOVIS was picked up for the campaign because of his broad policy
background.  In addition to his military time, CLOVIS had run for office
in Iowa where he found out he was good at campaigning but not at
fundraising.  The TRUMP campaign recruited him heavily.  CLOVIS had met
TRUMP during the late summer of 2014 while CLOVIS was running for state
treasurer.  CLOVIS was fundraising for STEVE KING, CLOVIS' congressman in
Iowa, when TRUMP was a keynote speaker.  TRUMP pulled CLOVIS off to the
side and spoke with him at that event.  Then, in spring of 2015, CLOVIS
was asked to introduce TRUMP for a Lincoln dinner at Council
Bluffs.  TRUMP liked it and CLOVIS narrated a town hall for him shortly
after that.

CLOVIS got a call from TRUMP's people asking CLOVIS to be on the campaign
if TRUMP ran for president.  CLOVIS was helping a friend with a different
campaign at the time.  So he declined and was asked to consider the TRUMP

UNCLASSIFIED//~~FOUO~~

Investigation on    10/03/2017    at    Washington, District Of Columbia, United States (In Person)

File #    [                                    ]                                                Date drafted    10/03/2017    b7E

by    [                                                        ]    b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2219

b7E

- 1 of 5 -

**Official Record**

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    12/01/2017

SAMUEL HARVEY CLOVIS JR., date of birth (DOB) [          ] was approached    b6
by Agents [          ] and [                    ] on 10/03/2017 at his place of    b7C
employment, U.S. Department of Agriculture, 1400 Jefferson Drive,
Washington, DC after being previously interviewed that same day. After
the agents identified themselves, CLOVIS provided the following
information:

b3

b3

CLOVIS was asked who took over handling the foreign policy team and
replied that he didn't know who took it over. CLOVIS explained that
[                    ] and J.D. GORDON tried to keep the group together. CARTER
PAGE and GEORGE PAPADOPOULOS were not involved with the campaign
team. They were not players in the campaign. [                        ]    b6
[                        ] PAGE wasn't even at the March 31, 2016    b7C
meeting. CLOVIS thought [                ] was cultivating that    b3
group. MICHAEL FLYNN, KEITH KELLOGG and [                ] went to work in the
New York office. On occasion JARED KUSHNER would send things to CLOVIS as
well. [            ] and RICK DEARBORN handled policy.

UNCLASSIFIED//~~FOUO~~

Investigation on   10/03/2017   at   Washington, District Of Columbia, United States (In Person)

File # [                              ]                          Date drafted   10/16/2017    b7E

by [                                        ]                                                b6
                                                                                            b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2231

b7E

FD-302 (Rev. 5-8-10)

- 1 of 18 -

Official Record

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    03/22/2018

RICHARD HANNAH DAVIS (DAVIS) was interviewed at the Office of Special
Counsel, Washington, DC on February 8, 2018. Present for the duration of
the interview were FBI Special Agent [                    ] Forensic Accountant
[                    ] and Special Counsel Attorneys Kyle Freeny and Greg Andres.
Also present was DAVIS's attorneys [                              ] of the
law firm Petrillo, Klin & Boxer LLP.   After being advised of the
identities of the interviewing parties and the nature of the interview,
DAVIS provided the following information:

b6
b7C

DAVIS was advised his participation in the interview was voluntary. DAVIS
was also advised he needed to be truthful in his answers and lying to a
federal agent could constitute a federal crime. DAVIS acknowledged his
rights and obligations.

**Background**

[                                                                    ] After
being involved in campaigns in Alabama and Mississippi, he got more
involved in politics and came to Washington, DC. He became involved with
the College Republican National Committee during 1980 when Reagan was
nominated. He worked with LEE ATWATER organizing small campaigns for
Reagan. He ended up working as White House staff. DAVIS worked for the
Department of Health and Human Services in a role as White House Liaison
and was involved in speech writing. When he left the administration, he
worked with [                    ] and PAUL MANAFORT (MANAFORT) as
consultants managing a senate campaign in Virginia.

b6
b7C

During the Reagan administration, DAVIS worked in the Department of
Interior as well as the Commerce Department. DAVIS worked for Thomas
Barrack (BARRACK) where he was introduced to MANAFORT.

He worked for ATWATER again during Reagan's 1984 reelection campaign.
Afterwards, he did domestic policy work for Reagan. In 1987, he left and
joined BLACK, MANAFORT, STONE AND KELLY. This was DAVIS's first time
working with MANAFORT, but he had known him previously. He started as an
associate in the firm and then was promoted to junior partner. The firm
was bi-partisan. In the early 1990s, BLACK, MANAFORT, STONE AND KELLY was

| Investigation on | 02/08/2018 | at | Washington, District Of Columbia, United States (In Person) |

File # [                    ]                                    Date drafted  02/15/2018

b6
b7C
b7E

by [                              ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2254

**b7E**

- 1 of 5 -



FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    01/24/2018

DIANA DESTINE DENMAN, date of birth (DOB) ⬚ social
security account number ⬚
⬚ was interviewed at the FBI Special Counsel's Office, 395 E Street
SW, Washington, D.C. on December 4, 2017. Present for the interview were
Supervisory Special Agent ⬚ Special Counsel Attorney Aaron
Zelinsky, and DENMAN's attorney, ⬚ After being advised
of the identity of the interviewing agent and the nature of the interview,
DENMAN provided the following information:

**b6**
**b7C**

b5 per DOJ/OIP

b5 per DOJ/OIP

b5 per DOJ/OIP

b5 per DOJ/OIP

UNCLASSIFIED//~~FOUO~~

Investigation on   12/04/2017   at   Washington, District Of Columbia, United States (In Person)

File # ⬚                                          Date drafted   12/04/2017

by ⬚

**b6**
**b7C**
**b7E**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    06/13/2017

(U//~~FOUO~~) Diana Destine DENMAN, date of birth (DOB) ▇▇▇▇▇▇▇   **b6**
social security account number ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇   **b7C**
▇▇▇▇▇▇ was interviewed by SAs ▇▇▇▇▇▇▇▇▇▇▇▇▇
at the FBI San Antonio Field Office on June 7, 2017. After being advised
of the identity of the interviewing agents and the nature of the
interview, DENMAN provided the following information:

(U//~~FOUO~~) DENMAN was a Republican delegate for the state of Texas at the
2016 Republican National Convention (RNC) in Cleveland, Ohio. DENMAN was a
delegate for Senator Ted Cruz. Although first a Cruz delegate, DENMAN
stated she nevertheless supported Trump due to her duty to her country and
the Republican Party. DENMAN first participated in a Republican National
Convention 1980 in Detroit, Michigan, but she wasn't officially a delegate
until the 1984 Republican National Convention in Dallas, Texas. DENMAN
noted she foolishly did not run for the Platform Committee in 1984 but she
wishes she had. DENMAN did not participate in subsequent national
conventions until the 2016 RNC.

(U//~~FOUO~~) DENMAN noted this 2016 RNC was personally important to her due
to her belief of the poor current state of US national security policy.
DENMAN informed the interviewing agents she "worked her contacts" to make
certain she was on a subcommittee that mattered to her. Therefore DENMAN
landed on the national security and defense subcommittee, officially named
America Resurgent.

(U//~~FOUO~~) DENMAN advised approximately one to two weeks before the RNC she
received a phone call from Matthew Miller. According to DENMAN, Miller
stated he was hired by the Trump Campaign and wanted to touch base
regarding the national security and defense subcommittee and he offered to
help in her in any way he could. DENMAN stated she was gracious during the
phone call but told Miller she didn't need any help.

(U//~~FOUO~~) According to DENMAN, she received an email when arriving in
Cleveland for the RNC from Washington, DC delegate Rachel HOFF. DENMAN

UNCLASSIFIED//~~FOUO~~

| | | | |
|---|---|---|---|
| Investigation on | 06/07/2017 | at | San Antonio, Texas, United States (In Person) |

File # ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇        Date drafted   06/07/2017        **b3**
                                                                  **b6**
by ▇▇▇▇▇▇▇▇                                                        **b7C**
                                                                  **b7E**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2277

b7A
b7E

-1 of 6-

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//LES

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/18/2018

On Friday, July 6, 2018, Thomas "Tad" Devine was interviewed at the Office of the Special Counsel by Senior Assistant Special Counsel Greg D. Andres, DOJ Senior Financial Investigator [                    ] and FBI Forensic Accountant [                    ] Also present was Devine's attorney, [                    ] Garvey Schubert Barer, P.C., telephone number [                    ] After being advised the identities of the interviewing parties, Devine furnished the following information:

b6
b7C

### Background:

Devine has been a political media consultant/advisor since approximately 1980 when he worked on the President Jimmy Carter campaign. In addition to working on the Presidential campaigns for Walter Mondale, Michael Dukakis and John Kerry, Devine served as the Chief of Staff for former Providence Mayor Joseph Paolino and was an Assistant to Boston University President [                    ] Devine also provided services for approximately 20 presidential elections outside of the United States. Most recently, Devine worked for Bernie Sanders.

b6
b7C

[                    ]

b6
b7C

Since 1983, Devine has been a partner in several political media consulting firms. In or around 2007, Devine formed Devine & Mulvey [                    ] In or around 2013 [                    ] to form Devine Mulvey and Longabauch.

b6
b7C

### Ukraine:

In or around 2005, [                    ] of Davis Manafort reached out to Devine's [                    ] at D&D Media Inc. [                    ] to inquire about their interest in working in Ukraine. After speaking with Manafort on the telephone, Devine traveled to Ukraine and met with Manafort and the Party of Regions (POR). Devine recalled being impressed with the campaign team,

b6
b7C

UNCLASSIFIED//LES

| | | |
|---|---|---|
| Investigation on | 07/06/2018 | at Washington, District Of Columbia, United States (In Person) |
| File # | | Date drafted   07/11/2018 |
| by | | |

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2281

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 16 -

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    03/13/2018

    Richard William Gates III, previously identified, was interviewed by
FBI Special Agent [                    ] Supervisory Special Agent [                    ]
Forensic Accountant [                    ] and Special Counsel Prosecutors Andrew
Weissmann and Greg Andres.  Present for Gates were Thomas Green, [            ]
[                              ] of Sidley Austin LLP.  After being advised of the
identities of the interviewing parties and the nature of the interview,
Gates provided the following information:

b6
b7C

    Gates signed and acknowledged understanding the proffer agreement and
was reminded that the interview was voluntary, but if he chose to answer
questions he needed to be truthful in his responses.

[                    ]

b6
b7C

    Gates [                                                                ]

b6
b7C

    Gates stated [                                                          ]

b6
b7C

    Gates stated that there are things he cannot recall clearly.  For
example, Gates could not keep all [                                          ]

b6
b7C

    In general, [                                        ] with Gates.  Gates may
[                                                      ]

b6
b7C

Kilimnik Visits

Investigation on  01/30/2018  at  Washington, District Of Columbia, United States (In Person)

File # [                    ]                                      Date drafted  01/31/2018

by [                              ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2287

b7A
b7E

- 1 of 3 -

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   11/21/2018

On 10/29/2018, SA[        ]and Special Counsel Prosecutor Andrew    b6
Weissmann interviewed RICHARD GATES III at the offices of GATES' counsel.    b7C
GATES' counsel, Tom Greene was present for the interview. GATES provided
the following information:

### MANAFORT's China Efforts

MANAFORT worked with[        ]on a telephone project in China that    b6
never materialized.[        ]technology guy was[                    ]    b7C

[                                                                    ]    b7A

MANAFORT had tried to get some Chinese nationals into the inauguration,    b6
but GATES said no. GATES informed[            ]of the situation but did not    b7A
know what happened after that. GATES was not aware of any Chinese money    b7C
making its way into the PIC.

### MANAFORT Ukraine Work

In 2010, DMP hired a number of people to assist with work in Ukraine,    b6
including[                                                          ]    b7A
[                                        ]was a[              ]who    b7C
was brought in as a[                              ]to do Party of Regions
groundwork.

After the US Presidential election, GATES never heard any plans regarding
Eastern Ukraine. MANAFORT asked GATES to connect[            ]with the    b6
Ukrainian Ambassador to open a line of dialogue between DONALD TRUMP and    b7C
PETRO POROSHENKO.

MANAFORT told GATES that[                                    ]    b6
[                  ]GATES was not aware of a relationship between PATTEN    b7C
and KILIMNIK.

UNCLASSIFIED//~~FOUO~~

Investigation on  10/29/2018  at  Washington, District Of Columbia, United States (In Person)    b6
                                                                                                  b7A
File #[                ]                              Date drafted  11/14/2018    b7C
                                                                                  b7E
by[                        ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2322

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 5 -



UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    11/28/2018

Richard Gates III was contacted at Sidley Austin, 1501 K Street, Washington, D.C., in the presence of his attorney, Tom Green. Present for the interview was Senior Assistant Special Counsel (SASC) Zainab Ahmad, SASC Andrew Weissman, Forensic Accountant [redacted] Assistant Special Agent in Charge (ASAC) [redacted] and Special Agent [redacted] After being informed of the official identities of all present, Gates provided the following information:

b6
b7C

Gates stated that at the outset of his and Paul Manafort's work with the Trump campaign (in March 2016) the two had no control of budget or finances. Following the April 2016 primaries in which Trump took control of the Republican race, he (Trump) directed Manafort to develop state budgets. The amounts in the state budgets were minimal at first (approximately [redacted] to start, mostly to finance direct mailings). Larger budgets varied between [redacted] typically spent on media. Gradually, Gates and Manafort took more and more control of budgets as a strategy to win delegates took shape. Gates stated that the budgets (and duties) were divided during this time between Manafort and Corey Lewandowski.

b6
b7C

The de facto campaign "CFO" during this time was [redacted] [redacted] would track projects expending funds, and served as the first check on such expenses. [redacted]

b6
b7A
b7C

Gates stated that Trump self-financed his campaign prior to April/May 2016. Gates stated that prior to his and Manafort's arrival on the campaign, Trump loaned his campaign [redacted] Gates added that [redacted] Manafort explained to Gates that [redacted]

b6
b7C

UNCLASSIFIED//~~FOUO~~

Investigation on  10/29/2018  at  Washington, District Of Columbia, United States (In Person)

File #  [redacted]                                Date drafted  11/07/2018

by  [redacted]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2325

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    11/19/2018

On 10/9/2018, SA[          ]and Special Counsel Prosecutor Andrew    b6
Weissmann interviewed RICHARD "RICK" GATES III at the offices of GATES'    b7C
counsel. Present for the interview was GATES' counsel, Tom Green. GATES
provided the following information:

[                    ]was trying to get on TRUMP's campaign.[          ]had    b6
set up a meeting between PAUL MANAFORT and[          ]to get MANAFORT to    b7C
sell PSY Group's services to the campaign.[          ]received the
proposal, but GATES did not. GATES never discussed using front people as
part of the plan. GATES did not recall any further information related to
PSY Group[          ]

UNCLASSIFIED//~~FOUO~~

Investigation on  10/09/2018  at  Washington, District Of Columbia, United States (In Person)

File #[          ]                                          Date drafted  10/22/2018    b6
                                                                                        b7A
by[          ]                                                                          b7C
                                                                                        b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

-1 of 2-

FD-302 (Rev. 5-8-10)

**UNCLASSIFIED//~~FOUO~~**

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    11/19/2018

On 11/14/2018, SA [_____] IA [_____] and Special Counsel
Prosecutor Andrew Weissmann interviewed RICHARD "RICK" GATES III
telephonically.  After being advised of the identities of the individuals
on the call, GATES provided the following information:

b6
b7C

[_____]

[_____] was a colleague of [_____] from [_____] was a
[_____] GATES had met [_____]

A long time ago, [_____] had said he was helping [_____] with a project
investigating a money laundering scheme.

At one point in time, [_____] was working on a project that involved
tracking black money in Afghanistan. This project involved a United
Nations AID corollary and was trying to get support from the US government.

b6
b7C

[_____] wanted to bring [_____] in to help PAUL MANAFORT by showing
[_____]

[_____] brought [_____] into a group with some [_____] people in [_____]
[_____] asked GATES about it.

GATES last spoke to [_____]

b6
b7C

*Following the telephonic interview, GATES provided email communications
with* [_____] *[attached as a 1A].*

## EX1

GATES was read a Viber exchange between himself and MANAFORT in which
GATES asks about MANAFORT's meeting with "DJT". MANAFORT had told GATES
that he was meeting with TRUMP to determine whether or not he could attend
inauguration events.

**UNCLASSIFIED//~~FOUO~~**

b6
b7A
b7C
b7E

Investigation on   11/14/2018   at   Washington, District Of Columbia, United States (Phone)

File #                                                             Date drafted   11/19/2018

by [_____]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2331

b7A
b7E

- 1 of 2 -



FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    01/17/2019

b6
b7C

On 11/7/2018, SA [        ] SA [        ] FOA [        ]
Senior Assistant Special Counsel (SASC) Jeannie Rhee, SASC Andrew
Weissmann, and SASC Greg Andres interviewed Rick Gates at the Offices of
the Special Counsel. GATES' counsel was not present for the interview.
Gates provided the following information:

**\*\* Gates was shown an email to Melania Trump on 12/30/2016 \*\***

During the 2016 Presidential campaign, Donald Trump's (Trump) Friends &
Family list (the list) for people attending campaign events was broken
down by Trump family member. Lists would come from each of Trump's
children. Rhona Graff (Graff) handled the list from Trump himself. Melania
Trump would check and add names. If a name was associated with a specific
person, it would be put under their name on the list.

Graff was the gatekeeper of the list. People associated with the Trump
family sometimes added names.

The circle of people who were able to add names to the list were
immediate family members, close friends of immediate family members, and
staffers of immediate family members. For example, [        ]
added people to the list. In some cases, Gates would send the lists back
to the kids for review and the kids would say they didn't add a particular
name on their own list.

b6
b7C

b6
b7A
b7C

b6
b7A
b7C

UNCLASSIFIED//~~FOUO~~

| | | |
|---|---|---|
| Investigation on | 11/07/2018 at | Washington, District Of Columbia, United States (In Person) |

File # [        ]                                          Date drafted   11/13/2018

by [        ]

b3
b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

-1 of 4-

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

# FEDERAL BUREAU OF INVESTIGATION

Date of entry     11/13/2018

On 11/7/2018, SA [              ] Special Counsel Prosecutor (SCP) Greg     b6
Andres and SCP Andrew Weissmann interviewed RICK GATES at the Offices of   b7C
the Special Counsel. GATES' counsel was not present for the interview.
GATES provided the following information:

## Great America

Great America was a PAC run by COREY LEWANDOWSKI. Great America had been    b6
started with a donation of [                                            ]  b7A
[                                                       ]                   b7C

[                              ]                                            b6
                                                                           b7A
                                                                           b7C

                                                                           b7A

                                                                           b6
                                                                           b7A
                                                                           b7C

                                                                           b6
                                                                           b7C

[        ] had offices in the [        ]DC; his DC offices were based out of the   b6
[        ]offices. [        ]was [                    ]                             b7C

UNCLASSIFIED//~~FOUO~~

Investigation on  11/07/2018  at  Washington, District Of Columbia, United States (In Person)

File #  [              ]                                    Date drafted  11/12/2018      b6
                                                                                         b7A
by  [                    ]                                                                b7C
                                                                                         b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E



FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   11/19/2018

On 11/7/2018, SA [        ] Senior Financial Investigator [        ]     b6
[        ] Special Counsel Prosecutor (SCP) Greg D Andres, SCP Andrew A     b7C
Weissmann, and DOJ Money Laundering and Asset Recovery Section Attorney
Ann Brickley interviewed RICK GATES III at the Office of the Special
Counsel. GATES' counsel was not present for the interview. GATES provided
the following information:

GATES had learned about how Ukrainian politics worked from PAUL MANAFORT,     b6
[        ] Ukrainian oligarchs generated wealth     b7A
from the assets that they owned. Public officials were always on the take.     b7C
This was consistent with GATES' experience in Ukraine.

GATES believed that MICHAEL OKANOSKY was one of the few Ukrainian     b6
officials who seemed above-board, but OKANOSKY [        ]     b7C
[        ]

YANUKOVYCH's "Family"
b6
b7C

[        ]

b6
b7C

[        ]

UNCLASSIFIED//~~FOUO~~

Investigation on   11/07/2018   at   Washington, District Of Columbia, United States (In Person)

File #  [        ]                                       Date drafted   11/12/2018     b6
                                                                                        b7A
by  [        ]                                                                          b7C
                                                                                        b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b7A
b7E

- 1 of 20 -

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    03/23/2018

Richard William Gates III, previously identified, was interviewed by
FBI Special Agent [            ] Supervisory Special Agent [                ]
and Special Counsel Prosecutors Andrew Weissmann and Greg Andres.   Present       b6
for Gates were Thomas Green, [                            ] of Sidley                 b7C
Austin LLP.   After being advised of the identities of the interviewing
parties and the nature of the interview, Gates provided the following
information:

Gates signed and acknowledged understanding the proffer agreement and
was reminded that the interview was voluntary, but if he chose to answer
questions he needed to be truthful in his responses.

Other Crimes

Gates was asked about any other criminal offenses he had committed.

**Insider Trading**

The only insider trading and/or securities fraud offenses in which
Gates had been involved was related to ID Watchdog (IDW).

b6
b7C

b6
b7C

b6
b7C

Investigation on   02/12/2018   at   Washington, District Of Columbia, United States (In Person)

File # [                    ]                                         Date drafted   02/13/2018          b6
                                                                                                        b7A
by [                                      ]                                                              b7C
                                                                                                        b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E



-1 of 15-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    03/28/2018

     Richard William Gates III, previously identified, was interviewed by
FBI Special Agent [          ] Supervisory Special Agent [          ]      b6
and Senior Special Counsel Attorneys Andrew Weissmann and Greg           b7C
Andres.  Present for Gates were Thomas Green, [                    ]
[                              ] After being advised of the identities of the
interviewing parties and the nature of the interview, Gates provided the
following information:

     Senior Special Counsel Attorney Greg Andres presented Gates with a copy
of the original proffer agreement and was initialed and dated by Andres,     b6
Gates, and Gates' attorney [              ] Senior Special Counsel Attorney   b7C
Andrew Weissmann then advised Gates of the terms and conditions regarding
providing information to the government under the signed proffer
agreement. Weissmann advised that under the terms of the agreement Gates
has agreed to provide information to the government, and to respond to
questions truthfully and completely. Weissmann advised that only being 90
percent truthful would violate the terms of the agreement and that it was
only in Gates' interest to be 100 percent truthful. Weissmann advised that
should the government and Gates not proceed with a cooperation agreement
and be prosecuted, under the terms of the proffer agreement no statement
made by Gates during the meeting could be used against him in the
government's case-in-chief at trial except the government may use any
statement made or information provided by Gates in a prosecution for false
statements, perjury, or obstruction of justice, premised on statements or
actions during the meeting. Moreover, the government may also use any such
statement or information at sentencing in support of an argument that
Gates failed to provide truthful or complete information during the
meeting. The government may make derivative use of any statements made or
other information provided by Gates during the meeting. Gates advised that
he understood the terms and agreed to the terms.

Deripaska Lawsuit in New York

     In January 2018, Manafort told Gates that  Oleg Deripaska sued Manafort
and Gates in New York state court in an effort to demonstrate that he was
willing to help the government's investigation by being a witness against
them in exchange for being granted a visa.  Gates believed that this was

Investigation on   02/12/2018   at  Washington, District Of Columbia, United States (In Person)   b6
                                                                                                   b7A
File # [                    ]                              Date drafted   02/26/2018              b7C
                                                                                                   b7E
by [                              ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2385

b7A
b7E

- 1 of 4 -

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   02/17/2019

On 02/15/2019 Special Agent [                    ] Intelligence Analyst       b6
[                    ] Senior Assistant Special Counsels Greg Andres, Jeannie       b7C
Rhee, and Andrew Weissman interviewed RICHARD GATES (GATES) at the Special
Counsel's Office. Present for the interview was GATES's counsel, Tom
Greene. After being advised of the identity of the interviewing Agent and
the nature of the interview, GATES provided the following information:

GATES has never seen FD-302s written related to his interviews with the
Special Counsel's Office.

**Polling Data Sent to KONSTANTIN KILIMNIK**

MANAFORT directed GATES to send internal polling data from the DONALD J.
TRUMP CAMPAIGN to KONSTANTIN KILIMNIK (KILIMNIK), and GATES did so. The
internal polling data was provided by TONY FABRIZIO (FABRIZIO). GATES       b6
utilized WHATSAPP to forward the "top line" internal polling data to       b7A
KILIMNIK. [                                                            ]       b7C

[                                                                         ]

GATES understood KILIMNIK would send the internal polling data on to       b6
Ukrainian oligarchs at MANAFORT's request [                          ]       b7C
[              ] MANAFORT wanted to show Ukrainian oligarchs that he was doing
"wonders" with the TRUMP Campaign in securing the nomination. OLEG
DERIPASKA was also in the mix. GATES recalled, however, that the letter to
DERIPASKA was related to MANAFORT's and DERIPASKA's legal dispute. GATES
does not specifically know if MANAFORT sent internal polling data to
DERIPASKA.

[                                                                    ]       b6
[                                            The majority of polling was done in ]       b7A
battleground states. [                                    ]       b7C
[                              ] GATES recalled there would be a list of five or six
states per poll.

Investigation on  02/15/2019  at  Washington, District Of Columbia, United States (In Person)

File # [                    ]                              Date drafted  02/15/2019       b6
                                                                                          b7A
by [                                  ]                                                    b7C
                                                                                          b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2400

b7A
b7E

- 1 of 2 -

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    03/09/2018

RICHARD GATES III (GATES) was proffered at the Office of the Special
Counsel, Washington, D.C.  Present for the proffer were FBI Special Agent
[          ], DOJ Senior Financial Investigator [          ], and    b6
Special Counsel Attorney Andrew Weissmann.  Also present was GATES'        b7C
attorney Tom Green with the law firm Sidley Austin LLP. After
being advised of the identity of the interviewing Agent and the nature of the
proffer, GATES provided the following information:

GATES initially discussed the hiccup of signing the plea agreement over
the past few days.  GATES explained the prior five days have been very
difficult for him and his family.  He spoke at length to [        ] about    b6
the ramifications of pleading guilty to the charged offenses.                  b7C

Over the past several days, GATES spoke to a number of other
individuals about whether to sign the plea agreement.  He first spoke to     b6
[          ] who GATES considered a mentor.  GATES asked [      ]            b7C
for advice about what to do.

GATES also spoke to PAUL MANAFORT (MANAFORT) three times.  He spoke to
MANAFORT on the phone.  On Tuesday February 20, 2018, GATES told MANAFORT
he was not going forward with the plea agreement.  They also spoke about
getting their lawyers together to talk; however, their lawyers never spoke
to each other.  GATES also asked MANAFORT about tapping into the Legal
Defense Fund resources to help pay for some of his mounting legal
expenses.  MANAFORT told him to apply for the funding.

GATES also had two calls with MANAFORT on Wednesday February 21, 2018,
both concerning the Legal Defense Fund.  GATES told MANAFORT the Legal
Defense Fund would receive his application by the end of the week.  GATES
was hopeful to get money from the fund before signing the plea
agreement.  To date, GATES had not submitted the application.  GATES also
contended there was nothing said between he and MANAFORT about GATES not
cooperating with the Special Counsel because GATES could not afford
it.  MANAFORT did not know GATES intended to sign the plea agreement.

Investigation on  02/22/2018  at  Washington, District Of Columbia, United States (In Person)    b7A
                                                                                                   b7E
File # [          ]                                    Date drafted  02/23/2018                    b6
by  [                              ]                                                                b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2404

b7A
b7E

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    02/25/2019

On 02/22/2019 Special Agent[                    ] Intelligence Analyst     b6
[              ] Senior Assistant Special Counsels Greg Andres and Andrew     b7C
Weissmann interviewed RICHARD GATES (GATES) via telephone. GATES's counsel
THOMAS GREEN (GREEN) was not present on the call, however, the attached
email communication indicated Green approved the direct contact. After
being advised of the identity of the interviewing Special Agent and the
nature of the interview, GATES provided the following information:

[SASC Weissmann admonished GATES that any questions were not intended to
reveal any communications with GREEN or anyone from GREEN's office.
Weissmann further admonished GATES to not discuss any attorney-client
privileged information of any kind during the interview; which included
any information from which GATES's sole knowledge came through GREEN or
GREEN's office.]

[GATES was admonished to not discuss communications between GATES and[    ]     b6
[      ]     b7C

When asked if since it had become publicly known that the U.S. Government
was alleging that[                    ]
[                    ] had GATES had any conversations, excluding
privileged, with anyone regarding the substance of the suspected
violation, including the topics of[                    ]     b6
[                    ]     b7A
                                                                                b7C

GATES recalled[            ]alerted GATES to the allegation discussed     b6
above, as well, but their communication had no substance.     b7C

GATES was not contacted by, nor did he have any substantive discussions     b6
regarding the allegation with,[                    ]or anyone in     b7C
[            ]GATES did not receive any messages from these people.

Investigation on   02/22/2019   at   Washington, District Of Columbia, United States  (Phone)     b7A
                                                                                                   b6
File #[            ]                                    Date drafted   02/22/2019                   b7C
                                                                                                   b7E
by[            ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2406



b7A
b7E

- 1 of 17 -

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry        05/24/2018

     Richard William Gates III, previous identified, was interviewed by FBI
Special Agents [                    ] and [                    ] Supervisory Special
Agent [                    ] Assistant Special Agent in Charge [                    ]
and Special Counsel Prosecutors Andrew Weissmann, Greg Andres and Brian
Richardson.  Present during the interview was counsel for Gates, Tom Green
from Sidley Austin LLP.  After being advised of the identities of the
interviewing parties and the nature of the interview, Gates provided the
following information:

    Gates was advised that the interview was voluntary and the terms of his
plea agreement, any responses he provided must truthful.

<u>Communications Accounts</u>

**Email**

    Gates provided the following email accounts as those used by him
currently, or in the past:

b6
b7C

b6
b7C

Investigation on   02/27/2018   at   Washington, District Of Columbia, United States (In Person)

File # [                    ]

Date drafted   02/28/2018

by [                    ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2408

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 2 -



UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   06/13/2018

**Richard William Gates III** was interviewed by Supervisory Special Agent
(SSA) [          ] ASAC [                    ] Senior Special Counsel        b6
Attorney Andrew Weissmann and Senior Special Counsel Attorney Greg Andres.    b7C
After being advised of the identities of the interviewing parties and the
nature of the interview, Gates provided the following information:

**Bank Contacts:**
     Gates stated that [                ] and [              ] had         b6
relationships with many banks. [                    ] was another contact at the   b7C
banks tied to [                    ] Paul Manafort's (Gates didn't recall the
name). According to Gates, business transactions went through [            ]
[            ]

     Gates stated that [          ] had relationships with [              ]   b6
[              ]                                                               b7C

     Gates was asked about [                      ] He was not aware of     b6
[      ] misleading documents or DMP P&Ls.                                   b7C

{At this point Forensic Accountant [            ] entered the room.}         b6
                                                                             b7C

**Campaign:**

b6
b7A
b7C

                                                                      Gates    b6
stated that Reince Priebus was aware of this, [              ]               b7C

UNCLASSIFIED//FOUO

Investigation on  02/28/2018  at  Washington, District Of Columbia, United States (In Person)   b6
                                                                                                 b7A
File # [                    ]                        Date drafted  06/11/2018                     b7C
                                                                                                 b7E
by [                        ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2425

b7A
b7E

- 1 of 12 -

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    03/22/2018

Richard William Gates III, previously identified, was interviewed by
FBI Special Agent [                    ] Supervisory Special Agent [                    ]    b6
and Special Counsel Prosecutors Andrew Weissmann and Greg Andres.  Present    b7C
for Gates were Thomas Green, [                              ] of Sidley
Austin LLP.  After being advised of the identities of the interviewing
parties and the nature of the interview, Gates provided the following
information:

Gates signed and acknowledged understanding the proffer agreement and
was reminded that the interview was voluntary, but if he chose to answer
questions he needed to be truthful in his responses.

<u>Congressman Dana Rohrabacher</u>

Gates was reminded about the memorandum from Manafort to "SL" dated
March 23, 2013 with the subject line, "US Consultants Activity - Weekly
Update" which was shown to him in a previous proffer.  Gates was reminded
that the metadata from this memorandum showed that Gates was the author of
the document.  The relevant portion of the memorandum read as
follows:

"Meeting with Congressman Dana Rohrabacher (Chairman, House
Subcommittee on Europe, Eurasia and Emerging Threats).

The meeting with Cong Rohrabacher went well.  He and I are building a
plan to create a framework to promote positive interactions between the
Govt of Ukraine and Rohrabachers' [sic] Subcommittee.

Cong Rohrabacher is open minded on Ukraine.  He is prepared to visit
Ukr to gain more understanding.  He is opposed to sanctions and said he
would not let the Subcommtitee on Eurasia entertain any proposed
legislation regarding sanctions for Ukraine."

Gates was asked why he previously said the meeting between Manafort,
[          ] and Rohrabacher in March 2013 did not relate to Ukraine.    b6
                                                                           b7C

Investigation on  02/09/2018   at   Washington, District Of Columbia, United States (In Person)

File #  [                    ]                                    Date drafted   02/13/2018    b6
                                                                                              b7A
by  [                                        ]                                                b7C
                                                                                              b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2427

b7A
b7E



- 1 of 4 -

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/11/2018

**Richard William Gates III** was interviewed by Assistant Special Agent in Charge [          ] and Special Counsel Senior Attorneys Andrew Weissmann and Greg Andres. Gates' attorney, [          ] of Sidley Austin LLP, was present. After being advised of the identity of the interviewers and the nature of the interview, Gates provided the following information:

b6
b7C

Gates stated that he has had his present mobile telephone since December 2017. He gave his previous mobile telephone to [          ] His phone prior to that was provided to [          ]

b6
b7C

**August 2016 Meeting at the Havana Club:**

Gates stated that he hadn't previously read the 6/19/2017 Washington Post article, which contained a statement from Konstantin Kilimnik regarding a meeting held in New York on 8/2/2016. Gates stated that following the 8/2/2016 meeting (which was held at New York's Havana Club), Gates spoke to Paul Manafort regarding a subsequent Politico story about it. The author of the Politico article, Kenneth Vogel, had emailed a list of questions to Manafort. Manafort forwarded these questions to Gates, who answered "no" to all the questions. Gates admitted that he lied to Vogel with these responses. He had been assured no one would find out about this meeting. Gates stated that Jared Kushner became angry following the Politico article, unsure as to why Manafort would have such a meeting.

While Gates claims he can't recall many conversations with Manafort regarding the 8/2/2016 meeting, he did recall that Manafort asked him if he (Gates) had received any telephone calls about the meeting. [          ]

b6
b7A
b7C

[          ] Gates did not recall whether he or Manafort reached out to Kilimnik once news articles of the meeting surfaced.

Gates noted that the 6/19/2017 Washington Post article quoted Kilimnik that he and Manafort spoke merely about unpaid bills, a general update on the political situation in Ukraine, and general news. Kilimnik insisted

UNCLASSIFIED//~~FOUO~~

Investigation on   03/01/2018   at   Washington, District Of Columbia, United States (In Person)

File # [          ]                                    Date drafted   04/05/2018

by [          ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2439



b7A
b7E

-1 of 11-

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/19/2018

On or around 3/12/2018, Special Agents [        ] and [        ]
and Special Counsel Prosecutor Greg Andres interviewed RICHARD "RICK"
GATES III. Also present for portions of the interview was Special Agent
[        ] and Forensic Accountant [        ] After being
advised of the identity of the interviewing team and the nature of the
interview, GATES provided the following information:

b6
b7C

### Personal Background

b6
b7C

b6
b7C

b6
b7C

b6
b7C

b6
b7C

b6
b7A
b7C

UNCLASSIFIED//~~FOUO~~

Investigation on   03/12/2018   at   Washington, District Of Columbia, United States (In Person)

File #   [        ]                                    Date drafted   03/14/2018

by   [        ]

b7A
b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2443

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 2 -



UNCLASSIFIED//~~FOUO~~

### FEDERAL BUREAU OF INVESTIGATION

Date of entry   04/18/2018

**Richard William Gates III** was interviewed by Assistant Special Agent
in Charge [                    ] and Special Counsel Senior Attorney Greg
Andres. After being advised of the identity of the interviewing Agent and
the nature of the interview, Gates provided the following information:

b6
b7C

**Overseas Travel:**
{NOTE: Gates provided three expired passports of his for review.}

   Gates stated that he had travelled to Germany on multiple occasions,
often transiting through the country. He did meet on at least one occasion
with representatives of Ukraine's Opposition Bloc in Germany.

   Gates recalled two trips he made to Russia to meet with representatives
of Oleg Deripaska's Pericles Fund. The two representatives [          ]

b6
b7A
b7C

   Gates stated that his travel to Zurich may have been a trip to the
World Economic Forum in Davos, at which he met Deripaska in 2007. It may
also have been a meeting with [                    ]

b6
b7C

**Ukraine:**
   Gates stated that he and Manafort had a number of Ukrainian
'paymasters," to include Rinat Akhmetov, [                    ]
[          ] Among the items the group worked on was brokering a truce between
Viktor Yanukovich and [              ] for the 2020 elections in the
country.

b6
b7C

   Gates stated that in the 2010 elections in Ukraine, Manafort had
brought in election observers and had provided polling data to [    ]

b6
b7C

   Serhiy Lyovochkin was viewed as a centrist who had conducted business
deals with [                    ]

b6
b7C

UNCLASSIFIED//~~FOUO~~

| Investigation on | 03/16/2018 | at | Washington, District Of Columbia, United States (In Person) |
|---|---|---|---|

File # [                    ]

Date drafted   03/31/2018

by [                    ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2454



b7A
b7E

-1 of 5-

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   04/25/2018

Richard William Gates III, previously identified, was interviewed by
Supervisory Special Agent (SSA) [ ] ASAC [ ] Senior
Special Counsel Attorney Andrew Weissmann and Senior Special Counsel Attorney Greg
Andres. After being advised of the identities of the interviewing parties and the
nature of the interview, Gates provided the following information:

b6
b7C

Pericles Fund

The first time Gates traveled to Russia was in late 2007 or early 2008. Gates
traveled from the U.S. to Moscow and stayed there for approximately two days. At
Paul Manafort's direction, Gates traveled to meet [ ] and B-
Invest employees in Moscow regarding the Pericles investment. This meeting was
scheduled soon after Oleg Deripaska and Manafort decided to create and fund
Pericles. [ ] was responsible for organizing logistics related to Gates'
meeting with B-Invest. However, [ ] did not attend the meeting. Manafort
purposefully excluded [ ] from the meeting because [ ] was not aware of
the amount of money which was invested in the Pericles, and Manafort wanted a wall
between his political work portfolio and his financial work portfolio.

b6
b7A
b7C

Gates met with the following B-Invest employees at their Moscow office: [ ]
[ ] The purpose of the meeting was to
discuss the Pericles investment strategy. The following investment sectors were
considered: (1) telecom; (2) real estate - focus on Odessa; (3) pharmaceuticals;
(4) agriculture; and (5) media companies.

Approximately two to three month later, a second meeting was held in Moscow
which Gates attended. Gates speculated that he traveled from Ukraine to Moscow
for this meeting. The purpose of this meeting was to finalize their investment
strategy, pick the top five investment targets and agree on funding for
Pericles. The same people from B-Invest who attended the first meeting attended
this meeting. Gates did not meet [ ] during this trip.

b6
b7A
b7C

At approximately the end of 2008, Manafort directed Gates to attend a third
meeting with B-Invest representatives in Moscow. At this meeting, Gates was
advised by B-Invest that the Perciles was being put on hold and that no capital
contributions were going to be made by Deripaska. Gates assumed Manafort had
already heard this from Deripaska.

Ukraine

Investigation on   03/18/2018   at   Washington, District Of Columbia, United States (In Person)

File # [ ]                                        Date drafted   04/02/2018

by [ ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

- 1 of 7 -



FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    05/29/2018

Richard Gates, was interviewed at 395 E Street SW, Washington, D.C.
Present for the interview were SA [        ] Senior Assistant
Special Counsel (SASC) Jeannie Rhee, SASC Andrew Weissmann, IA [     ]
[        ] and SSA [        ]. After being advised of the official
identities of the interviewing parties and the nature of the interview,
Gates provided the following information:

    Gates first joined the Trump campaign team on or about March 26, 2016.
Gates said his assignment was in North Dakota.

    Roger Stone helped bring Paul Manafort onto the Trump campaign team.
Stone specialized in media strategy, while Manafort was the "man on the
ground" focusing on things like primaries. Manafort did not know Trump
that well

b6
b7A
b7C

    Gates was asked to provide context to [        ]
sent from Stone to Gates.

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

UNCLASSIFIED//~~FOUO~~

Investigation on    03/21/2018    at    District of Columbia, District Of Columbia, United States
    (In Person)

File #    [        ]                                    Date drafted    04/18/2018

by    [        ]

b6
b7A
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2461

b7A
b7E

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   04/18/2018

    **Richard William Gates III** was interviewed by FBI Supervisory Special
Agent[         ] Assistant Special Agent in Charge[        ]    b6
[     ]and Senior Special Counsel Attorneys Andrew Weissmann and Greg   b7C
Andres. After being advised of the official identities of the interviewing
parties and the nature of the interview, Gates provided the following
information:

    Gates indicated that[      ]had worked with Paul Manafort and[  ]
[   ]on the[      ]project.[                ]     b6
                                                                    b7C

    In 2014, Davis Manafort Partners (DMP) started winding down, having
unsuccessfully sought to assist Opposition Block efforts in Ukraine.[  ]

b6
b7C

    Throughout their dealings[     ]asked Gates to seek additional    b6
investors throughout Europe. Gates, utilized his contacts in Europe, as   b7C
well as the lure of tax credits for film investments, to find investors in
Ukraine and Great Britain.

    Gates understood that[   ]had additional separate projects he was not  b6
familiar with. He did at some point meet[        ]a former[      ]   b7C

UNCLASSIFIED//~~FOUO~~

| | | |
|---|---|---|
| Investigation on  03/27/2018  at  Washington, District Of Columbia, United States (In Person) | | |
| File #[           ] | Date drafted  03/31/2018 | b7A b7E |
| by[             ] | | b6 b7C |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//~~FOUO~~

FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/23/2018

On 03/18/2018, Richard GATES was interviewed, which was documented in
an FD-302, Serial 445 of captioned investigation.

b6
b7A
b7C

UNCLASSIFIED//~~FOUO~~

b3
b6
b7A
b7C
b7E

Investigation on  04/17/2018  at  Washington, District Of Columbia, United States (In Person)

File #                                                Date drafted  04/17/2018

by

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2470

b7A
b7E

FD-302 (Rev. 5-8-10)

-1 of 1-



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    05/01/2018

**Richard William Gates III** was interviewed by FBI Supervisory Special Age
nt [          ] and Senior Special Counsel Attorneys Greg Andres. After
being advised of the official identities of the interviewing parties and
the nature of the interview, Gates provided the following information:

b6
b7C

b6
b7C

Gates stated that Paul Manafort had

b6
b7C

b6
b7C

b6
b7C

b6
b7C

Investigation on  04/17/2018  at  Washington, District Of Columbia, United States (In Person)

File # [          ]                                                    Date drafted  04/24/2018

by [          ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2471

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 3 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   06/22/2018

(U) On 04/17/2018 Special Agents                          b6
and  Assistant Special Counsels Greg Andres and Aaron Zelinksy interviewed   b7C
RICHARD GATES (GATES) at the Special Counsel's Office. After being advised
of the identity of the interviewing Agent and the nature of the interview,
GATES provided the following information:

(U) GATES was shown a photograph of Theodore Malloch. GATES did not
believe he knew the person or had met the person in the DONALD J. TRUMP
(TRUMP) campaign or at TRUMP campaign headquarters. GATES recognized the
person in the photograph from recent appearances in the news.

(U) GATES recalled BOB MCLAUGHLIN (ph), a tall Congressman from the State
of Georgia. GATES' recollection involved JEROME CORSI (CORSI). GATES
                                      They met related to CPAC and   b6
MCLAUGHLIN was on a subcommittee of CPAC which GATES said he could find by   b7C
looking at open sources related to CORSI.
                      They had no discussions related to the hack of DNC emails
or Wikileaks.

(U) GATES was sure there was an opposition document related to TRUMP but
did not recall any specifics. He did not recall anyone,                 b6
              talking about an opposition document. GATES did not think it was a   b7A
single codified document, but more a collection of opposition research.   b7C
The discussions would have been about TRUMP needing to worry about this or
that as opposed to an exact document.

(U) They heard lots of things about DNC opposition research, but again not
a document. It was information held by specific people like                   b6
                                                                              b7C

(U) The TRUMP campaign did not receive a lot of assistance from the RNC
until TRUMP became the nominee. Before then, they experienced opposition
from both the left and the right.

Investigation on   04/17/2018   at   Washington, District Of Columbia, United States (In Person)

File #                                              Date drafted   04/24/2018   b6
                                                                                b7A
by                                                                              b7C
                                                                                b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2472

b7A
b7E

FD-302 (Rev. 5-8-10)

-1 of 3-

OFFICIAL RECORD

UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/30/2018

RICHARD GATES, was interviewed at 395 E Street SW, Washington, D.C.
Also present in the interview were SSA _____ Senior Assistant
Special Counsel (SASC) Greg Andres, and Assistant Special Counsel (ASC)
Aaron Zelinsky. After being advised of the official identities of the
interviewing parties and the nature of the interview, GATES provided the
following information:

b6
b7C

GATES was shown a photograph (enclosed) of _____
_____ and asked if he recognized the person shown. GATES advised he did
not recognize the individual in the photograph. GATES was then asked if
_____
_____
_____ GATES said it was not
uncommon for people seeking meetings to contact RHONA GRAFF directly. Most
often, GRAFF would forward these requests to GATES.

b6
b7A
b7C

GATES advised JARED KUSHNER and JASON GREENBLATT took the lead on
campaign matters related to the Jewish community and wanted GATES to set
up a Jewish coalition to support the campaign. GATES said KUSHNER
mentioned Israelis quite often. GATES recalled hearing the name WALID
PHARES. GATES further advised _____ had numerous private
conversations with DONALD TRUMP and KUSHNER.

b6
b7C

b6
b7A
b7C

b6
b7A
b7C

UNCLASSIFIED//FOUO

Investigation on   04/19/2018   at   Washington, District Of Columbia, United States (In Person)

File #  _____   Date drafted   04/23/2018

by _____

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2475

b7A
b7E

FD-302 (Rev. 5-8-10)

-1 of 2-



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/04/2018

**Richard William Gates III** was interviewed by FBI Supervisory Special
Agent [        ] and Senior Special Counsel Attorney Greg Andres. After
being advised of the official identities of the interviewing parties and
the nature of the interview, Gates provided the following information:

b6
b7C

In 2017, at the direction of [            ], Gates and [            ]
[                        ] formed an entity called [            ] This entity
was formed as a vehicle for [        ] to invest in [            ]

b7A
b6
b7C

b6
b7C

b6
b7C

b6
b7C

Investigation on  04/19/2018  at  Washington, District Of Columbia, United States (In Person)

File # [            ]                                             Date drafted  04/24/2018

b7A
b7E

by [            ]

b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

- 1 of 2 -

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/05/2018

**Richard William Gates III** was interviewed by Assistant Special Agent in
Charge _____ and Special Counsel Attorney Greg Andres.
After being advised of the identity of the interviewers and the nature of
the interview, Gates provided the following information:

**Ledgers/Accounts:**
    Gates stated that he met _____ on one occasion at Paul
Manafort's home. Gates believed that _____ was on the company's
health care plan, possibly listed as an employee.

b6
b7C

b6
b7C

b6
b7C

b6
b7C

**Work with Poroshenko:**
    In 2014, following the departure of Viktor Yanukovych from Ukraine,
there was a chaotic interval (from March 2014 until December 2014) in
which Manafort was retained by Petro Poroshenko. The two eventually split
over a financial dispute.

b6
b7C

b6
b7C

UNCLASSIFIED//~~FOUO~~

Investigation on  05/24/2018  at  Washington, District Of Columbia, United States (In Person)     b7A
                                                                                                    b7E
File # _____                                          Date drafted  06/04/2018

by _____                                                                                     b6
                                                                                                    b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 2 -

UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   05/11/2018

**Richard William Gates III** was interviewed by Assistant Special Agent in
Charge [                    ] Special Counsel Attorney Greg Andres, and
Forensic Accountant [                    ] After being advised of the identity
of the interviewers and the nature of the interview, Gates provided the
following information:

b6
b7C

Gates stated that Paul Manafort divided up funds amongst [            ]
[        ] These fiscal moves were typically done by either Gates or
[        ]

b6
b7C

[                    ] that, upon receiving
bank statements, would prepare financial statements to justify money
movements. Gates and Manafort worked with [    ] in 2009 to 2010, though no
engagement letter was signed with that company. [    ] had accounts in St.
Vincent & Grenadines.

b6
b7A
b7C

b6
b7C

Gates stated that following the election of Viktor Yanukovych in
Ukraine, Davis Manafort Partners (DMP) entered into a $1 million per
quarter consulting agreement with the administration. This agreement was
forwarded to DMP by [                    ] for Sergey Lyovochkin who is
based in Cyprus.

b6
b7C

In their dealings with Ukrainian clients in creating new contracts,
Manafort would initially forward the terms of the contract to Gates. Gates
would draft a contract, which would then be sent to Konstantin Kilimnik
for translation prior to being sent to the other party.

UNCLASSIFIED//~~FOUO~~

| | | | |
|---|---|---|---|
| Investigation on | 05/03/2018 | at | Washington, District Of Columbia, United States (In Person) |
| File # | [            ] | | Date drafted   05/09/2018 |
| by | [                ] | | |

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

- 1 of 2 -

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/23/2018

**Richard William Gates III** was interviewed by Assistant Special Agent in
Charge [                    ] and Special Counsel Attorneys Greg Andres and    b6
Brandon Van Grack. After being advised of the identity of the interviewers    b7C
and the nature of the interview, Gates provided the following information:

Throughout the spring of 2016, the Trump campaign sought surrogates to
speak on its behalf on various topics. By mid-April 2016 principal among
these were Jeff Sessions, Larry Kudlow, Rudolph Giuliani, and Mike Flynn.
Gates described Flynn as the "chief surrogate" of Trump who traveled with
the candidate often, including to several rallies in the South.

Gates could not recall anything about a 6/30/2016 meeting between Paul
Manafort and Flynn in New York. Gates first met Flynn in person on the
campaign plane. Gates had previously emailed and telephoned Flynn and [    ]    b6
[    ] regarding campaign logistics.                                              b7C

Gates could not recall a specific telephone call with Flynn on 6/23
/2016. Gates was shown an email dated 6/23/2018 between Flynn and [    ]       b6
[    ] arranging a telephone call. Gates opined the call may have taken         b7C
place to coordinate logistics. Gates recalled that Flynn had discussed
contacting consultants on matters such as opposition research, and sought
to identify additional surrogates. He was unsure whether Flynn discussed
social media matters.

Upon being shown a one page document titled "The MediaMeter," a
business proposal on social media, Gates stated he "vaguely" recalled the
document, but added that everyone was trying to bring their own contacts
and proposals to the campaign. Gates stated that Brad Parscales handled
the bulk of social media work for the campaign. Gates stated he did not
recall meeting with a company at the request of Flynn.

Gates was present on the campaign plane when Flynn spoke to Trump
regarding his views on the weakness of the U.S. intelligence agencies.
Gates believed Flynn was personally bitter for having been fired from his

UNCLASSIFIED//~~FOUO~~

| | | |
|---|---|---|
| Investigation on | 05/03/2018 at Washington, District Of Columbia, United States (In Person) | b6 b7A |
| File # [                    ] | Date drafted 05/07/2018 | b7C b7E |
| by [              ] | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2484

b7A
b7E

-1 of 2-

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/08/2018

    **Richard William Gates III** was interviewed by Assistant Special Agent in
Charge [ ] and Special Counsel Attorney Greg Andres.
After being advised of the identity of the interviewers and the nature of
the interview, Gates provided the following information:

b6
b7C

## July 2014 Interview:
    Gates stated that he was previously interviewed by the FBI in July
2014. At the time, the U.S. DOJ was working with Ukrainian authorities
examining the movement of assets by Viktor Yanukovych. Gates was
interviewed first, followed by Paul Manafort. Gates stated that he
provided the interviewers with names of accounts and individuals he dealt
with in Ukraine.

## DMP:
    Gates reiterated that the principals of Davis Manafort Partners (DMP)
were [ ] and Paul Manafort. [ ] held no equity in
the firm. Gates described himself as an employee of DMP. He received W2s
from the company during his time there.

b6
b7A
b7C

## Ukraine:
[ ] was DMP's principal when they first entered into business in
Ukraine. Eventually, when [ ] Manafort remained to
handle Ukrainian matters.

b6
b7C

    Gates stated that the Party of Regions was a successful political party
in Ukraine for a five year stretch. Sergey Lyovochkin, Chief of Staff for
Yanukovych, was among the party's leaders. [ ] was considered
a "#2" in the party handling nationwide campaigns.

b6
b7C

    Gates met [ ] a few times while working on the campaign of
[ ] Gates met [ ] a few times as well.

    Gates stated that Kilimnik worked in the Moscow office of the
International Republican Institute (IRI), whose stated goal was to foster
democracy as a NGO which enjoyed bi-partisan support. John McCain was a
Chairman of the IRI.

UNCLASSIFIED//~~FOUO~~

Investigation on  05/03/2018  at  Washington, District Of Columbia, United States (In Person)

File # [ ]                                             Date drafted  06/06/2018

by [ ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2486

b7A
b7E

- 1 of 1 -

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//~~FOUO~~

FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/12/2018

**Richard William Gates III** was interviewed by Assistant Special Agent in Charge [          ]. After being advised of the identity of the interviewer and the nature of the interview, Gates provided the following information:

b6
b7C

Gates stated that Donald Trump 'hated' Nikki Haley. Gates stated that it was known among Trump's advisors that [                              ]

b6
b7C

Vice President Mike Pence has all the ties in Congress amongst the administration. Gates pointed out that President Trump and Senator Mitch McConnell hated each other.

Gates believes that Treasury Secretary Steve Mnuchin, as well as several other cabinet members, merely accepted their roles to obtain a divestment tax credit for their portfolios.

Gates stated that he had discussed two deals with Timur Sapir in the past.

b6
b7C

UNCLASSIFIED//~~FOUO~~

Investigation on    05/03/2018    at    Washington, District Of Columbia, United States (In Person)

File #                                                                    Date drafted    06/11/2018

by

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 1 -

UNCLASSIFIED/~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     06/13/2018

**Richard William Gates III** was interviewed by Assistant Special Agent in Charge [                    ] and Special Counsel Attorney Greg Andres. After being advised of the identity of the interviewers and the nature of the interview, Gates provided the following information:

b6
b7C

**Contacts:**

Since last being interviewed, Gates spoke to [            ] three times (once alone and twice in the presence of [            ] [            ] Gates has also had one conversation with [            ] [            ] and two conversations with Maggie Haberman.

b6
b7C

Last week, Gates exchanged a text message with Brad Parscale over being named in a lawsuit filed by the Democratic National Committee (DNC).

**PIC:**

[            ] and Wiley-Rein were the legal representatives for the Presidential Inauguration Committee.

b6
b7C

**Antes:**

Gates identified Antes as a Bahamian entity tied to Paul Manafort.

UNCLASSIFIED/~~FOUO~~

| | | |
|---|---|---|
| Investigation on | 05/03/2018 at | Washington, District Of Columbia, United States (In Person) |
| File # | | |
| by | | Date drafted   06/08/2018 |

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//~~FOUO~~

FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/04/2018

**Richard William Gates III** was interviewed by Assistant Special Agent in
Charge [                    ] and Special Counsel Attorney Greg Andres.
After being advised of the identity of the interviewers and the nature of
the interview, Gates provided the following information:

b6
b7C

[                                                           ]

[                                        ] The job was previously held

b6
b7C

[                          ] Gates stated that [                          ]

[                          ]

Gates stated that [                                        ]. That
job, he believed, was done by [          ] if needed.

b6
b7C

Investigation on   05/31/2018   at   Washington, District Of Columbia, United States (In Person)

File # [                        ]                                          Date drafted   06/01/2018

by [                        ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2490

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//~~LES~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/26/2018

On Wednesday, June 13, 2018, Richard Gates appeared at the Office of the
Special Counsel
Also present were Senior Assistant
Special Counsel Greg D. Andres and Gates' attorney, Tom Green. The
following information was furnished:

b6
b7C

Since his last meeting with the Office of the Special Counsel, Gates has
been in contact with

Gates could not recall the name and/or ever meeting

Gates acknowledged he was aware of

b6
b7C

UNCLASSIFIED//~~LES~~

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b6
b7A
b7C
b7E

Investigation on   06/13/2018   at   Washington, District Of Columbia, United States (In Person)

File #                           Date drafted   06/18/2018

by

b7A
b7E

FD-302 (Rev. 5-8-10)

-1 of 1-



UNCLASSIFIED//~~LES~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     07/03/2018

On Wednesday, June 20, 2018, Richard Gates appeared at the Office of the
Special Counsel in preparation for

[                                    ] Also present were Senior Assistant
Special Counsel Greg D. Andres and Gates' attorney, Tom Green. The
following information was furnished:

b6
b7C

Prior to pleading guilty, [    ] Paul Manafort [          ] told Gates
he had to be careful with his new attorney, Tom Green, because

b6
b7A
b7C

Manafort and Gates were both [              ]

b6
b7C

As far as Gates was aware, DMP International was 100% owned by Paul
Manafort.

Gates stated

b7A

b7A

Investigation on   06/20/2018   at   Washington, District Of Columbia, United States (In Person)

File #

Date drafted   06/28/2018

by

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2492

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 1 -

UNCLASSIFIED//~~LES~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/03/2018

On Wednesday, June 27, 2018, Richard Gates appeared at the Office of the
Special Counsel

                                     Also present were Senior Assistant
Special Counsel Greg D. Andres and Gates' attorney, Tom Green. The
following information was furnished:

b6
b7C

(

b6
b7C
b7E

b6
b7C

b6
b7C

b6
b7C

UNCLASSIFIED//~~LES~~

b6
b7A
b7C
b7E

Investigation on   06/27/2018   at   Washington, District Of Columbia, United States (In Person)

File # _____    Date drafted   06/28/2018

by _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2493

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//~~LES~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/18/2018

On Thursday, July 5, 2018, Richard Gates appeared at the Office of the
Special Counsel ⬚                           Also present were Senior Assistant
Special Counsel Greg D. Andres, FBI Special Agent ⬚               and          b6
⬚                      . The following                                           b7C
information was furnished:

Since his last meeting with the Office of the Special Counsel on July 5,
2018, Gates has been in contact with ⬚           regarding a potential          b6
news article about Gates, ⬚                   in the NY Times.                    b7C

Note: After approximately two hours SA ⬚     left and ⬚                           b6
⬚                                  took over.                                     b7C

⬚                                                                                 b6
⬚                                                                                 b7C

⬚

b6
b7A
Investigation on   07/12/2018   at   Washington, District Of Columbia, United States (In Person)    b7C
                                                                                                     b7E
File # ⬚
                                              Date drafted   07/14/2018

by ⬚

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2494

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 3 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   09/12/2018

Richard W. Gates III, previously identified, was interviewing
telephonically by FBI Special Agent [                    ] FBI Contractor [          ]
[              ] and Special Counsel Prosecutors Andrew Weissman and Greg
Andres.  Present on the call during the interview was Gates' counsel, Tom
Green.  After being advised of the identities of the interviewing agents
and the nature of the interview, Gates provided the following information:

b6
b7C

Gates was not involved in the distribution of funds as it related to
the Presidential Inaugural Committee (PIC).  Gates was not involved in the
financial/budget decisions for the PIC either. [                              ]

b6
b7A
b7C

While testifying at Paul Manafort's trial in the Eastern District of
Virginia (EDVA), Gates said it was "possible" that he submitted a false
expense report to the PIC [                                              ]

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

Gates did not like or get along with [          ] When [        ] initially
joined the PIC, she got mad at Gates because Gates did not [              ]
[                    ] Gates also did not like [                  ]

b6
b7C

Investigation on  08/18/2018  at  Washington, District Of Columbia, United States  (Phone)

File [                              ]                         Date drafted  09/10/2018

by [                            ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

— 1 of 3 —



FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     10/23/2018

On or around 9/27/2018, SA [REDACTED] Special Counsel Prosecutors
(SCP) Greg Andres and Andrew Weissmann interviewed RICHARD GATES III at
the offices of GATES' counsel, Thomas C Green. Green was present for the
interview. After being advised of the identity of the interview team,
GATES provided the following information:                    b6
                                                             b7C

**Black Caviar Email**

GATES was shown the above-referenced email (attached as a 1A).

"V" was a reference to VICTOR BOYARKIN. GATES understood BOYARKIN to be
OLEG DERIPASKA's security person.

Fine caviar and fine vodka were common gifts in Ukraine. The only time
GATES recalled any of DMP's clients giving PAUL MANAFORT caviar was a
story that [REDACTED]                                           b6
[REDACTED]                                                     b7A
[REDACTED]                                                     b7C

[REDACTED]                                                     b6
                                                               b7C

The largest payments that DMP had received for its Ukraine work had come   b6
from [REDACTED]                                                            b7C

[REDACTED]                                                     b6
                                                               b7A
                                                               b7C
[REDACTED]                                                     b6
                                                               b7C
[REDACTED]

[REDACTED]                                                     b6
                                                               b7C

UNCLASSIFIED//~~FOUO~~

Investigation on   09/27/2018   at   Washington, District Of Columbia, United States (In Person)   b6
                                                                                                    b7A
File # [REDACTED]                                                                                    b7C
                                                       Date drafted   10/01/2018                     b7E

by [REDACTED]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

- 1 of 8 -

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/26/2018

On or around 9/27/2018, SA [          ] SA [          ] Special
Counsel Prosecutor (SCP) Greg Andres, Assistant US Attorneys [          ]
[                              ] and Trial Attorney [          ]
[                    ] from DOJ's Counterintelligence and Export Control
Section interviewed RICHARD GATES III at the offices of GATES'
counsel, Tom Green. Green was present for the interview. After
being advised of the identity of the interview team, GATES provided
the following information:

b6
b7C

### Genesis of MANAFORT lobbying for Party of Regions

PAUL MANAFORT had tried to pitch a lobbying campaign to VICTOR
YANUKOVYCH and SERGEI LYOVOCHKIN in advance of the elections in
2007 or 2008, but was unsuccessful. MANAFORT had pitched. GATES had
helped draft a memo on this topic that had then been given to
KONSTANTIN KILIMNIK for translation.

In 2011 or 2012, YANUKOVYCH signed off on a lobbying campaign.
GATES opined that at this time, YANUKOVYCH was in a financially
better position and that he had more trust in MANAFORT from their
work together.

b6
b7A
b7C

UNCLASSIFIED//~~FOUO~~

b3
b6
b7A
b7C
b7E

Investigation on   09/27/2018   at   Washington, District Of Columbia, United States (In Person)

File # [                        ]                            Date drafted   10/01/2018

by [                              ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2521

b7E

- 1 of 14 -

Ｏfficial Ｒecord

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    03/12/2018

Robert Ian Goldstone, DOB: _____ 1500 Washington Street, 2W, Hoboken,
New Jersey 07030, 917 743-1438, was interviewed at the Special Counsel's
Office, Washington D.C. Also present were attorneys _____
_____ of Gage, Spencer and Fleming, Assistant Special                    b6
Counsel L. Rush Atkinson, Special Agents _____ and                        b7C
_____ Intelligence Analysts _____ and _____ and
Staff Operations Specialist _____ After being advised of the
identity of the interviewing agents and the nature of the interview,
GOLDSTONE provided the following information:

b5 per DOJ/OIP

Some of GOLDSTONE'S clients include _____                    b5 per DOJ/OIP
_____ EMIN AGALAROV

b5 per DOJ/OIP
b6
b7C

In 2012 GOLDSTONE started working for EMIN AGALAROV.

b5 per DOJ/OIP
b6
b7C

b5 per DOJ/OIP
b6
b7C

UNCLASSIFIED//FOUO

Investigation on  02/08/2018  at  Washington, District Of Columbia, United States (In Person)
                                                                                    b6
File # _____                              Date drafted  02/09/2018               b7C
                                                                                    b7E
by _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2529

b7E

FD-302 (Rev. 5-8-10)

- 1 of 11 -



UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    03/01/2019

    Jeffrey Duane GORDON, date of birth (DOB)         cellular telephone number        email address of          was interviewed at the FBI Washington Field Office, 601 4th St NW, Washington D.C. GORDON was accompanied by his attorney,        Present for the interview were Special Agent        Supervisory Intelligence Analyst      Senior Assistant Special Counsel Jeannie Rhee, and Assistant Special Counsel Aaron Zelinsky. After being advised of the identity of the interviewing agents and the nature of the interview, GORDON provided the following information:

b6
b7C

b5 per DOJ/OIP

    During the March 31, 2016 foreign policy meeting TRUMP had said that he didn't want to have World War III over Ukraine and that he wanted better relations with Russia.

b5 per DOJ/OIP

UNCLASSIFIED//~~FOUO~~

Investigation on  02/14/2019  at  Washington, District Of Columbia, United States (In Person)

File #

Date drafted  02/14/2019

by

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2543

b7E

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry   11/28/2017

    JEFFERY D. GORDON (GORDON), date of birth (DOB) [_____] was
interviewed at the FEDERAL BUREAU OF INVESTIGATION (FBI), Washington Field
Office (WFO), 601 4th Street NW, Washington, DC 20535 on August 29, 2017.
GORDON's telephone number is [_____] and his email address is [_____]
[_____] GORDON was advised that the nature of the interview
was to discuss activities related to Russia and the 2016 Presidential
campaign. GORDON was advised that false statements to the FBI were a
violation of federal law and that his statements must be true and accurate
to the best of his knowledge. After being advised of the identities of the
interviewing Agents and the nature of the interview, GORDON provided the
following information:

b6
b7C

    GORDON was glad the interviewing Agents were speaking with him as he
believed there were a lot of shenanigans happening at the highest levels.
Specifically, GORDON was upset that the administration had not been
truthful in the media with regards to contact with Russians. GORDON has
kept apprised of the information about Russia in the news and relayed his
willingness to fully cooperate with the Special Counsel investigation.

Background

    GORDON served as a Commander in the Navy and formerly held the position
of spokesperson for the US DEPARTMENT OF DEFENSE (DOD) at the Pentagon.
During his prior service and employment, GORDON interacted with many
foreign governments on an official capacity. Upon his departure from the
US DOD, three separate governments held going away parties in GORDON's
honor; Finland, Yemen, and Canada. GORDON received approval to attend
those events and coordinated with U.S. Government agencies for the event
held at the Yemeni consulate. All of the events were held at their
respective foreign consulates or embassies.

    GORDON now operates his own consulting business, called J.D. GORDON
COMMUNICATIONS, LLC. GORDON has been a political guest speaker on a
variety of media outlets, such as FOX NEWS and the WASHINGTON TIMES.

---

Investigation on   08/29/2017   at   Washington, District Of Columbia, United States (In Person)

File # [_____]                                   Date drafted   09/01/2017

by [_____]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2554

b7A
b7E

FD-302 (Rev. 5-8-10)

- 1 of 14 -

UNCLASSIFIED//~~LES~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/16/2018

On Tuesday, January 9, 2018, JONATHAN HAWKER (HAWKER) was interviewed
at the Office of the Special Counsel in Washington, D.C. Present for the
interview were FBI Special Agent [                    ] DOJ Senior Financial
Investigator [                    ] Senior Assistant Special Counsels
Andrew A. Weissmann and Greg D. Andres and Assistant Special Counsel Brian
M. Richardson. Also present were HAWKER's attorneys, [                    ]
[          ] Hunton & Williams LLP, 2200 Pennsylvania Avenue, Washington
DC, telephone number (202) 955-1500. After being advised of the identity
of the interviewing parties and the nature of the interview, HAWKER
provided the following information:

b6
b7C

**NOTE: Special Agent** [      ] **and Senior Assistant Special Counsel Andres were
only present for the morning portion of the interview of HAWKER.**

b6
b7C

Prior to the interview commencing, Attorney [        ] advised he
represented both HAWKER and HAWKER's former employer, FTI Consulting.

b6
b7C

Special Counsel Attorney Andrew Weissmann advised HAWKER that his
participation in the interview was voluntary. HAWKER was also advised that
he needed to be truthful in his answers and lying to a Federal agent could
constitute a Federal crime. HAWKER verbally acknowledged that he
understood.

HAWKER BACKGROUND

b6
b7C

UNCLASSIFIED//~~LES~~

| | | | |
|---|---|---|---|
| Investigation on | 01/09/2018 at | Washington, District Of Columbia, United States (In Person) | b6 b7A |
| File # | | | b7C b7E |
| | | Date drafted 01/10/2018 | |
| by | | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7E

FD-302 (Rev. 5-8-10)

- 1 of 10 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   03/22/2018

(U) On 02/01/2018 Special Agents                        and
Intelligence Analyst                        and Assistant Special Counsel     **b6**
Aaron Zelinksy interviewed JACOB HEILBRUNN (HEILBRUNN) at The Special     **b7C**
Counsel's Office in Washington, DC. Present for the interview were
Heilbrunn's counsel,                        . The
interview was pursuant to a proffer agreement. After being advised of the
identity of the interviewing Agents and the nature of the interview,
HEILBRUNN provided the following information:

b5 per DOJ/OIP

b5 per DOJ/OIP

b5 per DOJ/OIP

b5 per DOJ/OIP

Investigation on   02/01/2018   at   Washington, District Of Columbia, United States (In Person)

File #                              Date drafted   02/05/2018     **b6**
**b7C**
by                                                                **b7E**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7E

- 1 of 3 -

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    05/30/2017

(U//~~FOUO~~) Rachel Mary HOFF, date of birth (DOB) [          ] social    b6
security number [          ] residence [          ]    b7C
[          ] was interviewed by SAs [          ]
[          ] at the FBI Washington Field Office on May 26, 2017.  After
being advised of the identity of the interviewing agents and the nature of
the interview, HOFF provided the following information:

(U//~~FOUO~~) HOFF was a delegate for the District of Columbia at the 2016
Republican National Convention (RNC).  HOFF explained her first time being
a delegate at the RNC was in the 2012 election cycle.  The 2016 RNC was
HOFF's first time on a Platform Committee.  HOFF worked on the National
Security and Defense Platform Committee.  Her full-time employment was
working [          ] where    b6
she was employed during the time of the RNC up until approximately    b7C
[          ] HOFF informed the interviewing agents she began employment with
[          ]

(U//~~FOUO~~) HOFF explained the National Security and Defense Platform
Committee worked for approximately two days.  According to HOFF the room
was filled with delegates to the RNC, certain members of the media or VIP
staff, one RNC paid transcriber, two volunteers from the Republican
National Committee, and two members from the 2016 Trump
Campaign.  However, HOFF stated only delegates were permitted to take part
in the formal discussions on what the platform should state.  HOFF
believed the non-delegates in the room may interject their opinions or
ideas informally to delegates during breaks or outside of the official
Platform Committee meeting room.  According to HOFF the two Republican
National Committee staffers were [          ] and    b6
the Trump Campaign members were JD Gordon and an individual who's name was    b7C
unknown to her.  According to HOFF, [          ]
[          ] works on Capitol Hill as a staffer for
an unknown congressman or senator.

(U//~~FOUO~~) HOFF informed the interviewing agents she had met JD Gordon
previously but still is unaware who the other Trump Campaign staffer
is.  According to HOFF, she had limited interaction with JD Gordon during

UNCLASSIFIED//~~FOUO~~

Investigation on    05/26/2017    at    Washington , District Of Columbia, United States (In
Person)

File # [          ]    Date drafted    05/26/2017    b3
b6
by [          ]    b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2610

b7E

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry        12/15/2017

JAMES M. HOSKINS JR., date of birth (DOB) [          ] social
security account number (SSAN) [          ] was interviewed at his
residence, [                                    ] HOSKINS was
advised the nature of the interview was to discuss a foreign policy
meeting he attended for the DONALD J. TRUMP campaign on March 31, 2016.
HOSKINS was further advised intentionally providing false statements to
the interviewing Agents would be a violation of federal law. After being
advised of the nature of the interview and the identities of the
interviewing Agents, HOSKINS provided the following information:

b6
b7C

HOSKINS acknowledged his presence at the meeting on March 31, 2016.
The agents showed HOSKINS a photograph which was taken at the meeting. The
Agents then advised of a recent Washington Post article which alleged
GEORGE PAPADOPOULOS had introduced the concept of arranging a meeting
between then-Candidate TRUMP and Russian president, VLADIMIR PUTIN.

HOSKINS immediately identified PAPADOPOULOS in the photograph and
stated to the best of his recollection, he remembered everyone at the
meeting went around the table and introduced themselves. When it was
PAPADOPOULOS' turn, he said something to the effect of "Mr. PUTIN would
like to meet you," which was almost immediately met with a response of "no
you shouldn't" from the others in the room. HOSKINS remembered the
response happened microseconds after PAPADOPOULOS proposed the idea.
HOSKINS couldn't recall who had spoke first but surmised it was likely
JEFF SESSIONS who was the first to say no to PAPADOPOULOS. That was the
first and last time HOSKINS saw PAPADOPOULOS.

HOSKINS further identified SESSIONS, [          ] J.D. GORDON, [       ]
[                                    ] and KEITH KELLOGG in the
photograph. SESSIONS invited HOSKINS to the meeting to discuss topics
related to intelligence and cyber activities. During the meeting, HOSKINS
expressed that Russia, China, terrorism in the Middle East, and North
Korea would all be continued threats in the immediate future. HOSKINS
spoke after PAPADOPOULOS.

b6
b7C

HOSKINS did not remember the topic of the Ukraine being brought up at
any time. He rather recalled the focus of the meeting was on the nuclear

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2613

b7E
b6
b7C

FD-302 (Rev. 5-8-10)

CLASSIFIED BY: NSICG
REASON: 1.4 (C)
DECLASSIFY ON: 12-31-2042
DATE: 02-11-2020

- 1 of 14 -

~~SECRET~~

~~UNCLASSIFIED~~//~~FOUO~~

Official Record

**FEDERAL BUREAU OF INVESTIGATION**

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

Date of entry    10/05/2017

Jason James Miller, date of birth [          ] was interviewed at
the law offices of Greenberg Traurig, at 2101 L. Street, N.W., Washington,
D.C. 20037. Miller was accompanied by his personal counsel, [          ]
and email address [          ] from the law offices of Greenberg
Traurig. Participating in the interview were FBI Special Agents (SA)
[          ] and Special Counsel's Office
attorneys Brandon VanGrack and Zainab Ahmad. After being advised of the
identities of the interviewing team and the purpose of the interview,
Miller provided the following information:

b6
b7C

b5 per DOJ/OIP

b6
b7C

b5 per DOJ/OIP

b5 per DOJ/OIP

~~UNCLASSIFIED~~//~~FOUO~~

Investigation on   08/31/2017   at  Washington, District Of Columbia, United States (In Person)

File #  [          ]                          Date drafted   08/31/2017

by  [          ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

~~SECRET~~

b6
b7A
b7C
b7E

FBI(19cv1278)-2616

b7A
b7E

- 1 of 6 -

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/01/2018

b6
b7C

Olga Kalashnikova, date of birth (DOB) _____ was interviewed at the Office of Special Counsel in Washington, D.C.  SSA _____ IA _____ and Special Prosecutor Brian Richardson were present for the interview.  Kalashnikova was represented by _____ _____ of the law firm Bryan Cave Leighton Paisner. Kalashnikova was presented with a proffer agreement which she and her attorney, _____ signed and dated.  Special Prosecutor Richardson explained the proffer agreement to Kalashnikova and her and her attorney advised they had no questions regarding the agreement.  After being advised of the identity of the interviewing Agent and the nature of the interview, Kalashnikova provided the following information:

b6
b7A
b7C

Kalashnikova was born in _____ She lived in _____ until _____ when she moved to _____ to attend _____ She graduated with a degree in _____

b6
b7A
b7C

b6
b7A
b7C
b7E

Investigation on    05/17/2018    at    Washingtong, District Of Columbia, United States (In Person)

File # _____    Date drafted    05/21/2018

by _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2630

b7E

FD-302 (Rev. 5-8-10)

- 1 of 10 -



# FEDERAL BUREAU OF INVESTIGATION

Date of entry     01/23/2018

ZALMAY KHALILZAD, former United States (U.S.) Ambassador and current Board of Directors member of CENTER FOR THE NATIONAL INTEREST (CNI), was interviewed pursuant to a proffer agreement at Baker & Hostetler, LLP, 1050 Connecticut Avenue NW, Washington, DC 20036 by Special Agent (SA) _____ SA _____ Intelligence Analyst (IA) _____ Assistant Special Counsel (ASC) Aaron Zelinsky, and ASC Andrew Goldstein. Accompanying KHALILZAD was CNI's outside counsel attorneys _____ from Baker & Hostetler, LLP. After being advised of the identities of the interviewing officials and after reviewing the proffer agreement, in the presence of his attorneys, KHALILZAD executed the proffer agreement, whereupon he provided the following information:

b6
b7C

From 2003 to 2005, KHALILZAD was the U.S. Ambassador to Afghanistan. **b5 per DOJ/OIP** From 2005 to 2007, KHALILZAD was the U.S. Ambassador to Iraq. From 2007 to 2009, KHALILZAD was the U.S. Ambassador to the United Nations (UN).

b6
b7C

**b5 per DOJ/OIP**

**b5 per DOJ/OIP**

**b5 per DOJ/OIP**

Investigation on   01/09/2018   at   Washington, District Of Columbia, United States (In Person)

File #   _____                                                Date drafted   01/09/2018

b6
b7C
b7E

by   SA   _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2636

b7E

- 1 of 3 -

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    09/11/2018

(U) On 08/30/2018 Special Agents (SA) [                    ] and [          ]
[            ] interviewed DAVID N. KLEIN (KLEIN) at the French Press Coffee
Roasters Uptown at 95 E Kennedy Blvd, Lakewood, NJ 08701. The interview
was establish via a telephone call to [                ] During the phone call,
KLEIN stated he was willing to talk with the FBI, had concerns about
speaking to the FBI without an attorney present, but he could not afford
an attorney. KLEIN stated he would meet with the SAs but reserved the
right to not answer any questions or could stop the interview to consult
with an attorney. In person and prior to the interview, SA [          ]
reiterated to KLEIN the interview was entirely voluntary and KLEIN could
stop the interview at any time. After being advised of the identities of
the interviewing SAs and the purpose of the interview, KLEIN provided the
following information:

b6
b7C

(U) During the 2016 Presidential Election, DONALD J. TRUMP (TRUMP) had a
lot of support from people in Lakewood, NJ. KLEIN is from Los Angeles, CA
and had a [                                      ] with JASON
GREENBLATT (GREENBLATT), TRUMP's one-time attorney. KLEIN reached out to
GREENBLATT offering assistance to the TRUMP CAMPAIGN, but GREENBLATT never
followed up with KLEIN.

b6
b7C

(U) KLEIN felt he could represent the people of Lakewood's interests to
the TRUMP CAMPAIGN because KLEIN knows the players in Lakewood, NJ. [        ]
[                                                                            ]

b6
b7C

(U) KLEIN recalled that before and during the run-up to the 2016 election
there was interest in improving relations between Russia and the United
States (U.S.) unlike today. KLEIN felt it made sense to have a friendly
relationship with Russia. KLEIN recalled SECRETARY HILLARY CLINTON's
"reset" with Russia.

(U) KLEIN is Orthodox Jewish and thought he could reach out to assist in
improving U.S.-Russian relations through that community. KLEIN searched
online and found RABBI BEREL LAZAR (LAZAR), the Chief Rabbi of Russia.
KLEIN found LAZAR's email address online and contacted LAZAR. LAZAR's
office reached out to KLEIN that LAZAR was planning a trip to the U.S.

Investigation on  08/30/2018   at  Lakewood, New Jersey, United States (In Person)

File # [                    ]                              Date drafted   08/31/2018

by [                                    ]

b7E
b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b7E

- 1 of 8 -

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   03/22/2018

(U) On 02/27/2018 Special Agents [        ] and [            ] with
Assistant Special Counsel Aaron Zelinksy interviewed LENDWOOD LANDRUM AKA
PETE LANDRUM (LANDRUM) at the Special Counsel's Office in Washington, DC.
LANDRUM's counsel, [        ] and [        ] were also present. ASC
Zelinksy admonished LANDRUM that it is a crime to lie to the FBI, that
this interview was voluntary, and that any questions asked were not
intended to elicit information discussed with LANDRUM's counsel. [        ]
stated that LANDRUM was prepped on the documents perviously provided.
[        ] stated that LANDRUM would be happy to research any other information
and provide it. After being advised of the identity of the interviewing
Special Agents and the nature of the interview, LANDRUM provided the
following information:

b6
b7C

b5 per DOJ/OIP

b5 per DOJ/OIP

b6
b7C

b5 per DOJ/OIP

b6
b7C

Investigation on   02/27/2018   at   Washington, District Of Columbia, United States (In Person)

File #   [            ]                                   Date drafted   03/01/2018

by   [            ]   SA   [            ]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2649

b7E

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    12/22/2017

COREY LEWANDOWSKI, date of birth [                ] Social Security
Account Number (SSAN) [              ] was interviewed on November 8, 2017 at
the Federal Bureau of Investigation - Special Counsel's office, 395 E
Street SW, Washington, D.C. Present during the interview were
LEWANDOWSKI's Attorney [              ] FBI Special Agent (SA) [              ]
[        ] SA [              ] Special Counsel Attorney JEANNIE RHEE, Special
Counsel Attorney AARON ZELINSKY, and Special Counsel Attorney ANDREW
GOLDSTEIN.

b6
b7C

Prior to the interview, LEWANDOWSKI and his attorney were provided with
the attached show documents to review for approximately two hours at the
interview location.  They were allowed to review the documents at the FBI
office but did not receive a copy of the documents.  At the beginning of
the interview, LEWANDOWSKI signed the attached agreement and was informed
that making intentional false statements to the SAs could result in
federal charges.  LEWANDOWSKI then provided the following information:

LEWANDOWSKI initially became involved in the DONALD J. TRUMP (TRUMP)
presidential campaign when he was the National Director for Voter
Registration in Manchester, NH.  In April 2014, he was involved in an
event for 2016 presidential candidates and DAVID BOSSIE of CITIZENS UNITED
asked LEWANDOWSKI about joining the TRUMP campaign.

LEWANDOWSKI met with TRUMP in January 2015 and then became the Senior
Political Advisor working with the TRUMP ORGANIZATION until the official
campaign was stood up.  Then LEWANDOWSKI became the Campaign Manager for
the TRUMP presidential campaign.  LEWANDOWSKI was paid approximately
[                    ] base salary with the opportunity for bonuses.  The bonuses
were [          ] for each state if TRUMP won the primaries for Iowa, New
Hampshire, or South Carolina.  The bonus was [          ] if TRUMP placed
second in those states.  These payments were negotiated with TRUMP prior
to the campaign being stood up.

b6
b7C

At the time LEWANDOWSKI was brought on, he and [              ] were the
only paid campaign team members.  [          ] was involved in the campaign

b6
b7C

Investigation on  11/08/2017  at  Washington, District Of Columbia, United States (In Person)

File # [              ]                                                    Date drafted  11/09/2017

by [                          ]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2657

b7E

FD-302 (Rev. 5-8-10)

- 1 of 7 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry   02/21/2018

(U) On 1/30/2018 SANDRA LUFF was interviewed by Special Agent [          ]        b6
[          ] Intelligence Analyst [               ] and Assistant Special    b7C
Counsels Andrew Goldstein and Aaron Zelinsky at the Office of Special
Counsel (SCO), 395 E Street SW, Washington, DC 20024. Accompanying LUFF
was her attorney [          ] After being advised of the identity of the
interviewing officials and the nature of the interview, LUFF provided the
following information:

(U) LUFF currently works for [                              ]               b6
[                                      ] LUFF speaks                         b7C
infrequently with Attorney General Jefferson Sessions and the last time
they spoke was in early December 2017 at a mutual acquaintance's
retirement party. Before that, they probably saw each other a few months
prior at another social gathering. LUFF worked for Senator Sessions for 8
years, the last 6 as his legislative director and the first 2 as his
national security advisor. As legislative director, her job was to
maintain watch on all legislation moving through congress and to assist
Senator Sessions with offering solutions to bills or writing the bills
themselves. LUFF [                        ] and was offered a
position with Senator John Warner working with the Armed Services
Committee. Around the time Senator Warner retired in January 2009, Rick
Dearborn, Sessions' chief of staff, offered LUFF a position with Sessions.

(U) Sessions' office had teams for the various committees he served on,
such as agriculture, budget, judiciary, defense, etc. Foreign policy fit
under the defense team. LUFF sometimes traveled with Sessions on foreign
trips and trips back to Alabama. The outreach and travel to foreign
countries was conducted as part of congressional delegations (CODELS) or
meetings with foreign dignitaries.

(U) Sessions was the first senator to endorse Donald Trump for president.
Sessions was later tapped in February or March 2016 to head Trump's
national security team. LUFF was unfamiliar with how Sessions was chosen,
but opined it was a dynamic, unofficial process. LUFF thought someone from
the campaign told Sessions to handle the national security team. LUFF did
not receive updates from the Trump campaign while she worked for Senator
Sessions.

Investigation on   01/30/2018   at   Washington, District Of Columbia, United States (In Person)

File #  [                                      ]        Date drafted   01/30/2018        b3
                                                                                         b6
by  [                              ]                                                     b7C
                                                                                         b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2683

b7E

FD-302 (Rev. 5-8-10)

- 1 of 5 -

Official Record

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   12/06/2017

MATTHEW MILLER, date of birth (DOB) [          ] social security
account number (SSAN) [          ] was interviewed on October 25, 2017 at
the U.S. Department of Labor, 200 Constitution Avenue Northwest,
Washington, D.C. 20210.  After being advised of the identities of the
interviewing Agents and the nature of the interview, MILLER provided the
following information:

b6
b7C

MILLER started off on the TRUMP presidential campaign as a Pennsylvania
state director in the primaries.  Then he became the National Director of
Vets for Trump.

At the Republican National Convention (Convention), there were three
GOP Platform buckets - economic, social and national defense.  J.D. GORDON
and MILLER were involved in the national defense committee meetings with a
third campaign individual who was an attorney serving as the parliamentary
expert but MILLER can not recall that individual's name.  GORDON was the
head campaign representative and MILLER was the second.  [          ] was
the co-chair.

b6
b7C

Numerous amendments were proposed at the committee meeting MILLER was
in.  One of them was presented by DIANA DENMAN, a [  ] year old woman who
was very supportive of freedom fighters and worked in movies with RONALD
REAGAN.  DENMAN's amendment involved committing the U.S. to defend Ukraine
with all means possible if Russia attacked.  Some of the amendments passed
and others were defeated but the Ukraine amendment was tabled until
later.  The tabling of this amendment during that meeting is the first
time MILLER discussed the topic of the amendment.

b6
b7C

MILLER doesn't recall if GORDON talked to the chairman about tabling
the amendment. It was as non-nefarious as it comes since the NATO
mentality was if you attack one you attack all and it shouldn't just fall
on the U.S. to defend Ukraine.  MILLER didn't think it made sense for the
platform to lock the president in to making such a significant commitment
to defend Ukraine.  GORDON talked to DENMAN about lightening the amendment
and eventually the lightened version passed the vote.

Investigation on  10/25/2017   at  Washington, District Of Columbia, United States (In Person)

File #  [          ]

Date drafted  11/09/2017

by  [          ]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2690

b7A
b7E

- 1 of 8 -

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD

UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   11/07/2018

Paul J. Manafort, date of birth [        ] was interviewed at the
Office of the Special Counsel in Washington, D.C.  The interviewers were
FBI Special Agents [                    ] Assistant Special
Counsels (ASC) Jeannie S. Rhee, Andrew Weissmann and Greg Andres; and
Assistant United States Attorney [            ]  Present representing
Manafort were attorneys Richard Westling, Thomas Zehnle and Kevin Downing
and paralegal [            ]  FBI SA [      ] advised Manafort of his
rights.  Manafort stated that he understood his rights and that he was
willing to answer questions. Manafort signed a FD-395, Advise of
Rights.  FBI SA [        ] advised Manafort that it was a crime to lie to the
FBI.  Manafort stated that he understood.  ASC Weissmann reviewed the
terms of a letter setting forth the agreement upon which Manafort made
himself available for interview.  Manafort, Downing and ASC Weissmann
signed the letter agreement.  After being advised of the identities of the
interviewers and the nature of the interview, Manafort provided the
following information:

b6
b7C

Manafort read from a typewritten statement regarding his conduct as it
related to the Counts alleged in the Eastern District of Virginia and the
District of Columbia.  The statement will be maintained in the 1-A section
of this casefile.

b6
b7A
b7C

At the end of February or beginning of March 2016, Manafort and Tom
Barrack were in California.  Manafort told Barrack things that he thought
the Trump Campaign was doing wrong.  Barrack asked Manafort if Manafort
was interested in running the Campaign.  Barrack and Manafort had a series
of calls during the next couple of weeks.  At the middle or end of March
2016, Donald Trump called Manafort to discuss Manafort joining the

UNCLASSIFIED//~~FOUO~~

Investigation on  09/11/2018   at   Washington, District Of Columbia, United States (In Person)

File # [                    ]

Date drafted  09/17/2018

by [                              ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

- 1 of 7 -

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   11/07/2018

Paul J. Manafort, date of birth ⬚⬚⬚⬚⬚ was interviewed at the
Office of the Special Counsel in Washington, D.C.  The interviewers were
FBI Special Agents ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ Assistant Special
Counsels (ASC) Jeannie S. Rhee, Andrew Weissmann and Greg Andres; and
Assistant United States Attorney ⬚⬚⬚⬚⬚ Present representing
Manafort were attorneys Richard Westling, Thomas Zehnle and Kevin Downing
and paralegal ⬚⬚⬚⬚ FBI SA ⬚⬚⬚ advised Manafort of his
rights.  Manafort stated that he understood his rights and that he was
willing to answer questions.  Manafort signed a FD-395, Advise of
Rights.  ASC Weissmann reviewed the terms of a letter setting forth the
agreement upon which Manafort made himself available for
interview.  Manafort, Downing and ASC Weissmann initialed the letter
agreement.  After being advised of the identities of the interviewers and
the nature of the interview, Manafort provided the following information:

b6
b7C

Manafort knew that if Trump got elected, there would be opportunities
for him to make money.  After Trump was elected, Manafort traveled to the
Middle East, Cuba, Korea, Japan and China where he got paid to explain
what a Trump presidency would be like.  In mid-2017, a Ukrainian candidate
for President, ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ approached Manafort about political
consulting.

b6
b7C

Manafort asked Konstantin Kilimnik to track down documents related to
the indictments against Manafort, including contracts and ECFMU
brochures.  Manafort and Kilimnik communicated using encrypted
applications such as Viber, Signal, WhatsApp and others.  They started
using the applications over a concern that people in the Ukraine and
Russia were hacking their accounts. ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚
⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚
⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ After he was
indicted, Manafort purchased a "pay" phone to talk with Kilimnik and
Gates.  The pay phone did not have any applications on it.  About six
months ago, Manafort got a cellphone ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ In
September or October 2017, a BBC reporter, First Name Unknown (FNU) Woods,
called Manafort on his ⬚⬚⬚ or ⬚⬚⬚ phone number. ⬚⬚⬚⬚⬚⬚⬚

b3
b6
b7A
b7C
b7E

UNCLASSIFIED//~~FOUO~~

Investigation on  09/12/2018  at  Washington, District Of Columbia, United States (In Person)

File # ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚                    Date drafted  09/17/2018

by ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E



- 1 of 8 -

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    11/07/2018

Paul J. Manafort, date of birth [            ] was interviewed at the
Office of the Special Counsel in Washington, D.C.   The interviewers were
FBI Special Agents [                        ]   FBI Forensic
Accountant [                ]   and Assistant Special Counsels (ASC) Andrew
Weissmann and Greg Andres.   Present representing Manafort were attorneys
Richard Westling, Thomas Zehnle and Kevin Downing and paralegal [        ]
[        ]   After being advised of the identities of the interviewers and the
nature of the interview, Manafort provided the following information:

   b6
   b7C

Manafort used encrypted applications to communicate, typically at the
recommendation of Rick Gates.   Manafort does not recall his usernames or
passwords for the applications. [                                    ]
[                                            ]   Manafort
will work with his counsel to prepare a list of usernames and passwords
for his communication accounts.

   b6
   b7C

Manafort primarily used two iPhones to communicate. The phones were
assigned telephone numbers [                        ]   Manafort
purchased a pay-as-you-go Boost phone last year.   Manafort does not recall
its assigned number.

   b6
   b7C

Manafort had WhatsApp on his [                    ]
cellphones.   Manafort used WhatsApp to communicate with people in
Europe.   At Gates's suggestion, Manafort downloaded Telegram but he never
used it.   Manafort used Wickr for communications with people in the Middle
East.   Manafort recently used Signal to communicate with Konstantin
Kilimnik.   Manafort used Threema to communicate with [            ] and
individuals in China.   Manafort did not recall whether he used Threema to
communicate with Gates.   Manafort used Skype for personal communications
with his family members.   Manafort used Snapchat only for social
networking.   Manafort used Viber in Ukraine.   Manafort also used Viber for
communications related to the Trump Campaign.   Manafort used Hushmail to
communicate with Kilimnik and Gates.   Manafort used WeChat to communicate
with people in China.   At [            ] suggestion, Manafort used Voxer, but
only for a couple of days in 2017.   Zello sounds familiar but Manafort
does not recall using it.

   b6
   b7C
   b7E

UNCLASSIFIED//~~FOUO~~

Investigation on  09/20/2018  at  Washington, District Of Columbia, United States (In Person)

File # [                    ]                                   Date drafted  09/20/2018

by [                                        ]

   b6
   b7A
   b7C
   b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7A
b7E

- 1 of 3 -

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    11/07/2018

Paul J. Manafort, date of birth [          ] was interviewed at the
Office of the Special Counsel in Washington, D.C.  The interviewers were
FBI Special Agents [                        ] FBI Forensic
Accountant [             ] and Assistant Special Counsels (ASC) Andrew
Weissmann and Greg Andres.  Present representing Manafort were attorneys
Richard Westling, Thomas Zehnle and Kevin Downing and paralegal [     ]
[     ]   After being advised of the interviewers and the nature of the
interview, Manafort provided the following information:

b6
b7C

Manafort talked to [            ] to get the story out regarding the
Ukraine platform fight at the Republican National Convention.  Manafort
briefed Trump about the issue along with other post-convention
matters.  Manafort does not believe that Trump knew about the floor fight
until after the convention.  Konstantin Kilimnik asked about the platform
language at some point, but Manafort does not recall the details of their
conversation.

b6
b7C

Trump publicly stated that the people of Crimea wanted to be part of
Russia.  Trump and Manafort had not talked about Russia policy before
Trump made this statement.  Trump follows the news a lot and probably read
this view somewhere and then repeated it.  Manafort told Trump that
Manafort disagreed with the statement.  Manafort gave Trump a brief
history on Ukraine.  Trump does not generally like to commit on foreign
policy issues until a specific scenario arises.  Trump believes that he
can solve foreign policy disputes by avoiding the bureaucratic logjam and
having face-to-face meetings.

Trump and Manafort did not have a lot of policy discussions.  Manafort
and Trump sometimes spoke on the plane but it usually revolved around
issues in the news.  Manafort and Trump spoke on the plane about whether
Obama's sanction against Russia were working.  Manafort did not have any
other policy discussions with Trump regarding Russia or Ukraine.

Dimitri Simes wrote a foreign policy speech for Trump.  Henry Kissinger
had recommended Simes to Kushner.  Trump did not like the speech, so
Stephen Miller redrafted it.

UNCLASSIFIED//~~FOUO~~

| | | |
|---|---|---|
| Investigation on | 09/21/2018 | at Washington, District Of Columbia, United States (In Person) |

File # [                    ]                                    Date drafted   09/21/2018

by [                              ]

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2735

b3
b7E

- 1 of 4 -



FD-302 (Rev. 5-8-10)

# FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/26/2018

BEATRIZ M. MARINELLO, date of birth [          ] social security     b6
account number [          ] was interviewed at the FBI New York field   b7C
office, 26 Federal Plaza, New York, New York 10278. MARINELLO resides at
[                                          ] Her cell
phone number is [              ] MARINELLO was advised the nature of the
interview pertained to Russian nationals who may have attended the World
Chess Championship in 2016 [2016 WCC]. After being advised of the
identities of the interviewing Agents and the nature of the interview,
MARINELLO provided the following information:

MARINELLO is the Vice President of the World Chess Federation. She has
met a lot of Russians through her position. MARINELLO has traveled to
Russia on a number of occasions for chess-related events. She has never
met VLADIMIR PUTIN but understands he is a big fan of chess. MARINELLO
added that world chess competitions are very important to Russians in
general.

The 2016 WCC consisted of a player from Russia and a player from
Norway. The Norwegian won. The dates of the event were November 10, 2016
through November 30, 2016. MARINELLO attended almost every day with the
exception of maybe one or two. There were various areas designated for
spectators and a special area for VIP personnel. The players competed in a
sound-proof cabin in order to minimize distractions from the crowd.

The 2016 WCC was attended by various celebrities and prominent
businessmen from New York. Hollywood actor, WOODY HARRELSON, was present
for the opening ceremonies. When asked whether or not any Russian
government officials were in attendance, MARINELLO stated, "likely,
because the event was full of Russians." MARINELLO remembered seeing the
Russian Press Officer at the event. When asked if that individual was
DMITRY PESKOV, MARINELLO did not recall the name. MARINELLO believed the
individual she met may have gone by the name of [              ]          b6
[phonetic]. Another individual at the event claimed that PUTIN was in     b7C
Florida on that day. MARINELLO believed that statement to be false
however, as she did not see any news coverage of PUTIN being in Florida.

---

Investigation on  05/31/2018  at  New York, New York, United States (In Person)

                                                                           b3
File # [                ] / [                ]        Date drafted  06/13/2018  b7E

by [                                    ]                                   b6
                                                                           b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2738

b3
b7E

FD-302 (Rev. 5-8-10)

- 1 of 3 -



UNCLASSIFIED/~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/18/2018

On 3/30/2018, SA [        ] and IA [          ] interviewed STEVEN B
NIX, Director at the Eurasia Division for IRI with a work address of 1225
Eye Street NW, Suite [    ] in Washington DC, a telephone number of 202-408-
9450 and a work email of [            ] at his place of work. Also present
for the interview was [                                        ] for
IRI.  After advising NIX and [    ] of the identity of the interview agent
and analyst, NIX provided the following information:

Prior to joining IRI, NIX had been an attorney at a large law firm where
he practiced some international law, including overseas election law. NIX
had worked in Ukraine for four years as outside legal counsel for the
Ukrainian Parliament, a position he had obtained through the International
Association for Election Foundations.

NIX was hired by IRI in late 2000 or January 2001 as Director of the
Eurasia Division.

## KONSTANTIN KILIMNIK

KONSTANTIN KILIMNIK was hired by IRI in approximately 1998. At the time of
NIX's hiring, KILIMNIK was an employee based out of IRI's Moscow office.
KILIMNIK did translation work and general office management in IRI's
Moscow office along with other different things (NFI).

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

b6
b7C

UNCLASSIFIED/~~FOUO~~

Investigation on  03/30/2018   at  Washington, District Of Columbia, United States (In Person)

File # [              ]                                    Date drafted  03/30/2018

by [                        ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b3
b6
b7C
b7E

b7E

- 1 of 4 -

OFFICIAL RECORD

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    11/07/2017

GEORGE DIMITRIOS PAPADOPOULOS, [redacted] Social Security Account Number (SSAN) [redacted], was interviewed at the BREEN & PUGH law office, 53 West Jackson Street, Suite 1215, Chicago, Illinois 60604. Present during the interview were PAPADOPOULOS' Attorneys [redacted] and [redacted] FBI Special Agent (SA) [redacted] FBI Intelligence Analyst (IA) [redacted] Special Counsel Attorney AARON ZELINSKY, and Special Counsel Attorney ANDREW GOLDSTEIN.

b6
b7C

At the beginning of the interview, GOLDSTEIN advised PAPADOPOULOS that the same rules applied for this interview as they did in the previous proffer interviews on August 10, 2017, August 11, 2017, and September 19, 2017. PAPADOPOULOS was provided a copy of the agreement he signed on the dates prior, acknowledging his understanding of the continued proffer agreement. PAPADOPOULOS initialed and signed the agreement for this interview. His signature was witnessed and initialed by [redacted] After being advised of the nature of the interview and the identifies of the interviewers, PAPADOPOULOS provided the following information:

b6
b7C

b5 Per DOJ/OIP

b6
b7C

b5 Per DOJ/OIP

Investigation on    09/20/2017    at    Chicago, Illinois, United States (In Person)

File # [redacted]                                    Date drafted    10/31/2017

by [redacted]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2793

b7E

- 1 of 4 -

FD-302 (Rev. 5-8-10)

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry      07/17/2018

On May 30th 2018, at the office of [                    ]
[                    ] John Podesta former Campaign Chairman for Hillary
For America, was interviewed by employees of the Special Counsel's Office.
In attendance were Attorney [                    ] Associate
Federal Bureau of Investigation Special Agent [                    ] Federal
Bureau of Investigation Management and Program Analyst [                    ]
Assistant Special Counsel Lawrence Rush Atkinson V, and Assistant Special
Counsel Jeannie Rhee. After being advised of the identity of the
interviewing agents, and purpose of the interview, Podesta stated the
following:

b6
b7C

In the Spring of 2016, Podesta worked out of an office in Brooklyn, New
York shared with his assistants [                    ] Podesta
traveled a lot in March 2016, up to three to four times a week. Most of
this travel during the campaign was with the goal of raising money for the
Clinton Campaign in primary states. [                    ]
[                    ]

b6
b7C

Podesta confirmed [                    ] which he
used from 2007 until the time of the leaks in 2016. [                    ]

b6
b7C

To Podesta's

UNCLASSIFIED//~~FOUO~~

Investigation on   05/30/2018   at   Washington, District Of Columbia, United States (In Person)

File #  [                    ]                                        Date drafted   05/30/2018

by  [                    ]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2797

b7E



FD-302 (Rev. 5-8-10)

- 1 of 19 -

## FEDERAL BUREAU OF INVESTIGATION

Date of entry        03/19/2018

Josh Raffel was interviewed at the Special Counsel's Office, located at
395 E Street SE, Washington, DC, pursuant to a proffer agreement.  Raffel
was accompanied by his attorneys [          ] and [                   ]        b6
[          ].  Present for the interview were Special Agent (SA) [          ]   b7C
[          ] SA [                          ] Senior Counselor to the Special
Counsel James L. Quarles, and Senior Assistant Special Counsel Andrew
Goldstein. After being advised and acknowledging it is a crime to lie to
the FBI in the course of an investigation, Raffel provided the following
information:

[**Agent note:** All times referenced in the body of the document are in
Coordinated Universal Time (JTC).]

b5 per DOJ/OIP

b5 per DOJ/OIP

b5 per DOJ/OIP

b6
b7C

b5 per DOJ/OIP

Investigation on   02/08/2018   at   Washington, District Of Columbia, United States (In Person)

File #  [          ]                                                Date drafted   02/09/2018

by  [                                                    ]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2811

b7E



FD-302 (Rev. 5-8-10)

- 1 of 1 -

UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    08/18/2017

James Rybicki, identifying information having previously been provided, was interviewed via Lync pursuant to documents recovered from former FBI Director James Comey. Rybicki provided the following information:

On Wednesday, July 26, 2017, Comey called the front office telephone number and left a telephone message for Rybicki. On the same day, Rybicki returned Comey's call either from his work desk or cell phone. Comey told Rybicki, while packing for an upcoming move, he found a folder with government documents. Comey agreed to provide the documents the next day when individuals from FBI Finance & Facilities Division (FFD) were returning Comey's personal property.

On Thursday, July 27, 2017, unknown personnel from FFD retrieved one blue "standard" folder from Comey at his residence. The folder contained a one page email, a one page chart with handwritten notes on the back and civil litigation paperwork for Comey. On the same day, [            ], assigned to FFD, gave the above listed items to Rybicki at his office. Rybicki requested guidance from FBI Acting Director Andrew McCabe later that evening on how to handle the documents. McCabe requested that Comey's civil litigation paperwork go to the FBI's Office of General Counsel (OGC) and the remaining items be provided to FBI's Records Management Division. Rybicki sent the civil litigation paperwork to [            ] the Acting Deputy General Counsel at OGC.

b6
b7C

On either Thursday, July 27, 2017 or Friday, July 28, 2017, Rybicki spoke with David Bowdich (Associate Deputy Director) regarding the remaining documents. On Friday at approximately 1:17 pm, Rybicki emailed [       ] assigned to FFD. On the following Monday, July 31, 2017, [    ] retrieved the documents from Rybicki.

b6
b7C

**Administrative:**

The documents retrieved from Comey are being maintained in the custody of the Records Management Division.

UNCLASSIFIED//FOUO

| | | |
|---|---|---|
| Investigation on | 08/07/2017 | at | Washington, District Of Columbia, United States (, Other (Lync)) |

File # [                    ]                                      Date drafted    08/07/2017

by [                                        ]

b3
b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-2844

b7E

FD-302 (Rev. 5-8-10)

- 1 of 31 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry   03/22/2018

PAUL SAUNDERS, Executive Director for CENTER FOR THE NATIONAL INTEREST
(CNI), was interviewed pursuant to a proffer agreement at Patriots Plaza
II, 395 E Street SW, Washington, DC 20546 by Special Agent (SA)                     b6
                    SA                  Intelligence Analyst (IA)                    b7C
            and Assistant Special Counsel (ASC) Aaron Zelinsky.
Accompanying SAUNDERS were CNI's outside counsel attorneys
                                                                 After being
advised of the identities of the interviewing officials and after
reviewing the proffer agreement, in the presence of his attorneys,
SAUNDERS executed the proffer agreement, whereupon he provided the
following information:

b5 per DOJ/OIP

b6
b7C

b5 per DOJ/OIP

b5 per DOJ/OIP

b6
b7C

b5 per DOJ/OIP

b6
b7C

Investigation on  02/15/2018  at  Washington, District Of Columbia, United States (In Person)

File #                                                              Date drafted  02/20/2018

by   SA

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7E



FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    12/04/2017

PAULA MARY SHUGART                    date of birth (DOB)
office telephone            cell telephone                email          b6
                                                                         b7C
was interviewed at the Special Counsel's Office,         b7E
Washington, D.C. Also present were          and
from DEBEVOISE & PLIMPTON, 919 Third Avenue, New York, New York, 10022;
Senior Assistant Special Counsel Jeannie Rhee; Assistant Special Counsel
L. Rush Atkinson; and Supervisory Intelligence Analyst
After being advised of the identity of the interviewing agent and the
nature of the interview, SHUGART provided the following information:

b5 per DOJ/OIP

b6
b7C

b5 per DOJ/OIP

b5 per DOJ/OIP

b6
b7C

Investigation on  09/25/2017  at  Washington, District Of Columbia, United States (In Person)
                                                                                              b6
                                                                                              b7C
File #                                                Date drafted  09/25/2017                b7E

by

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2883

b7E



FD-302 (Rev. 5-8-10)

- 1 of 12 -

UNCLASSIFIED//~~FOUO~~

### FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/12/2018

CATHERINE MARIE VARGAS, [            ] was interviewed on April 4,    b6
2018 at the Special Counsel's Office. Present for the interview    b7C
were Senior Assistant Special Counsel Andrew Goldstein, Senior
Assistant Special Counsel Zainab Ahmed, Special Agent [        ]
[          ] and Intelligence Analyst [            ] VARGAS was
accompanied by her attorney, [              ]

[_____]    b5 per DOJ/OIP

b6
b7C

[_____]    b5 per DOJ/OIP

b6
b7C

[_____]    b5 per DOJ/OIP

b6
b7C

[_____]    b5 per DOJ/OIP

b6
b7C

[_____]    b5 per DOJ/OIP

UNCLASSIFIED//~~FOUO~~

Investigation on  04/04/2018  at  Washington, District Of Columbia, United States (In Person,
Phone)

File #  [_____]                        Date drafted  04/05/2018     b6
                                                                              b7C
by  [_____]                                                         b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2936

b7E

-1 of 8-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    06/08/2017

(U) On or about 06/01/2017 Special Agent _____ and Special
Agent _____ interviewed Yuval Weber (Weber),
_____ phone _____ email _____

b6
b7C

(U) The interview was established through a phone call earlier in the day
in which SA _____ identified himself as "with the FBI." Upon meeting
Weber, SA _____ introduced himself and SA _____ by first and last name

b6
b7C

through this early portion of the interview, SA _____ referred to
himself as an FBI Agent, and Weber observed SA _____ badge. Later in
the interview, Weber stated that he originally thought that SA _____

b6
b7C
b7A

SA _____ stated that he had
said "F-B-I" on the phone and that is what likely caused the confusion.
Additionally, SA _____ added that they did not intend to utilize a ruse
or to cause confusion, it was just coincidental that Weber misheard SA
_____ on the phone.

(U) During the interview Weber provided the following information:

Investigation on  06/01/2017        at  _____  United States (In Person,
                                         Phone)

File # _____                Date drafted  06/02/2017

by _____

b3
b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7E

FD-302 (Rev. 5-8-10)

- 1 of 5 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    02/12/2018

(U) On 1/25/2018 DCV ZAKHEIM, Vice Chairman of the Board for the Center for the National Interest (CNI), was interviewed by Special Agent [          ] [          ] Intelligence Analyst [          ] and Assistant Special Counsels Andrew Goldstein and Aaron Zelinsky at the Office of Special Counsel, 395 E Street SW, Washington, DC 20024. Accompanying ZAKHEIM were attorneys [          ] and [          ] from Baker Hostetler, LLP. After being advised of the identity of the interviewing officials and the nature of the interview, ZAKHEIM provided the following information:

b6
b7C

b5 per DOJ/OIP

b5 per DOJ/OIP

(U) Henry Kissinger is the Honorary Chairman of the Board of CNI [     ]   b5 per DOJ/OIP

Investigation on  01/25/2018  at  Washington, District Of Columbia, United States  (In Person)

File # [          ]                                           Date drafted  01/25/2018

b6
b7C
b7E

by [          ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b7E

FD-302 (Rev. 5-8-10)

- 1 of 33 -

 Official Record

UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/13/2018

JARED COREY KUSHNER, date of birth (DOB) [                    ] was
interviewed at the Special Counsel's Office (SCO) on April 11,
2018. Also present during the interview were KUSHNER's attorneys
[                                                    ] from Norton Rose
Fulbright US LLP, Senior Assistant Special Counsel (SASC) Zainab
Ahmad, SASC Andrew Goldstein, FBI Special Agent (SA) [            ]
[        ] and FBI SA [                    ] The interview began at
approximately 9:15 a.m. and concluded at approximately 5:45 p.m.
Water was provided to KUSHNER and his three attorneys. Multiple 5-
10 minute breaks were taken. One 30 minute lunch break was taken.
After being advised of the identity of the interviewing agents,
KUSHNER voluntarily provided the following information:

b6
b7C

b5 Per DOJ/OIP

b5 Per DOJ/OIP

b5 Per DOJ/OIP

b5 Per DOJ/OIP

UNCLASSIFIED//~~FOUO~~

Investigation on   04/11/2018   at   Washington, District Of Columbia, United States (In Person)

File #  [                    ]                                    Date drafted   04/20/2018

by  [                                            ]

b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

b7E

FD-302 (Rev. 5-8-10)

- 1 of 5 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   09/14/2018

Richard "Rick" M. GERSON, date of birth (DOB) _____   Social
Security Account Number (SSAN) _____ Address _____
_____ was interviewed at the Special Counsel's Office, Washington, D.
C. Present representing GERSON were _____ and _____
of Paul Hastings, LLP. The interviewing team was FBI Special Agent
_____ FBI Intelligence Analyst _____ and
Assistant Special Counsel Aaron Zelinsky. After being advised of the
identity of the interviewing agent and the nature of the interview, GERSON
provided the following information:

b6
b7C

GERSON was aware of Kirill DMITRIEV's two roles: _____
_____ being tasked by
Vladimir PUTIN to develop a reconciliation plan. DMITRIEV told GERSON that
he was reporting directly to PUTIN _____
_____

b5 Per DOJ/OIP

GERSON's discussions with DMITRIEV were in his own capacity _____

b5 Per DOJ/OIP

_____ GERSON wasn't tasked by the transition team and he worked on
the reconciliation plan on his own.

b5 Per DOJ/OIP

Investigation on 06/15/2018 at Washington, District Of Columbia, United States (In Person)

File # _____ Date drafted 07/17/2018

by _____

b3
b6
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-1216

b7E



FD-302 (Rev. 5-8-10)

- 1 of 6 -

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    08/28/2018

Richard "Rick" M. GERSON, date of birth (DOB) [          ] Social
Security Account Number (SSAN) of [          ] Address of
[          ] was interviewed at the Special Counsel's Office, Washington,
D.C. Present representing GERSON were [          ] and [          ]
[          ] of Paul Hastings, LLP. The interviewing team were FBI Special
Agents [          ] and [          ]
FBI Intelligence Analyst [          ] and Assistant Special Counsels
Jeannie Rhee, Aaron Zelinsky, and Zainab Ahmad. After being advised of the
identities of the interviewing agents and the nature of the interview,
GERSON provided the following information:

**b6**
**b7C**

**b5 Per DOJ/OIP**

Jared KUSHNER has been a friend of GERSON's [          ]    **b5 Per DOJ/OIP**
When KUSHNER became involved in the Trump campaign, their friendship
continued. GERSON would occasionally bump into KUSHNER and they would talk
about the campaign wherein KUSHNER would update GERSON as a friend. [          ]

                                                GERSON helped setup a
lunch with [          ] Tony BLAIR [          ]

**b5 Per DOJ/OIP**

[          ] meeting with the UAE representatives [          ]    **b5 Per DOJ/OIP**

Investigation on   06/05/2018   at   Washington, District Of Columbia, United States (In Person)

File # [                                        ]    Date drafted   07/11/2018    **b3**
                                                                                  **b6**
by [                            ]                                                 **b7C**
                                                                                  **b7E**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FBI(19cv1278)-1221

b7A
b7E

- 1 of 3 -



FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   07/31/2018

HENRY OKNYANSKY, aka HENRY GREENBERG, date of birth (DOB) [        ]
social security account number [        ] was interviewed at the Special
Counsel's Office, 395 E Street SW, Washington, DC 20546. OKNYANSKY resides
at [        ] Present
during the interview was FBI Special Agent (SA) [        ] FBI SA
[        ] and Associate Special Counsel Aaron
Zelinsky. OKNYANSKY was advised the interview was entirely voluntary and
that he could discontinue it at any time. OKNYANSKY was further advised
that intentionally providing false statements to FBI Agents was a
violation of federal law. After being advised of the identity of the
interviewing Agents and the nature of the interview, OKNYANSKY provided
the following information:

b6
b7C

In May 2016, OKNYANSKY met with ROGER STONE. [        ]

b6
b7A
b7C

OKNYANSKY arranged the meeting with STONE in
2016. [        ] CAPUTO accompanied STONE at the meeting and
provided an introduction. [        ]

b6
b7A
b7C

OKNYANSKY was accompanied by his Ukrainian friend, ALEXEI RASIN, who
offered STONE damaging information on HILLARY CLINTON. RAISIN formerly
worked for Clinton and was allegedly in possession of financial statements
which demonstrated her involvement in money laundering activities with
RASIN's companies. STONE inquired about the amount of financial
misappropriations related to CLINTON and asked if it was in the amount of
millions. RASIN relayed that it was rather somewhere in the amount of
hundreds of thousands. STONE ultimately refuted the offer and stated that
he did not believe DONALD TRUMP would pay for opposition research
information. The meeting then concluded shortly thereafter.

Investigation on   07/13/2018   at   Washington, District Of Columbia, United States (In Person)

File #                                                    Date drafted   07/17/2018

by

b6
b7C
b7A
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

# EXHIBIT B

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//~~FOUO~~

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/09/2018

    Richard GATES, was interviewed at the 395 E Street SW, Washington, D. C. Also present in the interview were Senior Assistant Special Counsel (SASC) Zainab Ahmad, SASC Andrew Weissmann, ASAC [ ] and SSA [ ] Gates was interview as part of the terms of his plea agreement.  GATES provided the following information:

**b6**
**b7C**

    GATES joined the Donald J. TRUMP Presidential Campaign in March 2016. The financial health of the campaign was not good at the time because TRUMP was self-funding the expenses. TRUMP made a pledge to his supporters on this point which he wanted to uphold. GATES did not think there were any fundraising opportunities at the time. The campaign had apathy towards not doing anything else and the RNC [Republican National Committee] support was not yet there. Eventually the TRUMP Campaign started to build a fundraising mechanism.

    [Steven] MNUCHIN joined the campaign and became the finance chair around May of 2016. Other people on the campaign had a problem with the decision to bring MNUCHIN on because he had never raised a fundraising penny in his life. TRUMP realized the magnitude of self-funding a campaign - it could not be done. Paul MANAFORT did not have much of a role in the campaign in March or April. MANAFORT became more involved after TRUMP won the primary. MANAFORT and Jared [KUSHNER] spoke often about how much it work it would be to fundraise. After the primary they were able to lean on the RNC to assist with fundraising.

    There were many fundraising events.

**b6**
**b7A**
**b7C**

UNCLASSIFIED//~~FOUO~~

Investigation on  03/20/2018  at  Washington, District Of Columbia, United States (In Person)

**b3**
**b6**
**b7C**
**b7E**

File # [ ]    Date drafted  03/20/2018

by [ ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b7E

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~FOUO~~

Continuation of FD-302 of  (U) Richard Gates Interview 3/20/2018 ,On 03/20/2018 ,Page 2 of 8

b6
b7A
b7C

The campaign could never buy the advertising time they wanted because the financial expense was not in the ballpark of what they could afford to spend. The [James] COMEY email scenario helped – the last ten days before the election were good from a fundraising perspective. The money never really flowed. People contributed to big PACs due to the fact there were competitive House and Senate races. _____ contributed.

b6
b7C

MANAFORT and _____ knew each other for a long time. _____ was hired on to the campaign. The campaign wanted _____ to move to New York which was something he did not want to do.

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

UNCLASSIFIED//~~FOUO~~

FBI(19cv1278)-2980

b7E

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~FOUO~~

Continuation of FD-302 of  (U) Richard Gates Interview 3/20/2018 , On  03/20/2018 , Page  3 of 8

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

b7A

FBI(19cv1278)-2981

**b7E**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~FOUO~~

Continuation of FD-302 of  (U) Richard Gates Interview 3/20/2018 , On  03/20/2018 , Page  4 of 8

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

UNCLASSIFIED//~~FOUO~~

FBI(19cv1278)-2982

**b7E**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~FOUO~~

Continuation of FD-302 of (U) Richard Gates Interview 3/20/2018 , On 03/20/2018 , Page 5 of 8

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

UNCLASSIFIED//~~FOUO~~

FBI(19cv1278)-2983

**b7E**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~FOUO~~

Continuation of FD-302 of  (U) Richard Gates Interview 3/20/2018 , On  03/20/2018 , Page  6 of 8

**b7A**

**b6**
**b7A**
**b7C**

**b6**
**b7A**
**b7C**

**b6**
**b7A**
**b7C**

**b6**
**b7A**
**b7C**

UNCLASSIFIED//~~FOUO~~

b7E

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~FOUO~~

Continuation of FD-302 of  (U) Richard Gates Interview 3/20/2018          , On   03/20/2018   , Page   7 of 8

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

b6
b7A
b7C

FBI(19cv1278)-2985

**b7E**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~FOUO~~

Continuation of FD-302 of  (U) Richard Gates Interview 3/20/2018 ____ , On  03/20/2018 , Page  8 of 8

**b6**
**b7A**
**b7C**

UNCLASSIFIED//~~FOUO~~

FBI(19cv1278)-2986

# EXHIBIT C

b7E

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     03/22/2018

RICHARD HANNAH DAVIS (DAVIS) was interviewed at the Office of Special
Counsel, Washington, DC on Febraury 8, 2018. Present for the duration of
the interview were FBI Special Agent [            ] Forensic Accountant                    b6
[            ] and Special Counsel Attorneys Kyle Freeny and Greg Andres.         b7C
Also present was DAVIS's attorneys [                        ] of the
law firm Petrillo, Klin & Boxer LLP.   After being advised of the
identities of the interviewing parties and the nature of the interview,
DAVIS provided the following information:

DAVIS was advised his participation in the interview was voluntary. DAVIS
was also advised he needed to be truthful in his answers and lying to a
federal agent could constitute a federal crime. DAVIS acknowledged his
rights and obligations.

### Background

[                                                        ] After
being involved in campaigns in Alabama and Mississippi, he got more
involved in politics and came to Washington, DC. He became involved with
the College Republican National Committee during 1980 when Reagan was
nominated. He worked with LEE ATWATER organizing small campaigns for          b6
Reagan. He ended up working as White House staff. DAVIS worked for the        b7C
Department of Health and Human Services in a role as White House Liaison
and was involved in speech writing. When he left the administration, he
worked with [                    ] and PAUL MANAFORT (MANAFORT) as
consultants managing a senate campaign in Virginia.

During the Reagan administration, DAVIS worked in the Department of
Interior as well as the Commerce Department. DAVIS worked for Thomas
Barrack (BARRACK) where he was introduced to MANAFORT.

He worked for ATWATER again during Reagan's 1984 reelection campaign.
Afterwards, he did domestic policy work for Reagan. In 1987, he left and
joined BLACK, MANAFORT, STONE AND KELLY. This was DAVIS's first time
working with MANAFORT, but he had known him previously. He started as an
associate in the firm and then was promoted to junior partner. The firm
was bi-partisan. In the early 1990s, BLACK, MANAFORT, STONE AND KELLY was

Investigation on  02/08/2018  at  Washington, District Of Columbia, United States (In Person)

File # [                    ]                                         Date drafted  02/15/2018       b6
                                                                                                     b7C
by [                              ]                                                                   b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; and its contents are not
to be distributed outside your agency.

Continuation of FD-302 of  (U) Richard Hannah Davis Interview _____ , On  02/08/2018 , Page  2 of 18

sold to Burson-Marstellar. He stayed for about four years before he left
the firm in the mid-1990s. He set up a new firm, DAVIS, MANAFORT FREEDMAN.
ROGER STONE also worked at the new company. This evolved into DAVIS
MANAFORT INC. Around the end of the 1990s, DAVIS MANAFORT was really just
MANAFORT and DAVIS and they mostly did foreign consulting as there was
more money involved in foreign consulting. When needed, they hired
contractors. DAVIS wanted the company to stay small. He did not like the
atmosphere of large firms and managing people. The firm did some corporate
work domestically. Most of this was DAVIS's. There was no paid political
campaign work domestically. MANAFORT was not involved with any domestic
work, only foreign work.

The firm's foreign footprint went way back to BLACK, MANAFORT, STONE AND
KELLY. MANAFORT had done work in Africa and the Philippines in the past.
DAVIS did not get involved with foreign work until later. In the late
1980s, DAVIS took his first international trip to Argentina. MANAFORT was
working on the presidential campaign there. DAVIS went back occasionally
for political work. MANAFORT did most of the foreign work for the firm.
ATWATER also had foreign work, but he was in and out of U.S.
administrations. STONE also did some foreign work.

**DAVIS MANAFORT Entities**

DAVIS MANAFORT, INC was DAVIS and MANAFORT's first entity. It was a C
Corp. DAVIS MANAFORT PARTNERS, INC. (DMP) was formed later. DAVIS could
not recall why they needed the partnership structure. DAVIS was not
involved with DMP INTERNATIONAL LLC.

**JOHN HANNAH**

JOHN HANNAH was a pre-DMP entity. It was created when DAVIS, MANAFORT,
[          ] and others were buying vacation homes in Wintergreen, VA.                    b6
Originally, DAVIS and MANAFORT purchased a home together, but then              b7C
MANAFORT bought a separate place and DAVIS had to enlist [        ] to help pay
the mortgage on the place he and MANAFORT had originally purchased
together.

JOHN HANNAH began buying raw land on the mountain from developers. The
entity was used as an investment vehicle particularly for real estate
purchases. Initially, it was just Wintergreen properties, but they
expanded into flipping properties, buying and selling five or six
properties. When they had excess capital from DMP, they put it into JOHN
HANNAH and invested it. Sometimes, excess revenue was sent directly to the
JOHN HANNAH account.

**Trump Tower Purchase**

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of (U) Richard Hannah Davis Interview _____ , On 02/08/2018 , Page 3 of 18

The Trump Tower condo purchase was after they cashed out of Wintergreen. MANAFORT found the condo and bought it without DAVIS seeing it. The condo was used for business. MANAFORT used the condo more often. They used the condo for personal trips as well. MANAFORT handled the real estate transactions. The condo was purchased with income received from DMP.

## MCCAIN Campaign

Around 1999 to 2000, DAVIS began his relationship with MCCAIN and joined his presidential campaign. DAVIS took a leave of absence from DAVIS MANAFORT. DAVIS's relationship with MCCAIN has continued through the present. He returned to DAVIS MANAFORT in early 2000 after the primaries and worked there until 2006 when he returned to work for MCCAIN's second presidential campaign. DAVIS remained working with MCCAIN until he lost the election in November 2008. When he was done with the MCCAIN campaign, he met with MANAFORT and they decided to part ways and so began the unwinding DMP.

## PEGASUS

After parting with MANAFORT, DAVIS restarted his relationship with Craig Cogut at Pegasus Captial and began working for them as a partner around                      He is still with them as a partner. There are four partners. DAVIS is not a financial professional, but functions as an operating partner with a network of consultants, advisors, and researchers. DAVIS is involved with

b6
b7C

DAVIS was introduced to Pegasus by                           He was first introduced to                           was a New York finance guy.                           did not have anything in common except their shared interest in environmental issues. DAVIS had previously done environmental defense work.

b6
b7C

In 2009, DAVIS and          talked regarding the need for investing funds in the environmental space.         pitched Pegasus as fund for sustainable markets, and DAVIS decided to join the firm.

b6
b7C

DAVIS did some previous work for Pegasus which involved helping with the

b6
b7C

FD-302a (Rev. 05-08-10)

b7E

Continuation of FD-302 of (U) Richard Hannah Davis Interview _____ , On 02/08/2018 , Page 4 of 18

b6
b7C

DAVIS's transition from politics to private equity was difficult. DAVIS
was looking for a career change. He did not want to work in Washington, DC
or with MANAFORT anymore. The MCCAIN campaign was bruising for DAVIS.
There were attacks on lobbyists. DAVIS was attacked by the Obama campaign
for doing work as a lobbyist. DAVIS did not like being in the spotlight.

There were moments during the MCCAIN campaign when MANAFORT wanted to be
involved but DAVIS said no because of MANAFORT's background. MANAFORT's
ego was bruised badly because he could not get into the MCCAIN campaign.
When DAVIS got out of campaign, he learned that MANAFORT's only client was
the Party of Regions and Victor Yanukovych. That was not appealing to
DAVIS. MANAFORT only wanted to do foreign work. There was tension between
DAVIS and MANAFORT after the campaign.

Prior to the MCCAIN campaign, DAVIS had a close relationship with
MANAFORT. They spent a lot of time together, invested together and their
families were close. After Black, MANAFORT Stone and Kelly was bought out,
Black and Kelly stayed with the firm, but MANAFORT, DAVIS, and STONE left
to start their new company.

## Party of Regions/Ukraine Work

When asked why he did not want to participate in Party of Regions
/Yanukovych work, DAVIS said he wanted a change of venue. He wanted to get
out of politics. He could not reconcile being a MCCAIN guy and working for
Yanukovych. MCCAIN had always been Russia's worst enemy in the U.S. Senate
and Yanukovych was Russia/PUTIN's puppet.

MANAFORT was knee deep in Yanukovych's resurrection.

## Other MANAFORT-DAVIS entities

DAVIS could not recall the entity Vernon View Partners. _____
_____ so he said it could have been an
entity that DAVIS and MANAFORT shared.

b6
b7C

3eDC was a company organized by MANAFORT and DAVIS around the end of 2005
or early 2006. They realized the Republican Party had done a poor job in

FD-302a (Rev. 05-08-10)

b7E

Continuation of FD-302 of (U) Richard Hannah Davis Interview _____ , On 02/08/2018 , Page 5 of 18

the intelligence and data gathering business. There was little investment
from the Republican Party in infrastructure, such as data gathering and
the computerization of campaigns. MANAFORT and DAVIS invested in data and
computerization, and social media. They hired a few people, and the MCCAIN
campaign became the company's first client. 3eDC became a vendor for the
campaign involved with voter data and internet advertising. The connection
to DAVIS got press attention because of DAVIS's position with the campaign
as the campaign chairman. As the chairman, DAVIS had an overarching
position running the campaign and was more involved with strategy,
recruiting, and fundraising. He was not involved in day to day operations.

3eDC was let go when the campaign was ultimately shut down in 2008. When
asked if 3eDC was a way to monetize his position on the campaign, DAVIS
said yes. It was not unusual for this type of monetizing. DAVIS was not
responsible for hiring 3eDC by MCCAIN. He presented the company. There was
no comparable firms. It was a revolutionary idea.

3eDC did some work in Virginia for legislative races. In the end 3eDC was
not a profitable, and DAVIS ended up losing money on 3eDC.

There was no relationship between 3eDC and JOHN HANNAH; however, JOHN
HANNAH could have invested in 3eDC, but DAVIS could not recall.

In the early 2000s, MANAFORT

b6
b7C

MANAFORT embarked upon outside
projects. He had a movie company
He always had the biggest house and
fanciest car, and had expensive suits. Working with MANAFORT was
stressful. He had an aggressive approach, but that was MANAFORT, he had an
edge, and it worked.

In the early 2000s, DAVIS's understanding was that MANAFORT's only source
of income was DAVIS MANAFORT.

handled DAVIS MANAFORT                    of KWC was also
involved until DAVIS left.

b6
b7C

LOAV Ltd was another one of MANAFORT's entities. DAVIS was not involved
with the company. It was used for MANAFORT's side projects.   When asked
if DAVIS knew if money transferred between LOAV and JOHN HANNAH, DAVIS
said it might have since LOAV was MANAFORT"s investment vehicle. There
could have been transfers into and out of either JOHN HANNAH or DMP or
both companies. Funds were comingled. DAVIS assumed DMP funds were coming
from other sources. MANAFORT never shared where money was coming from.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  (U) Richard Hannah Davis Interview          , On  02/08/2018  , Page  6 of 18

b7E

When asked if MANAFORT borrowed money from DAVIS, he said no, but MANAFORT
took more than his share from the company. DAVIS would usually find out
from [          ]

b6
b7C

[                                   ] was MANAFORT's buddy [            ]
[                                   ] He seemed close with MANAFORT
and got MANAFORT into international activities. [        ] got MANAFORT into
fancy suits and high living. When asked why he thought [        ] was giving
MANAFORT money, DAVIS said it was a rumor that DAVIS had heard from other
people. For example, [                                                   ]
[          ]      DAVIS did not know the nature of MANAFORT's business or
investments with [          ] He only knew [                              ]
[          ] before DAVIS became a partner with MANAFORT.

b6
b7C

DAVIS first met MANAFORT around 1977 to 1978 when he was chairman for the
College Republic National Committee in Alabama. [                        ]
[                        ] he met young republicans, connected with MANAFORT,
ATWATER, and STONE through [            ] when he went to Memphis on a WHIP
for Young Republicans to lobby. STONE was the chairman of the Young
Republicans. MANAFORT was running phone banks. In 1981 or 1982, he got
closer to MANAFORT during the Virginia senate rate.

b6
b7C

### Rick Gates (GATES)

GATES worked for BLACK, MANAFORT, STONE, AND KELLY. GATES worked as a
driver. DAVIS did not know how he got hired. [                        ]
lottery company, was a client. [                                        ]
[                        ] and MANAFORT were close as well going back to the early days
of MANAFORT's political life.

b6
b7A
b7C

GATES left [                              ] MANAFORT was looking to hire
because DAVIS and [        ] were leaving. MANAFORT hired GATES. DAVIS and
GATES knew each other but never really worked together. The only
overlapped for a couple of months. Over the years, DAVIS has communicated
with GATES for scheduling, but he always messed it up.   GATES was not
very organized.

b6
b7C

DAVIS and MANAFORT invested in Washington Nationals tickets together,
which they kept until last year when MANAFORT dropped out and did not pay
the bill. [                                          ] MANAFORT did not notify
DAVIS he was dropping out, he just didn't pay the bill.

b6
b7C

### Foreign Work

FD-302a (Rev. 05-08-10)

b7E

Continuation of FD-302 of (U) Richard Hannah Davis Interview ___ , On 02/08/2018 , Page 7 of 18

Montenegro was DAVIS's last foreign gig. Montenegro was the last bit of
Yugoslavia under Serbian rule. At the time, DAVIS was working with [____]
[_____] in Eastern Euriope. [_____]   b6
[_____] DERIPASKA was the largest business owner in   b7C
Montenegro. He owned power and aluminum plants.

[_____] DERIPASKA, [_____]   b6
[_____] wanted to invest in Montenegro. They bought a navy base on the   b7C
coast and converted it to super yacht port. They asked DAVIS to get
involved in Montenegro's independence referendum. DAVIS and MANAFORT
worked on the election and referendum campaign which occurred in early
2006. DAVIS was more involved than MANAFORT. [_____] was in Eastern
Europe at the time. [_____] hired DAVIS to be a political "risk
adjuster." He wanted information on first generation election countries.
[_____] was making investments in Eastern Europe and wanted DAVIS to
meet with politicians and corporate heads and look at assets.

This work occurred around 2004 to 2006. [_____]   b6
[_____]   b7A
DAVIS sometimes met with politicians and sometimes took surveys. DAVIS   b7C
made the phone calls, set up the meetings, gave advice, did some research
on stability and government, and political climate. [_____] firm in
London was a client of DMP.

DAVIS met [_____] via a friend in early 2004. DAVIS could not recall   b6
who the friend was. The friend had called DAVIS and said he had a client   b7C
who wanted to meet him in New York the next day. DAVIS went to Atticus
Capital, a hedge fund in New York, and met [_____] who explained what he
wanted. [_____] said he had found DAVIS on Google. DAVIS started
working with [_____] one month later.

DAVIS first met DERIPASKA in London at lunch. DAVIS believed it was around
the end of 2004. [_____] introduced DERIPASKA as his friend and board   b6
member doing business together in Russia and Eastern Europe. DERIPASKA   b7C
seemed to have an interesting background. DAVIS learned DERIPASKA was
[_____]
[_____] DERIPASKA was an aluminum magnate, bigger than Alcoa. He was on
an acquisition binge.

DAVIS mostly met DERIPASKA at meetings in Moscow. He met with him about
four times. DERIPASKA's business focus was aluminum. He bought aluminum
plants all over the world. [_____] was investing in various real   b6
estate. One example was an old Bulgarian train station. DERIPASKA and   b7C
[_____] had some shared business, including power companies.

MANAFORT was not involved with ⬛⬛⬛⬛ and DERIPASKA until late 2005 or     **b6**
2006. DAVIS introduced DERIPASKA to MANAFORT. They did some work together.     **b7C**
DERIPASKA became a client of DMP. They were paid by for work in
Montenegro. DAVIS was not clear how they divided up payments. He knew
wires were coming in. For example, they would send an invoice to
⬛⬛⬛⬛ or DERIPASKA, and then a wire would come in from overseas to a
DMP account in US, and they had to figure out from whom.

DAVIS said there was an account set up in the Seychelles many years
earlier, but it was shut down and they were not using it.

In Montenegro, they were just paid for the independence referendum. They     **b6**
were paid by ⬛⬛⬛⬛ and DERIPASKA.     **b7C**

In Georgia, ⬛⬛⬛⬛ originally wanted to look at assets and assess
political environment and ability to invest. ⬛⬛⬛⬛
⬛⬛⬛⬛ DAVIS got to know the
President of Georgia who wanted ⬛⬛⬛⬛ investment. There was minimal
commercial growth in the country and still Russian influence and     **b6**
recovering from revolution. ⬛⬛⬛⬛ was considering buying ⬛⬛⬛⬛     **b7C**
⬛⬛⬛⬛ The President had an issue with ⬛⬛⬛⬛
⬛⬛⬛⬛ ended up not buying it ⬛⬛⬛⬛
⬛⬛⬛⬛

⬛⬛⬛⬛     **b6**
⬛⬛⬛⬛     **b7A**
⬛⬛⬛⬛     **b7C**

⬛⬛⬛⬛ DAVIS did not     **b6**
do any political consulting work in Georgia. DAVIS got to know the many     **b7C**
people in the Georgian government who was made up mostly of Georgia ex-
expats, but he did not work on campaign there.

DAVIS did not work in Uzbekistan, but he believed MANAFORT worked in one
of the "stans." DAVIS did not think DMP worked in the "stans." They only
worked in Montenegro and Ukraine.

DAVIS's work in the Ukraine began prior to the 2006 election. ⬛⬛⬛⬛     **b6**
and DAVIS fly to Kiev for the election of Yanukovych versus Yuschenko.     **b7C**
They had meetings with people associated with KUCHMA, the existing

FD-302a (Rev. 05-08-10)

b7E

Continuation of FD-302 of  (U) Richard Hannah Davis Interview          , On  02/08/2018  , Page  9 of 18

president of Ukraine.                                                          b6
                            so he wanted to get a sense of the election. His    b7C
people were friends of Kuchma.

DAVIS learned about the split dynamic between the east and the west in
Ukrainian politics. DAVIS read through surveys and polls and got a sense
for what was happening in elections. There was an assumption that
YANUKOVYCH would get the job and be KUCHMA's successor. KUCHMA was leaving
office, but he was coy regarding his support for YANUKOVYCH. At the time,
the Ukrainian economy was doing well and the country was more unified.
DAVIS met with legislators who were members of the Party of Regions. DAVIS'
s assessment was that it "smelled bad." People wanted change. That was
clear from polling data. Everyone was saying YANUKOVYCH was going to win.
DAVIS didn't think so because people wanted change. DAVIS told             b6
that there was instability and YANUKOVYCH may not win. DAVIS left without   b7C
plans to do future work in Ukraine. After DAVIS left Kiev, around the time
of the election, there were new polls, and              was alarmed by the
results. DAVIS sent                 to Ukraine to monitor the elections.
This was when the Orange Revolution happened. YANUKOVYCH claimed the win,
but the validity of the elections were challenged and the results
overturned.

DAVIS did not do any more work in Ukraine and never went back to Ukraine.
Beginning in late 2006, DAVIS started working with MCCAIN more. MANAFORT
got together with                 and DERIPASKA and was introduced to      b6
Rinat AKHMETOV (AHKMETOV). This was the beginning of DMP's relationship     b7C
with AHKMETOV.

DAVIS said the work for AHKMETOV was a different kind of work, meaning not
political consulting work.                                                 b4

When asked how DMP got involved in political work for the Party of
Regions, DAVIS stated that AHKMETOV funded the Party of Regions. DMP got
involved in political work for the Party of Regions branching from work
done for AHKMETOV. After the Orange Revolution, the Party of Regions was
not really active or doing anything. AHKMETOV and MANAFORT orchestrated a
Party of Regions come back. During this time period, DAVIS was doing
Montenegro and MCCAIN work, and was not in the Ukraine.

**Konstantin Kilimnik**

The first time that DAVIS met Konstantin Kilimnik (KILIMNIK) was in Moscow
He was introduced by                 This was probably around the time      b6
            went to Ukraine.                                                b7C

Continuation of FD-302 of  (U)  Richard Hannah Davis Interview _____ , On  02/08/2018 , Page  10 of 18

When asked about DMP's Moscow office, DAVIS said Black MANAFORT Stone and
Kelly had a Moscow office back in 1992, but DMP did not have an office
there. DAVIS only went to Moscow to meet with DERIPASKA.

DAVIS tried to put KILIMNIK in Montenegro but ended up not hiring him. He
learned KILIMNIK was working for DMP in Ukraine from [          ] DAVIS          b6
described KILIMNIK as the "IRI guy." KILIMNIK was referred as a potential      b7C
hire because he spoke Russian and had political experience. DAVIS later
learned in the media that KILIMNIK was Army Intelligence. DAVIS did not
particularly like KILIMNIK. [                                              ]

## Cyprus

When asked about work in Cyprus, DAVIS stated he did not work there.
MANAFORT may have been involved in a campaign when DERIPASKA's lawyer was
running for Prime Minister, but DAVIS was not involved. DAVIS did not know
the name of DERIPASKA's lawyer. DAVIS never met with the lawyer and never
went to Cyprus.

DAVIS also did political work in Panama and Argentina in the early 2000s.

## Foreign Agent Registration Act (FARA)

When asked about lobbying in the US, DAVIS stated he used [          ] as          b6
a lawyer to look into FARA issues. He did not lobby much. Lobbying was not      b7C
part of DAVIS's business.

DAVIS stated he did not do US outreach for Montenegro.

DAVIS did have conversations with MANAFORT about FARA. They had frequent
conversations regarding FARA when clients wanted to lobby in the US. DMP
did not do lobbying in the US, but would hired firms to the work.

## DERISASKA and MCCAIN

MCCAIN and DERIPASKA met on two occasions. The first time was in Davos
around January 2006. They happened to be in the same place at the same
time. During this first meeting, MCCAIN and DAVIS were in Davos together.
DERIPASKA had a big dinner. [     ] also had a big dinner at Cloisters, and      b6
DERIPASKA was there. DAVIS introduced DERIPASKA to MCCAIN at that dinner.      b7C
They engaged in small talk.

The second time MCCAIN and DERIPASKA met was in Montenegro around August
2006. MCCAIN was traveling in Eastern Europe with eight other US Senators.
The Senators went to Georgia and then Montenegro. MCCAIN had been invited
to Montenegro by the Prime Minister. While there, the President of

Continuation of FD-302 of  (U) Richard Hannah Davis Interview                    , On  02/08/2018  , Page  11 of 18

Montenegro threw a big party with government officials and others. When
DERIPASKA and [          ] learned the delegation was coming, they decided       b6
to bring their yachts to the port in Montenegro, and they met MCCAIN after       b7C
the dinner party. [                                                    ]
[          ]  It was a social meeting. DERIPASKA had a close relationship
with and investments in Montenegro. There were no requests by Montenegro
to reach out to US. They did not need US influence for the Montenegro
referendum.

## Eurasia 21

Eurasia 21 was a DMP project. At the time, there was no easy way to know
about current events in the news in Eastern Europe. They wanted to set up
a web portal for Eastern Europe press reporting, translated to English and
put online in order to aggregate news in one place. [          ] funded          b6
the project but ultimately, it shut down. The website was set up by a            b7C
woman named [          ] and a think tank in DC was hired to run the content.
DERIPASKA was also involved in Eurasia 21. He knew about the project but
did not fund it. The Eurasia Heritage Fund was something different.

DERIPASKA was practical with his relationship with Russia and PUTIN. He
knew PUTIN could give and take away and PUTIN's favor was practical to
DERIPASKA's business.

Basel (Basic Element) was DERIPASKA's holding company. DAVIS did not
recall exactly but believed there were Basel offices in Moscow and London.
DAVIS attended a Basel board meeting in London one time.

## DERIPASKA's involvement in other countries

When asked if DERIPASKA funded anything other than Montenegro, DAVIS said
he may have funded Georgia work as well as various activities, such as
polling, in other countries. It was hard to determine who was paying what
bill because overseas wires came from entities. It was unclear who the
sender was and the description of work was not always listed on wires.

## Loans from DERIPASKA

DAVIS was not aware of loans from DERIPASKA. MANAFORT talked about
receiving loan, but DAVIS did not think any of the money coming in was
actually a loan. MANAFORT said they were going to treat money as a loan
from DERIPASKA, but DAVIS was concerned regarding this. DAVIS understood
the purpose of treating the incoming funds as a loan was to shield income;
however this was not explicitly said. DAVIS never saw a loan agreement.
DAVIS stated DAVIS MANAFORT/DMP made a lot of money from DERIPASKA in the
form of income, but they had never received a "loan" from Deripaska before.

FD-302a (Rev. 05-08-10)

b7E

Continuation of FD-302 of (U) Richard Hannah Davis Interview , On 02/08/2018 , Page 12 of 18

DERIPASKA did not loan money for Trump Tower. At the time, DERIPASKA and [ ] were paying DMP for work DMP had done.

b6
b7C

DAVIS was referred to an email chain dated September 13, 2007 with the subject of "JOHN HANNAH." (Exhibit 1) The email chain included a thread between MANAFORT AND [ ] copying DAVIS, [ ] and [ ] [ ] asked for more details about the loans from the Ukrainian/Russian lender. MANAFORT responds stating "this was a loan to JHI for investment purposes. They NY apt was such an investment." DAVIS did not think it was a loan. DAVIS never saw the loan documents, was not aware of any loan terms and the loan was not repaid. Money received by DMP from DERIPASKA was for services.

b6
b7C

DAVIS's last communication with DERIPASKA was around October 2006.

When MANAFORT and DAVIS were winding down their business together, there were discussions regarding the "loans" to JOHN HANNAH and from a Russian lender. [ ] handled this because MANAFORT and DAVIS did not communicate with each other very much at this time. DAVIS told [ ] he did not think they were loans and if there were any loans on the books, DAVIS was suspicious of them. DAVIS told [ ] that MANAFORT could keep any of the assets derived from the "loans".

b6
b7C

**Other Loans**

When asked if he was aware of other loans used to purchase assets, DAVIS stated that he did not know if the Traxys investment had been purchased with a loan, but it was bought by JOHN HANNAH. In the winding down, TII Holdings and JOHN HANNAH went to MANAFORT and Traxys went to DAVIS.

DAVIS was not aware of promissory notes where he owed money to the business. DAVIS was shown promissory notes from 2005 and 2007 from DMP to DAVIS (Exhibit 2). DAVIS did not recall executing promissory notes and did not know why he would have a promissory note. He does not recall receiving the money or the promissory note. The amount of the promissory note in 2005, [ ] was close to annual income from DMP. The amount of the promissory note in 2007, [ ] was more than he believed he had received in income that year. Funds received by DAVIS from DMP were income not loans.

b6
b7C

DAVIS would have seen ledgers for DMP and JOHN HANNAH prior to 2007. DAVIS used KWC to prepare his taxes. He does not ever recall seeing loans on the books of the company. DAVIS could not recall if he received distributions in 2008, but it was possible.

**DMP Income**

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of (U) Richard Hannah Davis Interview _____ , On 02/08/2018 , Page 13 of 18

When DMP was winding down, [_____] did not ask about the promissory notes, or funds "Due from DAVIS". Funds were divided 50/50 between MANAFORT and DAVIS. During the years 2006 through 2008, DAVIS had quit taking salary from DMP. His distribution from DMP was from previous activity, not from new client funds.

b6
b7C

Some funds received would have gone directly to JOHN HANNAH instead of DMP. DAVIS was not aware of money going to LOAV unless MANAFORT would have directed that.

b6
b7C

DAVIS's last contact with [_____] was in New York. DAVIS ran into him six months ago. [_____]
[_____] was still in contact with [_____] worked in [_____] for DAVIS. [_____] might have also done a little work in [_____]
[_____]

**Funds received by Foreign Entities**

DAVIS was asked about $14 million to DMP from Vega Holdings in 2005, of which DAVIS received approximately [_____] DAVIS did not know for sure, but thought it might have been for work done for Akhmetov.

b6
b7C

When asked whether there were written contracts, DAVIS stated that it was routine to have contracts with corporate clients, but this was difficult with governments. DMP likely had a contract with AKHMETOV because it was a corporate project and they hired an accountant/law firms and needed to pay them.

Political consulting contracts were divided into phase, but DAVIS did not know specifics on contracts with Ukraine as he did not work on Ukraine.

When asked about ANTES MANAGEMENT, DAVIS did not recall why DMP was paid by the company. When asked about SCM, DAVIS said it could have related to AKHMETOV. When asked about NEOCOM SYSTEMS and ALGEMES SOLUTIONS, DAVIS did not recall why they were being paid by these entities.

**PERICLES**

PERICLES was an outgrowth of activities in Eastern Europe. [_____]
[_____] was not that interested in investing in the venture because he had his own hedge fund. DAVIS and MANAFORT did not know much about private equity so they reached out to

b6
b7A
b7C

b7E

FD-302a (Rev. 05-08-10)

**b7E**

Continuation of FD-302 of  (U) Richard Hannah Davis Interview _____ , On  02/08/2018 , Page  14 of 18

**b7A**

They launched the fund, documents were executed and opportunities were looked at.

DAVIS did not go to Ukraine or Poland to look for investments because he left to work for the MCCAIN campaign. By the time DAVIS had finished working for MCCAIN, MANAFORT said PERICLES was done. MANAFORT said

**b7A**

DAVIS did not know about

DAVIS was not aware that investments were made. He learned of the investments through the Cayman Islands lawsuit. DAVIS did not have discussions with MANAFORT regarding the lawsuit or the deposition in connection with the lawsuit.

MANAFORT had told DAVIS that around November 2008,                           DAVIS did not speak with regarding the investments.   DAVIS has not spoken with                since around 2006. When asked if he spoke with        regarding the matter, DAVIS said        had pulled out. DAVIS had spoken with him in the spring of 2009.

**b6
b7A
b7C**

## Cyprus Bank Accounts

DAVIS was not aware of the Cypriot bank accounts. DAVIS was not aware of any accounts set up in the Cayman Islands. When DAVIS left, there were no Cayman accounts set up.

## Other Contacts

DAVIS did not know who                    was.

**b6
b7C**

sounded familiar, but DAVIS did not know him.

was a                              who had worked with MANAFORT on Ukraine stuff. DAVIS has not had contact with        in about a decade.

**b6
b7C**

was                              DAVIS was not aware of any work she did for DMP.

**b6
b7C**

A few years ago, DAVIS became aware that MANAFORT was using DAVIS's name after he left the company. MANAFORT did not ask permission. DAVIS called RICK GATES and told him not to use his name or his initials.

FD-302a (Rev. 05-08-10)

b7E

Continuation of FD-302 of  (U)  Richard Hannah Davis Interview _____ , On  02/08/2018 , Page  15 of 18

_____ worked for DMP and had previously worked for DAVIS as an      b6
intern for MCCAIN work in 2000. _____ was involved in Montenegro, the            b7C
Panama Presidential Campaign, and Ukraine. _____ left DMP to work on
MCCAIN campaign.

b6
b4
b7A
b7C

b6
b7A
b7C

_____ and MANAFORT had a relationship as very close friends. They were          b6
involved in some business together. There was a project involving                   b7A
insurance in Virginia.                                                              b7C
                                                                                   b6
                                                                                   b7C
DAVIS did not know who _____ was.

DAVIS said he had not met _____ and had no business with him.              b6
                                                                                   b7A
                                                                                   b7C
DAVIS did not meet SERHIY LYVOCHKIN, VICTOR YANUKOVYCH, or RINAT AKHMETOV.
DAVIS knew MANAFORT worked for AKHMETOV as the Party of Regions. AKHMETOV
was the Party of Regions post-Yuschenko election and the Orange Revolution.

**Memo dated July 1, 2005 from MANAFORT and DAVIS to DERIPASKA regarding**
**"Work Plan" (Exhibit 3)**

When shown the memo, DAVIS did not specifically recall the document, but
he had no reason to believe it was not sent to him. The purpose of the
memo was to line up projects. Funding was project by project.

DERIPASKA, MANAFORT and DAVIS met in Moscow probably three times. Some
things in the memo materialized. Georgia and Ukraine materialized. DAVIS
was not aware if Tajikistan materialized. MANAFORT possibly did some work
there.

FD-302a (Rev. 05-08-10)

b7E

Continuation of FD-302 of  (U) Richard Hannah Davis Interview _____ , On 02/08/2018 , Page 16 of 18

DERIPASKA never retained DMP to do lobbying in the US. He was not looking for this service.

When asked if DMP hired Akin Gump, DAVIS did not know of this. When asked if they hired Project Associates, DAVIS stated they were hired for communications and public relations work in Montenegro but not in the US. It was an EU centric campaign.

DAVIS said there never was a Moscow DMP office. When asked why the Moscow office was referenced, DAVIS stated that KILIMNIK worked for DMP, and he was in Moscow.

**Memo dated July 1, 2006 from MANAFORT to DERIPASKA regarding "Work Plan and Model" (Exhibit 4)**

DAVIS was shown a memo from July 2006 from MANAFORT and DAVIS to DERIPASKA. DAVIS generally recalled the document, but not the specifics. DAVIS commented it looked like a draft because the work was not completed. The document was likely written by MANAFORT. Generally, MANAFORT would write proposals and plans. DAVIS did not know who the "Basel Officials" were. DAVIS met with DERIPASKA directly when met with DERIPASKA. MANAFORT may have met with other officials at Basel.

When asked about the reference to Ukraine, DAVIS said Ukraine was the economic driver in the region, but DERIPASKA was not that interested in Ukraine. DERIPASKA was friends with people associated with the Party of Regions such as AKHMETOV and YANUKOVYCH, but DERIPASKA was not actively involved in Ukraine politics. That was AKHMETOVs' turf.

When asked about work in Georgia and "-stan" countries, DAVIS stated that by the time of this memo, DAVIS was done in Georgia. The work in the "stans" did not come to fruition.

When asked why foreign politicians and businessmen were hiring DMP, DAVIS stated that they thought DMP was smarter.

When asked about the reference to the Eurasia Heritage Fund, DAVIS did not know exactly what this was referring to. This was not the Eurasia 21 website. It may have been an NGO or a think tank. DAVIS said it was not a fund or a charitable entity. There were no conversations regarding this type of entity being used for this work.

**Russian NGO**

BLACK, MANAFORT, STONE AND KELLY, had a rich history in Russia. They helped set up the stock exchange and cabinet. In the early 1980s, the post-

b7E

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of (U) Richard Hannah Davis Interview , On 02/08/2018 , Page 17 of 18

Soviet era, there were conversations about the development of institutions and NGO development because Russia did not have any. DAVIS did not know if anything ever materialized.

DAVIS also recalled conversations about public policy and social responsibility by the Russian elite. Relations with Russia were different in those times. It was more friendly.

**Oguster**

DAVIS did not recall who Oguster was. He was not familiar with the entity.

**Email dated August 29, 2016 from DAVIS to _____ of KWC with subject "Re: RKD Partners pending questions" (Exhibit 5)**

In the email, _____ asked DAVIS about the status of _____

When asked if had ever been paid via stock or shares, DAVIS stated that he asked for this but never received it. DAVIS wanted equity position, but was not offered one.

T-II Holdings and IGPS were part of the Traxys portfolio of Pegasus. JOHN HANNAH invested in these companies. When JOHN HANNAH wound down, DAVIS ended up with T-II, and DAVIS and MANAFORT split IGPS 50/50.

**Executed Termination Document of JOHN HANNAH (Exhibit 6)**

DAVIS was shown an executed termination document of JOHN HANNAH. DAVIS stated it was his signature on the document. He did not recall the document specifically, but he had no reason to believe it was not the actual document.

DAVIS did not recall the assumption of the Russian lender debt of _____ Although, DAVIS did not recall the debt, he signed the document saying he was assuming the debt. DAVIS stated that this did sound familiar, but the goal was to get MANAFORT to take on the Russian lender debt.

When asked if this put on DAVIS's books, DAVIS assumed so because _____ When asked why he agreed to assume the debt, DAVIS said MANAFORT told him DERIPASKA had loaned them money. DAVIS questioned this. DAVIS stated that there was no loan. DERIPASKA paid them fees; he did not lend money. When asked how he

b6
b7C

FD-302a (Rev. 05-08-10)                                                                                        b7E

Continuation of FD-302 of   (U)  Richard Hannah Davis Interview          , On  02/08/2018  , Page  18 of 18

ended up with the debt, DAVIS said he did not know. DAVIS thought this was
irrelevant because he did not believe there was a loan and did not believe
they owed any money.

## YIAKORA VENTURES

DAVIS had not heard of YIAKORA.

## JOHN HANNAH

DAVIS believes JOHN HANNAH was re-incorporated by MANAFORT in Florida
after they separated. DAVIS learned this from the indictment.

## Memo from MANAFORT to AKHMETOV dated June 2, 2005 with the subject "Re: Major Development in US Government Position on Ukraine Re-Privatization"

DAVIS did not recall MANAFORT contacting the National Security Council
(NSC) about the re-privatization issue. MANAFORT did not ever lobby
directly for anyone. He had relationships. DAVIS was not sure if MANAFORT
had a point of contact on the NSC at the time. It was not unlike MANAFORT
to ask someone to ask someone for him. DAVIS did not know specifically who
his contacts were because MANAFORT had been out of domestic business for a
long time.

## Additional Contacts

When asked about [                                              ] DAVIS stated he knew     b6
them well.                                                                                 b7C

When asked about ROHRABACHER, DAVIS said MANAFORT knew ROHRABACHER from
the 1980s during freedom fighter days of the Angolan war. DAVIS did not
know if MANAFORT and ROHRABACHER maintained their acquaintance.

DAVIS did not know of a relationship between AKHMETOV and Russia.

# EXHIBIT D

FD-302 (Rev. 5-8-10)

- 1 of 6 -

b7A
b7E

UNCLASSIFIED//LES

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/18/2018

On Friday, July 6, 2018, Thomas "Tad" Devine was interviewed at the Office
of the Special Counsel by Senior Assistant Special Counsel Greg D. Andres,
DOJ Senior Financial Investigator [        ] and FBI Forensic
Accountant [        ] Also present was Devine's attorney, [        ]
[        ] Garvey Schubert Barer, P.C., telephone number [        ]
After being advised the identities of the interviewing parties, Devine
furnished the following information:

b6
b7C

Background:

Devine has been a political media consultant/advisor since approximately
1980 when he worked on the President Jimmy Carter campaign. In addition to
working on the Presidential campaigns for Walter Mondale, Michael Dukakis
and John Kerry, Devine served as the Chief of Staff for former Providence
Mayor Joseph Paolino and was an Assistant to Boston University President
[        ] Devine also provided services for approximately 20
presidential elections outside of the United States. Most recently, Devine
worked for Bernie Sanders.

b6
b7C

[                                                                    ]

b6
b7C

Since 1983, Devine has been a partner in several political media
consulting firms. In or around 2007, Devine formed Devine & Mulvey [    ]
[        ] In or around 2013 [                        ] to form
Devine Mulvey and Longabauch.

b6
b7C

Ukraine:

In or around 2005, [        ] of Davis Manafort reached out to Devine's
[        ] at D&D Media Inc. [        ] to inquire about their
interest in working in Ukraine. After speaking with Manafort on the
telephone, Devine traveled to Ukraine and met with Manafort and the Party
of Regions (POR). Devine recalled being impressed with the campaign team,

b6
b7C

UNCLASSIFIED//LES

| | | |
|---|---|---|
| Investigation on | 07/06/2018 at | Washington, District Of Columbia, United States (In Person) |
| File # [        ] | | Date drafted   07/11/2018 |
| by [        ] | | |

b6
b7A
b7C
b7E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI(19cv1278)-2281

FD-302a (Rev. 05-08-10)

b7A
b7E

UNCLASSIFIED//~~LES~~

Continuation of FD-302 of (U/~~LES~~) Thomas "Tad" Devine - July 6, 2018 ,On 07/06/2018 ,Page 2 of 6

to include ▯ an outside election observer. He subsequently agreed to join the team to manage the media campaign for Manafort and the POR.

b6
b7C

Devine and his team initially signed up to work on the 2005-06 parliamentary elections, but also worked on subsequent parliamentary elections as well as the 2010 Presidential election.

Other individuals who provided services for Manafort and the POR include his ▯ (media), ▯ (media), ▯ Pollster - ▯ and ▯

b6
b7A
b7C

Devine stopped working for Manafort and the POR after former Prime Minister Yulia Tymoshenko was imprisoned in or around late 2011. However, a few people who worked for and with Devine, such as ▯ continued to work for Manafort and the POR.

b6
b7C

Devine only met Yanukovych at one of the media photo/video shoots.

Devine never met Rinat Akhemetov, but knew from conversations with Manafort that Akhemetov was one of the principal fundraisers for the POR. Manafort told Devine that Akhemetov was funding the POR for ▯

b6
b7C

Manafort's staff in the Ukraine included ▯ and Konstantin Kilimnik. ▯

b6
b7A
b7C

Approximately 95% of Devine's work in the Ukraine involved producing media ads, to include short 30-second ads and a few half-hour pieces. Devine also wrote several speeches for Yanukovych, to include an economic speech and his 2010 political convention speech.

For the 2010 Presidential election, Devine and his team were paid ▯ plus a ▯ win bonus.

b6
b7C

After the 2014 Ukrainian Revolution and the exile of President Viktor Yanukovych, Manafort's partner Rick Gates asked Devine to come back and meet with the new opposition block party. Devine stated he went back to Ukraine and did work for Manafort and Gates for one week. He was paid a total of ▯

b6
b7C

Paul Manfort:

FBI(19cv1278)-2282

b7A
b7E

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~LES~~

(U/~~LES~~) Thomas "Tad" Devine - July 6,
Continuation of FD-302 of 2018                                    , On 07/06/2018 , Page 3 of 6

Devine had a very good professional relationship with Manafort, but never
really socialized with him. He described Manafort as [                    ]           b6
was good to/with Devine. Devine's impression of Manafort while in the         b7C
Ukraine was a positive one. While very demanding, he had an enormous
challenge and worked very hard, day and night.

While working in the Ukraine, Devine would see Manafort at breakfast and
meetings at Manafort's office in Kiev. They might have also had a few
dinners together.

Manafort met regularly with Yanukovych and other POR Officials. Devine
knew this from his conversations with Manafort.

Devine described both Manafort and [          ] as his peers while in the      b6
Ukraine.                                                                       b7C

**Rick Gates:**

Rick Gates was Manafort's business guy who and was involved in all the
campaigns, but more in a business aspect.

**Documents:**

Devine was shown the following documents:

  1. Consulting Agreements between Devine related entities and Paul
  Manafort. Devine stated these were standard contracts where there
  would have been schedules attached hereto. Document 009 would have
  been the contract for the 2010 Ukraine Presidential Campaign.

  2. Various memos regarding the media campaign in the Ukraine during
  2005. Devine could tell from the memo structure that these were memos
  he authored. For memos written "from" both Devine and Manafort, Devine
  would author and Manafort would modify. Devine recalled Manafort liked
  Akhmethov.

  3. Various Invoices from Devine/Mulvey/Longabaugh to Davis Manafort.
  Devine stated these were routine invoices that in the end got paid.
  Manafort never discussed "loans" with Devine. Gates would often tell
  Devine they (Davis Manafort) were expecting a new "traunche" and would
  be sending payment to Devine.

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//LES

(U//LES) Thomas "Tad" Devine – July 6,
Continuation of FD-302 of  2018                                              , On  07/06/2018  , Page  4 of 6

4. January 13, 2006, email conversation between Devine,[          ]
[                              ] Devine recalled this email was written after
receiving [          ] polling data. Devine identified [       ] as an
employee of Davis Manafort in Ukraine.

**b6
b7C**

5. February 3, 2010, email conversation between Devine and Manafort
regarding **Election Night Speech.** Devine recalled Manafort asked Devine
to draft an election night speech for Yanukovych. Devine confirmed
this the speech he drafted.

6. February 16, 2010, email conversation between Devine and Manafort
regarding **FYI.** Devine stated this was a conversation about an agreed
to bonus between Devine and Manafort for Yanukovych's victory.

7. August 12, 2010, Media Strategy and Presentation of Message Memo
from PJM (Manafort) to Yanukovych with cc's to [          ] and bcc's
to [                    ] Devine confirmed this was a memo he authored and
Manafort adopted. Devine was unsure of all the individuals identified
by initials; however,[       ] might have been a reference to [          ]
[      ] It was Manafort's practice refer to everyone by their initials.

**b6
b7C**

8. September 1, 2010, email conversation between Devine, Manafort,
[              ] Gates, [                        ] regarding **Talking Points.**
Devine recalled these talking points were drafted for Yanukovych's
convention speech.

**b6
b7C**

9. August 15, 2011, email conversation between Devine, Gates, [       ]
and [      ] regarding **Meeting.** Devine recalled Gates reached out to
Devine to see if he could arrange a tour/meeting of the White House
press office. Devine could not recall if he reached out to anyone.

**b6
b7C**

10. September 20, 2011, email from [     ] to [     ] and [        ]
regarding **Ukraine - First Draft.** Devine recalled this was drafted in
response to the attached polling data forwarded by [            ] of
the Tarrance Group.

**b6
b7C**

11. February 8, 2012, email conversation between Devine and [        ]
[            ] regarding **Updating Website.** As previously mentioned, Devine
stopped working for Manafort and the POR after the imprisonment
Tymoshenko.[          ] was asking Devine if he wanted to keep the
reference to past work in Ukraine on their website.

**b6
b7C**

UNCLASSIFIED//LES

FBI(19cv1278)-2284

b7A
b7E

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//~~LES~~

(U/~~LES~~) Thomas "Tad" Devine - July 6,
Continuation of FD-302 of  2018 _____, On  07/06/2018 , Page  5 of 6

Devine further recalled being told by Gates that Manafort and the POR
hired an outside law firm to conduct and independent review of the
Tymoshenko's imprisonment.

12. April 2, 2012, email conversation between Devine, [        ] Gates
and [        ] regarding **Ukraine.** Devine recalled Gates reached out to
Devine and [        ] regarding additional work in the Ukraine. As
previously stated, Devine and [        ] decided to stop doing work in
Ukraine following the imprisonment of Tymoshenko.

b6
b7C

13. August 6, 2012, email conversation between TAD (Devine) and
Manafort at [                    ] regarding **Memo.** Devine recalled that
although they were no longer working for Manafort and the POR,
Manafort wanted to pick his brain and Devine also wanted to maintain
his good relationship with Manafort.

b6
b7C

14. November 27, 2013, email conversation between Devine and
[                    ] regarding **Ukraine.** [           ] was a [           ]
in the firm and Devine wanted to include him in the decision making
process.

b6
b7C

15. March 31, 2014, email conversation between TAD (Devine),
[                    ] regarding **Call - Important.** This was after
Yanukovych fled and Poroshenko took over. Nothing came out of this
business proposal and a contract was never executed.

b6
b7C

16. April 1, 2014 email conversation between TAD (Devine), [          ]
[           ] regarding [                                        ]
[                    ]

b6
b7A
b7C

17. June 9, 2014, email conversation between TAD (Devine), Gates,
[                    ] regarding **Kyiv.** This was a conversation
regarding Devine's last project in Ukraine.

b6
b7C

18. June 16, 2014, email conversation between Devine, [           ]
[                    ] Devine identified [     ] as his
[                    ]

b6
b7A
b7C

19. June 19, 2014, email conversation between TAD (Devine) and
[                    ]

b6
b7A
b7C

UNCLASSIFIED//~~LES~~

FBI(19cv1278)-2285

FD-302a (Rev. 05-08-10)

b7A
b7E

UNCLASSIFIED//~~LES~~

(U/~~LES~~) Thomas "Tad" Devine - July 6,
2018

Continuation of FD-302 of _____ , On  07/06/2018 , Page  6 of 6

20. August 16, 2015 email conversation between Manafort and Devine
regarding **Meet the Press.** Manafort reached out to compliment Devine
after a Bernie Sanders appearance on Meet the Press.

21. May 26, 2016, email conversation between _____ Devine and _____
regarding **Manafort's cell:** _____ Devine recalled then
Presidential Candidate Trump appeared on TV and when asked if he would
debate Sanders he said he would. They wanted to reach out to Manafort
about setting up the debate.

b6
b7C

22. September 21, 2017, email conversation between Devine and _____
_____ Devine stated the date as noted
appears to be an error.

b6
b7A
b7C

**Miscellaneous:**

Devine recalled being surprised when he read the Manafort indictments.

**Administrative:**

A copy of the above-referenced documents and interview notes have been
attached for the file.