UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/15/2023
```

ELLIOTT BROIDY and BROIDY CAPITAL MANAGEMENT, LLC,

                    Plaintiffs,

                -against-

GLOBAL RISK ADVISORS LLC, GLOBAL RISK ADVISORS EMEA LIMITED, GRA MAVEN LLC, GRA QUANTUM LLC, GRA RESEARCH LLC, QRYPT, INC., KEVIN CHALKER, DENIS MANDICH, ANTONIO GARCIA, and COURTNEY CHALKER,

                    Defendants.

1:19-cv-11861-MKV

**OPINION AND ORDER
DENYING MOTION
FOR SANCTIONS**

MARY KAY VYSKOCIL, United States District Judge:

      This case involves allegations by Plaintiff Elliott Broidy and his investment firm Broidy Capital Management ("BCM") against Defendants, whom he claims hacked into his email servers and distributed confidential data. The motion before the Court involves accusations by Plaintiffs that Defendants' former counsel, Gibson Dunn, had a serious conflict when initially representing Defendants at the outset of this case because Gibson Dunn partner, Zainab Ahmad, purportedly participated in a government investigation of Plaintiff Broidy during her prior employment at the Office of Special Counsel ("OSC"). Plaintiffs moved for sanctions against Gibson Dunn for the alleged conflict of interest. For the reasons that follow, Plaintiffs' motion for sanctions is DENIED.

**FACTUAL BACKGROUND**

      The Court assumes familiarity with the underlying facts of this case and its prior decisions. *Broidy v. Glob. Risk Advisors LLC*, No. 1:19-CV-11861 (MKV), 2021 WL 1225949 (S.D.N.Y. Mar. 31, 2021); *Broidy v. Glob. Risk Advisors LLC*, No. 1:19-CV-11861 (MKV), 2023 WL

1

6258135 (S.D.N.Y. Sept. 26, 2023). The Court reviews only those facts and procedural history relevant to the pending motion.

**Plaintiffs' Original Counsel Raises Potential Conflict of Interest**

Plaintiffs, represented at the time by Steptoe & Johnson, LLP, commenced this action in 2019, alleging that Defendants were hired by the nation of Qatar to hack into Plaintiffs' email servers and then distribute confidential data in an attempt to smear his reputation. *See* Second Amended Complaint [ECF No. 116] ("SAC") ¶¶ 39–42; see also Complaint [ECF No. 1] ("Compl.") ¶¶ 1–2. Throughout the action, Plaintiffs have alleged that "one of the central goals of the Qatari-Funded Criminal Enterprise" was "to portray Broidy as a target of special counsel Robert Mueller's investigation." SAC ¶ 153; *see also* Compl. ¶ 2. Specifically, Plaintiffs have alleged that Defendants' purported hacking scheme prompted media outlets "to falsely claim that Broidy was a target in the investigation of special counsel Robert Mueller into Russian interference in U.S. elections, whereas in reality he was never interviewed by Mueller's team and does not appear once in the Mueller Report." SAC ¶ 300; *see also* Compl. ¶ 2.

Approximately nine months after commencing the action, Plaintiffs' attorneys at Steptoe sent a letter dated August 26, 2020 to Gibson Dunn's General Counsel alleging that Ms. Ahmad, a Gibson Dunn partner working on Defendants' case, had "participated in at least one investigation in which she acquired confidential government information that could be used to the material disadvantage of [Plaintiffs]." Daniel R. Benson Declaration [ECF No. 165-4] ("Benson Decl."), Ex. D. The letter alleged that "Ms. Ahmad was employed at DOJ and participated in the Mueller investigation," and "it is public information that Ms. Ahmad participated in the interview of Rick Gates, which focused extensively on Mr. Broidy, and in particular on issues that became public only when Mr. Broidy's private emails were hacked and leaked to the media." Benson Decl.,

Ex. D.  The letter did not provide a date or any further identifying details related to the alleged interview.  The letter further alleged that "[g]iven the extensive discussion about Mr. Broidy during the interview of Mr. Gates, and the broad powers of DOJ, we believe it is likely that Ms. Ahmad obtained additional confidential information concerning Mr. Broidy."  Benson Decl., Ex. D.  Steptoe requested that Gibson Dunn "investigate her role, what consent (if any) she received from the government to work on the above matter, how she was not timely screened from the case, and whether [Gibson Dunn] intend[ed] to withdraw from the matter."  Benson Decl., Ex. D.

Gibson Dunn responded via letter the following week asserting that Steptoe's allegations were "false."  Benson Decl., Ex. E.  Specifically, Gibson Dunn stated that "the Special Counsel's investigation had nothing to do with the circumstances of the alleged hacking of Mr. Broidy's information, much less Mr. Broidy's claims that [Defendants were] responsible for the alleged hacking."  Benson Decl., Ex. E.  Gibson Dunn further noted that as "[Plaintiffs] acknowledge[d] in [its] letter and as Mr. Broidy alleges in his complaint, Mr. Broidy 'was never a target of the Mueller investigation,' 'was never interviewed by Mueller's team,' and 'does not appear once in the Mueller Report.' "  Benson Decl., Ex. E (quoting Benson Decl., Ex. D; Compl. ¶ 321).

With respect to Plaintiffs' specific allegation that Ms. Ahmad had "participated in at least one investigation" that focused on Mr. Broidy, Gibson Dunn "assume[d]" Plaintiffs were referring to an interview of Mr. Gates on March 18, 2018, *see* Benson Decl., Ex. E, for which the Department of Justice ("DOJ") released a redacted FBI Form FD-302 ("302") memorializing the interview.  *See* Benson Decl., Ex. C.  According to the 302, DOJ attorneys conducted Mr. Gates's interview, which discussed efforts by an individual whose name is redacted in the memorandum to influence the DOJ's investigation into the 1Malaysia Development Berhad ("1MDB") scandal.  *See* Benson Decl., Ex. C.  Although the individual's name is redacted, the parties appear to concede

3

that these discussions related to Mr. Broidy. *See* [ECF No. 163 at 5]; [ECF No. 168 at 6]. The 302 notes that, at some point, Ms. Ahmad and an unnamed FBI agent "joined the meeting," and "[a]t this point, [Supervisory Special Agent] [REDACTED] took notes of the interview and it will be documented in a *separate 302*." Benson Decl., Ex. C (emphasis added). According to the 302, this apparent separate interview lasted approximately an hour and a half at which point the agent and Ms. Ahmad left the interview. Benson Decl., Ex. C. In its letter response, Gibson Dunn affirmatively asserted that "Ms. Ahmad did not acquire any 'confidential government information' during her tenure at the Department of Justice that could be used to Mr. Broidy's 'material disadvantage' in this litigation." Benson Decl., Ex. E.

Steptoe responded by letter dated September 9, 2020 that Gibson Dunn's letter "raise[d] more questions than answers." Benson Decl., Ex. F. Specifically, Steptoe expressed that the firm "doubt[ed]" it was a "coincidence" that Defendants chose to switch from Wilmer Hale to Gibson Dunn and "just happened to hire one of a handful of former [DOJ] attorneys who had participated in a government investigation of Mr. Broidy that appears to have been triggered by the hacking scheme." Benson Decl., Ex. F. Ultimately, Steptoe requested that Gibson Dunn inform them if "1) Ms. Ahmad had ever participated in any witness or source interview or otherwise discussed Mr. Broidy or the hack-and-smear campaign targeting him with any DOJ officials . . . and 2) if, in fact, the representations in [Gibson Dunn's previous] letter are indeed based on weighing what may or may not disadvantage Mr. Broidy, and, if so, the basis for your conclusion that the information would not materially disadvantage Mr. Broidy in the civil case." Benson Decl., Ex. F.

On September 23, 2020, Gibson Dunn again responded by letter to Steptoe's allegations. Benson Decl., Ex. H. First, Gibson Dunn reasserted that Ms. Ahmad was not present for the portion of the March 18 interview during which Mr. Broidy was discussed and "did not interview

4

Mr. Gates (or participate in an interview of Mr. Gates) in which she obtained 'confidential government information' about Mr. Broidy—on March 18, 2018 or at any other time—during her tenure at [DOJ]." Benson Decl., Ex. H. Specifically, Gibson Dunn referred to a newly released "2470 Memo," which related to the portion of the March 18, 2018 interview in which Gibson Dunn conceded Ms. Ahmad did participate, and which did not reflect any information about Mr. Broidy. Benson Decl., Ex. H. Finally, Gibson Dunn explained that the reason it was hired for this matter was due to a prior relationship between Gibson Dunn partner, Orin Snyder, and Defendant Kevin Chalker. Benson Decl., Ex. H.

After the 2020 exchanges of letters, the parties spoke by phone on September 30, 2020, merely a week after Gibson Dunn's last letter. Benson Decl., Ex. H. Following the call, Gibson Dunn followed up with an email dated October 4, 2020, which reattached the two 302 memoranda and reaffirmed its representation that "Ms. Ahmad did not investigate Mr. Broidy, or acquire any confidential government information regarding Mr. Broidy, during her tenure in the Special Counsel's office or any other part of the Department of Justice." Benson Decl., Ex. H.

Thereafter, Steptoe did not raise the issue with the Court or pursue the issue any further. When new counsel from McGuire Woods LLP substituted in as Plaintiffs' counsel in February 2021, the firm did not raise any issue of an alleged conflict.

**Plaintiffs' Third Counsel Re-Raises the Issue**

Over one year later, Plaintiffs again hired substitute counsel—their third set of lawyers—this time retaining Kasowitz Benson Torres LLP ("Kasowitz"). [ECF No. 115]. A few months later, Plaintiffs obtained a declaration from Richard Gates, one of the targets of the OSC's investigation. *See* Benson Decl., Ex. B. Mr. Gates's declaration asserts that, as part of his cooperation with OSC, he was interviewed with Ms. Ahmad present on at least three occasions in

5

2018, during which he was asked numerous questions about Mr. Broidy. Benson Decl., Ex. B. Mr. Gates asserts that his first interview with Ms. Ahmad and others occurred on March 18, 2018 and that during that interview he was "asked a series of questions pertaining to topics associated with Mr. Broidy," including questions related to the hacking scheme. Benson Decl., Ex. B ¶ 12. Mr. Gates asserts he was shown a wide variety of documents, including screenshots of WhatsApp messages that Mr. Broidy had exchanged with others, and personal emails including an email between Mr. Broidy and his wife. Benson Decl., Ex. B ¶ 24–25. Mr. Gates's declaration asserts that he had two additional interviews on March 20, 2018 and October 29, 2018, during which Ms. Ahmad was present, and during which he was asked a number of questions relating to Mr. Broidy. Benson Decl., Ex. B ¶ 33, 40, 43–44.

Plaintiffs provided Gibson Dunn with a copy of the Gates Declaration shortly after obtaining it and advised Gibson Dunn that Plaintiffs planned to file a pre-motion letter *that day* seeking to disqualify the Firm as counsel in the matter. Benson Decl. ¶ 11; *see* Brian C. Ascher Declaration ("Ascher Decl."), Ex. A. Gibson Dunn quickly responded with a letter disputing various assertions in Gates's declaration and providing the legal basis for its position that disqualification was unwarranted. Benson Decl., Ex. I. In sum, Gibson Dunn stated that it "strongly disagree[d]" that Ms. Ahmad or Gibson Dunn had a conflict of interest in this matter. Benson Decl., Ex. I at 1. The firm argued that "there is substantial reason to believe that Mr. Gates either misremembers or has intentionally misstated facts in the declaration—at best he claims that Ms. Ahmad was present for a very small number of interviews conducted." *Id*. Additionally, Gibson Dunn contended that "even assuming that Mr. Gates's declaration is accurate, it does nothing to establish that Ms. Ahmad acquired any 'confidential government information' about

Mr. Broidy that remains confidential today, much less confidential information that could be used to Mr. Broidy's 'material disadvantage' in this lawsuit." *Id*.

The parties continued to correspond about these issues over the next several weeks. At one point in time, Plaintiffs notified Gibson Dunn that it obtained a written statement from Thomas C. Green, Mr. Gates's counsel during the interviews with OSC. Benson Decl., Ex. J. Mr. Green's statement, in sum and substance, expresses that "to the best of [his] recollection and belief," Ms. Ahmad "was in attendance and participated in" the three interviews identified in Mr. Gates's declaration. Benson Decl., Ex. J. Mr. Green stated he "believe[d]" the interrogations that at these interviews related to Mr. Broidy and other matters. Benson Decl., Ex. J. Gibson Dunn maintained its position that there was no disqualifying conflict of interest. Benson Decl., Ex. L.

**Defendants Replace Gibson Dunn as Counsel**

In June 2022, Plaintiffs filed a pre-motion letter seeking leave to file a motion for disqualification of Gibson Dunn as counsel for Defendants, and the Court subsequently set a briefing schedule. [ECF Nos. 131–32]. Before Plaintiffs filed their motion, however, Defendants privately informed Gibson Dunn that they wanted to substitute counsel rather than oppose the disqualification motion, despite Gibson Dunn's "confiden[ce] that [Ms. Ahmad's] government service does not pose a conflict." *See* Ascher Decl., Ex. B. As per Defendants' request, Gibson Dunn promptly filed a stipulation of withdrawal and new counsel, Hughes Hubbard & Reed LLP, appeared for Defendants. [ECF Nos. 133–37].

On the same day that the Court endorsed the stipulation and order to substitute new counsel in place of Gibson Dunn, Plaintiffs filed a pre-motion letter, this time seeking leave to move for sanctions, which the Court granted. [ECF Nos. 137, 138, 142]. Thereafter, Plaintiffs filed a Memorandum of Law in support of its motion for sanctions against Gibson Dunn, ECF No. 163

7

("Pl. Br."), a declaration of counsel, ECF Nos. 164, and various other declarations, including the declaration of Richard Gates, ECF No. 165-2, and the statement from Mr. Gates' counsel during the time he was interviewed with the OSC.  ECF No. 165-10.  Gibson Dunn opposed the motion with a memorandum of law, ECF No. 168 ("Opp."), a declaration of counsel, ECF No. 170, and, among other documents, a declaration from Ms. Ahmad, ECF No. 168.  Plaintiffs then submitted a Reply Memorandum of Law, ECF No. 185 ("Reply").  Plaintiffs motion for sanctions against Gibson Dunn is now before the Court.

## LEGAL STANDARD

A party seeking sanctions under either 28 U.S.C. Section 1927 or the Court's inherent authority must provide "clear evidence that (1) the offending party's claims were entirely without color, *and* (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay."  *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (emphasis added); *see also Adkins v. Gen. Motors Acceptance Corp.*, 479 F. App'x 386, 387 (2d Cir. 2012) (summary order); *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999).

Generally, the Second Circuit has "interpreted the bad faith standard restrictively." *Eisemann*, 204 F.3d at 396.  In other words, "[a]lthough both findings [lack of merit and bad faith] must be supported by a high degree of specificity, bad faith may be inferred *only if actions are so completely without merit* as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (emphasis added).  Ultimately, "the decision to impose sanctions is uniquely within the province of a district court."  *Eisemann*, 204 F.3d at 396 (quoting *Schlaifer*, 194 F.3d at 334).

## ANALYSIS

Plaintiffs argue that sanctions are appropriate here because Gibson Dunn acted unreasonably, vexatiously, and in bad faith when it did not screen Ms. Ahmad from the case at the outset, and thereafter, when it did not withdraw from representation after Plaintiffs raised the alleged conflict. Plaintiffs argue that, because of this misconduct, "Plaintiffs have incurred and continue to incur hundreds of thousands of dollars in fees investigating and litigating Gibson Dunn's conflict," and Gibson Dunn should bear those expenses. Pl. Br. at 4.

### I. Plaintiffs Fail to Meet Their Burden of Proving That Gibson Dunn Acted "Entirely Without Color"

First, Plaintiffs must provide "clear evidence" that Gibson Dunn's failure to screen Ms. Ahmad from the case or its decision not to withdraw from representation of Defendants after Plaintiffs' demands "was entirely without color." *Eisemann*, 204 F.3d at 396.

A "claim is entirely without color when it lacks *any* legal or factual basis." *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999) (emphasis added). Conversely, a claim is "colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78–79 (2d Cir. 2000). "[A] claim that fails as a matter of law is not necessarily lacking *any* basis at all." *Schlaifer*, 194 F.3d at 337 (emphasis in original). "[A] claim lacks a colorable basis when it is *utterly devoid* of a legal or factual basis." *Id*. (emphasis added). Factually, "[t]he question is whether a reasonable attorney . . . could have concluded that facts supporting the claim *might be established*, not whether such facts actually had been established." *Schlaifer*, 194 F.3d at 337 (emphasis original); *see also United States v. Prevezon Holdings, Ltd.*, 305 F. Supp. 3d 468, 479 (S.D.N.Y. 2018).

The crux of Plaintiffs' argument is that Gibson Dunn, through Ms. Ahmad, had a disqualifying conflict of interest in violation of Rule 1.11(c) of the New York Rules of Professional Conduct, concerning representations in private practice by former government attorneys.[1] *See* Pl. Br. at 12. Rule 1.11(c) prohibits former government lawyers from "having information that the lawyer knows is confidential government information about a person, acquired when the lawyer was a public officer or employee" from representing "a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person." 22 N.Y.C.R.R. § 1200.0, R. 1.11(c). For purposes of Rule 1.11(c), "confidential government information" means information "obtained under governmental authority and that, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, and that is not otherwise available to the public." *Id*. A firm with which a former government lawyer is associated is also prohibited from the representation unless "the disqualified lawyer is timely and effectively screened from any participation in the matter." 22 N.Y.C.R.R. § 1200.0, R. 1.11(b).

Defendants' reason for not screening Ms. Ahmad from the case at the outset, and its decision not to withdraw immediately from representation of Defendants after Plaintiffs' demands, is the same: Defendants assert that Ms. Ahmad is not, and never was, conflicted from representing Defendants. Thus, the Court considers whether Plaintiffs have demonstrated by clear evidence that Gibson Dunn's decision that Ms. Ahmad did not have a disqualifying conflict of interest—and its arguments in support thereof—"lack[] any legal or factual basis." *Schlaifer*, 194 F.3d at 337.

---

[1] Although the authority to disqualify an attorney is a function of the court's inherent supervisory power, courts in this Circuit generally look to the American Bar Association Model Rules of Professional Conduct and to state disciplinary rules for guidance. *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 207 (S.D.N.Y. 2009). Nevertheless, these rules are not binding. Accordingly, "not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005). Conversely, disqualification may be justified even in the absence of a clear ethical breach "where necessary to preserve the integrity of the adversary process . . . ." *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979).

### A. The Legal Standard for Disqualification of Counsel is High

At the outset, the Court acknowledges that the standard for disqualifying counsel is high and generally such motions are disfavored because they "are often interposed for tactical reasons, and . . . even when made in the best of faith, such motions inevitably cause delay.' " *Pagan v. C.I. Lobster Corp.*, 549 F. Supp. 3d 356, 359 (S.D.N.Y. 2021) (citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791–92 (2d Cir. 1983)). As such, "not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video*, 409 F.3d at 132.

Therefore, when analyzing whether Gibson Dunn's position that Ms. Ahmad did not have a disqualifying conflict is "utterly devoid of a legal or factual" basis, the Court recognizes that Plaintiffs would have had to overcome a very high burden for their contemplated disqualification motion to have been successful. Indeed, Gibson Dunn likely considered the high standard required for disqualification when weighing whether the factual record supported its position that Ms. Ahmad did not have a disqualifying conflict.

### B. Gibson Dunn's Position That There Is No Disqualifying Conflict Does Not Lack "Any Factual Basis"

At the heart of the dispute is a "he said, she said" between two conflicting declarations—that of Mr. Gates, *see* Benson Decl., Ex. B, and that of Ms. Ahmad, *see* Declaration of Zainab N. Ahmad ("Ahmad Decl.").[2] In sum, Mr. Gates attests in his declaration that, as part of his cooperation with OSC, he was interviewed with Ms. Ahmad present on at least three occasions in

---

[2] Plaintiffs argue that it was "inexcusable failure" for Gibson Dunn to "refus[e] to provide its own declaration from Ms. Ahmad" to contradict Mr. Gates's declaration when Plaintiffs first raised a possible conflict issue. Pl. Br. at 3; Reply at 4. The Court disagrees. Gibson Dunn repeatedly represented that Ms. Ahmad did not interview Mr. Gates, or participate in an interview of Mr. Gates, in which Plaintiff alleges that she obtained confidential government information about Plaintiffs. *See e.g.*, Benson Decl., Ex. E; Benson Decl., Ex. H; Benson Decl., Ex. L. Gibson Dunn repeatedly responded promptly by letter and email to Plaintiffs' concerns. *Id*. Defendants were not under any obligation to provide Plaintiffs with a formal declaration absent any motion to be ruled on by the Court. Presumedly, however, Ms. Ahmad herself informed Gibson Dunn's previous representations to Plaintiffs, as such representations were consistent with Ms. Ahmad's declaration that was sworn to once Plaintiffs filed their motion.

2018, during which he was asked numerous questions about Mr. Broidy. Benson Decl., Ex. B. Conversely, Ms. Ahmad asserts in her declaration that she "was not involved in any investigation into Mr. Broidy, including any investigation into Mr. Broidy being hacked" and that "[t]o the best of [her] knowledge and recollection, no one at the OSC investigated the alleged hacking of Mr. Broidy." Ahmad Decl. ¶ 6. Additionally, Ms. Ahmad's declaration states that she "never learned any confidential information regarding any issue relevant to this pending litigation, including in connection with Mr. Broidy's alleged hacking or otherwise" and she has no "knowledge regarding whether the OSC obtained any non-public confidential materials relating to the alleged hacking of Mr. Broidy." Ahmad Decl. ¶¶ 6–7.

It cannot be disputed that Ms. Ahmad has had a successful, accomplished legal career. Prior to joining Gibson Dunn, Ms. Ahmad served in various roles with the DOJ for eleven years, including as an Assistant United States Attorney in the Eastern District of New York and Deputy Chief of the National Security and Cybercrime Section at the United States Attorney's Office in the Eastern District of New York. Ahmad Decl. ¶ 2. From 2017 to 2019, she served as a Senior Assistant Special Counsel in Special Counsel Robert S. Mueller's Office. Ahmad Decl. ¶ 2. Thus, Gibson Dunn's decision to place weight in Ms. Ahmad's word that she did not learn any confidential information regarding any issues relevant to this action is not unreasonable.[3]

In addition, Ms. Ahmad's sworn testimony is reasonably corroborated by contemporaneous, now-public memoranda of interviews that Mr. Gates claims Ms. Ahmad

---

[3] The Court also notes that Plaintiffs attached a statement (not a sworn declaration) from Mr. Gates's attorney during his OSC interviews, which purportedly corroborates Mr. Gates's declaration. *See* Benson Decl., Ex. J. The statement, however, is extremely cursory and vague, simply stating "at these times when Ms. Ahmad was present [during Mr. Gates's interviews with OSC] I *believe* the interrogations related to Mr. Broidy *and other matters*." *See* Benson Decl., Ex. J (emphasis added). The Court acknowledges that Mr. Green's statement may weigh in favor of Plaintiffs' argument that Ms. Ahmad had a disqualifying interest; however, the Court stops there. The inquiry in this case is not which parties' argument is stronger. The Court's role is solely to determine whether Gibson Dunn had *any* factual basis to support its position that Ms. Ahmad did not have a disabling conflict of interest. *Schlaifer*, 194 F.3d at 337.

attended, which memoranda were prepared by FBI agents in the ordinary course of their duties. First, the 2456 Memo summarizes the portion of the March 18, 2018 interview conducted by Special Counsel Attorneys Andrew Weissman and Greg Andres, with two FBI agents present. One topic discussed was Mr. Gates's involvement with Mr. Broidy and his connection with the 1MDB investigation. *See* Benson Decl., Ex. C at 2–5. The 2456 Memo notes that thereafter Ms. Ahmad and an unnamed FBI agent "joined the meeting," and "[a]t this point, SSA [REDACTED] took notes of the interview," to be documented "*in a separate 302*," purportedly the 2470 Memo. Benson Decl., Ex. C at 5 (emphasis added). Gibson Dunn argues that the 2470 Memo summarizes the portion of the March 18, 2018 interview for which Ms. Ahmad was present, and demonstrates that Ms. Ahmad was *not* present during the times Mr. Broidy was discussed. *See* Ahmad Decl., Ex. B. Plaintiffs disagree, arguing that the 2470 Memo is too short to summarize an interview and lacks key information that 302 memoranda are expected to include, including the identification of the prosecutors who conducted the interviews. Reply at 6.

    The issue before the Court, however, is not to weigh the adequacy of the 302 memoranda or to determine which argument prevails. Rather, the question for the Court is whether Gibson Dunn's reliance on Ms. Ahmad's recollection and the 302 memoranda, which on their face appear to support Ms. Ahmad's recollection that she was not present during the portions of Mr. Gates's interview where Mr. Broidy was discussed, was reasonable. The Court concludes that Gibson Dunn's reliance on the 302s to support its position that Ms. Ahmad did not discuss Mr. Broidy with Mr. Gates at the March 2018 interview was colorable. *See, e.g.*, *Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 805 F.2d 49, 54 (2d Cir. 1986) (holding that FBI reports were admissible as a public record and that "these reports were especially reliable since they were prepared by the FBI in a criminal investigation which was only tangentially related to

this civil action"); *see generally Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) (noting that Rule 803(8) for public records "is based upon the assumption that public officers will perform their duties, [and] that they lack motive to falsify").

In short, given Ms. Ahmad's sworn declaration and the contemporaneous interview memoranda, Gibson Dunn's position that Ms. Ahmad was free of conflict is not "utterly lacking" a factual basis. *Schlaifer*, 194 F.3d at 337. The question before the Court is ultimately whether "a reasonable attorney . . . could have concluded that facts supporting [Gibson Dunn's] claim *might [have been] established*, not whether such facts actually [would have] been established." *Schlaifer*, 194 F.3d at 337 (emphasis original). As such, the Court finds that Gibson Dunn's position that it was not disqualified from representing Defendant did not lack a color basis.

To be clear, the Court does *not* find that Ms. Ahmad lacked a conflict of interest. It very well may have been the case that if Plaintiffs had filed a motion to disqualify Gibson Dunn, Plaintiffs' disqualification motion may have been successful. That issue is moot, however, since Gibson Dunn withdrew, and substitute counsel appeared before Plaintiffs moved for disqualification. Now, on Plaintiffs motion for sanctions—brought *after* Gibson Dunn withdrew voluntarily—the question is whether Plaintiffs have met the very high burden for *sanctions* against Gibson Dunn. The Court concludes they have not. While there may be facts that support that Ms. Ahmad was, in fact, conflicted, the Court cannot conclude that Gibson Dunn's actions were "utterly devoid of a legal or factual basis." *Schlaifer*, 194 F.3d at 337.

As such, Plaintiffs have failed to provide "clear evidence" that Gibson Dunn's failure to screen Ms. Ahmad from the case or its decision not to immediately withdraw from representation of Defendants after Plaintiffs' demands "was entirely without color," *Eisemann*, 204 F.3d at 396, so as to warrant the imposition of sanctions, an extreme remedy.

### II. Plaintiffs Fail to Meet Their Burden of Proving Gibson Dunn Acted in "Bad Faith"

Even if Plaintiffs had demonstrated clear evidence that Gibson Dunn's actions were entirely without color, Plaintiffs cannot establish that Gibson Dunn's actions were undertaken in bad faith, as required to obtain sanctions. Despite Plaintiffs' vehement and spirited assertions that Gibson Dunn made "egregious" and "bombast" "threats" "seeking to intimidate" Plaintiffs, *see* Reply at 4, the record does not suggest that Gibson Dunn adopted its legal position to harass Plaintiffs, delay this case, or otherwise improperly engage the legal process.

"The bad faith requirement is a high bar to satisfy," *Revson*, 221 F.3d at 77–78, and the term is "interpreted . . . restrictively." *Eisemann*, 204 F.3d at 396. "[B]ad faith may be inferred *only if actions are so completely without merit* as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Enmon*, 675 F.3d at 143 (emphasis added). Additionally, "the court's factual findings of bad faith must be characterized by a high degree of specificity." *Schlaifer*, 194 F.3d at 338.

The cases that Plaintiffs cite in support of their assertion of bad faith are distinguishable from Gibson Dunn's actions here. In *THOIP v. Walt Disney Co.*, 2009 WL 125074 (S.D.N.Y. 2009), the defendant's attorney had an *existing* attorney-client relationship with both the plaintiff's parent company and the plaintiff's affiliate. In *Madison 92nd Street Associates, LLC v. Marriott International, Inc.*, 2013 WL 5913382 (S.D.N.Y. 2013), a law firm was sanctioned for representing a client in litigation against a former client that related to that prior representation. The paradigmatic conflicts in these cases were so egregious that—as the Court in *Madison 92nd Street Associates* phrased it—a "first year law student on day one of an ethics course should be able to spot." 2009 WL 125074, at *1.

Instead, a *private, internal* email between Gibson Dunn and its client written days before Defendants requested Gibson Dunn withdraw as counsel suggests that Gibson Dunn was "confident that [Ms. Ahmad's] government service [did] not pose a conflict" and that the firm would "defeat [Plaintiffs'] disqualification attempt." *See* Ascher Decl., Ex. B. The candid exchange between Gibson Dunn and its clients supports the position that Gibson Dunn had a good faith basis to believe that Ms. Ahmad did not have a conflict of interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for sanctions against Gibson Dunn is DENIED. The Court of Clerk is respectfully requested to terminate Docket Entry 162.

**SO ORDERED.**

Dated: New York, New York
November 15, 2023

_____
MARY KAY VYSKOCIL
United States District Judge